UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MERCER HEALTH & BENEFITS LLC,

Plaintiff,

-against-

MATTHEW DIGREGORIO, JOANNE STEED, JADA PRESTON and LOCKTON COMPANIES, LLC,

Defendants.

Case No.: _____

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

---

A. Michael Weber
Shawn Matthew Clark
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ..................................................................... 3

    A.    Background On Mercer ................................................................ 3

    B.    DiGregorio's Employment With Mercer ...................................... 3

    C.    Steed's Employment with Mercer ............................................... 4

    D.    Jada Preston's Employment with Mercer ..................................... 4

    E.    The Non-Solicitation and Confidentiality Agreements .................... 5

    F.    The Abrupt Resignation of DiGregorio, Steed and Preston ............. 6

    G.    Breaches Of The Non-Sonication Agreements And Confidentiality Agreements By The Individual Defendants ................................... 7

    H.    Mercer's Efforts to Abate the Individual Defendants' Breaches ......... 9

ARGUMENT ................................................................................... 9

I.    MERCER IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ............................................. 9

    A.    Mercer Will Suffer Irreparable Harm Absent Injunctive Relief ......... 10

    B.    Mercer Has A Likelihood Of Success On The Merits Or Can Demonstrate A Sufficiently Serious Question Going To The Merits To Make Each Of Their  Claims Fair Grounds For Litigation .......................................... 12

        1.    Breach of Contract (Claims I, II and II) ................................ 13

        2.    Breach of Fiduciary Duties (Claim IV) and Unfair Competition (Claim VII) ............................................................... 16

        3.    Tortious Interference Claims (Claims V and VI) ..................... 17

    C.    A Balancing of the Equities Tips in Favor of Granting Preliminary Injunctive Relief .................................................................. 19

II.    MERCER SHOULD NOT BE REQUIRED TO POST A BOND ................. 20

# TABLE OF CONTENTS
### (CONTINUED)

**PAGE**

III.    THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR EXPEDITED
        DISCOVERY ................................................................................................................. 20

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Andino v. Fischer,*
  555 F. Supp. 2d 418 (S.D.N.Y. 2008)................................................................. 10

*DAG Jewish Directories, Inc. v. Y & R Media, LLC,*
  2010 WL 46016 (S.D.N.Y. Jan. 7, 2010) ........................................................... 21

*Devos, Ltd. v. Record,*
  2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015) .................................................... 12

*Envtl. Servs., Inc. v. Recycle Green Servs., Inc.,*
  7 F. Supp. 3d 260 (E.D.N.Y. 2014) ................................................................... 18

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,*
  922 F. Supp. 2d 435 (S.D.N.Y. 2013).................................................................. 9

*IDG USA, LLC v. Schupp,*
  416 F. App'x 86 (2d Cir. 2011) ......................................................................... 10

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,*
  323 F. Supp. 2d 525 (S.D.N.Y. 2004)........................................................... 11, 13

*Marsh USA Inc. v. Karasaki,*
  2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) ......................................... 14, 15, 20

*Marsh USA Inc. v. Schuhreimen,*
  183 F. Supp. 3d 529 (2016) ........................................................... 14, 16, 19

*MasterCard Int'l Inc. v. Nike, Inc.,*
  2016 WL 797576 (S.D.N.Y. Feb. 23, 2016)....................................................... 13

*N. Atl. Instruments Inc. v. Haber,*
  188 F.3d 38 (2d Cir. 1999)................................................................................ 12

*Nebraskaland, Inc. v. Brody,*
  2010 WL 157496 (S.D.N.Y. Jan. 13, 2010) ...................................................... 21

*Oliver Wyman, Inc. v. Eielson,*
  2017 WL 4403312 (S.D.N.Y. Sept. 29, 2017)................................................... 14

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE**

*PLC Trenching Co., LLC v. Newton,*
2011 WL 13135653 (N.D.N.Y. Dec. 12, 2011).......................................................... 17

*R.L.E. Corp. d/b/a Casa Imports v. Ferraro Foods, Inc.,*
2015 WL 1456178 (N.D.N.Y. March 30, 2015).......................................................... 20

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.,*
745 F. Supp. 2d 343 (S.D.N.Y. 2010)........................................................................ 17

*Scutti Enters., LLC. v. Park Place Entm't Corp.,*
322 F.3d 211 (2d Cir. 2003)...................................................................................... 18

*Silipos, Inc. v. Bickel,*
2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006).............................................................. 14

*Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC,*
2011 WL 497978 (S.D.N.Y. Feb. 10, 2011)............................................................... 20

*Ticor Title Ins. Co. v. Cohen,*
173 F.3d 63 (2d Cir. 1999)........................................................................................ 11

*Uni-World Capital, L.P. v. Preferred Fragrance, Inc.,*
73 F. Supp. 3d 209 (S.D.N.Y. 2014)......................................................... 11, 12, 16, 20

*USI Ins. Servs. LLC v. Miner,*
801 F. Supp. 2d 175 (S.D.N.Y. 2011)......................................................... 13, 15, 16

## PRELIMINARY STATEMENT

Plaintiff Mercer Health & Benefits LLC ("Mercer") submits this memorandum of law in support of its motion for a temporary restraining order, a preliminary injunction and expedited discovery, brought by Order to Show Cause dated February 26, 2018. Mercer seeks to enjoin Defendants Matthew DiGregorio, Joanne Steed and Jada Preston (collectively the "Individual Defendants"), as well as their current employer Lockton Companies, LLC ("Lockton"), and anyone acting in concert with them, under their supervision, or on their behalf, from violating the terms of the Non-Solicitation and Confidentiality Agreements each Individual Defendant signed during their respective employment with Mercer, and from engaging in continued tortious conduct.

Mercer employed the Individual Defendants in senior sales and client management roles. In these capacities, each Individual Defendant gained valuable knowledge of Mercer's clients, including client needs, preferences, and benefit plan and policy terms and dates, as well as fees and revenues paid to Mercer. This client confidential information is protected by Mercer and not available to the general public.

On January 17, 2018, within minutes of each other, each Individual Defendant resigned his or her employment, by submitting nearly identical resignation notices, without providing the two weeks' notice required by Mercer's Employee Handbook. The Individuals Defendants immediately joined Defendant Lockton, a competitor or Mercer's, and that same day, January 17th, Lockton announced the hiring of Defendant DiGregorio touting his credentials and experience, including his employment at Mercer.

Thereafter, Mercer learned that the Individual Defendants contacted at least eleven Mercer clients following their resignations, and met with at least two other Mercer clients to pitch work on behalf of their new employer, in breach of each Individual Defendant's Non-

Solicitation Agreement. Additionally, Mercer learned that the Individual Defendants provided confidential client revenue data to Lockton in violation of their Confidentiality Agreements. On February 22, 2018, just over one month after the Individual Defendants' resignations, a client formerly serviced by Steed and Preston informed Mercer that it was terminating its relationship with Mercer to work with another vendor—Lockton.

Lockton's tortious conduct in this case is part of corporate pattern of luring employees from competitor businesses and using the confidential information it learns from its new employees to unfairly solicit its competitors' clients. Indeed, since 2006, Lockton has been sued in at least sixteen separate actions alleging, among other claims, unfair competition, misappropriate of trade secrets, tortious inference with contract, tortious interference with economic advantage, civil conspiracy, breach of non-solicitation agreements and violations of the Defend Trade Secrets Act.[1] Nine of those sixteen actions were commenced within the last year.

Here, as a result of the Individual Defendants' breaches and all Defendants' tortious conduct, Mercer has suffered and will continue to suffer irreparable harm in the form of lost client relationships, goodwill and other irreparable injury for which there is no adequate remedy at law. Mercer respectfully requests that this Court issue the requested temporary restraining

---

[1] *See USI Ins. Servs. Nat'l, Inc. v. Lockton Cos., LLC*, No. 17-cv-02895 (M.D. Fla. 2017); *USI Ins. Servs. Nat'l, Inc. v. Lockton Cos., LLC*, No. 18-cv-00158 (N.D. Ill. 2018); *USI Ins. Servs. Nat'l, Inc. v. Lockton Cos., LLC*, No. 17-cv-02711 (D. Kansas 2017); *USI Ins. Servs., LLC v. Lockton Cos., LLC*, No. 17-cv-09946 (JMF) (S.D.N.Y. 2017); *USI Ins. Servs., LLC v. Lockton Cos., LLC*, No. 17-cv-09948(RA) (S.D.N.Y. 2017); *USI Ins. Servs., LLC v. Lockton-Dunning Series of Lockton Cos., LLC* No. 17-cv-03389-M (N.D. Tex. 2017); *USI Ins. Servs. Nat'l Inc. v. Lockton Cos., LLC*, No. 17-cv-01842 (W.D. Wash. 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Galioto*, No. 17-cv-04588 (D. Minn. 2017); *Willis of Seattle Inc. v. Walton*, No. 17-2-08461-1 (Wash. Superior Ct., King Cnty. 2017); *Tompkins Ins. Agencies, Inc. v. Sumner*, No. CV 16-2217, 2016 WL 3345452, at *1 (E.D. Pa. June 15, 2016); *Graham Co. v. Keith*, No. 14-cv-06128 (E.D. Pa. 2014); *Marsh & McLennan Agency LLC v. Houstoun*, Index No. 651521/2012 (N.Y. Sup. Ct., N.Y. Cnty. 2012); *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 766 (Tex. 2011); *Willis Grp. Holdings Public Ltd Co. v. Cummings*, Index No. 652603/2011 (N.Y. Sup. Ct., N.Y. Cnty. 2011); *Aon Corp. v. Haskins*, No. 09-cv-03531 (D. Minn. 2009); *Palmer & Cay of Ga., Inc. v. Lockton Cos., Inc.*, 280 Ga. 479, 479, 629 S.E.2d 800, 801 (2006).

order, preliminary injunction and expedited discovery to prevent future irreparable injury to Mercer.

## STATEMENT OF FACTS

### A.    Background On Mercer

Mercer is a world leader in the health and benefits marketplace. (Lynn Decl. ¶ 3).[2]   It provides clients with a comprehensive array of health and benefits solutions, including managing employee benefit plans, assisting clients with choosing the right employee benefits plans to fit their needs, providing access to market experts, and advising on regulatory compliance. (*Id.*)

### B.    DiGregorio's Employment With Mercer

DiGregorio began his employment with Mercer as a Principal/Sales Professional in January 2010. (*Id.* ¶ 5). Immediately prior to joining Mercer, DiGregorio worked at Mercer's affiliated company, Marsh USA Inc. ("Marsh"), as an Associate Client Executive with a focus on property and casualty liability insurance. (*Id.* ¶ 6). He had limited experienced selling employee health and benefits solutions of the type that Mercer provides, prior to joining Mercer. (*Id.* ¶ 7).

As a Principal/Sales Professional, DiGregorio was responsible for, among other tasks, generating new client business and growing business with existing clients. (*Id.* ¶ 8). DiGregorio relied extensively on his Mercer colleagues to develop and grow client relationships. (*Id.* ¶ 9). He depended on Principals and Senior Associates to handle day-to-day service issues for clients, allowing him to focus on client development. (*Id.*) Mercer supported DiGregorio's client-facing role by sponsoring client events, financing his membership in professional and networking organizations, and investing in marketing and sales tools, all of which DiGregorio used to form and strengthen client relationships on behalf of Mercer. (*Id.* ¶ 10). DeGregorio gained valuable knowledge of Mercer's clients, including their health and benefits needs and preferences, fees

---

[2] Citations to the "Lynn Decl." refer to the Declaration of Cory Lynn executed on February 26, 2018.

and revenues paid to Mercer, amounts paid in insurance premiums, recent losses and other risk factors, and plan terms and renewal dates. (*Id.* ¶ 11). This client confidential information is protected by Mercer and not available to the general public. (*Id.*) Therefore, such information about a specific client would be valuable to a competitor looking to compete for that client's business. (*Id.*)

### C. Steed's Employment with Mercer

Steed began her employment with Mercer in or around April 2007 as a Principal. (*Id.* ¶ 13). In that capacity, Steed was responsible for managing client relationships and ensuring client retention by evaluating client risks and developing solutions to address client needs. (*Id.* ¶ 14). She served as primary client contact for day-to-day client needs and client questions. (*Id.*) Steed directly managed approximately twelve client relationships. (*Id.* ¶ 15). She relied on financial and internal resources from Mercer to manage client relationships, and developed client relationships by virtue of her employment and with the support of an experienced team of Mercer employees, on whom she relied on to carry out her job duties. (*Id.* ¶ 16). Mercer supported Steed's client-facing role by financing client related travel and entertainment expenses, sponsoring client events, and investing in marketing and sales tools, all of which Steed used to manage and strengthen client relationships on behalf of Mercer. (*Id.* ¶ 17).

### D. Jada Preston's Employment with Mercer

Preston began her employment with Mercer in or around October 2006 as an Enterprise Consulting Analyst. (*Id.* ¶ 19). In that capacity, Preston was responsible for managing client relationships and ensuring client retention by evaluating client risks and developing solutions to address client needs. (*Id.* ¶ 20). Preston served as a client contact for day-to-day client needs and client questions. (*Id.* ¶ 21). She assisted Steed in managing approximately twelve client relationships, serving in essence as Steed's primary deputy. (*Id.* ¶ 22). Like Steed, Preston relied

on financial and internal resources from Mercer to manage client relationships. (*Id.* ¶ 23). She developed client relationships by virtue of her employment and with the support of an experienced team of Mercer employees, on whom she relied on to carry out her job duties on behalf of Mercer. (*Id.*)

### E.   The Non-Solicitation and Confidentiality Agreements

Each Individual Defendant executed a Non-Solicitation Agreement and a Confidentiality Agreement in connection with his or her commencement of employment at Mercer. (*Id.* ¶¶ 12, 18, 24; Exs. A, B and C). In each non-Solicitation Agreement, each Individual Defendant agreed that he or she would not, for a period of twelve months following his or her separation from employment with Mercer, directly or indirectly solicit business from or perform services for Mercer clients with whom each Individual Defendant had contact during his or her employment for Mercer. (*Id.*) Further, in each Non-Solicitation Agreement, each Individual Defendant agreed that he or she would not, for a period of twelve months following his or her separation from employment with Mercer, directly or indirectly solicit employees with whom he or she worked in the last two years of his or her employment, or about whom he or she obtained confidential information. (*Id.*) Finally, each Individual Defendant agreed in his or her Non-Solicitation Agreement that he or she would not use his or her "position, influence, knowledge of Confidential Information or Trade Secrets or [Mercer's] assets for personal gain." (*Id.*)

In each Confidentiality Agreement, each Individual Defendant agreed not to disseminate or disclose to any other person, organization or entity any of Mercer's "Confidential Information and Trade Secrets," which includes among other information: "client information," including the amounts paid by such clients to Mercer, "personnel information," and information relating to any prospective client. (*Id.*) By signing the Confidentiality Agreement, each Individual Defendant acknowledged: (1) that Mercer "is engaged in a highly competitive business and that its

competitive position depends upon its ability to maintain the confidentiality of the of the Confidential Information and Trade Secrets which were developed, compiled and acquired by [Mercer] at its great effort and expense"; and (2) that "any disclosing, divulging, revealing or using of any of the Confidential Information and Trade Secrets, other than in connection with [Mercer's] business or as specifically authorized by [Mercer], will be highly detrimental to [Mercer] and cause it to suffer serious loss of business and pecuniary damage. (*Id.*)

In both the Non-Solicitation Agreement and the Confidentiality Agreement each Individual Defendant expressly acknowledged that a breach of his or her obligations under either Agreement would cause Mercer irreparable harm, that monetary damages would not be readily calculable and that Mercer would be entitled to temporary and permanent injunctive relief, without the necessity of posting a bond, and recovery of its attorneys' fees. (*Id.*) Additionally, in both the Non-Solicitation Agreement and the Confidentiality Agreement each Individual Defendant agreed that the Agreements would be construed in accordance with the laws of the State of New York and that "any action or proceeding" arising out of the Agreements or the Individual Defendants' employment must be brought in the Supreme Court of the State of New York, New York County or the U.S. District Court for the Southern District of New York. (*Id.*)

### F.   The Abrupt Resignation of DiGregorio, Steed and Preston

On January 17, 2017, within minutes of each other, each Individual Defendant resigned his or her employment by submitting nearly identical "Notices of Resignation" to Cory Lynn Mercer's Florida Officer Leader. (Lynn Decl. ¶¶ 26). Although Mercer's employee handbook provides that departing employees should provide their managers with two weeks' notice of their resignation DiGregorio, Steed and Preston gave no advanced notice of their resignations. (*Id.* ¶ 28). That same day, January 17th, Lockton announced DiGregorio's appointment as Senior Vice President for Lockton's South Florida operation. Lockton's announcement stated that

DiGregorio would "advise clients . . . on employee benefits programs," and touted his experience as "a principal with Mercer Health & Benefits based in Fort Lauderdale," and as a member of several "professional associations" for which Mercer paid DiGregorio's membership fees. *See* https://www.lockton.com/newsroom/post/digregorio-will-join-lockton-as-senior-vice-president-in-florida (last visited Feb. 24, 2018).

### G.   Breaches Of The Non-Sonication Agreements And Confidentiality Agreements By The Individual Defendants.

On or about January 19, 2018, just two days after their abrupt resignations, if not earlier, the Individual Defendants began soliciting clients with whom they had contact at Mercer. (Lynn Decl. ¶ 29; Pernice Decl. ¶ 6; Marini Decl. ¶¶ 6-9).[3] Specifically, during the week of January 22, 2018, a Mercer client's Vice President for Human Resources told Joanna Marini, a Principal at Mercer that DiGregorio called the prior Friday and told the Vice President for Human Resources that he resigned his position at Mercer and accepted a position at Lockton. (Lynn Decl. ¶ 30; Marini Decl. ¶ 9). On January 31, 2018, during a meeting with representatives of a hotel client, the client representatives told Maggie Novo-Chavarry, another Principal at Mercer that they met with Steed and Preston, following Steed's and Preston's resignations from Mercer, and that Steed and Preston attempted to sell the client health and benefit services on behalf of Lockton Companies. (Lynn Decl. ¶ 32; Novo-Chavarry Decl. ¶¶ 5-8).[4]

Mercer employees continued to hear reports concerning the Individual Defendants' solicitations. On February 7, 2018, Ms. Marini received two emails from the Chief Financial Officer of a client in which the CFO forwarded emails he received from DiGregorio. (Lynn Decl. ¶ 34; Marini Decl. ¶¶ 10-13; Ex. G). Also on February 7th, Denise Pernice, a Principal at Mercer,

---

[3] References to the "Pernice Decl." refer to the Declaration of Denise Pernice executed on February 26, 2018, and references to the "Marini Decl." refer to the Declaration of Joanna Marini executed on February 26, 2018.

[4] References to the "Novo-Charvarry Decl." refer to the Declaration of Maggie Novo-Chavarry executed on February 26, 2018.

received a copy of a text message a client received from DiGregorio discussing DiGregorio's new position at Lockton. (Lynn Decl. ¶ 35; Pernice Decl. ¶ 9; Ex. F).

The following week, on February 14, 2018, Ms. Pernice met with a law firm client who had been a client of Mercer's for approximately four years. (Pernice Decl. ¶ 11). Following the meeting, a representative for the law firm client informed Ms. Pernice that for the first time in four years the law firm would be soliciting proposals from other companies to provide health and benefits solutions. (Pernice Decl. ¶ 12). On February 15, 2018, Ms. Pernice and Mr. Lynn met with the Owner and the Chief Financial Officer of a restaurant client which had been serviced by Steed and Preston during their employment at Mercer. (Lynn Decl. ¶ 39; Pernice Decl. ¶ 13). During that meeting, the Chief Financial Officer informed Mercer employees that the restaurant was considering moving its business to a different vendor. (Lynn Decl. ¶ 39; Pernice Decl. ¶ 14). He acknowledged that he had recently met Steed and Preston, and that he was considering moving his business to Lockton. (Lynn Decl. ¶ 39; Pernice Decl. ¶ 14). Problematically, the restaurant client was unaware the Mercer employees were subject to non-solicitation agreements and responded upon learning that fact that "didn't want to get anybody in trouble." (Pernice Decl. ¶ 15).

Then, on February 22, 2018, Planned Parenthood of South, East and North Florida ("Planned Parenthood"), a client formerly serviced by Steed and Preston, terminated its relationship with Mercer to engage the services of a new vendor. (Lynn Decl. ¶ 40; Fava Decl. ¶ 7; Ex. H).[5] Mercer learned the following day that Planned Parenthood engaged Lockton as its new broker of record. (Lynn Decl. ¶ 41; Fava Decl. ¶ 8).

---

[5] References to the "Fava Decl." refer to the Declaration of Melanie Fava executed on February 26, 2018.

### H.    Mercer's Efforts to Abate the Individual Defendants' Breaches

As early as January 23, 2018, shortly after learning of the Individual Defendants' initial solicitations, Mercer took action to remind the Individual Defendants of their contractual obligations and to inform Lockton of the breaches. The Individual Defendants did not respond and Lockton took no action to stop the breaches which were to its benefit.

Specifically, Jeffery Rosier, Senior Employment Counsel for MMC, sent cease and desist letters to each Individual Defendant and emailed copies of the cease and desist letters to counsel for Lockton. (Roiser Decl. ¶¶ 5-9; Exs. I- L). On January 31, 2018, after learning that Steed and Preston had visited a Mercer client (the hotel client) to pitch work, Rosier again emailed an attorney for Lockton to ask the attorney to "escalate th[e] matter quickly so that it does not get out of hand." (Roiser Decl. ¶¶ 10-11; Ex. M). Rosier ended his email by stating, "[w]e expect Ms. Steed and Ms. Preston to honor their obligations, but it appears they are presently ignoring them." (*Id.*) Lockton acknowledged receipt of the email but did not stop the solicitations made on its behalf. (Roiser Decl. ¶ 12).

### ARGUMENT

### I.    MERCER IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Mercer has established its entitlement to a temporary restraining order and a preliminary injunction. "In the Second Circuit, a plaintiff seeking a preliminary injunction must establish: '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,* 922 F. Supp. 2d 435, 439 (S.D.N.Y. 2013), *aff'd,* 764 F.3d 210 (2d Cir. 2014) (*citing Citigroup Global Mkts., Inc. v. VCG Special Opportunities*

*Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010)). The same standard applies to an application for a temporary restraining order. *See Andino v. Fischer,* 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").

### A.     Mercer Will Suffer Irreparable Harm Absent Injunctive Relief

"To establish irreparable harm, a plaintiff must establish both that an injury is likely absent the injunction and that the injury cannot be adequately remedied with money damages." *IDG USA, LLC v. Schupp,* 416 F. App'x 86, 88 (2d Cir. 2011). There is no question that Mercer will suffer irreparable harm without injunctive relief.

First, Mercer is more than "likely" to be injured absent injunction relief. The Individual Defendants have repeatedly demonstrated their willingness to breach their contractual obligations. Their deceitful conduct to date supports the conclusion that their conduct has been deliberate and calculated. Specifically, the Individual Defendants orchestrated their resignations to give themselves a head start on soliciting Mercer clients in violation of their Non-Solicitation Agreements by informing their supervisor by email, within minutes of each other, of their immediate resignations. (Lynn Decl. ¶¶ 25-28; Exs. D and E). That same day, Defendant Lockton announced DiGregorio's appointment as a Senior Vice President for Lockton's South Florida operation, touting his "credentials," his "experience," and his position as a Principal with Mercer. The Individual Defendants' continued breaches, in spite of express notice from Mercer informing them of their breaches and their continuing obligations, further demonstrate that each Individual Defendant will continue to breach his or her obligations to Mercer unless and until injunctive relief is granted.

Second, the Individual Defendants' violations of their Non-Solicitation Agreements "threaten to cause [Mercer] irreparable harm by luring away the business of a number of long-

term [Mercer] clients." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). Indeed, it is well-settled that the loss of "future sales, goodwill and entire client accounts" cannot be easily quantified. *Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014) (noting that the loss of client relationships and good will can only be remedied by monetary damages in unusual circumstances); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come").

The Individual Defendants have directly targeted significant, long-standing Mercer clients, with whom they developed relationships solely by virtue of their employment with Mercer. As a result of their conduct, Mercer has already lost one client relationship (Planned Parenthood) and the goodwill built up over the years, neither of which can be measured with monetary damages. *See e.g., Uni-World Capital,* 73 F. Supp. 3d at 236. It has also lost the benefit of the time to transition clients from the Individual Defendants to other Mercer employees without interference, which has also caused irreparable harm to its goodwill. *See, e.g. Johnson Controls,* 323 F. Supp. 2d at 532 ("the extent the purpose behind the non-compete clauses is to allow [plaintiff] a brief period to transfer the client relationships maintained through [the individual defendants] to their replacements, that benefit is inexorably lost by the failure to enforce the clauses immediately"). Most critically, Mercer stands to lose additional client relationships and goodwill that would produce indeterminate revenue in the future. *See id.* There is no evidence that this is the unique case in which such harm can be measured by monetary damages.

Third, the Individual Defendants contractually agreed that their current violations would constitute irreparable harm and that Mercer would be entitled to injunctive relief in the event of their breach. (Lynn Decl., Exs. A, B and C). Specifically, in each of the Non-Solicitation and Confidentiality Agreements, each Individual Defendant expressly acknowledged that "irreparable injury will result to [Mercer] in the event of a breach by the Employee of his/her obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor." (*Id.*) In the Second Circuit, such contractual provisions support a finding that irreparable harm as occurred. *See, e.g., N. Atl. Instruments Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm and relying, in part, on the former employee's acknowledgement that a breach of his agreement would cause "irreparable injury" to the employer); *Devos, Ltd. v. Record*, No. 15-CV-6916(ADS)(AYS), 2015 WL 9593616, at *10 (E.D.N.Y. Dec. 24, 2015) (finding irreparable harm where the restrictive covenant agreement stated that a breach would result in irreparable injury, that damages would be unascertainable in monetary terms, and that the plaintiff would have no adequate remedy at law); *Uni-World Capital*, 73 F. Supp. 3d at 236-37 (any breach of the non-compete agreement "may result in irreparable harm and continuing damages to the Employer and its business and that the Employer's remedy at law for any such breach or anticipated or threatened breach will be inadequate").

### B.    Mercer Has A Likelihood Of Success On The Merits Or Can Demonstrate A Sufficiently Serious Question Going To The Merits To Make Each Of Their Claims Fair Grounds For Litigation

As set forth below, Mercer is likely to succeed on the merits of its claims against the Individual Defendants and Lockton, or at the very least Mercer can demonstrate a sufficiently serious question going to the merits on each of its claims.

### 1.     Breach of Contract (Claims I, II and II)

The Non-Solicitation and Confidentiality Agreements are enforceable and the Individual Defendants breached them. New York courts apply a "three-part test to determine the reasonableness, and ultimately the enforceability, of anti-competitive employee agreements." *MasterCard Int'l Inc. v. Nike, Inc.,* No. 15-CV-114 (NSR), 2016 WL 797576, at *4 (S.D.N.Y. Feb. 23, 2016) (citing *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 388–89 (1999)). Under that test, "[a] restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* The Non-Solicitation and Confidentiality Agreements at issue here easily meet this three-part test.

First, the restrictions imposed by the Non-Solicitation and Confidentiality Agreements are no great than is required to protect Mercer's legitimate interests. Under New York law, an employer "has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *USI Ins. Servs. LLC v. Miner,* 801 F. Supp. 2d 175, 187-88 (S.D.N.Y. 2011). Here, it is undeniable that Mercer has a legitimate interest in protecting its client relationships for which the Individual Defendants were responsible in the last two years of their respective employment, and its confidential information relating to its client relationships. The Individual Defendants' efforts to develop, retain and expand business during their employment with Mercer were financed and supported by Mercer, which paid, among other expenses, their salaries and the salaries of the entire support team who were essential to the overall client relationships. *See Johnson Controls,* 323 F. Supp. 2d at 536 (plaintiff had a legitimate interest in protecting client relationships that were developed by

individual defendants in connection with their employment and supported by efforts of other employees).

Moreover, the provisions of the Non-Solicitation Agreements are narrowly tailored to cover *only* those clients and prospective clients with whom the Individual Defendants had contact, or about whom they obtained confidential information during the last two (2) years of their respective employment, and for *only* one year following the Individual Defendants' resignations. New York courts have routinely upheld non-solicitation provisions with a duration of one-year, or longer, as reasonable. *See Oliver Wyman, Inc. v. Eielson*, No. 15 CIV. 5305 (RJS), 2017 WL 4403312, at *6 (S.D.N.Y. Sept. 29, 2017) (finding that the duration of a non-solicitation clause—extending for one year following a defendant's employment—is not unduly burdensome); *Marsh USA Inc. v. Schuhreimen*, 183 F. Supp. 3d 529, 535 (2016) ("Particularly relevant is the fact that the ban on solicitation lasts for just one year"); *Silipos, Inc. v. Bickel*, No. 06-CV-02205, 2006 WL 2265055 at *6 (S.D.N.Y. Aug. 8, 2006) (observing that "New York courts routinely find one-year restrictions to be reasonable").

Importantly, this Court has twice found that the restrictions imposed by non-solicitation and confidentiality agreements involving Mercer's affiliated company, Marsh USA Inc., containing nearly identical terms, were reasonable in light of the interests they sought to protect and the limited duration of the restrictions. *See Schuhreimen*, 183 F. Supp. 3d at 535; *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195 (JGK), 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008). For the reasons acidulated in the *Karaski* and *Schuhriemen* cases, the Non-Solicitation and Confidentiality Agreements at issue here are no greater than is required for the protection of the legitimate interest of the employer.

Second, the Non-Solicitation and Confidentiality Agreements do not impose undue hardship on the Individual Defendants. New York courts have routinely found that an individual does not suffer undue hardship where the restrictive covenant at issue merely prohibits him from soliciting his former employer's clients for a reasonably defined period of time. *See USI Ins. Servs.,* 801 F. Supp. 2d at 190 ("USI is not seeking to preclude Miner from working as an insurance producer for IOA. USI instead seeks only to preclude Miner from soliciting or servicing former USI clients"). Here, the Non-Solicitation and Confidentiality Agreements do not prevent the Individual Defendants from working as insurance brokers or sales professionals or generally from servicing organizations seeking employee benefit services. Nor do they restrict the Individual Defendants from being employed by Lockton, a direct competitor, or even from competing against Mercer. The Individual Defendants are only prohibited from: (1) soliciting, interfering with, or servicing the limited group of clients for which they were responsible or about whom they obtained confidential information in their last two years at Mercer, (2) soliciting employees with whom they worked in the last two years of employment or about whom they have confidential information, and (3) disclosing or utilizing Mercer's confidential information and trade secrets. Because they are free to pursue a "wide array" of other clients on behalf of Lockton, and because the non-solicitation restrictions apply for only one year, "Mercer is likely to prevail on its showing that the agreements do not impose an undue hardship on [the Individual Defendants]." *Marsh USA Inc.,* 2008 WL 4778239, at *18.

Third, enforcing the Non-Solicitation Agreements will not harm the public, the majority of which is free to work with the Individual Defendants. The clients the Individual Defendants worked with in their last two years at Mercer also are not harmed because they can work with the Individual Defendants or Lockton after the narrow one-year restriction period expires. In fact,

"[i]f anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Uni-World,* 73 F. Supp. 3d at 237.

Finally, Mercer likely will be able to establish that the Individual Defendants breached their agreements. Following their resignations, Defendants Steed and Preston met with at least two Mercer clients with whom they worked during their last two years of employment, in clear contravention of their Non-Solicitation Agreements. (Lynn Decl. ¶¶ 32, 39; Pernice Decl. ¶¶ 12-15; Novo-Chavarry Decl. ¶¶ 5-8). A third client serviced by Steed and Preston during their employment with Mercer informed Mercer by email on February 22, 2018 that it "decided to engaged [the] services of another vendor"—Lockton. (Fava Decl. ¶ 7, Ex. H).

The Individual Defendants' announcements of their departures to existing Mercer clients through individualized distribution and other targeted solicitations also violated the Non-Solicitation Agreements. In *USI Insurance Services v. Miner,* this Court found that the defendant breached his non-solicitation agreements by sending an email that informed his former clients of his new position at a competing insurance company and touted the merits of the his new employer. *USI Ins. Servs.,* 801 F. Supp. 2d at 192-3. Likewise in *Schuhriemen,* this Court found that the defendant's "notice announcing his employment . . . was not a general announcement," but rather a targeted solicitation likely in violation of the defendant's non-solicitation agreement. *Schuhriemen,* 183 F. Supp. 3d at 536. The email, text and phone solicitations by the Individual Defendants here are no different.

### 2. Breach of Fiduciary Duties (Claim IV) and Unfair Competition (Claim VII)

Under New York law, employees owe their employers a fiduciary duty of loyalty, including a duty to not use or disclose the employer's confidential information for the purpose of

competing with the employer. *PLC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *9 (N.D.N.Y. Dec. 12, 2011). Here, as set forth above, the Individual Defendants owed Mercer a fiduciary duty of loyalty not to disclose Mercer's confidential information for the purpose of competing with Mercer. As evidenced by Lockton's February 16th email containing Mercer's client revenue estimates, the Individual Defendants breached their duty by providing information Mercer treats as confidential to a competitor for purposes of attracting the business to their new employer. Based on these facts, Mercer has a likelihood of success on the merits of its breach of fiduciary duty claim.

"To state an unfair-competition claim on a theory of misappropriation under New York common law, a plaintiff must allege that the defendant (1) misappropriated and used, (2) the plaintiff's property, (3) to compete against the plaintiff's own use of the same property." *Id.* Similarly, "[t]o state a claim for misappropriation of confidential information, a plaintiff must allege that the defendant used the plaintiff's confidential information for the purpose of securing a competitive advantage." *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp. 2d 343, 352 (S.D.N.Y. 2010). The facts stated above demonstrate that Mercer has a likelihood of success on the merits of its unfair competition claim and its misappropriation of confidential information claim insofar as Defendants are in possession of Mercer's confidential information concerning Mercer's expected annual client revenues and have or will use that information to unfairly compete with Mercer for business.

### 3.    Tortious Interference Claims (Claims V and VI)

"To state a claim for tortious interference with business relations under New York law, four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the

relationship." *Scutti Enters., LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003). Here, Mercer has business relationships with each of its clients, including Planned Parenthood, and its prospective clients. Defendants interfered with Mercer's business relationships by soliciting Mercer's clients with knowledge of Mercer's pricing and expected revenues for the purpose of undermining Mercer's relationship with those clients, and converting those clients to become clients of Lockton. One client, Planned Parenthood, has already terminated its relationship with Mercer in favor of Lockton based on Defendants' tortious conduct. Two other clients have indicated that they would solicit proposals from other vendors, which, upon information and belief, includes Lockton. Mercer likely will be successful on this claim.

To prevail on its claim against Lockton for tortious interference with contract under New York law, Mercer must demonstrate: (1) the existence of valid contracts between Mercer and the Individual Defendants, (2) Lockton's knowledge of those contracts, (3) Lockton's procurement of the Individual Defendants' breaches of those contracts, and (4) damages. *Envtl. Servs., Inc. v. Recycle Green Servs., Inc.*, 7 F. Supp. 3d 260, 276 (E.D.N.Y. 2014). Each of these elements is met here. First, as demonstrated above, the Individual Defendants' Non-Solicitation and Confidentiality Agreements are valid and enforceable contracts. Second, Lockton was aware of the existence of the contracts no later than January 23, 2018 for DiGregorio, and January 25, 2018 for Steed and Preston—i.e. the dates on which counsel for Mercer's parent company provided copies of the agreements to Lockton's attorney. Third, notwithstanding their knowledge of the Agreement, Lockton permitted the Individual Defendants to solicit Mercer clients throughout February 2018, covert a Mercer client on February 22, 2018, and provide confidential client revenue information to Lockton on or around February 16, 2018. Mercer is likely to succeed on this claim.

**C.    A Balancing of the Equities Tips in Favor of Granting Preliminary Injunctive Relief**

Mercer has demonstrated a likelihood of success on the merits for each of its eight claims. However, insofar as the Court finds that Mercer has only raised sufficiently serious questions going to the merits of each claim, the Court should still issue the requested temporary restraining order and preliminary injunction because a balance of the equities tips in favor of Mercer.

Mercer merely seeks to maintain the status quo and prevent Defendants from breaching their contractual obligations, breaching their fiduciary duties and engaging in tortious and unfair business practices. The Individual Defendants' contractual obligations are reasonable and narrowly tailored. The Agreements do not prevent the Individual Defendants form working for Lockton or developing business based on their current employment and resources. Nor do the Agreements prevent Lockton from engaging in business which fairly competes with Mercer.

On the other hand, if the Court denies Mercer's request for immediate equitable relief, Defendants will be allowed to continue to unfairly compete with Mercer using Mercer's confidential information and undermining the investment of substantial time, resources and goodwill that Mercer made in its client relationships. Therefore, the balance of the equities decidedly weight in favor of Mercer. *See Schuhriemen,* 183 F. Supp. 3d at 536–37 (granting preliminary injunctive relief and observing with respect to the "to the balance of equities," that the individual defendant was unlikely to suffer "great hardship" if he was prevented for one year from soliciting" the plaintiffs' clients, and further observing that plaintiff could have "face[d] the prospect of losing business to a major competitor, transported by a high-level company official").

## II.     MERCER SHOULD NOT BE REQUIRED TO POST A BOND.

"The language of Rule 65(c) confers broad discretion on the trial judge to set the amount of the bond, even to dispense with the bond requirement altogether." *R.L.E. Corp. d/b/a Casa Imports v. Ferraro Foods, Inc.*, No. 6:15-cv-123 (GLS/TWD), 2015 WL 1456178, at *1 (N.D.N.Y. March 30, 2015) (bond requirement was unnecessary where individual defendant failed to establish that he was likely to suffer any harm absent the posting). In this case, neither the Individual Defendants nor Lockton can establish that they will be harmed if a bond is not posted. As discussed above, Mercer's requested relief will not prevent any Individual Defendants from earning a livelihood, and will not prevent Lockton from operating its business.

Moreover, each Individual Defendant expressly agreed in his or her Non-Solicitation Agreements that Mercer would be entitled "to temporary and permanent injunctive relief *(without the necessity of posting a bond)*." (emphasis added) No bond should be required where, as here, the parties have expressly agreed otherwise. *See Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC,* No. 10-cv-8976 (RJH), 2011 WL 497978, at *12 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012) (no bond required where franchisee agreed that franchisor "may have such injunction relief without necessity of posting a bond"); *Karasaki,* 2008 WL 4778239 at *21 ("the parties agreed in Section 7 of the RCA that no bond would be required for any temporary or permanent injunction, and the parties may agree to waive the bond requirement").

## III.    THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR EXPEDITED DISCOVERY

This Court has often granted expedited discovery in cases involving restrictive covenants. *See, e.g., Uni-World Capital,* 43 F. Supp. 3d at 241 (expedited discovery permitted in non-compete case); *Nebraskaland, Inc. v. Brody,* No. 09-CV-9155 (DAB), 2010 WL 157496, at *1

(S.D.N.Y. Jan. 13, 2010) (expedited discovery permitted in restrictive covenant case involving solicitation of customers); *DAG Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09 CIV. 7802 (RJH), 2010 WL 46016, at *1 (S.D.N.Y. Jan. 7, 2010) (expedited discovery granted in conjunction with a preliminary injunction). Here, Mercer seeks the prompt deposition of the Individual Defendants in New York and the production of limited documents, including all communications between each Individual Defendant and anyone acting in concert with them or on their behalf and any Mercer client with whom the Individual Defendants worked or about whom the Individual Defendants worked obtained confidential information during the last two years of their employment. Only the Individual Defendants know the full extent of their activities in violation of their Non-Solicitation and Confidentiality Agreements, and it will be impossible for Mercer to ascertain the full extent of their misconduct without their sworn deposition testimony and document production.

## CONCLUSION

For the foregoing reasons, Mercer respectfully requests the Court grant their motion for a temporary restraining order, preliminary injunction, and expedited discovery. The equitable relief sought has been narrowly tailored to achieve Mercer's legitimate and substantial interest in protecting itself from loss of good will, client relationships and irreparable harm. The injunctive relief would not unduly restrict the Individual Defendants from working for his current employer performing insurance brokerage and employees benefits services outside the scope of the restraining order, and would not otherwise prevent Lockton from operating its business.

Date:  February 28, 2018
       New York, New York

_____
A. Michael Weber
Shawn Matthew Clark
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022.3298
212.583.9600

*Attorneys for Plaintiff*
*Mercer Health & Benefits LLC*