# Exhibit A

# In The Matter Of:

*MERCER HEALTH & BENEFITS, LLC v.*
*MATTHEW DIGREGORIO, et al.*

---

*MATTHEW DIGREGORIO*
*March 09, 2018*

---

*DALCO Reporting, Inc.*
*170 Hamilton Avenue, Suite 303*
*White Plains, NY 10601*
*(914) 684-9009*
*dalcoreporting.com*



Original File DIGREGORIO_MATTHEW (3_9_2018).txt
Min-U-Script® with Word Index

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2
                CASE NO.:  18-cv-01805 (JGK)
 3
 4   MERCER HEALTH & BENEFITS, LLC,
 5        Plaintiff,
 6        -against-
 7   MATTHEW DIGREGORIO, JOANNE
     STEED, JADA PRESTON and
 8   LOCKTON COMPANIES, LLC,
 9
         Defendants.
10
                                      /
11   _____
12
13           DEPOSITION OF MATTHEW DIGREGORIO
14           TAKEN ON BEHALF OF THE PLAINTIFF
15
16              Friday, March 9, 2018
17              8:35 a.m. - 12:20 p.m.
18        Law Offices of Littler Mendelson P.C.
          333 Southeast 2nd Avenue, Suite 2700
19                 Miami, Florida 33131
20
21
22
23   REPORTED BY:
     VICTORIA SUAREZ, COURT REPORTER
24   NOTARY PUBLIC, STATE OF FLORIDA
```

Page 2

```
 1           APPEARANCES OF COUNSEL
 2   ON BEHALF OF THE PLAINTIFF:
 3        A. MICHAEL WEBER, Esquire
          LITTLER MENDELSON, P.C.
 4        900 Third Avenue
          New York, New York 10022
 5        212.583.9600
          mweber@littler.com
 6
     ON BEHALF OF THE DEFENDANTS:
 7
          MARTIN S. SIEGEL, Esquire
 8        GOLENBOCK EISEMAN ASSOR BELL & PESKOE, LLP
          711 Third Avenue
 9        New York, New York 10017
          212.907.7363
10        msiegel@golenbock.com
11   ON BEHALF OF THE DEFENDANTS MATTHEW DIGREGORIO,
     JOANNE STEED, AND JADA PRESTON:
12
          LYLE E. SHAPIRO, Esquire
13        HERSKOWITZ SHAPIRO PLLC
          9100 South Dadeland Boulevard
14        Suite 908
          Miami, Florida 33156
15        305.423.1986
          lyle@hslawfl.com
16
     ALSO PRESENT:
17
          AMY TREE, Mercer Representative
18
          JOANNE STEED
19
          JADA PRESTON
20
          MINOJ SHARMA
21
22
23
24
```

Page 3

```
 1              INDEX OF EXAMINATION
 2   WITNESS:  MATTHEW DIGREGORIO
 3   DIRECT EXAMINATION                        Page
        By Mr. Weber                            6
 4
     CROSS EXAMINATION
 5        By Mr. Shapiro                        172
 6   REDIRECT EXAMINATION
        By Mr. Weber                            182
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              INDEX OF EXHIBITS
 2   EXHIBIT       DESCRIPTION                  PAGE
 3     1     Confidentiality Agreement          11
 4     2     Non-Solicitation Agreement         18
 5     3     Compliance Policy                  19
 6     4     Code of Conduct                    63
 7     5     E-mail with Notice of Resignation  65
 8     6     Declaration                        72
 9     7     E-mail                             97
10     8     E-mail with Active Account Listing 98
11     9     E-mail with Marsh Prospect List   112
12    10     E-mail with Invitation            114
13    11     E-mail with Invitation            116
14    12     E-mail with Invitation            116
15    13     E-mail with Florida Pipeline Report 117
16    14     E-mail with MMA Florida Client List 122
17    15     E-mail with Complete Capabilities 123
18    16     E-mail with links                 125
19    17     E-mail                            127
20    18     E-mail                            131
21    19     E-mail with Commission chart      132
22    20     E-mail with attachments           133
23    21     E-mail with attachments           137
24    22     E-mail with attachment            143
```

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 5

| | EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | 23 | E-mail with attachment | 144 |
| 4 | 24 | E-mail with attachment | 146 |
| 5 | 25 | E-mail | 148 |
| 6 | 26 | E-mail | 152 |
| 7 | 27 | E-mail | 153 |
| 8 | 28 | E-mail | 153 |

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 6

1          DEPOSITION OF MATTHEW DIGREGORIO
2                    March 9, 2018
3 Thereupon:
4          MATTHEW DIGREGORIO
5 was called as a witness, and after having been first
6 duly sworn, testified as follows:
7          MR. WEBER: Should we get everyone's name on
8 the record so we're clear?
9          MR. SHAPIRO: Sure. In the room is the witness
10 Matt DiGregorio. I am Lyle Shapiro. Next to me is
11 Marty Siegel, Joanne Steed, Jada Preston, and Minoj
12 Sharma --
13          MR. SIEGEL: -- who is the corporate
14 representative.
15          MR. WEBER: And this is Amy Tree from Mercer.
16 And I'm Michael Weber obviously. All set?
17          **DIRECT EXAMINATION**
18 BY MR. WEBER:
19   Q.  Good morning.
20   A.  Good morning.
21   Q.  My name is Michael Weber as you heard. I'm one
22 of the attorneys for Mercer in this matter. I'm going
23 to ask you a series of questions. You're obviously
24 testifying under oath. If you don't understand anything

---

Page 7

1 I say, please let me know and I'll rephrase it or
2 restate it. Do you understand those directions?
3   A.  Yes.
4   Q.  And you have to give verbal answers just like
5 you did, not a nod of the head or gestures.
6   A.  Understood.
7   Q.  Please answer verbally so that the court
8 reporter can take everything down.
9        Have you ever had your deposition taken before?
10   A.  No.
11   Q.  Have you been a party to any litigation other
12 than this one, plaintiff or defendant?
13   A.  No.
14   Q.  Have you ever been a witness in a case?
15   A.  No.
16   Q.  If you need to take a break at any time, let me
17 finish my question. Let me ask the question, finish the
18 answer, and then if you need to take a break we will.
19   A.  Okay.
20   Q.  All right?
21        Any reason you can't testify truthfully today?
22   A.  No.
23   Q.  Are you under any medications that would affect
24 your memory?

---

Page 8

1   A.  No.
2   Q.  Are you under any medications at all?
3   A.  No.
4   Q.  Did you meet with anyone to prepare for this
5 deposition?
6   A.  Yes.
7   Q.  Who did you meet with?
8   A.  My attorneys.
9   Q.  The two gentlemen to your right?
10   A.  Yes.
11   Q.  Anyone else?
12   A.  Other attorneys as well.
13   Q.  From their offices?
14   A.  Yes.
15   Q.  Was anyone else present beside the attorneys
16 and yourself?
17   A.  The other defendants.
18   Q.  Anyone other than attorneys and defendants in
19 the meeting?
20   A.  No.
21   Q.  Are you being represented by these two
22 gentlemen -- strike that.
23        Are your legal fees being paid by your current
24 employer?

---

**Page 9**

1 A. Yes.

2 Q. Have -- strike that.

3 Has Lockton agreed to indemnify you for any

4 losses in this case?

5 A. Yes.

6 Q. And do you have an Employment Agreement with

7 Lockton?

8 A. Yes.

9 Q. And does that state that they will hold you

10 harmless and indemnify you for any claims brought by

11 Mercer in this action?

12 MR. SHAPIRO: Object to the form.

13 BY MR. WEBER:

14 Q. You may answer.

15 A. Yes.

16 Q. And when did you sign that Employment

17 Agreement?

18 A. I don't recall.

19 Q. Approximately the month?

20 A. Late January.

21 Q. When is the first time you saw that Employment

22 Agreement, a draft of it?

23 A. I don't recall.

24 Q. Does the indemnification provision in your

**Page 10**

1 Employment Agreement also state that they will continue

2 your salary in the event there might be an injunction in

3 this case?

4 A. I don't understand the question.

5 Q. In your Employment Agreement with Lockton, is

6 there a provision that you will continue to receive

7 compensation regardless of what happens in this lawsuit?

8 MR. SHAPIRO: Object to the form.

9 BY MR. WEBER:

10 Q. You can answer.

11 A. Not that I'm aware of.

12 Q. Other than your attorneys and the co-defendants

13 sitting here today, have you discussed this case with

14 anyone else?

15 A. Yes.

16 Q. Who is that?

17 A. My wife.

18 Q. Anybody else?

19 A. Perhaps other friends or family members.

20 Q. Can you state them for the record?

21 A. Could I change that answer?

22 Q. Sure.

23 A. I have not discussed this in any detail with

24 anyone besides my wife or my counsel.

**Page 11**

1 Q. Just in passing you may be involved in a

2 proceeding?

3 A. Correct.

4 Q. That's fine. When did you start your

5 employment with Mercer?

6 A. January of 2010, I believe.

7 Q. And what was your title at the time?

8 A. Senior associate.

9 Q. And what was your salary approximately?

10 A. Ninety thousand.

11 Q. Did you receive any commissions at the time?

12 A. No.

13 Q. And what was your job responsibilities or your

14 job duties when you first started?

15 A. To help generate opportunities for Mercer.

16 Q. Business development?

17 A. Yes.

18 Q. And is that generally -- you continued to

19 maintain that general responsibility since you've been

20 at the company?

21 A. Yes.

22 MR. WEBER: Plaintiff's Exhibit 1.

23 (Plaintiff's Exhibit 1, Confidentiality

24 Agreement, was marked for identification.)

**Page 12**

1 BY MR. WEBER:

2 Q. I'm showing you what's been marked Plaintiff's

3 Exhibit 1. Take a look at that document.

4 A. I'm sorry. Did you ask a question?

5 Q. I didn't. I'm showing you Plaintiff's

6 Exhibit 1. Would you please review that document and

7 I'm going to ask you if you recognize it.

8 A. I do, but I don't recall reading pages 6 and 7

9 before.

10 Q. Is that your signature on page 5?

11 A. Yes.

12 Q. Are you saying that you don't recall seeing 6

13 and 7?

14 A. Yes.

15 Q. Do you have any reason to believe that it

16 wasn't part of this agreement?

17 A. No.

18 Q. Okay. Would you look at paragraph 3 about

19 confidential information.

20 A. Okay.

21 Q. Have you disclosed any Mercer confidential

22 information or trade secrets?

23 A. No.

24 Q. Have you disclosed any Marsh or Marsh &

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

**Page 13**

1  McLennan confidential information or trade secrets?
2  A.  No.
3  Q.  Paragraph 4 states, "Return the Materials Upon
4  Termination".  Do you see that paragraph?
5  A.  Yes.
6  Q.  Have you returned all materials to Mercer that
7  were Mercer property?
8  A.  Yes, to the best of my knowledge.
9  Q.  What would help clarify your knowledge and your
10  response to that question?
11  A.  Define "returned".
12  Q.  Any materials that you had in your possession
13  during your employment with Mercer, have you returned
14  all those materials?
15  A.  I've either returned or deleted anything I had
16  in my possession.
17  Q.  Okay.  And when did you delete things?
18  A.  Prior to leaving Mercer.
19  Q.  When in particular, what date?
20  A.  Don't recall.
21  Q.  Approximately?
22  A.  Don't recall.
23  Q.  Do you recall what you deleted?
24  A.  Anything that I had in my possession

---

**Page 14**

1  electronically.  I don't recall the exact documents.
2  Q.  And were those documents on your company
3  laptop?
4  A.  No.
5  Q.  Where were they?
6  A.  In my personal e-mail account.
7  Q.  And what's that account address?
8  A.  Matt, M-A-T-T, D as in David, 5454@hotmail.com.
9  Q.  Any other e-mail addresses that you have?
10  A.  No.
11  Q.  Does your wife have an e-mail address?
12  A.  Yes.
13  Q.  Did you ever send materials to her?
14  A.  No.
15  Q.  So when you say you deleted Mercer materials
16  from your personal e-mail account, can you tell me what
17  materials you deleted?
18  A.  No.  I don't recall.
19  Q.  And I assume if we had your -- strike that.
20      What device were those documents on?  Was it a
21  home laptop?  Was it a home desktop?  Was it an iPad?
22  An iPhone?  All of the above?
23      MR. SHAPIRO:  Object to the form.
24  A.  Wherever Hotmail keeps their documents.  I have

---

**Page 15**

1  no idea.
2  BY MR. WEBER:
3  Q.  So I assume that they're retrievable if they
4  were just deleted from Hotmail; correct?
5  A.  I am not a technology professional.  I couldn't
6  answer that question.
7  Q.  But when I -- and I want to press you on this
8  answer.
9      When you say you deleted Mercer materials or
10  returned them, let's just break that down.  What Mercer
11  materials did you return?
12  A.  Anything that was in my possession was left in
13  my office along with my personal belongings I have yet
14  to be returned.
15  Q.  Okay.  So we have those.  Now, let's turn to
16  the materials that you said you deleted from your
17  personal Hotmail account.
18      Can you tell me what materials you deleted?
19      MR. SHAPIRO:  Object to the form.
20  BY MR. WEBER:
21  Q.  You can answer.
22  A.  Again, anything that was in there that I
23  thought was Mercer information was deleted.
24  Q.  Approximately what date did you delete them?

---

**Page 16**

1      MR. SHAPIRO:  Object to the --
2  A.  I don't --
3      MR. SHAPIRO:  Give me a chance.
4      Object to the form.
5  BY MR. WEBER:
6  Q.  To the best of your knowledge, tell me the date
7  you deleted materials.
8      MR. SHAPIRO:  Object to the form.
9  A.  Again, I don't recall.
10  BY MR. WEBER:
11  Q.  Was it a month before you resigned?
12  A.  Again, I don't recall.
13  Q.  Was it six months before you resigned?  I'm
14  trying to get a general sense of when you might have
15  deleted them.
16  A.  No, it would not have been six months before.
17  Q.  Would it have been approximately three months
18  before?
19  A.  Potentially.
20  Q.  Something in that range?
21  A.  Potentially.
22  Q.  Okay.  And is there anything that would help
23  refresh your recollection as to when you deleted those
24  materials?

---

DALCO Reporting, Inc.
800.325.8779

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 17

1    A.   Not that I'm aware of.
2    Q.   And is it your testimony that you didn't save
3  any of those -- strike that.
4        Is it your testimony you did not make copies or
5  otherwise transfer any of the deleted Mercer materials?
6    A.   That is correct.  I have not done that with
7  Mercer material -- with Mercer materials.
8    Q.   Okay.  In paragraph 6 of this document on page
9  3, subparagraph A Compliance, do you see that?
10   A.   Give me a chance to read it.
11   Q.   Please.
12       MR. SHAPIRO:  I'm sorry.  Mike, which section
13   are we in?
14  BY MR. WEBER:
15   Q.   Actually I want to go back to -- one second.  I
16  want to go back to paragraph 4.  Want to read the
17  introductory paragraph?
18   A.   Sure.
19   Q.   Out loud for record.
20   A.   Seriously?
21   Q.   Yeah.
22   A.   "Return of Materials Upon Termination of
23  Employment.  Immediately upon the termination of my
24  employment with the company for any reason, or at any

---

Page 18

1  time the Company so requests, I will return to the
2  Company."
3    Q.   And then it lists a number of things there;
4  correct?
5    A.   There are two subparagraphs with items included
6  within those, yes.
7    Q.   And did you comply with that paragraph?
8    A.   To the best of my knowledge, yes.
9    Q.   Have you, prior to or since your resignation
10  from Mercer, shared any Mercer materials with anyone?
11   A.   No.
12       (Plaintiff's Exhibit 2, Non-Solicitation
13  Agreement was marked for identification.)
14  BY MR. WEBER:
15   Q.   Let me show you what's been marked Plaintiff's
16  Exhibit 2.  Do you recognize this document?
17   A.   Yes.
18   Q.   And what is it?
19   A.   The Mercer Health and Benefits, LLC,
20  Non-Solicitation Agreement.
21   Q.   And you signed it when you began your
22  employment with Mercer?
23   A.   It was a condition of my employment was to sign
24  this document, yes.

---

Page 19

1    Q.   And you're familiar with the terms of the
2  document; right?
3    A.   I mean, I can read it now but not in its
4  entirety, but sure.
5    Q.   Well, when you received it and signed it were
6  you familiar with the terms?
7    A.   I believe I understood the general ideas of it,
8  but I did not have an attorney review it.
9    Q.   Okay.
10       (Plaintiff's Exhibit 3, Compliance Policy, was
11  marked for identification.)
12  BY MR. WEBER:
13   Q.   Show you what's been marked Plaintiff's
14  Exhibit 3.  It's ten pages but it's double-sided so it's
15  five pages.  Just take a look at that document, please.
16   A.   Okay.
17   Q.   You've taken various training programs when you
18  were employed by Mercer; correct?
19   A.   Yes.
20   Q.   And there are a number of online courses that
21  you took; correct?
22   A.   I recall taking online courses, yes.
23   Q.   And you took them over the seven or eight years
24  you were employed by Mercer; correct?

---

Page 20

1    A.   I don't recall the time frame when I started or
2  completed.
3    Q.   Do you remember taking a course on Legal &
4  Compliance Policy that's in front of you Plaintiff's
5  Exhibit 3?
6    A.   Not specifically, no.
7    Q.   Does this policy look familiar to you?
8    A.   I don't recall ever reading a document to this
9  extent before.
10   Q.   Do you ever remember getting any training on a
11  topic that's contained in Plaintiff's Exhibit 3?
12   A.   I don't remember any specific courses.  I do
13  know I have taken courses on various topics.
14   Q.   Well, as you look at this policy now, does it
15  refresh your recollection whether you've taken any
16  courses on Compliance Policy?
17   A.   Which one would be the courses?
18   Q.   This is one course.  I'm asking you if you
19  would review it and see if it refreshes your
20  recollection of whether you've taken courses related to
21  this topic.
22   A.   I couldn't say.  I don't recall specifically
23  taking a course entitled Protecting Personal and
24  Confidential Information.

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

**Page 21**

1  Q.  Do you remember taking a course on The Greater
2  Good:  Our Code of Conduct?
3  A.  I don't remember taking a course that was
4  called this, no.
5  Q.  Do you ever remember taking an online course
6  Acceptable Use of Information Assets?
7  A.  No.
8  Q.  Do you remember taking a course on Encryption
9  and Secure File Storage?
10  A.  No.
11  Q.  What about Information Security Policy Manual?
12  A.  Not that I recall.
13  Q.  What about a course entitled Keys to Data
14  Security?
15  A.  Not that I recall.
16  Q.  Remember taking any course on Personal
17  Information Policy?
18  A.  No.
19  Q.  How about on Record Retention?
20  A.  Yes.
21  Q.  When do you remember taking that course?
22  A.  Years ago, I believe.
23  Q.  Do you remember taking a course on Work Place
24  Violence Prevention and Response?

---

**Page 22**

1  A.  No.
2  Q.  Do you remember taking a course on Protecting
3  Personal Health and Confidential Information?
4  A.  I don't recall taking a course on that, no.
5  Q.  Do you remember taking a course on The Greater
6  Good Recertification?
7  A.  No.
8  Q.  Do you remember taking a course on Protecting
9  Confidential Information?
10  A.  No.
11  Q.  Now, prior to starting your employment with
12  Mercer, did you have any experience with employee
13  benefits?
14  A.  Yes.
15  Q.  What experience did you have?
16  A.  I obtained a Bachelor's degree from Temple
17  University, Risk Management Insurance and Health
18  Benefits, as well as a minor in Risk Management
19  Healthcare.  At my time of employment at Marsh I began
20  cross-selling and providing Mercer opportunities on the
21  employee benefits side.
22  Q.  So as I understand it, your experience is both
23  your education and your experience at Marsh?
24  A.  Correct.

---

**Page 23**

1  Q.  And was Marsh your first job out of school?
2  A.  Yes.
3  Q.  What was your title when you resigned from
4  Mercer?
5  A.  Principle.
6  Q.  And what were your general responsibilities?
7  A.  The same as when I started, business
8  development.
9  Q.  And you communicated directly with Mercer
10  clients?
11  A.  Yes.
12  Q.  Can you tell me the clients you communicated
13  with while you were employed during the two years prior
14  to your resignation?
15  A.  Off the top of my head, no.
16  Q.  Can you tell me any of them?
17  A.  Of clients would be J.J. Taylor, Miller's Ale
18  House, Signature Consultants, and many others.
19  Q.  Any others come to mind?
20  A.  Spectralink.  Gee, I don't know.  Champion
21  Solutions, Sendyne, Caregiver Services.  I'm drawing a
22  blank.  I'm sorry.
23  Q.  That's fine.  Those are the ones that come to
24  mind?

---

**Page 24**

1  A.  Yes.
2  Q.  Okay.  Do you remember the pricing arrangements
3  that Mercer had with those clients?
4  A.  No.
5  Q.  Any sense of what the fees were for those
6  clients?
7  A.  Could you repeat the names back to me, please?
8  Q.  Sure.
9  A.  Slowly.
10  (The requested portion of the record was read
11  back by the court reporter.)
12  A.  JJ Taylor I believe was under a fee and
13  commission arrangement.
14  Q.  What was it?
15  A.  I don't know.
16  Q.  Okay.  Next one.
17  (The requested portion of the record was read
18  back by the court reporter.)
19  A.  Fee and commission.
20  MR. SHAPIRO:  I think you need, just for the
21  record, I think you need to say Miller's Ale House
22  fee and commission.
23  MR. DIGREGORIO:  Okay.
24  A.  I'm willing, to the extent that answers your

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

**Page 25**

1 question, if it's fully insured, it's commission only.
2 If it's self insured, it's both fee and commission.
3 BY MR. WEBER:
4   Q.   And what I'm asking is can you give me the
5 specific fee and the specific commission to those
6 clients or not?
7   A.   No, I cannot.
8   Q.   You can't remember any of them as to any of
9 those clients; right?
10   A.   No.
11   Q.   Okay.  So your job was to go out and develop
12 new business for Mercer; is that right?
13   A.   Yes.
14   Q.   In the two years prior to your resignation, do
15 you remember communicating with any prospective clients?
16       MR. SHAPIRO: Object to the form.
17 BY MR. WEBER:
18   Q.   You can answer.
19   A.   I've communicated with several prospective
20 clients over the last two years.
21   Q.   Remember their names?
22   A.   Off the top of my head, no.
23   Q.   Do you understand when I use the term
24 "prospective clients" what that means?

**Page 26**

1       MR. SHAPIRO: Object to the form.
2   A.   Please define it.
3 BY MR. WEBER:
4   Q.   I'm asking for your understanding what a
5 prospective client is.
6       MR. SHAPIRO: Object to the form.
7   A.   I don't know what your understanding of
8 prospective client means.
9 BY MR. WEBER:
10   Q.   I'm asking for your understanding.  You have to
11 answer my question.  What's your understanding of a
12 prospective client?
13   A.   I believe that to mean any company of Mercer
14 that -- excuse me -- any company that potentially could
15 do business with Mercer that is not currently otherwise
16 engaged on any particular capability of Mercer.
17   Q.   Okay.  Thank you.  And just to be clear, you
18 don't remember any specific names of prospective clients
19 that you contacted within the two years prior to leaving
20 Mercer?
21   A.   With sufficient time I'm sure I could recall.
22   Q.   I understand that, but sitting here today?
23   A.   Again --
24       MR. SHAPIRO: If you want to take a couple

**Page 27**

1 minutes and name some you can.
2       MR. DIGREGORIO: Yeah.  This shouldn't be this
3 difficult.  I apologize.
4 BY MR. WEBER:
5   Q.   It's okay.  You're probably not used to being
6 deposed on a regular basis.
7   A.   This is new for me.  I'm sorry.
8   Q.   That's okay.
9       MR. SHAPIRO: If you can't remember you can't
10 remember.
11       MR. DIGREGORIO: Yeah.  I just --
12       MR. SHAPIRO: We'll give you the opportunity if
13 you wanted to take the time to remember.
14       MR. SIEGEL: But in the event you do
15 remember...
16       MR. DIGREGORIO: Sure.  Sure.
17   A.   MiX Telematics.  I'm drawing a blank.  I'm
18 sorry.
19 BY MR. WEBER:
20   Q.   Okay.  That's fine.  Thank you for that.
21       Generally speaking, how did you go about doing
22 your job when you were at Mercer?
23   A.   Can you be more specific?
24   Q.   Tell me what you generally did to develop

**Page 28**

1 business for the company.
2   A.   I would review publicly available information,
3 speak to centers of influence.
4   Q.   Describe centers of influence.
5   A.   Other service providers or companies that would
6 be doing business with the same companies I would be
7 targeting.  That's essentially the --
8   Q.   That's the job?
9   A.   Essentially.
10   Q.   Okay.  When is the first time you recall having
11 some contact with individuals from Lockton or
12 representing Lockton in 2017?
13   A.   Can you repeat that question?
14       MR. WEBER: Read it back, please.
15       (The requested portion of the record was read
16 back by the court reporter.)
17   A.   September time frame, I believe.
18 BY MR. WEBER:
19   Q.   And do you remember who that person was?
20   A.   Hiram Marrero.
21   Q.   And how was it that Mr. Marrero got in contact
22 with you?  Did you reach out to him or did he reach out
23 to you?
24   A.   He called me.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 29

1  Q.  Is that the first time you had spoken to him?
2  A.  No.
3  Q.  You spoke to him over the years?
4  A.  I've known Hiram for eight or nine years.
5  Q.  And how is it that you knew him?
6  A.  Work in the same business community.  He works
7  for -- he worked for multiple competitors over the
8  years.
9  Q.  Okay.  And prior to him reaching out to you in
10  September of 2017 when was the time prior to that that
11  you remember talking to him?
12  A.  I don't recall.
13  Q.  Did you see him at various business functions
14  where you would chat?
15  A.  Rarely.  Occasionally.
16  Q.  But the September 2017 call was specifically
17  related about you joining Lockton; is that right?
18  A.  No.
19  Q.  What was it about?
20  A.  Just to catch up.
21  Q.  When -- strike that.
22       During that tele -- was it a telephone
23  conversation you had?
24  A.  Yes.

---

Page 30

1  Q.  Tell me what was discussed during that
2  telephone conversation.
3  A.  I don't recall.  Typical pleasantries:  Hello,
4  how are you doing, it's been a while, that type of
5  conversation.
6  Q.  And was the possibility of you joining Lockton
7  discussed at that conversation?
8  A.  No.
9  Q.  When was the next conversation with anyone at
10  Lockton about you potentially joining Lockton?
11  A.  You mean when was the first conversation?
12  Q.  Fine.  I'll accept that.
13  A.  Maybe within that month time period of whenever
14  I initially spoke to Hiram.
15  Q.  September/October?
16  A.  Somewhere in that time frame, yes.
17  Q.  Is there a date that you could -- strike that.
18       Do you use Outlook contacts for your meetings?
19  A.  No.
20  Q.  What do you use for noting a meeting?  Is it do
21  you keep a diary?  Do you have an electronic diary?
22       How do you register when you have a meeting?
23  A.  Either using the Outlook calendar or using like
24  a paper calendar at home or something along those lines.

---

Page 31

1  Q.  Do you recall -- what did you typically use in
2  2017?
3  A.  Both.
4  Q.  And is there a way for you to go back and
5  determine when you had contact with someone from Lockton
6  some time in September or October to determine when you
7  had that first conversation about working for them?
8  A.  I would have no way of doing that.
9  Q.  There's no record do you think in your either
10  paper diary or electronic Outlook calendar that might
11  help you refresh your recollection?
12  A.  No.
13  Q.  You think it's in that September time frame
14  though?
15  A.  Yes.
16  Q.  Okay.  And who did you speak with?
17  A.  Hiram Marrero.
18  Q.  And did he call you or did you call him?
19  A.  He called me.
20  Q.  And what did he say the second time you spoke
21  to him?
22  A.  I don't recall the specifics of the discussion.
23  Q.  Can you give me a general overview?
24  A.  Our second conversation was, again, just to

---

Page 32

1  touch base:  How are things doing, same as the first.
2  Q.  I assume he wasn't calling you to see how your
3  physical health was, that he was interested in your
4  possible joining Lockton; correct?
5       MR. SHAPIRO:  Object.
6  BY MR. WEBER:
7  Q.  You can answer.
8       MR. SHAPIRO:  Object to the form.
9  A.  You'd have to ask him.
10  BY MR. WEBER:
11  Q.  What was your, what was your response to the
12  second time you called?
13  A.  Same as the first.
14  Q.  You didn't think he had any interest in you
15  joining Lockton?
16       MR. SHAPIRO:  Object to the form.
17  A.  You would have to ask him.
18  BY MR. WEBER:
19  Q.  I'm asking you.  What was your understanding?
20  A.  I can't testify to what he thought.
21  Q.  I'm asking your thinking.  What did you think
22  when you got that call from Mr. Marrero?
23  A.  That he was reaching out to catch up.
24  Q.  At some point in time the reaching out to catch

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 33

1  up turned into a discussion about joining Lockton;
2  correct?
3     A.  Yes.
4     Q.  And when was that?
5     A.  I don't recall the specific time frame.
6     Q.  Is it that same month or so period?
7     A.  Month or two, sure.
8     Q.  Okay.  And there's no way to pin that down
9  exactly when it was, is that what you're telling us?
10       MR. SHAPIRO: Object to the form.
11  BY MR. WEBER:
12    Q.  You can answer.
13    A.  I don't have access to anything that would tell
14  me that.
15    Q.  So we're in that general time period that you
16  you're mentioning?
17    A.  I don't understand the question.
18    Q.  In other words, you seem to say some time in
19  September or October there were conversations with
20  Mr. Marrero, that's the best you can recall as I
21  understand?
22    A.  Yes.
23    Q.  There came a time when the calling -- strike
24  that.

Page 34

1       Was there a third conversation you had with
2  Mr. Marrero?
3     A.  Sure.
4     Q.  When was that?  Same time period?
5     A.  Same time period.  Can I make the time period
6  more specific?
7     Q.  Sure.
8     A.  August to October time period is when the time
9  periods that I've had my initial discussions and the
10  ones you've referred to.
11    Q.  Good.  Thank you.
12       And you seem to remember -- do you remember a
13  date in August?
14    A.  I honestly don't.
15    Q.  Going to push my luck there and see.  What
16  about a date in October?
17    A.  I don't remember specific dates.
18    Q.  Okay.  Understood.
19       During that time period August to October of
20  2017, other than calling about your well being there
21  came a point in time I presume that you had a discussion
22  about joining Lockton; is that correct?
23    A.  Yes.
24    Q.  And in that time frame was that discussion

Page 35

1  initiated by Mr. Marrero?
2     A.  Yes.
3     Q.  And what did he say to you and what did you say
4  to him in that conversation?
5     A.  I don't recall the specific discussion.  My
6  vague recollection was, would you be interested in
7  learning more about Lockton?  My answer was, yes.  So we
8  began those discussions.
9     Q.  And we're talking about this time period;
10  right?
11    A.  Somewhere between August and October period.
12    Q.  I take it there were multiple conversations?
13    A.  Correct.
14    Q.  Do you recall approximately how many?
15    A.  Oh, no.  No.
16    Q.  More than five though?
17    A.  Yes.
18    Q.  More than ten?
19    A.  Probably.
20    Q.  And at some point in time did Mr. Marrero make
21  an offer to you to join Lockton within that time period?
22    A.  No.
23    Q.  Did someone else make an offer to you?
24    A.  No.

Page 36

1     Q.  At what point in time did you agree to join
2  Lockton?
3        MR. SHAPIRO: Object to the form.
4     A.  January 18th, 2018.
5  BY MR. WEBER:
6     Q.  I understand.  You resigned on that date from
7  Mercer?
8     A.  I may have the date off by a day, but somewhere
9  in that --
10    Q.  We'll get that.
11    A.  -- somewhere in that, that time frame.
12    Q.  Yeah, 17th, 18th, 19th.  We'll get there in a
13  second.
14    A.  Yeah.
15    Q.  Prior to resigning you had an offer to join
16  Lockton; correct?
17    A.  Yes.
18    Q.  I'm asking you when prior to your resignation
19  from Mercer did you have that offer?
20    A.  Late December, early January.
21    Q.  And who made that offer?
22    A.  Lockton.
23    Q.  Anyone in particular?
24    A.  I don't remember who it specifically came from,

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 37

1 no.
2 Q. It was a written offer; correct?
3 A. Yes.
4 Q. And did Mr. Marrero convey it to you --
5 A. No.
6 Q. -- or did someone else?
7 A. No, I don't believe so.
8 Q. Someone else did?
9 A. Yes, I believe so.
10 Q. And it was some time in you think December?
11 A. Late December, early January.
12 Q. And do you remember -- strike that.
13     What was the offer from Lockton? What was the
14 compensation and other arrangement from Lockton?
15 A. One, I'm contractually obligated not to share
16 that information; and two, I don't want to share that in
17 front of a Mercer employee.
18 Q. Okay. Well, you're under oath in this
19 litigation. Your attorney I'm sure will direct you to
20 answer that question.
21     MR. SHAPIRO: What we're prepared to do in
22 terms of compensation - because we don't think it's
23 relevant to this proceeding - we're happy to provide
24 the compensation for attorneys' eyes only at this

---

Page 38

1 point or for attorneys' eyes consideration only, and
2 then after the depositions we certainly can talk
3 about to the extent you want to use it the
4 appropriate protections. But his personal
5 compensation is something that is personal and
6 sensitive to him. He, nor any of my defendants,
7 would like to share, nor should they be required to
8 share their financial situation with each other or
9 anybody at Mercer.
10     MR. WEBER: I appreciate your comment. I don't
11 agree and we'll get a ruling from the Court on that,
12 but by way of compromise, would you provide the
13 Employment Agreements of your clients, the
14 individual defendant clients today for attorneys'
15 eyes only?
16     MR. SHAPIRO: During a break I will speak with
17 my client --
18     MR. WEBER: Okay.
19     MR. SHAPIRO: -- and respond to that.
20     MR. WEBER: Good. We'll get that in discovery
21 if necessary, and I'm sure the Court will order it
22 at the preliminary injunction hearing, so I want to
23 try to avoid the confrontation.
24     MR. SHAPIRO: I appreciate that.

---

Page 39

1     MR. WEBER: So we'll deal with that.
2     MR. SIEGEL: And, Michael, at some point soon
3 can we have a bathroom break?
4     MR. WEBER: We'll do it right now if you'd
5 like.
6     (Off the record 9:13 a.m.)
7     (On the record 9:19 a.m.)
8 BY MR. WEBER:
9 Q. Okay. We're back on the record. You discussed
10 a conversation you had with Mr. Marrero in that
11 August/September/October time period. Did you speak to
12 anyone else from Lockton or representing Lockton during
13 that period?
14 A. Yes.
15 Q. Who did you speak with?
16 A. Minoj Sharma.
17 Q. And who is that individual?
18 A. He's the chief operating officer of the
19 Southeast Series.
20 Q. And what did you discuss with him?
21 A. My background, my work, my capabilities,
22 education, general business processes, things like that.
23 Q. And how many times did you speak to Mr. Sharma?
24 A. Several over months.

---

Page 40

1 Q. Several over that period you're talking about?
2 A. No. No. I believe I met with and/or spoke to
3 Mr. Sharma once during that time period.
4 Q. Okay. Met with him and spoke with him each
5 once or only one --
6 A. Just one meeting in person.
7 Q. During the August/September/October period?
8 A. Correct.
9 Q. And then was there any other meetings or
10 discussions with him?
11 A. Not during that time period.
12 Q. What about subsequent to that time period?
13 A. Yes.
14 Q. And when, when did you have those discussions?
15 A. Some time over the December/January time
16 period.
17 Q. And how many discussions did you have with him
18 then?
19 A. I don't recall.
20 Q. Approximately?
21 A. A handful.
22 Q. Six?
23 A. Maybe. I don't recall.
24 Q. And to the best of your recollection, what did

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 41

1  you discuss during those approximate six conversations?
2  A.  I don't recall any specifics to any of the
3  discussions.
4  Q.  Generally what did you discuss?
5  A.  Lockton, myself.
6  Q.  The possibility of joining Lockton?
7  A.  Sure.
8  Q.  Compensation arrangement?
9  A.  I don't recall specifically a discussion
10  negotiating compensation with Minoj.
11  Q.  Anyone else from Lockton you spoke with prior
12  to resigning from Mercer in January 2018?
13  A.  I spoke to Hiram.
14  Q.  I understand that.  Well, let me go back to
15  that.
16      You spoke to Hiram after the
17  August/September/October time period as well?
18  A.  Yes.
19  Q.  How many times?
20  A.  I don't recall.
21  Q.  Approximately what dates do you remember
22  talking to him?
23  A.  I don't.
24  Q.  Any calendar notations that would help refresh

Page 42

1  your recollection?
2  A.  Not that I have access to.
3  Q.  You had it at one time?
4  A.  I don't know.
5  Q.  You ever remember noting in a calendar
6  electronic or paper about a meeting with --
7  A.  I'm sure I did.
8  Q.  It exists somewhere but you don't know where it
9  is?
10      MR. SHAPIRO:  Object to the form.
11  A.  Again, I don't have access to any Outlook
12  calendars where I believe I've notated that information,
13  and I no longer have access to any paper calendars in
14  2018 from 2017.
15  BY MR. WEBER:
16  Q.  Okay.  So other than the two individuals from
17  Lockton that you mentioned, did you have any
18  communications of any nature with anyone else from
19  Lockton prior to resigning from Mercer?
20  A.  Yes.
21  Q.  Who is that?
22  A.  I've spoke to Paul Bruno.
23  Q.  And who is Paul Bruno?
24  A.  He sits on the Southeast Series Executive

Page 43

1  Committee.
2  Q.  And who is he employed by?
3  A.  Lockton Southeast Series.
4  Q.  Okay.  And when did you speak to him?
5  A.  I don't recall the date.
6  Q.  Approximately?
7  A.  December, January.
8  Q.  What did you speak to him about?
9  A.  Background capabilities, education, other such
10  items.
11  Q.  How many times did you speak with him?
12  A.  Once.
13  Q.  Anyone else from Lockton that you spoke with?
14  A.  Neil Metzheiser.
15  Q.  And who is Neil?
16  A.  Neil sits on the executive committee of the
17  Southeast Series.
18  Q.  What's his title?
19  A.  I don't, I don't know.
20  Q.  What did you speak to him about?
21  A.  Same as Paul:  my background, my capabilities.
22  Q.  And do you remember when at all?
23  A.  December/January time period.
24  Q.  And in these con -- anyone else from Lockton

Page 44

1  that you spoke to other than the individuals you
2  mentioned?
3  A.  I believe I spoke to everyone on the Southeast
4  Series Executive Committee.
5  Q.  And how many individuals does that consist of?
6  A.  I believe -- I don't know the answer to that
7  how many people are on there.
8  Q.  And tell me --
9  A.  Actually let me correct that.  I think I spoke
10  to everyone but one person on the Southeast Series
11  Executive Committee.
12  Q.  So tell me the names of the individuals you
13  spoke with prior to your resignation.
14  A.  Minoj Sharma, Hiram Marrero.
15  Q.  Other than the individuals you mentioned.
16  A.  Paige, who I can't remember Paige's last name
17  off the top of my head.  I mentioned Rick.  I don't
18  remember anyone beyond the individuals that I've
19  referenced so far.
20  Q.  When did you first start discussing the terms
21  of employment with Lockton?
22  A.  Can you define "terms of employment"?
23  Q.  Compensation, salary, commissions, general
24  start date, health benefits, general terms and

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 45

1    conditions of employment.
2    A.  Can you put each one of those into a question?
3    Q.  Why don't we take each one and say when did you
4    first have a discussion concerning general compensation?
5    A.  Probably December/January time period.
6    Q.  And which individuals did you speak with about
7    general compensation?
8    A.  I believe Hiram Marrero and -- I believe, I
9    believe Hiram, yeah.
10   Q.  And generally, in light of your attorney's
11   objection - I'm not asking for the specifics - generally
12   did your offer -- strike that.
13        Generally did the discussion you had with Hiram
14   consist of a base salary and a commission component?
15        MR. SHAPIRO: Okay.  We'll --
16   BY MR. WEBER:
17   Q.  I'm not asking you for the numbers.  I'm asking
18   for concepts.
19   A.  Again, I'm contractually precluded from
20   discussing my compensation.
21   Q.  I'm not asking you for the numbers.  I'm asking
22   you for the framework.
23        MR. SHAPIRO: We'll --
24        MR. WEBER: I'm going to call the judge if I

Page 46

1    don't get an answer to that.  Okay?
2        MR. SHAPIRO: Why?
3        MR. WEBER: Because I am entitled to know what
4    the arrangement is without the specifics.  I want to
5    know --
6        MR. SHAPIRO: What's the -- why?  How is that
7    relevant?  I'm not trying to be difficult.
8        MR. WEBER: It's relevant because I want to
9    know what Lockton said to this individual about
10   general terms of compensation:  Does he have a base
11   salary and then commission component?  That's
12   what --
13        MR. SHAPIRO: And why can't that be treated the
14   same way.  We're trying to be cooperative.
15        MR. WEBER: Because it's not confidential, is
16   that question.
17        MR. SHAPIRO: Well, the nature of somebody's
18   compensation when they're sitting here --
19        MR. WEBER: Well, you know what?  Let's just
20   mark that.  We'll mark that for a ruling.  We'll
21   call the Court later.
22   BY MR. WEBER:
23   Q.  Are you refusing to answer that question?
24   A.  Under my contractual obligation with Lockton

Page 47

1    I'm precluded from sharing any aspects of my
2    compensation:  structure, numbers, or otherwise.
3    Q.  When did you have that discussion?  Is it
4    written anywhere?
5    A.  To the best of my knowledge, it's written in my
6    contract.
7    Q.  You can't discuss it?
8    A.  Correct.
9    Q.  And did you have the discussion before joining
10   Lockton?
11   A.  Which discussion?
12   Q.  That you couldn't discuss your compensation
13   arrangement.
14   A.  I don't recall that discussion.  I recall the
15   contract that I executed with Lockton which prohibits me
16   from sharing any information relative to my
17   compensation:  structure, numbers, or otherwise.
18   Q.  Did you ever have an attorney look at your
19   contract?
20   A.  Yes.
21   Q.  When was that?
22   A.  December/January time frame.
23   Q.  Who is your attorney that looked at it?
24   A.  The individual I had look at it, his name is

Page 48

1    Dave, and I don't remember Dave's last name off the top
2    of my head.
3    Q.  Do you remember the firm he's with?
4    A.  I do not.
5    Q.  Do you know how you got Dave's name?
6    A.  Through a friend of mine who used him before.
7    I could get that for you if I can go in my cell phone if
8    you'd like.
9    Q.  You can get that later.
10        Have you given me the names of everyone you
11   talked to prior to your resignation from Lockton?
12   A.  Define "everyone".
13   Q.  All individuals who are affiliated or
14   representing Lockton.
15   A.  To the best of my recollection, yes.
16   Q.  In your Lockton agreement --
17   A.  Actually can I change that?
18   Q.  Sure.  Yeah.
19   A.  I did go to Kansas City and I met with several
20   individuals of which I don't remember the names of each
21   person.
22   Q.  When did you go to Kansas City?
23   A.  I don't remember the time frame.
24   Q.  Remember the year?

---

Page 49

1   A.   2017 at some point.
2   Q.   Remember the month?
3   A.   I don't remember which month.
4   Q.   No recollection?
5   A.   Somewhere between I'm going to guess October to
6   November time frame.
7   Q.   Okay.  And you met with three individuals from
8   Lockton in Kansas City?
9   A.   I don't remember how many people I met with,
10   but I know I met with a number of individuals.
11   Q.   Okay.  I didn't try to put words in your mouth.
12        Approximately how many did you meet with?
13   A.   A handful or so.
14   Q.   And had you already received an offer at that
15   time?
16   A.   No.
17   Q.   That was part of your due diligence?
18   A.   Correct.
19   Q.   And do you know whether those individuals were
20   employed by Lockton Companies, LLC?
21   A.   I do not.
22   Q.   You don't know who their employers were?
23   A.   I don't know the structure of Lockton.  I
24   haven't been there long enough to understand the legal

Page 50

1   structure.
2   Q.   Okay.  How long did those meetings take place
3   in Kansas City?
4   A.   I believe over a day.
5   Q.   In all these discussions that you just
6   described with individuals representing Lockton
7   generally - and I don't mean to be narrow but broad
8   Lockton entities - did you discuss your non-solicitation
9   obligations with Mercer with them?
10   A.   No.
11   Q.   Did you ever show anyone representing Lockton's
12   interest your agreements Exhibits Plaintiff 1 and 2 to
13   anyone at Lockton?
14        MR. SHAPIRO:  Object to the form.
15        MR. SIEGEL:  Are you talking about before
16   employment or did you change the time frame?
17        MR. WEBER:  I'm referring to the documents that
18   the individual signed.
19        MR. SIEGEL:  I just would like you to clarify.
20   Are you still talking -- all your questions before
21   were before your employment.  Is this question about
22   before employment or up until today?
23        MR. WEBER:  Well, let's break it down.
24

Page 51

1   BY MR. WEBER:
2   Q.   Prior to your resignation from Mercer, did you
3   discuss your non-solicitation obligations that you had
4   with Mercer with anybody representing Lockton's
5   interest?
6   A.   No.  Can I add to that?
7   Q.   Sure.
8   A.   We discussed the possibility of there being
9   one, but I had no concrete knowledge that I had one.
10   Q.   You didn't recall the agreement you signed?
11   A.   No.
12   Q.   Generally who did you discuss with at Lockton
13   that you had -- you may have the non-solicitation
14   obligations?
15   A.   Anyone who asked.  I don't recall all who may
16   have asked.
17   Q.   Well, I'm trying to find out if you, one, if
18   you had the discussion.  It sounds like you did.
19   A.   The only discussions I had prior to joining
20   Lockton relative to any non-solicitation or any
21   agreement I may have signed with Mercer was does one
22   exist.
23   Q.   And what was your answer?
24   A.   I don't know.

Page 52

1   Q.   Did anybody from Lockton ask you to get a copy
2   of it?
3   A.   No.
4   Q.   Did anybody ask you if you had any obligations
5   not to solicit clients, prospects, or employees from
6   Mercer?
7   A.   Define "anyone".
8   Q.   Anyone representing Lockton's interest.
9   A.   At what point?
10   Q.   Any time prior to your resignation with Mercer?
11   A.   Again, no.  The only discussions I had were
12   relative does one exist or not.
13   Q.   And your answer to that is you did not know; is
14   that correct?
15   A.   Correct.
16   Q.   And did anyone pursue that answer further
17   representing Lockton's interest?
18   A.   No.
19        MR. SIEGEL:  Before you ask a question, just
20   one second.  I'm sorry.
21        MR. WEBER:  We're taking this time out from the
22   two-and-a-half hours.
23        MR. SHAPIRO:  We're not going to hold anybody
24   to 10 minutes, 15 minutes here or there.  That's not

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

**Page 53**

1 the way we work.
2     MR. DIGREGORIO: That's his perception.
3     MR. WEBER: I don't think there's a proper
4 objection.
5     MR. SIEGEL: There's no question pending.
6     MR. WEBER: Okay. So you're not going to make
7 any comment I hope.
8     MR. SHAPIRO: No.
9     MR. WEBER: Okay. Let's move on.
10     MR. SIEGEL: Wait, wait a second.
11     MR. WEBER: I don't want any direction to the
12 witness. I want no comment --
13     MR. SIEGEL: He can talk to the witness.
14     MR. WEBER: No, he can't, not during his
15 questioning in this deposition.
16     MR. SHAPIRO: I'm fine doing it after. Go
17 ahead.
18 BY MR. WEBER:
19 Q. You know who Joanne Steed is; correct?
20 A. Yes.
21 Q. She's sitting in this room; right?
22 A. Yes.
23 Q. Did you discuss potential employment at Lockton
24 with her?

---

**Page 54**

1 A. Yes.
2 Q. When was that?
3 A. Prior to joining Lockton.
4 Q. Approximately when?
5 A. I don't remember.
6 Q. What did you say to her?
7 A. I don't remember.
8 Q. Well, try to rack your brain a little bit and
9 see if you can recall what you said.
10 A. Prior to joining Lockton?
11 Q. Correct.
12 A. Through the course of our career working
13 together we've had various conversations around Mercer
14 and other companies and other opportunities. I'm
15 certain at various points we've discussed Lockton or
16 other companies. I don't recall specifics to exactly
17 when we discussed Lockton and this opportunity.
18 Q. Approximately when? Prior to your resignation;
19 correct?
20 A. Prior to my resignation, yes.
21 Q. And what do you recall generally discussing
22 with her prior to resignation from Mercer?
23 A. Considering an opportunity to join Lockton and
24 what that may or may not entail.

---

**Page 55**

1 Q. And where did this conversation take place?
2 A. Again, I was referring to general discussions
3 over a period of our employment at Mercer.
4 Q. My question as you probably understand is
5 specific to the time period let's call it six months
6 before you resigned about your joining Lockton. Did you
7 discuss your employment offer to join Lockton prior to
8 your resignation from Mercer with Ms. Steed?
9     MR. SHAPIRO: Object to the form.
10 A. I did not discuss my employment offer with
11 Joanne Steed prior to joining Lockton.
12 BY MR. WEBER:
13 Q. Did you tell her you were resigning?
14 A. At some point, yes.
15 Q. Prior to your resignation; correct?
16 A. Yes.
17 Q. Was it a month before?
18 A. No.
19 Q. Was it two months before?
20 A. No.
21 Q. Was it three months before?
22 A. No.
23 Q. Approximately when? Within a month of your
24 resignation?

---

**Page 56**

1 A. Within days of my resignation is when I told
2 her I was definitively resigning from Mercer.
3 Q. And what did you say?
4 A. I'm resigning from Mercer.
5 Q. And what else did you say?
6 A. On this date.
7 Q. And what else?
8 A. Specific to my resignation that's it.
9 Q. What else about joining Lockton?
10 A. At some point in time we had a conversation
11 around exploring other opportunities of which Lockton
12 was one of them.
13 Q. At the time, at the time you told her you were
14 resigning; correct?
15 A. No. That was preceding that time.
16 Q. Preceding that time did you discuss with her an
17 opportunity to join Lockton?
18 A. I did not discuss an opportunity for her to
19 join Lockton, no.
20 Q. Did you discuss the benefits of Lockton versus
21 Mercer?
22 A. No.
23 Q. Did you discuss that you were going to leave
24 Mercer and join Lockton?

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 57

1      MR. SHAPIRO: Object to the form.
2   A.  At some point we discussed, again, the
3   opportunities we've been presented.
4   BY MR. WEBER:
5   Q.  But when you say "we", do you know when she was
6   presented an opportunity to join Lock --
7   A.  I do not.
8      MR. SHAPIRO: Let him finish his question,
9   please.
10  BY MR. WEBER:
11  Q.  So you don't know when she was presented with
12  an opportunity to join Lockton, do you?
13  A.  I don't know the time frame when she was
14  presented an opportunity.
15  Q.  You have no sense at all?
16  A.  I would have to assume it was between December
17  and when we left.
18  Q.  Did you speak to Hiram about Ms. Steed?
19  A.  Yes.
20  Q.  When was that?
21  A.  I would assume between November and December.
22  Q.  2017?
23  A.  Correct.
24  Q.  You recommended her to him?

Page 58

1   A.  No.
2   Q.  Why did you discuss Ms. Steed with Hiram?
3   A.  She asked me to share her contact information
4   with him.
5   Q.  Was that after you told her you were
6   considering joining Lockton?
7      MR. SHAPIRO: Object to the form.
8   BY MR. WEBER:
9   Q.  You can answer.
10  A.  No.
11  Q.  When did you tell Ms. Steed that you had
12  received an offer from Lockton?
13  A.  January.
14  Q.  When January?
15  A.  Some time in January before I left.
16  Q.  A week before? Two weeks before?
17  A.  I don't have a calendar in front of me, but my
18  guess would be not the first week, maybe the second full
19  week of January.
20  Q.  And what did you tell her?
21  A.  That I made a decision that I'm going to leave.
22  Q.  And what did she say to you?
23  A.  I don't recall her specific response.
24  Q.  Generally.

Page 59

1   A.  Thank you for telling me and, you know, she was
2   going to make her decision.
3   Q.  And what did you understand that to mean that
4   she's going to make her own decision?
5   A.  I believe that to mean she would evaluate her
6   offer and make a decision on that.
7   Q.  And do you know when she received an offer?
8   A.  No, I do not.
9   Q.  Was it prior to that conversation --
10     MR. SHAPIRO: Object to the form.
11  BY MR. WEBER:
12  Q.  -- in January --
13     MR. SHAPIRO: Object to the form.
14  BY MR. WEBER:
15  Q.  -- if you know?
16  A.  I don't know when she received her offer.
17  Q.  Well, it was prior to that conversation though;
18  correct?
19     MR. SHAPIRO: Object to the form.
20  A.  I can't say certainly that whether she --
21  BY MR. WEBER:
22  Q.  Well, she said to you she was going to evaluate
23  her offer; right?
24  A.  She said she would evaluate her opportunity.

Page 60

1   Q.  With Lockton?
2   A.  Correct.
3   Q.  So that was prior to the second week in
4   January, was it not?
5   A.  No. That was -- the discussion I referred to
6   was the second week of January.
7   Q.  I understand that. And during that
8   conversation she discussed with you that she was going
9   to explore her opportunities to join Lockton?
10  A.  Correct.
11  Q.  And you know who Jada Preston is; correct?
12  A.  Yes.
13  Q.  She's sitting here as well?
14  A.  Yes.
15  Q.  And did you discuss potential employment
16  opportunities at Lockton with her?
17  A.  Yes.
18  Q.  When was that?
19  A.  Same time period as Joanne.
20  Q.  Second week in January?
21  A.  No. That's when we discussed the opportunity
22  and I communicated that I was resigning.
23  Q.  When did you discuss the possibilities of
24  joining Lockton with Ms. Preston?

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 61

1   A.  Some time between in that November and December
2   time period.
3   Q.  And where did that -- where did those
4   discussions take place?
5   A.  I don't remember where our first conversation
6   was.
7   Q.  And did you tell her you were considering
8   joining Lockton?
9   A.  Yes.
10  Q.  And what did she say?
11  A.  That she would be interested in exploring the
12  opportunity.
13  Q.  Did you put her in touch with Hiram?
14  A.  I provided her contact information to Hiram per
15  her request.
16  Q.  And what did you say to Hiram?
17      MR. SHAPIRO: Object to the form.
18  A.  Just --
19  BY MR. WEBER:
20  Q.  When you conveyed her contact information to
21  Hiram, did you say anything when you did so?
22  A.  Other than providing the contact information,
23  no.
24  Q.  You didn't say, Hiram, here's a potential

Page 62

1   candidate for you?
2   A.  No.  I gave him the name and numbers of both
3   Joanne and Jada and said that they were interested in
4   having a conversation with you.
5   Q.  Do you know if either Ms. Steed or Ms. Preston
6   had conversations with anybody else from Lockton prior
7   to that time?
8   A.  I don't know at what times they ever had
9   interactions with Lockton prior to that.
10  Q.  You had worked with both Ms. Steed and
11  Ms. Preston when you were employed by Mercer; correct?
12  A.  Yes.
13  Q.  And describe your working relationship with
14  them.  I don't mean -- what I mean is describe how you
15  worked in a professional way with them while you were
16  with Mercer.
17  A.  On new clients or future opportunities
18  prospective clients I would identify those, and when it
19  was appropriate I would bring them to meet the client
20  and we would attempt to convince them to move their
21  business to Mercer.
22  Q.  And as I understand it, you were the kind of
23  the front salesperson, they were the knowledgeable
24  people about the programs that Mercer would offer?

Page 63

1   A.  Correct.
2   Q.  And they had been with the company for awhile
3   as well?
4   A.  I believe they were there ten years, if I'm not
5   mistaken.
6   Q.  I want to go back to something to see if this
7   refreshes your recollection.
8   A.  Sure.
9       (Plaintiff's Exhibit 4, Marsh & McLennan Code
10  of Conduct, was marked for identification.)
11  BY MR. WEBER:
12  Q.  I'm showing you what's been marked Plaintiff's
13  Exhibit 4.  It's a document from Marsh & McLennan
14  Companies entitled The Greater Good:  Our Code of
15  Conduct, and then it says Compliance Policies attached
16  to it about six, seven pages.  Could you review that and
17  I'm going to ask if you've seen that before.
18      MR. SIEGEL: Michael, I notice that on page 1
19  and 4 there are two --
20      MR. WEBER: All the documents have the same --
21      MR. SIEGEL: No, they're highlighted.
22      MR. WEBER: Correct.
23      MR. SIEGEL: Is that something that was added
24  for the deposition or is that something that --

Page 64

1       MR. WEBER: Yeah, for the deposition.
2       MR. SIEGEL: So it wasn't originally --
3       MR. WEBER: Correct.
4       MR. SIEGEL: -- in that form?
5       MR. WEBER: Correct.
6   BY MR. WEBER:
7   Q.  Have you had a chance to look at it?
8   A.  Yes.
9   Q.  Is this familiar to you?
10  A.  No.
11  Q.  You never saw it before?
12  A.  I don't recall reading this document before or
13  ever going to Compliance.mmc.com.
14  Q.  Do you ever remember taking any online training
15  courses that dealt with The Greater Good?
16      MR. SHAPIRO: Object to the form.
17  A.  I don't specifically remember taking an online
18  training course for -- what did you call it?  The
19  Greater Good?
20  BY MR. WEBER:
21  Q.  The title of the document is The Greater Good:
22  Our Code of Conduct.
23  A.  Oh, I'm sorry.  Yes.  I don't specifically
24  remember taking that course.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 65

1   Q.   Do you remember any general recollection of
2   taking a course related to the substance of this
3   document?  You could take a look at it again if you
4   want.
5   A.   Yeah, I don't specifically recall taking this
6   course.  Again, I've taken many online courses over the
7   time of my employment with Mercer.  I just don't
8   remember the names of those.
9   Q.   Right.  And you register online for those
10  courses; correct?
11  A.   You go to a website and go into it, correct.
12  Q.   Right.  And that website records your taking
13  the course, does it not?
14  A.   I would assume so, yes.
15  Q.   You understand that to be the case, don't you?
16  A.   I would assume it takes a record of completing
17  a course, yes.
18  Q.   Right.  So if the Mercer records reflect that
19  you took a course on The Greater Good, do you believe
20  that would be accurate?
21  A.   I'd have to review those records to determine
22  my perspective.
23  Q.   Okay.
24       (Plaintiff's Exhibit 5, E-mail with Notice of

Page 66

1   Resignation, was marked for identification.)
2   BY MR. WEBER:
3   Q.   Showing you what's been marked Plaintiff's
4   Exhibit 5, a two-page document, an e-mail from you to
5   Mr. Cory Lynn and a copy of the Notice of Resignation.
6   Familiar with that document?
7   A.   Yes.
8   Q.   What is it?
9   A.   My resignation letter.
10  Q.   And you sent that to Mr. Lynn on January 17th
11  at about 8:35 in the morning?
12  A.   Yes, sir.
13  Q.   And you copied your home e-mail Hotmail
14  address?
15  A.   Yes, sir.
16  Q.   And who drafted page 2 of this document, your
17  Notice of Resignation?
18  A.   I did.
19  Q.   Did you have any assistance in drafting it?
20  A.   Conferred with my attorney.
21  Q.   Which attorney is that?
22  A.   Lyle Shapiro.
23  Q.   When did you first retain Lyle Shapiro?
24  A.   I don't remember the exact date.

Page 67

1   Q.   Approximately?
2   A.   October/November time frame.
3   Q.   And did you retain him at Lockton's
4   encouragement?
5   A.   Lockton re --
6        MR. SHAPIRO:  Object to the form.
7   A.   Lockton retained him on my behalf.
8   BY MR. WEBER:
9   Q.   In October of -- approximately October 2017?
10  A.   October or November.
11  Q.   Is there a record of knowing when you would
12  first know that Mr. Shapiro was representing you?
13  A.   Not that I have access to.
14  Q.   You believe it was in that October/November
15  time period?
16  A.   I believe so, yes.
17  Q.   And do you believe that Mr. Shapiro helped
18  draft this letter?
19  A.   Yes.  Well, no, I didn't say he drafted this
20  letter.  You asked for whether or not I had support or
21  guidance and I referred to my attorney when drafting the
22  letter.
23  Q.   Just so it's clear, did Mr. Shapiro help you
24  draft the letter is my question?

Page 68

1   A.   He provided guidance on the draft.
2   Q.   Did you send this to anybody else other than
3   Mr. Lynn?
4   A.   No.  And myself.
5   Q.   Did you discuss this resignation with Ms. Steed
6   and Ms. Preston?
7   A.   Yes.
8   Q.   And when did you discuss it with them?
9   A.   Prior to sending it in the January time frame.
10  Q.   And was there a time when your attorneys
11  told you not to destroy any electronic or hard copies --
12  and let me generally say we lawyers call a litigation
13  hold letter advising you not to destroy any materials.
14  Did you ever receive that guidance from any attorney?
15  A.   Can you repeat the question?
16  Q.   Sure.
17       At any time from August to today, did any of
18  your attorneys ever advise you what we call, as I say, a
19  litigation hold or tell you not to destroy an electronic
20  or hard copy documents?
21  A.   Would that be attorney/client privilege?
22  Q.   Believe me, you're well represented.  Don't
23  worry about it.
24  A.   I never heard of a hold letter.  The only

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 69

1  instruction I ever can recall is not to take any Mercer
2  documents with me when I left.
3      Q.  Okay.  We will not pursue that any further.
4      You coordinated your resignation with Ms. Steed
5  and Ms. Preston; correct?
6      A.  No.
7      Q.  The fact that they resigned the exact same time
8  that you did is a coincidence?
9      A.  I thought you said I coordinated it.  We
10  coordinated it.
11      Q.  Who is "we"?
12      A.  Myself, Joanne, and Jada.
13      Q.  In the sense of -- explain what you mean by "we
14  coordinated".
15      A.  I mean, the three of us discussed what we
16  mutually -- or excuse me -- what we exclusively decided
17  on our own and we decided when after that discussion
18  what we wanted to do going forward.
19      Q.  Any advice from counsel on that?
20      MR. SHAPIRO: Object to the form.
21      MR. WEBER: You can answer.
22      MR. SHAPIRO: I don't want you to get into any
23  client, attorney/client communications.
24      MR. DIGREGORIO: Okay.

---

Page 70

1      MR. SHAPIRO: So --
2  BY MR. WEBER:
3      Q.  Did you have any guidance?
4      MR. SHAPIRO: If there's non attorney/client
5  communications, then you can respond to that
6  question.
7      MR. DIGREGORIO: Sure.
8      A.  So what's the question?
9      MR. SHAPIRO: Did you have any -- sorry.  I
10  can't help myself.
11      MR. WEBER: I can use all the help I can get.
12      MR. SIEGEL: Did you have any guidance?
13      A.  I'm sorry.  The question.
14  BY MR. WEBER:
15      Q.  Did you have any guidance from anybody as to
16  the date of resignation?
17      A.  Define "guidance".
18      Q.  I'll move on.
19      Were you aware of an obligation to give two
20  weeks prior notice resignation?
21      A.  No.
22      Q.  Were you aware of that provision in the
23  employee handbook?
24      A.  Never seen an employee handbook from Mercer.

---

Page 71

1      Q.  Never signed it or saw or received one?
2      A.  I don't recall ever receiving an employee
3  handbook from Mercer.
4      Q.  Why did you BCC yourself on this e-mail?
5      A.  So I had a copy of it for my records.
6      Q.  Is it -- strike that.
7      You didn't feel it was appropriate to give some
8  advanced notice of your resignation?
9      A.  No.  I didn't feel I had an obligation.
10      Q.  In the second paragraph of your resignation
11  letter you say you performed a thorough, diligent search
12  and confirmed you don't have any confidential Mercer
13  information in your possession, electronic or otherwise.
14  Do you see that?
15      A.  Yes.
16      Q.  Were you given any guidance on saying that?
17      A.  I don't believe I can answer that question.
18      Q.  Why not?
19      A.  Due to attorney/client privilege.
20      Q.  Is part of your compensation package with
21  Lockton a commission?
22      MR. SHAPIRO: I'm going to lodge the same
23  objection, and we're happy to during a break discuss
24  providing plaintiff's counsel with information he's

---

Page 72

1  requested with appropriate protections.
2      (Plaintiff's Exhibit 6, Declaration, was marked
3  for identification.)
4  BY MR. WEBER:
5      Q.  Show you what's been marked Plaintiff's
6  Exhibit 6, a three-page Declaration in this case.  Are
7  you familiar with it?
8      A.  Yes.
9      Q.  And is that your signature?
10      A.  Yes.
11      Q.  In paragraph 4 you state, "On January 17th,
12  2018, I sent my resignation letter to Cory Lynn at
13  Mercer.  That same day, I accepted a position with
14  Southeast Series of Lockton Companies, LLC ('Lockton
15  Southeast') as a Senior Vice President."  Is that an
16  accurate statement?
17      A.  Yes, sir.
18      Q.  So you didn't accept a position at Lockton till
19  you resigned from Mercer; right?
20      A.  Correct.
21      Q.  What's the date of your Employment Agreement
22  with Lockton?
23      A.  I don't have that in front of me so I don't
24  know.

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 73

1    Q.   Approximately?
2    A.   After January 17th, 2018.
3    Q.   The date of your employment with Lockton is
4    after January 17th, 2018?
5    A.   To the best of my recollection, it's either the
6    17th or after.
7    Q.   When is the first time you received a draft of
8    your Employment Agreement?
9    A.   December/October -- excuse me.
10   December/January time period.
11   Q.   And did you make any changes to that agreement
12   between November/December and when you finally signed
13   it?
14   A.   December and January is when I received it.
15   Did I make changes?  I believe there were changes to the
16   original agreement.
17   Q.   That your attorney may have made.  I'm not
18   asking you for those discussions.
19   A.   Correct.
20   Q.   On your behalf?
21   A.   Yes, sir.
22   Q.   In paragraph 5 of the Declaration, Plaintiff's
23   Exhibit 6, you state, "Prior to resigning my position at
24   Mercer, I sent myself a copy of my Outlook contact list.

Page 74

1    My Outlook contact list consists of publicly available
2    information, such as names, addresses, phone numbers,
3    and e-mail addresses for the contacts.  My contact list
4    does not include any notes of any Mercer client's
5    business such as preferences, lines of business, or
6    pricing."  Is that an accurate statement?
7    A.   To the best of my knowledge, yes.
8    Q.   And on your -- and you sent this to your home
9    e-mail address; right?
10   A.   No.
11        MR. SHAPIRO: Object to the form.
12   A.   No.
13   BY MR. WEBER:
14   Q.   You said, "I sent myself a copy of my Outlook
15   contact list."  Where did you send it?
16   A.   I didn't.  I did not.  I sent it to my phone.
17   Or excuse me.  No.
18   Q.   Okay.  Read paragraph 5 to the record, please.
19   This is your sworn Declaration; correct?
20   A.   "Prior to resigning my position at Mercer, I
21   sent myself a copy of my Outlook contacts.  My Outlook
22   contact list consists of publicly available information,
23   such as names, addresses, phone numbers, and e-mail
24   addresses for the contacts.  My contact list does not

Page 75

1    include any notes about Mercer client's business such as
2    preferences, lines of business, or pricing."
3    Q.   Where did you send that?
4    A.   I believe it was to my home computer.
5    Q.   At your home e-mail address at Hotmail?
6    A.   No.
7    Q.   How did it get to your home computer?
8    A.   I airdropped it.
9    Q.   And tell me how you airdrop it.
10   A.   I don't understand the question.
11   Q.   Well, I'm not a technologically savvy person so
12   explain for the record what airdropping is.
13   A.   An airdrop is having the ability of taking a
14   contact from one place and putting it in another.
15   Q.   Is there any trail or tracking of that process?
16   A.   I'm not a technology expert.  I don't know.
17   Q.   Well, you knew enough how to drop it in there
18   instead of sending it to your home e-mail address;
19   right?
20        MR. SHAPIRO: Object to the form.
21   A.   I don't understand that question.
22   BY MR. WEBER:
23   Q.   Why didn't you just e-mail it to your home
24   e-mail address?

Page 76

1    A.   Airdrop is the method I decided to use.
2    Q.   Have you ever used it before?
3    A.   Yes.
4    Q.   When?
5    A.   For other personal contacts.
6    Q.   Such as?
7    A.   From one phone to another.
8    Q.   What did you send for airdrop?
9    A.   Oh, the question was did I ever use it before.
10   Q.   Correct.  And I'm asking you -- you said yes,
11   and I'm saying for what purpose?
12   A.   For getting other people's contacts
13   information.
14   Q.   Fine.  Is it only contact information that you
15   use the airdrop?
16   A.   I'm sorry.  Can you repeat that?
17   Q.   Is it only -- do you only use airdrop for
18   contact information or do you use it for other purposes?
19   A.   I've never used it for a different purpose.
20   Q.   Just for contact information?
21   A.   Correct.
22   Q.   Is there a way to track the use of an airdrop?
23        MR. SHAPIRO: Object to the form.
24   A.   Again, I'm not a technology expert.  I don't

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 77

1  know the answer to that.
2  BY MR. WEBER:
3  Q.  But you knew enough how to drop it into the
4  airdrop; right?
5  A.  Correct.
6  Q.  And where does that contact list reside right
7  now?
8  A.  In multiple locations.
9  Q.  One of them is at Lockton; correct?
10  A.  One of them would be on my Outlook, correct.
11  Q.  And you used that list to send announcements of
12  your joining Lockton; correct?
13  A.  Correct.
14  Q.  Now, you say in your declaration this contact
15  list consists of publicly available information;
16  correct?
17  A.  Yes.
18  Q.  And there's some Mercer clients on that list;
19  correct?
20  A.  There would be contact information for
21  individuals who work for Mercer clients, yes.
22  Q.  And is it your testimony that that information
23  is publicly available?
24  A.  Yes.

---

Page 78

1  Q.  And where would one find that public
2  information?
3  A.  Many public sources: LinkedIn, their websites,
4  among others.
5  Q.  Okay.  And LinkedIn has the individual's e-mail
6  address?
7  A.  You have the ability via LinkedIn to send an
8  e-mail to someone at whatever e-mail address they input.
9  Q.  You have to have that e-mail address first;
10  right?
11  A.  Correct.
12  Q.  What other public sources are there for
13  somebody's e-mail address?
14  A.  Employer's websites.
15  Q.  Employer's website, is that your testimony?
16  MR. SHAPIRO: Object to the form.
17  A.  The company's website, meaning if I go to
18  company ABC's website you can find out the @ part of the
19  address.  You can also find out who the executives'
20  names are typically.
21  BY MR. WEBER:
22  Q.  So your testimony is that, for example, clients
23  of Mercer's websites have the e-mail address of the
24  contact people of those employers?

---

Page 79

1  A.  In some cases, yes.
2  Q.  In what cases?
3  A.  In the cases where those companies decide to
4  list their executives' contact information.
5  Q.  But I'm asking to your knowledge, tell me which
6  companies do that.
7  A.  I couldn't, I couldn't say which ones do.
8  Q.  Okay.  What other public sources are there for
9  somebody's e-mail address?
10  A.  Form 5500 filings.
11  Q.  And what is that?
12  A.  A list that you can purchase from other various
13  locations that collect this type of data.
14  Q.  Did you ever do that?
15  A.  I've never had the need to do that.
16  Q.  Okay.  What's on a 5500 form?
17  A.  5500 forms are IRS required filings for any
18  company that has over a hundred participants on their
19  benefits plan in any one given year.
20  Q.  Do you ever look at them?
21  A.  Can I finish the question?
22  Q.  Sure.
23  A.  They have renewal dates information on there.
24  They have the client contact on there, whoever was

---

Page 80

1  responsible for signing the document.  They have premium
2  information on there.  They have the carrier information
3  on there.  They have what lines of coverage they
4  purchase on there.  They have the broker commissions on
5  there which is their compensation.  They have the number
6  of participants that participate, a number of employees.
7  They have -- let me see if I've left anything out.
8  Other such information that references the lines of
9  coverage that they purchased.
10  Q.  All done?  When is --
11  A.  Yes.
12  Q.  -- the last time you looked at the 5500 form?
13  A.  This week.
14  Q.  And prior to your resignation when was the last
15  time you looked at it?
16  A.  Probably that week or the week before.
17  Q.  And prior to that?
18  A.  It's something I would look at, if not daily,
19  at least once or twice a week.
20  Q.  And what's the purpose of looking at it?
21  A.  To obtain publicly available information about
22  companies.
23  Q.  And did you ever download any information from
24  the 5500 form?

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 81

1    A.  I'm not sure I understand the question.
2    Q.  Did you ever take information that you observed
3  on a form 5500 and transfer it to any personal account,
4  contact list, or anything else?
5    A.  That doesn't make any sense.  No.
6    Q.  Okay.  I'll rephrase it.
7        When you sent your contact list or when you
8  airdropped your contact list to your home computer,
9  where else did you send it?
10       MR. SHAPIRO: Object to the form.
11   A.  I airdrop my contacts to my home computer, and
12  that's the only place I sent that to.
13  BY MR. WEBER:
14   Q.  Okay.  And then you transferred it from there
15  to the Lockton account; correct?
16   A.  No. No.
17   Q.  Does Lockton have your contact list?
18   A.  Yes.
19   Q.  And how did they get it?
20   A.  Via my Apple ID.
21   Q.  And how did they get it via your Apple ID?
22   A.  Because I have an Apple phone which I logged in
23  with my Apple ID and it automatically would pull it up
24  on your phone.

Page 82

1    Q.  And you transferred that to Lockton?
2    A.  No.  It automatically loaded.
3    Q.  Well, my point is the information on your Apple
4  phone somehow got to a Lockton computer; correct?
5    A.  Again, I'm not a technological savvy
6  individual.  What I can say - if you'll let me answer
7  the question - is I airdropped the contacts from Outlook
8  to my personal computer which is logged in to my Apple
9  ID.  When I logged in to my Apple phone, which has
10  Lockton apps on it, it showed up in my Outlook.
11   Q.  Understood.
12   A.  I mean, but your statement was that I
13  downloaded or did something to make it happen.  It just
14  happened.  I didn't --
15   Q.  It just happened just by itself?
16   A.  I didn't, I didn't download it.  The point is
17  then it was there.
18   Q.  The phone just walked into Lockton by itself
19  and it gave it information; right?
20       MR. SHAPIRO: Object to the form.
21   A.  Do phones have feet?  No.  So...
22  BY MR. WEBER:
23   Q.  There's no doubt that because your information
24  was in your iPhone and you connected it to the Lockton

Page 83

1  system it automatically uploaded it; correct?
2        MR. SHAPIRO: That's what he said.
3    A.  That's what I said.
4        Can I have some water, please?
5  BY MR. WEBER:
6    Q.  Please.
7    A.  May I get up and get it?
8    Q.  You may.
9        You mentioned that you airdropped this contact
10  list into your home computer.  Do you still have that
11  home computer?
12   A.  Yes.
13   Q.  What kind of computer is that?
14   A.  It's an Apple something.  It's a desktop.  I
15  don't know the model number.
16   Q.  Apple desktop?
17   A.  Yeah.
18   Q.  And other than your Apple desktop, your iPhone
19  and your Lockton computer, does that contact list exist
20  anywhere else?
21   A.  I believe anywhere I'm logged in to my Apple ID
22  is where it would be on: so my phone or I guess my
23  Outlook, and I guess, you know, wherever I'm logged in
24  on my Apple ID, so my iPad as well, it would as well be

Page 84

1  on there.
2    Q.  Okay.  Do all the Mercer clients with whom you
3  worked, do the contact information from those clients
4  appear on your contact list?
5    A.  I wouldn't know.
6    Q.  What's your best estimate?
7    A.  There would be a percentage of them for sure
8  that would be on there.  I don't know if all of them are
9  on there, but a good number of them would be on there.
10   Q.  Okay.  Where would the ones who were not on
11  that contact list appear?
12   A.  I wouldn't have them.
13   Q.  You wouldn't have them?
14   A.  No.
15   Q.  And what about Mercer prospects, would they
16  appear on your contact list?
17   A.  I'm confident there are contacts in my Outlook
18  that are not clients of Mercer.
19   Q.  Would you call them prospects?  You're not much
20  of a salesperson if they're not all prospects, are you?
21       MR. SHAPIRO: Object to the form.
22       MR. SIEGEL: Depends on your definition of
23  "prospect".
24       MR. DIGREGORIO: Yeah.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 85

1   A. Again, I'm confident there are client
2   company -- there's contact information in there that are
3   prospects of Mercer. Not all of them are Mercer
4   prospects.
5   BY MR. WEBER:
6   Q. Understood.
7       Does the contact list contain the names of
8   individuals that you met at Mercer-sponsored events such
9   as cocktail parties, connections and cigar events?
10  A. Yes.
11  Q. In paragraph 6 you write that include
12  "professional contacts". What does that mean by
13  "professional contacts"?
14  A. Can I read the paragraph?
15  Q. Please.
16  A. Professional contacts would be companies that I
17  have contact -- individuals I have contact with that I
18  could not do business with directly, so not prospects.
19  Q. I'm sorry?
20  A. Not prospects, but individuals I have contact
21  with from a business perspective but they would not be
22  prospective clients.
23  Q. Can you give me an example?
24  A. Sure. So JP Morgan Chase, a large gigantic

Page 86

1   company, cannot be a prospect for me because they're not
2   headquartered here, and I have friends that are bankers
3   there that I rely on from a business associate
4   perspective.
5   Q. Got it. Okay. Thank you.
6       In paragraph 6 you also state, "These names
7   were accumulated from all types of personal and
8   professional interactions over the course of
9   approximately 18 years, including, among other things,
10  attending trade shows and professional or networking
11  events, doing Internet research, reviewing directories
12  from business associates and attending personal
13  functions"; correct?
14  A. Yes.
15  Q. During your employment at Mercer, did you ever
16  incur expenses related to the activities you described
17  in paragraph 6?
18  A. Yes.
19  Q. And did Mercer reimburse you for those
20  expenses?
21  A. Yes.
22  Q. And did you submit regular expense reports in
23  that regard?
24  A. Define "regular".

Page 87

1   Q. You tell me. Well, let me ask it this way.
2       Whenever you submitted expense reports related
3   to business development activities --
4   A. Mm-hmm.
5   Q. -- were those expense reports reimbursed?
6   A. Prior to, prior to my leaving, yes, they still
7   owed me money.
8   Q. Okay. How much do they owe you?
9   A. It's hard to figure out because they won't give
10  me the information I need to ascertain that.
11  Q. Okay. Over -- strike that.
12      On an annual basis, on an average annual basis,
13  approximately how much did you incur for business
14  expenses that was reimbursed by Mercer?
15  A. I don't know. I didn't have access to that
16  information.
17  Q. Did you keep copies of your expense reports
18  that you submitted?
19  A. No.
20  Q. Mercer has them?
21  A. Yes.
22  Q. In paragraph 9 you state that someone from
23  Lockton tells you not to bring any Mercer documents or
24  information to Lockton. See that?

Page 88

1   A. Yes.
2   Q. And who told you that?
3   A. Hiram Marrero, and then I was instructed by my
4   attorney as well.
5   Q. And did you comply with that directive?
6   A. Yes.
7   Q. And approximately when did you have those
8   conversations with the individuals from Lockton?
9   A. I don't recall the exact time.
10  Q. And you state in paragraph 10 that you have not
11  used any confidential documents or information since
12  joining Lockton; correct?
13  A. Correct.
14  Q. And that's an accurate statement; right?
15  A. Yes.
16  Q. And paragraph 11 says, "I did not retain any
17  documents concerning client pricing, preferences, or
18  renewal dates.
19  A. Correct.
20  Q. Did you retain any other documents not related
21  to client pricing, preferences, or renewal dates that
22  are Mercer documents or property?
23  A. No.
24  Q. You sent an e-mail to everyone on your contact

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 89

1  list as you've stated in paragraph 12; right?
2  A. Yes.
3  Q. And you advised them that you had joined
4  Lockton; is that right?
5  A. Yes.
6  Q. How many people received announcements that you
7  had joined Lockton?
8  A. I have no idea.
9  Q. Approximately?
10  A. No idea. I've never counted how many people
11  are in my contacts.
12  Q. Do you have a ballpark estimate?
13  A. I could not accurately make that statement.
14  Q. Five thousand?
15  A. Again, I could not accurately make that
16  statement.
17  Q. No sense at all? Could be 10,000?
18  A. I'm confident it's not 10,000. I'm sure we
19  could get that answer for you if we --
20  Q. Somewhere between 5,000 and 10,000?
21  A. I doubt it.
22  Q. Somewhere between 2,500 and 5,000?
23  A. Again, I don't know the answer to that
24  question.

Page 90

1  Q. Do you know Tim Burns?
2  A. Yes.
3  Q. Who is he?
4  A. He is the CFO for FabSouth.
5  Q. And how do you know him?
6  A. I met him prior to my employment at Mercer.
7  Q. Where did you meet him?
8  A. I don't recall exactly where I met him.
9  Q. Was he a Mercer client before you joined
10  Mercer?
11  A. I don't know.
12  Q. He became a Mercer client?
13  A. I'm sorry?
14  Q. He became a Mercer client?
15  A. I don't know. I don't know when FabSouth
16  became a client of Mercer. They weren't a client of
17  mine.
18  Q. Did you send him an e-mail?
19  A. When?
20  Q. I'm asking you, did you send him an e-mail
21  announcing your joining Lockton?
22  A. Yes. He's in my contacts so he would have
23  received an e-mail.
24  Q. Did you announce your new position in any other

Page 91

1  way other than sending e-mails to your contact list?
2  A. Not intentionally. My understanding is that
3  some people received faxes somehow. No idea how that
4  happened.
5  Q. So other than the contact list or the faxes,
6  you didn't announce your departure in joining Lockton
7  any other way?
8  A. I also would change my information on LinkedIn,
9  which I suppose would probably create some kind of
10  announcement I'm guessing.
11  Q. Anything else?
12  A. I did not send that e-mail in any other
13  fashion.
14  Q. And you didn't announce your joining Lockton in
15  any other fashion other than what you've just said?
16      MR. SHAPIRO: Object to the form.
17  A. Are we talking about the e-mails or --
18  BY MR. WEBER:
19  Q. Any announcement that about -- any indication
20  that you joined Lockton.
21  A. Yeah, I'm sure that between LinkedIn, the
22  e-mail, and running into people and/or talking to people
23  over the phone that I suppose those would count as
24  announcements as well.

Page 92

1  Q. Okay. You said some people received faxes of
2  your joining Lockton; correct?
3  A. Yes.
4  Q. Do you know how that happened?
5  A. I have no idea how that happened. Apparently
6  it was a good thing because apparently no one receives
7  faxes.
8  Q. Do you know who Rogi Metvani (ph)?
9  A. Yes.
10  Q. Who is he?
11  A. He is, I believe his title is executive vice
12  president or COO for Acumen.
13  Q. How do you know him?
14  A. I originally produced that account for Mercer
15  when we originally sold it.
16  Q. Did you know him before you joined Mercer?
17  A. No.
18  Q. His company is a Mercer client; right?
19  A. Yes.
20  Q. And did you send an announcement to him via
21  text message?
22  A. No.
23  Q. Do you ever use text messages?
24  A. Yes, I use text messages.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 93

1   Q.   And when do you use them?
2   A.   To contact friends and other people.
3   Q.   Did you ever use text messages to communicate
4   with anyone from Lockton prior to your resignation?
5   A.   I'm sure I did.
6   Q.   Was that your method of communication with
7   representatives of Lockton prior to your resignation?
8          MR. SHAPIRO: Object to the form.
9   BY MR. WEBER:
10  Q.   You can answer.
11  A.   I use various forms of communication.
12  Q.   Well, I'm asking if you used text messages.
13         MR. SHAPIRO: Object to the form.
14  A.   Do I use text messages?
15  BY MR. WEBER:
16  Q.   Did you use text messages to communicate with
17  anyone representing Lockton's interest prior to your
18  resignation from Mercer?
19         MR. SHAPIRO: Object to the form.
20  BY MR. WEBER:
21  Q.   You can answer.
22  A.   I'm sure I did.
23  Q.   Was that your preferred method of communication
24  with representatives of Lockton prior to your

---

Page 94

1   resignation?
2   A.   I don't have a preferred method of
3   communication.
4   Q.   Well, did you use text messages more than
5   e-mails, for example?
6   A.   I don't have a count on those things so I
7   couldn't comment.
8   Q.   Did you communicate with Lockton
9   representatives via e-mail prior to your resignation?
10  A.   Yes.
11  Q.   When?
12  A.   Don't recall.
13  Q.   How often?
14  A.   Don't recall.
15  Q.   To whom?
16  A.   Minoj, one of Lockton's counsels, maybe Hiram,
17  and I'm sure I communicated with Lyle, my attorney, via
18  e-mail as well.
19  Q.   How often did you use e-mail to communicate
20  with the individuals you just mentioned?
21  A.   Infrequently.
22  Q.   Less than five times?
23  A.   I don't know the exact count.
24  Q.   Less than ten times?

---

Page 95

1   A.   I don't know the exact count.
2   Q.   So you stated in your Declaration that you
3   performed a thorough and diligent search for any Mercer
4   material. Can you describe what steps you took in your
5   search?
6   A.   I made sure that I didn't have any paper
7   documents at my home residence.
8   Q.   And when you say you made sure you didn't have
9   any, what did you do?
10  A.   I don't -- I never really kept paper documents
11  at my house. I just made sure there wasn't anything
12  sitting on my office desk or anything like that --
13  Q.   Okay.
14  A.   -- or in my briefcase.
15  Q.   What else did you do?
16  A.   I also went through my personal e-mail and
17  attempted to locate anything that I may have sent from
18  Mercer over the course of my career and deleted it.
19  Q.   Did you find anything?
20  A.   Yes.
21  Q.   How many documents did you find?
22  A.   I don't recall the number.
23  Q.   Approximately?
24  A.   I don't recall the number.

---

Page 96

1   Q.   More than ten?
2   A.   I don't want to speculate on the number.
3   Q.   More than 20?
4   A.   I don't want to speculate on the number.
5   Q.   More than 30?
6   A.   We can keep raising the number but I'm not
7   going to commit to a number that I can't recall.
8   Q.   And how did you delete them?
9   A.   Using a delete button.
10  Q.   That's all you did?
11  A.   And then I deleted my delete files.
12  Q.   Anything else?
13  A.   I believe that's all you need to do to delete.
14  Q.   Did you wipe any files?
15  A.   I never kept any hard copy documents, to the
16  best of my recollection, on any computer.
17  Q.   So with respect to the Mercer documents which
18  you had on your computer --
19  A.   Yes.
20  Q.   -- you simply deleted them and then deleted the
21  delete file; is that right?
22  A.   Correct.
23  Q.   And you have none of those now?
24  A.   Can you repeat the last question, please?

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 97

1    Q.   And you have none of those documents?
2    A.   I'm sorry.  The question before the last
3  question, can you repeat that?
4    Q.   I believe you said you searched your computer
5  for Mercer documents.
6    A.   Mm-hmm.
7    Q.   Those that you found that were Mercer
8  documents, you deleted them --
9    A.   Yeah.
10   Q.   -- then you deleted the delete file; correct?
11   A.   Yes.
12   Q.   And did you keep any of those documents that
13  you claim you deleted?
14   A.   No.
15   Q.   And did you transfer them anywhere?
16   A.   No.
17   Q.   And you don't have any hard copies in your
18  possession at this time?
19   A.   No.
20   Q.   And you've not used any of the materials from
21  those documents at this time?
22   A.   No.
23        (Plaintiff's Exhibit 7, E-mail, was marked for
24  identification.)

---

Page 98

1    Q.   Show you what's been marked Plaintiff's
2  Exhibit 7.  It appears to be an e-mail from you to your
3  home e-mail address dated October 11th, 2017.  Can you
4  tell me what that is?
5    A.   Jewelers Mutual is an online insurance company
6  that my insurance adviser told me about so I can insure
7  my wife's jewelry.
8    Q.   Nothing's remarkable about that?
9    A.   I'm surprised to see that, which reminds me I
10  still have to get that stuff insured.
11   Q.   Better get going.
12   A.   Can I take that with me as a reminder?
13        MR. SIEGEL:  Could you mark the transcript
14  smoking gun.
15        MR. WEBER:  I'm giving you a copy.
16        (Plaintiff's Exhibit 8, E-mail with Active
17  Account Listing, was marked for identification.)
18  BY MR. WEBER:
19   Q.   Before I show you that document, did you have
20  any issues with your compensation in or about
21  October 2017 with Mercer?
22   A.   You'd have to be more specific with the issues.
23  I'm not sure I understand what your question is.
24   Q.   Let me ask you this.  What was your

---

Page 99

1  compensation at Mercer in 2016, total compensation
2  package, commissions and selling?
3    A.   I'd prefer not to answer that in front of
4  Mercer employees.
5        MR. WEBER:  Lyle.
6        MR. SHAPIRO:  Could we just do it outside the
7  presence of Mercer?
8        MR. WEBER:  They can step out if you want.
9        MR. SHAPIRO:  Including Mercer?
10       MR. DIGREGORIO:  That would be helpful.
11       MR. SHAPIRO:  Yeah.  Do you guys mind stepping
12  out?
13       MS. STEED:  Not at all.
14       MS. TREE:  Want me to step out?
15       MR. WEBER:  No.
16       MR. DIGREGORIO:  I would.
17       MR. WEBER:  That's not your prerogative.
18       MR. DIGREGORIO:  You asked for it.
19       MR. SIEGEL:  Mercer has that information.
20       MR. DIGREGORIO:  Mercer employees do not, and
21  they're not going to be happy.
22       (Ms. Steed, Ms. Preston, and Mr. Sharma
23  exited.)
24       MS. TREE:  You're aware of the time; right?

---

Page 100

1        MR. WEBER:  Before I get there, you said you
2  were flexible on the time.  I'm going to have very
3  little time with your other two clients.  I'd like
4  to spend it here.  I think it's more important.
5        MR. DIGREGORIO:  No.
6        MR. WEBER:  Do you have a problem with that?
7        MR. SIEGEL:  It depends on how much.
8        MR. WEBER:  Two hours instead of -- I mean,
9  three hours instead of two-and-a-half.
10       MR. SHAPIRO:  Okay.  Let's see.
11       MR. WEBER:  I'm trying to get through this.
12       MR. SHAPIRO:  I've got to talk to my client
13  about it.
14       MR. WEBER:  Off the record.
15       (Off the record 10:22 a.m.)
16       (On the record 10:22 a.m.)
17  BY MR. WEBER:
18   Q.   So what was your total compensation in 2016 at
19  Mercer?
20   A.   To the best of my recollection, somewhere in
21  the neighborhood of $750,000.
22   Q.   In 2017 did your total compensation at Mercer
23  change?
24   A.   I don't believe my base compensation changed.

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 101

1   My variable comp most certainly changed.
2   Q.   What was your base comp?
3   A.   I want to --
4   Q.   Approximately?
5   A.   130,000 or something.
6   Q.   Okay.  And what was your -- your variable comp,
7   you mean your commissions?
8   A.   No.  Meaning the amount of money that Mercer
9   made, the percentage that I would take off of that.
10  Q.   You don't call that commissions?
11  A.   No.
12  Q.   What do you call that?
13  A.   Variable comp.
14  Q.   Variable comp is total revenues and then you
15  receive some percentage of that?
16  A.   Correct.
17  Q.   That's variable comp?
18  A.   Correct.
19  Q.   Did that total about 750 in 2016?
20  A.   No.  You asked the total of my total
21  compensation was 750, so it would be the 750 minus the
22  130 or roundabout numbers.
23  Q.   Thank you.  In 2017 did your total comp change?
24  A.   It wouldn't because the variable component.  I

---

Page 102

1   would not know what the variable differential was.
2   Q.   You wouldn't know what that was?
3   A.   I haven't looked at my W-2 yet so I don't know
4   the difference.
5   Q.   You didn't have any -- strike that.
6        You have no knowledge of any change in your
7   total comp in 2017 at Mercer?
8   A.   I'm sure there was a change because of the
9   variable component, meaning it varies from year to year.
10  Q.   Right.  Well, you had a two-year period of time
11  where you got variable comp from clients, right, at
12  Mercer?
13  A.   Correct, a larger percentage on the first year
14  and an extremely small percentage on the second.
15  Q.   And then it dropped off?
16  A.   Then there was no comp after that.
17  Q.   Correct.  So if you didn't bring in new
18  business your variable comp would go down?
19  A.   Correct.
20  Q.   And isn't it true that in October you had
21  discussions with representatives from Mercer about your
22  variable comp being lower?
23  A.   About my variable comp being lower?
24  Q.   In other words, your total compensation going

---

Page 103

1   down.
2   A.   No.
3   Q.   You didn't?
4   A.   Not that I recall.
5   Q.   Do you know who Karen Doolittle is?
6   A.   Oh, yeah.
7   Q.   Who is she?
8   A.   She is the sales manager based in Atlanta for
9   whatever region Mercer calls it now.
10  Q.   And you had communications with her in October
11  of 2017, did you not?
12  A.   Yes, I communicated with Karen Doolittle in
13  2017.
14  Q.   And you communicated about your total
15  compensation package, did you not?
16  A.   I don't recall speaking to her about my total
17  compensation.
18  Q.   What do you recall speaking to her about?
19  A.   She was one of my direct reports, so
20  conversations with Karen would be around opportunities,
21  pipeline, and promotions, things like that.
22  Q.   You don't recall any conversation with her on
23  or about October 11th about your total package, comp
24  package?

---

Page 104

1   A.   Again, I don't recall speaking to her about my
2   compensation.  If you were to tell me I did, I'd believe
3   you, but I don't recall.
4   Q.   I'm telling you you did.  I have an e-mail that
5   she said she spoke to you on October 11th, 2017, at --
6   in fact, I have an e-mail that she sent you on
7   October 11th, 2017, at 8:56 in the morning for a
8   one-on-one where there's a breakdown of your
9   compensation, year one AR goal, year one BOR goal.  You
10  know what those things are; right?
11  A.   I think you're misinformed.  That's not
12  compensation.
13  Q.   Okay.  Tell me what I'm referring to.
14  A.   Those are goals that Mercer sets relative to
15  what they're expecting me to produce on an annual basis
16  for annual revenue.
17  Q.   Okay.  Thank you.
18       And those goals relate to your total
19  compensation to some degree; correct?
20  A.   No.  I could explain if you'd like me to.
21  Q.   I would.  Thank you.
22  A.   You guys don't want me to go in narrative.  I'm
23  going on the narrative.
24  Q.   Go right ahead.  They'll stop you if --

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 105

1   A.  Yeah, I know.
2   Q.  Don't worry about them.
3   A.  Mercer's variable compensation, which I believe
4   they call the SCP plan, is based off of revenue that
5   Mercer brings in the door, meaning they can set a goal
6   of $2 million, it has zero impact on how I get paid.
7   They have not tied the two together.  So if I bring in
8   $2 million, I will get paid a percentage on that once it
9   comes in the door the first year.  But if they said,
10  we're doubling your sales goal, and I didn't hit it, I
11  still would be paid whatever I --
12  Q.  You still get paid that variable comp number?
13  A.  So what's in that e-mail is irrelevant to my
14  compensation.
15  Q.  Does it refresh your recollection that you had
16  a discussion with her on October 11th about goals, BOR
17  goal, year two goal, year two BOR goal, year three goal,
18  et cetera?
19  A.  I remember - I don't know if it was October or
20  not - I remember her sending me a document similar to
21  what you're describing, and she was asking for my
22  opinion on the structure for tenure because they were
23  trying, I believe they were attempting to put a new
24  guideline together for tenured individuals and what

Page 106

1   their sales goal should be relative to number of years
2   and title.
3   Q.  Do you remember what those guidelines were or
4   goals?
5   A.  No, I don't.
6   Q.  Do you remember how it might have impacted you?
7   A.  I think, if I recall -- and, again, that was
8   not presented to me as a final.  That was presented to
9   me as, hey, Matt, we'd like your opinion on this before
10  we decide on it.
11  Q.  And did you give your opinion?
12  A.  Yes.
13  Q.  And what did you say?
14  A.  I don't recall specifically what I said, and
15  you haven't shared the e-mail so I can't provide my
16  comments directly on what I may have said.
17  Q.  Did you ever tell Karen Doolittle that you
18  thought the goals were too aggressive based on what our
19  competitors are selling?
20  A.  You'd have to show me what you're referring to
21  for me to --
22  Q.  I'm asking you if you recall generally that
23  type of discussion.
24  A.  I'm confident I said something to that degree

Page 107

1   most likely because Mercer's goals are ridiculous
2   relative to the industry.
3   Q.  Did you -- do you recall saying that you
4   recommended having similar AR goals for both associate
5   and principal for years one and two?
6   A.  No, I don't recall saying that.
7   Q.  Do you recall Karen asking for your comments on
8   the SCP?
9   A.  Yes.
10  Q.  Do you remember what the SCP is?
11  A.  We just discussed it a minute ago.
12  Q.  Okay.  And did you provide your comments?
13  A.  I'm sure I did.
14  Q.  Do you remember saying that you didn't like the
15  thresholds being tied to salary?
16  A.  Yes.
17  Q.  You said not only is it complicated to
18  understand, it becomes a negative and starts to
19  disincentive -- disincent people at some point, i.e.
20  discourage, advance...  Do you remember that
21  conversation?
22  A.  The statement you made is true, meaning
23  relative to how the plan works that's exactly how it
24  works.  Whether I said it that exact way I can't tell

Page 108

1   you.
2   Q.  Is that something that you felt and you may or
3   may not have said that to Karen?
4   A.  Yes.
5   Q.  You said you'd like to see a more equitable
6   Marsh-Mercer referral arrangement.  Do you remember
7   that?
8   A.  Yes.
9   Q.  What were you referring to?
10  A.  When Mercer -- or excuse me.
11  Q.  Yes.
12  A.  When Mercer sends something to Marsh, our
13  compensation was limited to 10 percent.  I think they
14  capped it at 10 percent of $250,000 credit, meaning you
15  would get 10 percent on -- said another way.
16      If you referred something to Marsh and let's
17  say it was a $500,000 deal, Mercer would only allow you
18  to get credit for 250,000 of it and they would only pay
19  you 10 percent.
20  Q.  Understood.  You were not happy with that?
21  A.  Correct.
22      Conversely, because when Marsh sends something
23  over to Mercer, they get paid 100 percent and at their
24  whatever percentage they normally get paid at, and then

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

**Page 109**

1   it takes 50 percent out of my personal comp.
2       So said another way, if they send over $100,000
3   deal, instead of me getting my percentage on 100,000, I
4   get my percentage on 50 percent.
5   Q.  So you're not happy with that?
6   A.  Well, no, because I've been doing the work.
7   And it wasn't mutually, it wasn't aligned mutually,
8   meaning it didn't work one way -- it worked one way for
9   me and one way for them, both to my detriment.
10  Q.  Not happy with that?
11  A.  Nope.
12  Q.  Do you recall also saying that there were
13  discussions in the past about putting in an LTI plan for
14  top salespeople?
15  A.  Yes.
16  Q.  And what is that?
17  A.  Long-term incentive plan.
18  Q.  Do you recall at any time any discussions about
19  your compensation total package being reduced in 2017?
20  A.  No.
21      MR. SIEGEL: You're not marking the document?
22      MR. WEBER: No.
23      MR. SHAPIRO: Are we done with the compensation
24  discussions?

---

**Page 110**

1       MR. WEBER: Yes.
2       MR. DIGREGORIO: Is it okay to ask them to come
3   back in?
4       MR. WEBER: Yes.
5       MR. DIGREGORIO: Thank you.
6       (Ms. Steed, Ms. Preston, and Mr. Sharma
7   reentered.)
8       MR. WEBER: I'm sorry. I forgot to give you
9   that 8.
10      MR. SHAPIRO: You gave us 8.
11      MR. WEBER: I didn't give him 8. I gave you 8.
12  I'm going to give him 8. And we'll mark that 9, but
13  let's give him 8.
14  BY MR. WEBER:
15  Q.  I'm showing you what's been marked Plaintiff's
16  Exhibit 8, an e-mail from you to yourself, October 11th.
17  Can you describe what that is?
18  A.  The attachment is titled Active Account List.
19  Q.  And what's the word after that?
20  A.  .PDF.
21  Q.  Go ahead.
22  A.  The attached page says Active Account List
23  Confidential and then it lists lead consultants, names
24  of companies, and office.

---

**Page 111**

1   Q.  And these are clients of Mercer and the
2   individual consultants who work with them; is that
3   right?
4   A.  Yes.
5   Q.  And why did you send this to your home?
6   A.  I don't recall why I sent it to myself
7   originally.
8   Q.  Do you have this document now?
9   A.  No.
10  Q.  You didn't need this information to do your
11  job, did you?
12      MR. SHAPIRO: Object to the form.
13  BY MR. WEBER:
14  Q.  You can answer.
15  A.  Sure, this type of information would be helpful
16  to do my job --
17  Q.  It would?
18  A.  -- at Mercer.
19  Q.  How was that if these clients are already
20  Mercer clients and that they are already assigned to a
21  lead consultant?
22  A.  Well, one, it helps you not prospect existing
23  clients; and two, it helps you to develop relationships
24  with those other professional contacts we spoke about

---

**Page 112**

1   earlier and potentially helping them glean into what our
2   clients look like and who they may potentially be able
3   to get introductions to.
4   Q.  Okay. Let's go to Plaintiff's Exhibit 9.
5       (Plaintiff's Exhibit 9, E-mail with Marsh
6   Prospect List, was marked for identification.)
7   BY MR. WEBER:
8   Q.  Show you Plaintiff's Exhibit 9, an e-mail from
9   yourself to your home address dated October 11th. Do
10  you see that document?
11  A.  Yes.
12  Q.  Tell me what it is.
13  A.  It says 2017 Marsh Florida Prospect List.
14  Q.  And what does it consist of?
15  A.  Let's see. It says names of companies,
16  industry, addresses, names of individuals.
17  Q.  Contact people?
18  A.  I'm sorry?
19  Q.  You say contact people?
20  A.  No. It says CEO and CFO, so the names of the
21  CEO's and the CFO's at the respective corporations.
22  Q.  There appears to be a hyperlink to the Company
23  Website, Senior Management Team, and the Company News;
24  correct?

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 113

1  A.  Yes.
2      Can I have a recess, please?
3  Q.  Can you have a recess?
4  A.  Yeah.
5  Q.  Let's finish my question.
6  A.  My understanding I'm allowed to go to the
7  restroom if I want.
8  Q.  You are but not during one of my questions.
9  A.  I answered your last question. I'd ask for a
10  recess.
11      MR. WEBER: Okay.
12      MR. DIGREGORIO: Thank you.
13      (Off the record 10:35 a.m.)
14      (On the record 10:40 a.m.)
15  BY MR. WEBER:
16  Q.  Okay. We were discussing Plaintiff's
17  Exhibit 9, an e-mail you sent to yourself on
18  October 11th entitled Marsh Prospect List. Remember we
19  were talking about that document, correct --
20  A.  Yes.
21  Q.  -- before you wanted to take a break?
22      And why did you send this to your home e-mail
23  address?
24  A.  I don't recall. My presumption would be to

Page 114

1  have access to information relative to future clients.
2      (Plaintiff's Exhibit 10, E-mail with
3  Invitation, was marked for identification.)
4  BY MR. WEBER:
5  Q.  Show you Plaintiff's Exhibit 10, an e-mail from
6  yourself to yourself October 11th, two pages. Can you
7  tell me what this is?
8  A.  Yeah. This is a form e-mail that I send to
9  myself -- or excuse me -- that I send out for one of the
10  C-Suite networking events that I formed eight, nine
11  years ago.
12  Q.  And tell me about that event.
13  A.  Yeah, myself and seven or eight others that sit
14  on a board, we create an event targeting C-Suite
15  executives; started it, again, about eight years, eight,
16  nine years ago. So basically invite our contacts and
17  pay for cocktails.
18  Q.  And I assume C-Suite executives are potential
19  or actual clients?
20  A.  A C-Suite executive will mean any C-Suite
21  executive of a company, so CEO, CFO, COO.
22  Q.  I asked the wrong question.
23      Those individuals are either clients or
24  potential clients to you?

Page 115

1  A.  Some of those individuals in the room, yes; not
2  all.
3  Q.  Okay. And are you still part of that
4  organization?
5  A.  Yes, as a founding member, yes.
6  Q.  The South Florida Business Forum?
7  A.  Correct.
8  Q.  And have you had any events since resigning
9  from Mercer?
10  A.  One.
11  Q.  When was that?
12  A.  This week.
13  Q.  And how many people attended?
14  A.  I don't have the final numbers.
15  Q.  Is there a list of invitees?
16  A.  There would be a cumulative list of who
17  responded, not necessarily who attended.
18  Q.  Is there a list of who attended?
19  A.  No.
20  Q.  I assume that list is at Lockton; right?
21  A.  This list will be my personal information, not
22  party to Lockton.
23  Q.  So that's in your personal computer?
24  A.  The list?

Page 116

1  Q.  Yeah.
2  A.  No. I'm sure I saved it to my Lockton
3  computer.
4  Q.  Okay.
5      (Plaintiff's Exhibit 11, E-mail with
6  Invitation, was marked for identification.)
7  BY MR. WEBER:
8  Q.  Show you Plaintiff's Exhibit 11, an e-mail from
9  yourself to yourself. Do you recognize this document?
10  A.  Yes. It's a form e-mail from one of the
11  organizations that I've co-founded with some centers of
12  influence.
13  Q.  What is it? What is it?
14  A.  It's similar to the last event, a slightly
15  different format in that we target C-Suite executives to
16  invite and pay for cocktails and cigars.
17  Q.  And did Mercer reimburse you for those
18  expenses?
19  A.  At the time, yes. I was also hosting those
20  events prior to joining Mercer.
21  Q.  Okay.
22      (Plaintiff's Exhibit 12, E-mail with
23  Invitation, was marked for identification.)
24

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 117

BY MR. WEBER:
1   Q.   Show you Exhibit 12.  Can you identify that
3   document?
4   A.   Yes.  This is a form e-mail for an organization
5   that I used to be on the board of Financial Executives
6   International, again, a form e-mail that I would send
7   out to potential invitees.
8       (Plaintiff's Exhibit 13, E-mail with Florida
9   Pipeline Report, was marked for identification.)
10  BY MR. WEBER:
11  Q.   Show you what's been marked Exhibit 13.
12  A.   Yes.
13  Q.   This is an e-mail from yourself to yourself
14  dated November 16th.  You see that?
15  A.   Yes.
16  Q.   Tell me what it is.
17  A.   It says, "Florida Pipeline Report 11.16.17".
18  Q.   And there's numerous pages attached to it.  Do
19  you see that?
20  A.   Yes.
21  Q.   1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
22  15, 16, 17, 18, 19, 20, 21, 22, 23 pages.  You see that?
23  A.   Yep.
24  Q.   Tell me what this is.

Page 118

1   A.   This is a pipeline report that we would review
2   biweekly for -- and it's broken into multiple tabs,
3   although you counted every page.  We would go through
4   the first tab which were deals that either have closed
5   or were about to close over $100,000.  I believe the
6   second tab was something like the next 30 days.  Again,
7   I only reviewed deals above $100,000, despite what's on
8   the report.  And then I think the third tab was sort of
9   like the next six months to a year.  And, again, I only
10  reviewed anything that was potentially going to close
11  above $100,000.
12  Q.   What else is on these pages that are attached?
13  A.   You're asking me to read the top?
14  Q.   Well, if you can describe generally what's,
15  what's contained on these documents and the pages that
16  are attached.
17  A.   It appears to have the company names; whoever
18  the relationship manager was at Mercer for the new
19  business; office location of the relationship manager;
20  the name of the opportunity or which line of business,
21  address of the Mercer employee; potential close date;
22  and at what stage, whether it's finalist or identified
23  or in pursuit or otherwise; and then the number of days
24  that it's been in the pipeline.

Page 119

1       And then there's total opportunity revenue,
2   which is a three-year number; current year revenue,
3   which is what's expected to come in.  I can't read that.
4   I can't read whatever that column is, but it's got, most
5   of it says "none" when you look at the sales.  And I
6   can't read what the following three columns are.
7       MR. SIEGEL:  And, Michael, just once again,
8   there's a highlight in a column in yellow and
9   sometimes pink and green different colors.
10      MR. WEBER:  I think they were on the document,
11  Marty.
12      MR. SIEGEL:  That's all I wanted to distinguish
13  as to whether it was something --
14      MR. WEBER:  I believe so.  I'm not sure, but I
15  believe so, but we'll confirm that.
16  BY MR. WEBER:
17  Q.   Anything else on these other pages that are
18  relevant to this document?
19  A.   I don't understand the question.
20  Q.   In other words, you've described a number of
21  things that are contained here.  Is there anything else
22  that you haven't mentioned on this document?
23  A.   Yeah.  I mean, I haven't spoken to the fine
24  print in the upper left hand corner or any of the fine

Page 120

1   print numbers above the columns that I just read
2   through.  It's very small print.
3   Q.   Yeah, I'm sorry, but there's a fourth column
4   from the right in the later pages that seem to give some
5   commentary.  Do you see that?
6   A.   The fourth column from the right?
7   Q.   Yeah, in further pages back into the exhibit
8   there's a number of --
9   A.   Oh, I'm sorry.  What page are you on?
10  Q.   Well, I'm on page -- let's go from the back.
11  1, 2, 3, 4, 5, 6, 8, 9 and 10.  If you can kind of look
12  at those columns and see if you can describe --
13      MR. SIEGEL:  The second word is Activity.  The
14  first word --
15      MR. WEBER:  Your eyes are better than mine.
16  What's the first word before activity?
17      MR. SIEGEL:  I don't know.
18      MR. DIGREGORIO:  I can't read that.
19      MR. SIEGEL:  Right.  The second word is
20  Activity.  The first word I --
21      MR. WEBER:  I was going to say I was very
22  impressed that you --
23      MR. DIGREGORIO:  It says Activities?  Are you
24  sure?

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 121

1        MR. SHAPIRO: News Archive.
2        MR. DIGREGORIO: I think the second word is
3    Actions.
4        MR. SIEGEL: Something with an A. How about
5    that?
6        MR. DIGREGORIO: I think it says Actions.
7    BY MR. WEBER:
8    Q.  Okay.  So whether -- can you describe what's
9    under that title or that heading?
10   A.  I can read, it says, "10/10/16 building
11   relationship for 2017". There's another one that says,
12   "Meeting scheduled and confirmed with prospect on
13   October -- or excuse me -- January 10th, 2017, at
14   10:30 a.m. at their office. Spoke with John Cummings
15   and going to make an intro" -- I mean, it's hard to read
16   these things.  They look like, they appear -- I don't
17   know.  Maybe that says "need actions".  I can't, I can't
18   line them up.  I was trying to line it up because this
19   is obviously one, a spreadsheet that goes lengthwise and
20   you have it on 11 x 8 which makes it hard to figure out.
21   Q.  So are you describing what that column appears
22   to be?
23   A.  I don't know what the title of the column is.
24   Q.  What about the content under it?

Page 122

1    A.  It's hard to read a lot of it.  So it looks
2    like -- I don't know.  "Decisions to hold" -- I mean,
3    they look like comments about whoever -- I'm assuming
4    that these are companies because on the left-hand column
5    it doesn't have the name of the company.  It just -- oh,
6    wait.  There's the name of the company.  Yeah, I'm
7    assuming they're comments about that particular company
8    is my guess.
9    Q.  Okay.
10       (Plaintiff's Exhibit 14, E-mail with MMA
11   Florida Client List, was marked for identification.)
12   BY MR. WEBER:
13   Q.  Let me show you what's been marked as
14   Plaintiff's Exhibit 14, an e-mail dated October 11th
15   from yourself to yourself.  The subject is "MMA Florida
16   Client List" and the attachment is MMA Florida Client
17   List 5.5.17.pdf.  See that?
18   A.  Yes.
19   Q.  And what's the attachment there, the number of
20   pages that are attached?
21   A.  They're not numbered, so let me count them.
22   Q.  Let's count them.
23   A.  I counted 10, I believe.
24   Q.  I counted 10.

Page 123

1        What do the ten pages represent attached to
2    this e-mail?
3    A.  Marsh & McLellan Agency's, I assume a Florida
4    client list.
5    Q.  Right.
6    A.  This list is widely believed both at Mercer and
7    Marsh to be not accurate.
8    Q.  Why did you send that to yourself?
9    A.  Back in October?
10   Q.  October 11th, 1:03 p.m.
11   A.  Yeah, I don't remember the specific.  My, my
12   assumption would be so I understood who their clients
13   were and who they weren't, because technically we're not
14   allowed to go after their clients, even though we did --
15   Q.  Okay.
16   A.  -- with instruction from our management.
17   Q.  But you did send it to your home, right, your
18   home e-mail address?
19   A.  Yeah, that's what it says here on October 11th
20   at 1:03:22 p.m.
21   Q.  Right.  On October 11th?
22   A.  Yes, sir.
23       (Plaintiff's Exhibit 15, E-mail with MMA-FL
24   Complete Capabilities, was marked for identification.)

Page 124

1    BY MR. WEBER:
2    Q.  Show you Plaintiff's Exhibit 15, an e-mail from
3    yourself to your home e-mail address dated October 11th,
4    it contains a 28-page deck.  Familiar with that
5    document?
6    A.  Yes.
7    Q.  You sent it to your home; right?
8    A.  Yeah.
9    Q.  And what is the document?
10   A.  This is a Marsh & McLellan Agency Capabilities
11   deck that Mercer had in its possession that it obtained
12   through a client and should not have had it in its
13   possession.
14   Q.  Why did you send it to your home?
15   A.  It was helpful to compete against them in
16   situations where I had it, so having readily access to
17   it was helpful.
18   Q.  And how was it helpful?
19   A.  Well, Marsh & McLellan Agency was a competitor
20   of Mercer, so just like any competitor, knowing what
21   their capabilities were --
22   Q.  Even though --
23   A.  -- in a presentation would be helpful.
24   Q.  Even though they're a sister company, they're

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

**Page 125**

1  competitors?
2  A.  They are 100 percent a competitor to Mercer.
3  Q.  This would be helpful to any competitor of
4  Mercer; right?
5  A.  Excuse me?
6  Q.  This information would be helpful to any
7  competitor of Mercer?
8  A.  No.
9  Q.  It wouldn't?
10  A.  This is completely irrelevant to Mercer.  This
11  is about Marsh & McLellan Agency, a totally separate
12  company.
13  Q.  Would it be helpful to a competitor of Marsh &
14  McLellan?
15  A.  Would this be?
16  Q.  Correct.
17  A.  Yeah.
18  (Plaintiff's Exhibit 16, E-mail with links, was
19  marked for identification.)
20  BY MR. WEBER:
21  Q.  I'm showing you Plaintiff's Exhibit 16, an
22  e-mail dated October 11th from you to your home e-mail
23  Hotmail account, and there are five apparently
24  attachments that -- or links on this document.  Do you

**Page 126**

1  see that?
2  A.  Yes.
3  Q.  Can you explain what's attached to this, what
4  the links are?
5  A.  I'm not sure what the iMercer Compensation Data
6  link is to.
7  Q.  What do you think that is?
8  A.  I wouldn't want to comment on what I think it
9  is.  I don't know what it is.
10  Q.  But you sent it to your home e-mail so there
11  must have been a reason for that.
12  A.  Yeah, I can tell you exactly what this is.
13  Q.  Okay.
14  A.  So I believe, if I remember correctly if the
15  timing is correct, we were having a - what do we call
16  them - a offsite sales management meeting.  All this
17  stuff was forwarded to the attendees.  I could not
18  attend in person, so Cory Lynn asked me if I would be
19  able to participate over the phone.  I was not positive
20  I would be able to based on my calendar, so I forwarded
21  it to my home address so I had access to it.
22  Q.  And when was that call?
23  A.  That was an offsite meeting, so, again, if my
24  recollection is correct, it was somewhere on or around

**Page 127**

1  the time of that date, if I remember correctly.
2  Q.  On or around October 11th?
3  A.  If I remember correctly.
4  Q.  One of the links is to UHC Motion for 1-1-18.
5  Do you see that?
6  A.  Yes.
7  Q.  What's that about?
8  A.  I don't know.  Again, if my recollection is
9  correct, my understanding that these are all the things
10  that were going to be discussed about at that sales
11  conference.  Actually, no.  I think I know what that
12  might be.
13  Q.  Okay.
14  A.  I think that's a United Healthcare program
15  where they paid for something to do with health savings
16  accounts if individuals do certain things.  So it's
17  something that's proprietary to United Healthcare and
18  not Mercer.
19  Q.  Helpful though to your sales efforts?
20  A.  No.  It's irrelevant.  It would be helpful to
21  anyone who works at United Healthcare.  It's marketing
22  material.
23  (Plaintiff's Exhibit 17, E-mail, was marked for
24  identification.)

**Page 128**

1  BY MR. WEBER:
2  Q.  Let me show you what's been marked Plaintiff's
3  Exhibit 17, an e-mail you sent to your home Hotmail
4  account dated October 11th, "Emails" is the subject,
5  "Flag:  Follow up."  Can you describe what that document
6  is?
7  A.  Yeah.  This is a draft e-mail I used to keep
8  just so I could keep e-mail addresses tagged to certain
9  items, so when I wanted to send out invitations it was
10  easier to send it out versus having to click each
11  individual person I wanted to send invitations to.
12  Q.  And "PE" is what, private equity?
13  A.  Yes.  Those would be individuals that work at
14  private equity companies.
15  Q.  And were any of these clients of Mercer?
16  A.  Which ones?
17  Q.  I'm asking you, were any of them?
18  A.  Any of these e-mail addresses on here?  I'm
19  sure some of them here are clients of Mercer.
20  Q.  And C-Suite are?
21  A.  CEOs, CFOs, CIOs, CAOs, other executives.
22  Q.  And you compiled this list during your
23  employment at Mercer?
24  A.  No.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 129

1   Q.   When did you compile this list?
2   A.   On, on, before and during, meaning you could
3   count this to be equivalent to my Outlook contacts.
4   Q.   So this would have been compiled certainly with
5   employment at Marsh and/or Mercer; correct?
6   A.   And before.
7   Q.   Before you were in college?
8   A.   Yeah.  I had an internship at a couple
9   different places.  I also worked at Nationwide.  I also
10  attended personal events where I would meet people and
11  get business cards.
12  Q.   You can't tell by looking at this document
13  which of these contacts were from people you met before
14  joining Marsh or Mercer, can you?
15  A.   Not at this exact second, no.
16  Q.   We have PE.  We have C-Suite.  We have Senior
17  HR.  What is that?
18  A.   Those would be individuals that I would
19  consider to be more senior level HR people, so someone
20  that would be in human resources at the executive level.
21  Q.   Potential clients, if not actual clients?
22  A.   Yes, and also potentially companies that are
23  not clients or even potential clients because they're
24  too small for Mercer.

---

Page 130

1   Q.   And then the next category is Seminar Invites?
2   A.   Yes.
3   Q.   See that?  What is that?
4   A.   Again, like all of these sub headings are
5   e-mail addresses to individuals that I would want to
6   send something to quickly for invitations so I didn't
7   have to go through my Rolodex and click on each
8   individual e-mail to send it.
9   Q.   And the last one appears to be Golf?
10  A.   Yeah.
11  Q.   And what is that?
12  A.   I believe it's a list of e-mail addresses of
13  people that may have, at one point in time, mentioned
14  they liked to golf, so if I was ever hosting an event or
15  needed an extra person for a foursome I would send out
16  an e-mail.
17  Q.   Any of these Mercer or Marsh clients?
18  A.   Potentially.
19  Q.   I'm sorry?
20  A.   Potentially.  I would not know what Marsh
21  clients are.
22  Q.   Would you know Mercer clients?
23  A.   I would not know all the Mercer clients off the
24  top of my head either.

---

Page 131

1   Q.   In that Golf group can you recognize any Mercer
2   clients in that group?
3   A.   Pete Prygelski at Federated National, but that
4   e-mail address doesn't work because he doesn't work
5   there anymore and hasn't for well over a year.
6   Q.   You sent that document to yourself on
7   October 11th; right?
8   A.   Yeah.  I'm still reading.
9   Q.   You don't have to read any further, but I want
10  to ask you, you felt it would be helpful to you, that
11  document?
12  A.   I don't remember why I sent this to myself at
13  that time.
14  Q.   Okay.
15       (Plaintiff's Exhibit 18, E-mail, was marked for
16  identification.)
17  BY MR. WEBER:
18  Q.   Show you what's been marked Plaintiff's
19  Exhibit 18, an e-mail from yourself to yourself dated
20  November 13th re:  Financial Wellness - Mercer.  Tell me
21  what that document is.
22  A.   If I can read it.  Give me a second, please.
23  Q.   Sure.
24  A.   It's an e-mail from one of my former colleagues

---

Page 132

1   to another former colleague requesting competitive
2   intelligence about Aon, which I suppose Mercer had in
3   their possession.
4   Q.   And is that those links to that information?
5   A.   I don't see links on here.
6   Q.   Well, where it says in the middle, looks like
7   "if Isupportlists".
8   A.   Those don't appear to be links.
9   Q.   Right.
10  A.   I can read what it says, but that's certainly
11  not a link.  If you type that in somewhere that wouldn't
12  do anything.
13  Q.   Did you try to type it in?
14  A.   No.  I'm just suggesting I know what a link
15  looks like and it does not look like a link.
16  Q.   Why did you send that e-mail on November 13th?
17  A.   I don't recall.
18       (Plaintiff's Exhibit 19, E-mail with Standard
19  Commission chart, was marked for identification.)
20  BY MR. WEBER:
21  Q.   Show you Plaintiff's Exhibit 19.  It's an
22  e-mail you sent to yourself on November 13th, Standard
23  Commission Benchmarks.  See that?
24  A.   Yes.

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 133

1    Q.  And tell me what this document is.
2    A.  Let me read it for a second.  It looks like it
3    is a list of lines of coverage, medical, stop-loss,
4    dental, vision, et cetera, and then by employee count
5    the average commission per line of business.  The below
6    remark says, "The above benchmarks are average and do
7    not take into account employer premiums that are
8    significantly greater or lower than industry norms.
9    Such factors may cause commission percentages to vary."
10   Q.  Are these commissions that you received as a
11   salesperson?
12   A.  No.
13   Q.  What are they?
14   A.  As I stated, these are average industry
15   commissions that any broker would potentially be getting
16   on any one of these line of businesses depending on the
17   size of the employer.
18   Q.  And why did you send it to yourself on
19   November 13th?
20   A.  It's helpful to have this information when
21   you're at a client meeting or a future client meeting.
22          (Plaintiff's Exhibit 20, E-mail with
23   attachments, was marked for identification.)
24

---

Page 134

1    BY MR. WEBER:
2    Q.  Show you Plaintiff's Exhibit 20, an e-mail from
3    yourself to yourself on November 13th forwarding an
4    e-mail from Deborah Lage or Lage to yourself and others.
5    Can you tell me what this document is?  It seems to
6    attach a deck of some sort.
7    A.  It appears to be a document that was presented
8    to Dream II Holdings.
9    Q.  Right.  And who is that or what is that?
10   A.  I can't recall when they became a client,
11   whether it was on or before this date, so it was either
12   a prospective client at the time or a client.  I don't
13   know.
14   Q.  Did you bring that client in?
15   A.  I was on the pursuit team for that, yes.
16   Q.  And tell me what this document is, the Dream II
17   Holdings, LLC.
18   A.  It says, "Optimize, Compete, and Excel.  Dream
19   II Holdings.  Program Review and Harmonization."
20   Q.  Tell me about Hollander Sleep Products (HSP)
21   Observations and Considerations, some data there; right?
22   A.  Which page are you on?
23   Q.  Page 4 of the --
24   A.  Yes, it says Hollander Sleep Products (HSP)

---

Page 135

1    Observations and Considerations.
2    Q.  Do you know what that's about?
3    A.  It appears to be information that was reviewed
4    and Mercer's observation about the information that
5    Hollander or HSP provided.
6    Q.  Was HSP a client?
7    A.  Again, I'm not sure at this time whether they
8    were or weren't a client of Mercer.
9    Q.  Did they become one, to your knowledge?
10   A.  Yes.
11   Q.  Are they one now?
12   A.  I have no privy into Mercer's current clients.
13   Q.  Have you reached out to them since you joined
14   Lockton?
15   A.  Yes.
16   Q.  When?
17   A.  I don't recall.
18   Q.  Since January 17th, 2018?
19   A.  Yes.
20   Q.  A couple pages down there is Pacific Coast
21   Feather Company.  See that?
22   A.  Which page are you on?
23   Q.  It says 6.
24   A.  Okay.

---

Page 136

1    Q.  Do you know what that is?
2    A.  Same as above.  It looks to be comments from
3    Mercer on specific items within Pacific Coast Feather
4    Company's program at the time.
5    Q.  Were they a client of Mercer?
6    A.  Again, I can't comment on on or before
7    November 13th whether they were or weren't a client at
8    that time.
9    Q.  Have you reached out to Pacific Coast Feather
10   Company since January 17th?
11   A.  They're the same company.
12   Q.  As Hollander?
13   A.  Yes.
14   Q.  Who did you reach out to at Hollander since
15   January 17th?
16   A.  Jim Allen.  He's a personal friend of mine.
17   He's a CFO for Hollander.  I called him just out of
18   respect to let him know I made a change to Lockton and
19   to thank him for his consideration.
20   Q.  Have you pitched business with him?
21   A.  No.  Well, actually - excuse me - let me take
22   that back.  When I was at Mercer, yes.  When I was at
23   Lockton, no.
24   Q.  Has anybody else at Lockton pitched business

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 137

1 for him?
2   A. I have no knowledge what anyone else at Lockton
3 has done with Hollander.
4      (Plaintiff's Exhibit 21, E-mail with
5 attachments, was marked for identification.)
6 BY MR. WEBER:
7   Q. I'll show you Plaintiff's Exhibit 21, an e-mail
8 from yourself again to yourself at your Hotmail address
9 dated November 14th. Can you tell me what this is?
10   A. I believe this is the meeting I was referring
11 to earlier that as to why I forwarded that e-mail to
12 myself.
13   Q. And what's the attachment?
14   A. These are Florida sales -- hold on. Agenda for
15 November 2017 Staff Meeting, Sunrise, Florida; Florida
16 Sales Grid; Unlock the Growth Together Handout; Unlock
17 Growth Together Handout 2; Carrier Assignments 2017; and
18 Carrier Relationship Management.
19      I believe this actually is directly related to
20 that e-mail you showed me earlier.
21   Q. And what's on page 3 of this document? It's
22 entitled Florida 2017 Sales and Percentage to Goal.
23   A. This is a separate report that Florida used to
24 keep on production.

Page 138

1   Q. Florida meaning Mercer?
2   A. No. Florida -- Mercer Florida only.
3   Q. I understand that. So tell me what's on that
4 list there, what's on the left column and what goes
5 across.
6   A. Last names.
7   Q. Of what?
8   A. Of people.
9   Q. Who?
10   A. Mercer employees --
11   Q. Okay.
12   A. -- as of November 10th, 2017.
13   Q. Right. What else is there?
14   A. It says "2017 Goal". I have no idea what the
15 second column says, it's too small, or the third.
16 Fourth says "Percentage of Goal" and then it has the
17 months listed from January to December.
18   Q. Are these sales figures?
19   A. Yes. From a monthly perspective, yes. These
20 are production numbers in any one given month.
21   Q. Does the third column appear to be annual
22 sales?
23   A. Third column. No.
24   Q. Now, looking at your own numbers there, does

Page 139

1 that help refresh your recollection of what your sales
2 were?
3   A. I know what my sales were.
4   Q. Okay. And tell me if that's accurate.
5   A. It's a little bit more than that.
6   Q. How much more?
7   A. I think it was 3.5.
8   Q. This is November, so you're thinking about
9 through the year?
10   A. Yeah, I'm just saying in total. These reports
11 aren't always a hundred percent accurate either, so...
12   Q. Well, as of November 10th, 2017, does that
13 number appear to be accurate for yourself?
14   A. No, because I know these reports are not
15 accurate. So no, that number is not accurate as of
16 November.
17   Q. But it's close to your sales; correct?
18   A. You'd have to define "close". It's within a
19 few hundred thousand dollars. Let's say it's within a
20 half a million.
21   Q. It's within 10 percent?
22   A. What's 10 percent of 320, 3,285,305?
23   Q. It's 320,000 the last I knew.
24   A. It's probably, it's within that, that and

Page 140

1 500,000 probably.
2   Q. Okay. And the other individuals list their
3 sales revenues as well?
4   A. Yeah. This is not exactly the same thing that
5 they're capturing on this report. I believe this report
6 captures what Mercer refers to as shadow credit, meaning
7 they didn't actually produce it. They were tagged to
8 it.
9   Q. Mm-hmm.
10   A. So Joanne and Jada, by example, if we produced
11 something together and it was worth $100,000, they would
12 get shadow credit for that. So they didn't actually
13 bring the money in. It's not real money that Mercer is
14 giving them credit for being part of the pursuit.
15   Q. Further on in the document there's something
16 called Mercer link.
17   A. What page are you on?
18   Q. Eight. See that? Page 1 of 2, "Site Page -
19 Unlocking Growth Together, MercerLink", see that?
20   A. Yeah.
21   Q. What is that?
22   A. This is the first time I'm seeing this.
23   Q. But you sent it to your home; right?
24   A. It doesn't mean I opened it or looked at it.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 141

1   Q. Are you saying you didn't?
2   A. To the best of my recollection I never opened
3 this document.
4   Q. You're saying you never opened the document
5 with this financial information on it when you sent it
6 to your home?
7   A. I'm saying looking on page 8 as you just
8 described, Unlocking Growth Together, this is the first
9 that I believe I've ever seen of this page.
10   Q. Well, we're going to the first page. You
11 acknowledge that you sent it to your home Hotmail
12 account; right?
13   A. Yes.
14   Q. Is it your testimony that you didn't look at
15 it, you just sent it to your home?
16     MR. SHAPIRO: Object to the form.
17   A. No, that's not what I'm saying. I'm saying I
18 don't recall seeing this specific page based on the
19 questions you had asked.
20 BY MR. WEBER:
21   Q. I see. You have may have seen it. You don't
22 recall?
23   A. Correct.
24   Q. So going back to it, do you recall what it

Page 142

1 means or what it refers to?
2   A. Let me read it. The first page looks to lay
3 out the new leadership team at Mercer, Ken Haderer. I
4 don't know. Mercer changed his leadership quickly, so I
5 assume he's the North American Regional. I've never met
6 him.
7   Q. Go two pages back in there, it says, "Draft,
8 Carrier by Coverage, Lead". Do you see that chart, two
9 pages?
10   A. You said back. Did you mean forward?
11   Q. I meant going back into the document. See
12 that? Tell me what that is.
13   A. I would -- I'm guessing this is -- I don't --
14 hold on. Let me see. This is the right page?
15     My guess would be this a carrier assignment
16 is my guess.
17   Q. Do you know why you sent that document to
18 yourself on November 14th?
19   A. I don't recall when I sent this or the reasons
20 for it.
21   Q. Well, you sent it on November 14th; right?
22   A. Yeah. Well, that's what this e-mail says, yes.
23   Q. But you're not disputing that it's the e-mail;
24 right?

Page 143

1   A. No. No. You asked me if I recall and I said
2 I'm not sure.
3   Q. Okay.
4     MR. SHAPIRO: Mike, I think we're at
5 two-and-a-half hours. Where are we?
6     MR. WEBER: I'm about three documents away.
7     MR. SHAPIRO: Okay. Good.
8     MR. WEBER: I'm going to be done in like my
9 three-hour. Thank you for your flexibility.
10     MR. SHAPIRO: You got it.
11     MR. WEBER: I'm talking as fast as I can.
12 She's not happy about that.
13     (Plaintiff's Exhibit 22, E-mail with
14 attachment, was marked for identification.)
15 BY MR. WEBER:
16   Q. Showing you Plaintiff's Exhibit 22, e-mail you
17 sent to yourself, correct, on November 16th?
18   A. Yes.
19   Q. Right? Tell me what that is.
20   A. So let me read it real quick. It appears to be
21 an e-mail from Harold Gubnitsky who is the, I think he's
22 president and chief strategy officer for ProcessMAP.
23 He's a friend of mine and he was offering me tickets to
24 a Dolphins game, and then he came as well I think, if

Page 144

1 I'm not mistaken.
2   Q. Is he a client of Mercer's?
3   A. No.
4     (Plaintiff's Exhibit 23, E-mail with
5 attachment, was marked for identification.)
6 BY MR. WEBER:
7   Q. Show you Plaintiff's Exhibit 23, e-mail that
8 you sent -- it's an e-mail you sent, right, to yourself
9 on November 16th?
10   A. Yes.
11   Q. And what is this document?
12   A. This is -- appears to be an e-mail that was
13 sent to For Eyes. It has within it Aon's Proprietary
14 Self Insured Statement of Work, and also Aon's
15 Proprietary HR Employee Benefits Statement of Work.
16   Q. And why did you send it home?
17   A. I believe at the time we were potentially going
18 to start going after this account again because we
19 didn't get the business last year.
20   Q. Did you go after the account?
21   A. In -- when? I mean, originally we did in
22 2000 -- I think early 2017 or late 2016. I don't
23 remember.
24   Q. Have you reached out to anyone at For Eyes

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 145

1   since you joined Lockton?
2      A.  Yes.
3      Q.  Who did you reach out to?
4      A.  I want to say Mary and Raysa.
5      Q.  And did you make this proposal to do business
6   with them?
7      A.  I never connected with them.
8      Q.  But you reached out to them?
9      A.  Yes, via my announcement and other e-mails.
10     Q.  You communicated with them beyond your initial
11  e-mail announcement; right?
12     A.  Again, I never made contact with them, just
13  those communications.
14     Q.  That's not my question.  Did you reach out to
15  them?
16     A.  Yes.
17     Q.  Since your initial e-mail?
18     A.  No.  Before.
19     Q.  Before you left?
20     A.  No.  If I understand your question correctly
21  was:  Did you reach out to them after joining Lockton?
22     Q.  Yes.
23     A.  I said yes, via my announcement.
24     Q.  Yes.  And I'm asking after your announcement

Page 146

1   did you make any effort to reach out to them again?
2      A.  I believe I reached out one or two more times
3   via e-mail but never connected with them.
4        (Plaintiff's Exhibit 24, E-mail with
5   attachment, was marked for identification.)
6   BY MR. WEBER:
7      Q.  Show you Plaintiff's Exhibit 24, an e-mail that
8   you sent home on November 16th, "Subject:  Annual
9   Renewal".  Do you see that document?
10     A.  Yes.
11     Q.  Tell me what it is.
12     A.  This is what appears to be a document that was
13  put together by Doug Czerwonka who's the vice president
14  the resources at Universal Trailer.
15     Q.  And what was the purpose of this e-mail
16  exchange?
17     A.  It wasn't an exchange.  He e-mailed me.
18     Q.  You e-mailed him back on November 16th, 2017,
19  at 11:45 a.m.; right?
20     A.  I don't have that e-mail in front of me.
21     Q.  Well, take a look in the middle of the page.
22  Do you see from yourself to Roberts?
23     A.  I think you're looking at the wrong --
24        MR. SHAPIRO: I think we've got different

Page 147

1   documents.
2        MR. DIGREGORIO:  You've got different
3   documents.  This is only two pages.
4        MR. WEBER:  That's good.  Always helpful.
5        MR. SHAPIRO:  We've got one.
6        MR. WEBER:  Are yours two the same and mine
7   different?
8        MR. SHAPIRO:  I've got a three-page.
9        MR. SIEGEL:  No.  The e-mail marked is
10  different than the one you handed us as Exhibit 24.
11        MR. WEBER:  Indeed it is.  Okay.  Let's see if
12  we can figure that one out.
13        MR. SIEGEL:  So that's going to be, the one you
14  marked is going to stay 24 and this one will be 25.
15        MR. WEBER:  Yeah, let's leave this.  But this
16  one is the right one.  This is what I'm talking
17  about, 24.
18        MR. DIGREGORIO:  That's what I was handed
19  though.
20        MR. WEBER:  Yeah.  I made a mistake.  This is
21  what I want you to see and for some reason --
22        MR. SHAPIRO:  So why don't we mark this.
23        MR. WEBER:  It is marked.
24        MR. DIGREGORIO:  This one is marked.

Page 148

1        MR. SIEGEL:  No.  No.  What was marked was a
2   different document.
3        MR. WEBER:  Let's mark that 24.  Thank you.
4   Sorry.
5        (Plaintiff's Exhibit 25, E-mail, was marked for
6   identification.)
7   BY MR. WEBER:
8      Q.  I'll show you what's been now marked
9   Plaintiff's Exhibit 25, ask you if you're familiar with
10  that document.
11     A.  Okay.  Give me a second to take a look at it.
12  Okay.  I've read it.  And your question?
13     Q.  Are you familiar with it?
14     A.  Yes.
15     Q.  You sent that yourself on November 16th?
16     A.  Yes.
17     Q.  And why did you send it home?
18     A.  I don't recall.
19     Q.  You say that -- you do see your e-mail in the
20  middle of the page, correct, November 16th at
21  11:54 a.m.?
22     A.  11:54.  Sure.
23     Q.  You see that; right?
24     A.  Yeah.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 149

1    Q.   You sent Robert an e-mail on November 16th at
2    11:54; right?
3    A.   Correct.
4    Q.   And you have a number of sentences, but the
5    last sentence says, "Can we talk in January about
6    evaluating your broker relationship?"  Correct?
7    A.   Correct, but I don't believe this was the end
8    of our discussion.  I believe we had other discussions.
9    Q.   I'm just asking you a question.
10   A.   So do I see that?  Yes, I see that this says,
11   "Can we talk in January about evaluating" --
12   Q.   Did you say that?
13   A.   Well, I wrote it, yes.
14   Q.   You wrote that; right?
15   A.   Yes.
16   Q.   And read his response to you.
17   A.   "We can.  I'm ready to make a move.  Per below,
18   though, you set a high expectation."
19   Q.   So when he says, "I'm ready to make a move" --
20   A.   Sure.
21   Q.   -- was he ready to make a move at that time in
22   November?
23   A.   No.
24   Q.   Okay.  We'll make an extra copy.  Let's put

---

Page 150

1    that -- exactly.
2         Now we'll go back to what was marked 24.
3    A.   So this is the one that I was just reviewing.
4         MR. SIEGEL: Do you have extra copies?
5    BY MR. WEBER:
6    Q.   Is that a two-page one?
7    A.   Yes.
8    Q.   Tell me what this document is.
9    A.   This is an e-mail from Doug Czerwonka, the VP
10   or -- excuse me -- vice president of Human Resources at
11   Universal Trailer to me saying, "Look this over and
12   let's have a quick call.  I'm anxious to move ahead
13   since we ended open enrollment."
14   Q.   And why did you send that to yourself on
15   November 16th?
16   A.   I believe to look it over.  If I'm not
17   mistaken, that's in or around Thanksgiving, I was
18   leaving for vacation, so I could actually review it.
19   Q.   And did you -- strike that.
20        Have you reached out to Mr. Czerwonka since you
21   joined Lockton?
22   A.   Yes.
23   Q.   And you made a proposal to him?
24   A.   They're a Lockton client.

---

Page 151

1    Q.   They were?
2    A.   Prior to me joining the firm and for years
3    prior to that.
4    Q.   And what kind of business did Lockton do with
5    Universal Trailer?
6         MR. DIGREGORIO: Is that propriety to Lockton?
7    Can I answer that?
8         MR. SHAPIRO: That's fine.
9    A.   Okay.  So my understanding is out of the
10   Chicago office Lockton does their employee benefits
11   brokers and their property and casualty brokers and has
12   for many, many years.
13   BY MR. WEBER:
14   Q.   Okay.  So now you're doing different business
15   with them now; correct?
16   A.   I don't understand your question.
17   Q.   Are you not doing business with them out of the
18   Florida office?
19   A.   I still don't understand the question.
20   Q.   When you went to see Mr. Czerwonka, did you go
21   to see him to expand the business that Lockton was doing
22   with them?
23   A.   I have not seen Doug since I joined the
24   company.

---

Page 152

1    Q.   Okay.  That answers that.
2         (Plaintiff's Exhibit 26, E-mail, was marked for
3    identification.)
4    BY MR. WEBER:
5    Q.   Let me show you what's been marked Plaintiff's
6    Exhibit 26.  It appears to be an e-mail you sent on
7    December 8th to yourself, "Subject:  Armin Strom".
8    A.   Yep.
9    Q.   Can you explain what that is?  It may be
10   nothing and it may be just --
11   A.   It's definitely nothing.
12   Q.   Humorous aside, but I'd like to know --
13   A.   This is the smoking gun 2.
14   Q.   Yep.
15   A.   Armin Strom is a high-end watchmaker, and these
16   are two watches I was looking at and the prices
17   associated with those watches.
18   Q.   30,000 and 4,000?
19   A.   54,000.
20   Q.   Not bad.
21        MR. SHAPIRO: I'm not charging enough.
22        MR. DIGREGORIO: I'm good at what I do.
23        MR. WEBER: That's why I wanted it.
24        MR. DIGREGORIO: For the record, I did not buy

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

**Page 153**

1    either one of those watches. They're very nice
2    watches. Give me a couple of years at Lockton, I
3    will buy those watches.
4        (Plaintiff's Exhibit 27, E-mail, was marked for
5    identification.)
6    BY MR. WEBER:
7        Q.  Showing you Defendant's -- excuse me --
8    Plaintiff's Exhibit 27, an e-mail that you sent home on
9    January 16th. Tell me what that is.
10       A.  Let me just read it real quick. This is
11   smoking gun 3 in that this is an e-mail from Jennifer
12   Buchanan who's a director of Senior Development at
13   Cystic Fibrosis of which is I was a chairman for their
14   largest event in south Florida for eight years.
15       Q.  They're not a client of Mercer, are they?
16       A.  No. She was reaching out to just catch up and
17   have lunch.
18       Q.  Are they a client of Lockton's?
19       A.  I have no idea who does Cystic Fibrosis
20   Foundation's work. I don't even know where they're
21   based out of. Again, I was the chairman for many, many
22   years in south Florida for one of their largest events.
23       Q.  Okay.
24       (Plaintiff's Exhibit 28, E-mail, was marked for

---

**Page 154**

1    identification.)
2    BY MR. WEBER:
3        Q.  Let me show you what's been marked Plaintiff's
4    Exhibit 28 e-mail from Warren Wirth to you on
5    January 26th. Do you see that?
6        A.  Sure.
7        MR. SHAPIRO: Object to the form.
8        MR. WEBER: What's that?
9        MR. DIGREGORIO: 28.
10       MR. SHAPIRO: I objected to the form of the
11   question, yeah.
12   BY MR. WEBER:
13       Q.  And this is an e-mail from Warren to you
14   congratulating you on your move. See that?
15       A.  It appears to be.
16       Q.  And was Ultimate Software a client of Mercer?
17       A.  No.
18       Q.  What is ultimate software?
19       A.  It's an HRS software company that delivers
20   software to employers.
21       Q.  Okay. Did you send a notice to him that you
22   had joined Lockton?
23       A.  Not at that time, no.
24       Q.  Do you understand why the subject is "Congrats

---

**Page 155**

1    on your move to Lockton", how he learned that
2    information?
3        A.  Well, because by the 26th of January I had
4    already left.
5        Q.  I understand that, but how did he -- do you
6    have any idea --
7        A.  You'd have to ask Warren how he found out.
8        Q.  You don't know?
9        A.  I don't know how Warren found out.
10       Q.  You never sent him any announcement?
11       A.  No. I never sent Warren a direct announcement
12   on or before the 22nd of January.
13       Q.  So we've gone through 28 documents of e-mails
14   that you sent while you were employed by Mercer to your
15   home e-mail account; correct?
16       A.  I didn't count them, but if that's the number,
17   then yes.
18       Q.  28 is the last exhibit.
19       A.  Okay.
20       Q.  You're right, not all of them were e-mails. A
21   substantial number of them.
22       Is it your testimony that you do not have
23   possession of any of those documents that you sent to
24   yourself?

---

**Page 156**

1        A.  No.
2        Q.  It is not your testimony?
3        A.  No.
4        Q.  What is your testimony? You have these
5    documents?
6        A.  No.
7        Q.  Let me rephrase it.
8        Is it your testimony that on all the e-mails
9    that you sent to yourself in October, November, and
10   December while you were employed by Mercer no longer
11   exist on any of your electronic devices?
12       MR. SHAPIRO: Object to the form.
13       A.  Can you repeat the question, please?
14   BY MR. WEBER:
15       Q.  Sure.
16       On all of the e-mails that you sent while you
17   were employed by Mercer to your home e-mail address that
18   we've just gone through this morning, do you still have
19   any of those documents either on your personal devices,
20   laptop, iPhone, airdrop, or any Lockton computer or
21   other similar device?
22       A.  Can you break that question up? That's like
23   multiple questions in one.
24       Q.  What don't you understand?

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 157

1   A.  You asked multiple questions and asked me to
2   give you a yes or no answer.
3   Q.  Okay.  My questions have to do with whether any
4   of these documents that we've gone through today exist
5   in your possession in any form or in Lockton's
6   possession in any form?
7   A.  Yes.
8   Q.  Do you understand that question?
9   A.  Yes.
10  Q.  Where do they exist?
11  A.  A few of them exist in my personal e-mail
12  account.
13  Q.  Which ones?
14  A.  I would have to physically go through them.
15  Q.  Go through them.
16       MR. SHAPIRO:  Please go through them.  The
17  first few were not.
18       MR. DIGREGORIO:  Could we start at wherever --
19       MR. SHAPIRO:  Yeah.
20       MR. DIGREGORIO:  Which number did it start at?
21       MR. SHAPIRO:  Here.  I got it.
22  BY MR. WEBER:
23  Q.  Start with the first e-mail in the exhibits
24  that you sent home.

---

Page 158

1   A.  Is this one of them?
2   Q.  No.  Here.  Starts here.
3   A.  That's not one?
4   Q.  No.  Starting here.
5   A.  Okay.
6       MR. SHAPIRO:  This is the resignation letter.
7       MR. DIGREGORIO:  But I have that in my own
8   e-mail account.
9       MR. SHAPIRO:  Technically you're right.  Okay.
10  Got it.
11  A.  So I have --
12  BY MR. WEBER:
13  Q.  Mention the exhibit number, please.
14  A.  I have Exhibit 5 in my home e-mail account.
15  Q.  Okay.
16       MR. SIEGEL:  The resignation letter.
17  A.  My resignation letter.
18  BY MR. WEBER:
19  Q.  Go ahead.
20  A.  I potentially could have the Jewelers Mutual
21  Insurance name of which was a jewelry insurance
22  company --
23  Q.  Okay.
24  A.  -- for my wife.

---

Page 159

1       My declaration, I may have that in my personal
2   e-mail.
3       MR. SHAPIRO:  Reference the exhibit number.
4   A.  Exhibit 6.
5       To the best of my knowledge I deleted
6   Exhibit 8.
7       MR. SIEGEL:  The only ones -- just go through
8   the ones you might have; not the ones you deleted.
9       MR. DIGREGORIO:  Okay.
10  A.  I may have Exhibit 9.  I may have Exhibit 10.
11  I may have Exhibit 11.  I may have Exhibit 12 I do
12  not -- oh, sorry.
13  BY MR. WEBER:
14  Q.  13?
15  A.  No.  I don't believe I have -- I don't believe
16  I have 14.
17  Q.  Okay.
18  A.  I believe I have 15.  I don't believe I have
19  16.  I do have 17.  I don't recall if I have 19.
20  Q.  How about 18?
21  A.  I don't.  I thought you asked me just to do the
22  ones I don't.
23  Q.  I'm sorry.
24  A.  I don't believe I have 19.  I can't recall if I

---

Page 160

1   have 22.  I have 23.  I don't believe I have 25.  I
2   don't believe I have 24.  I potentially could have 26.
3   I may have 27.  And most certainly I do not have 28
4   because it went to Mercer's server.
5   Q.  Okay.  Now, you identified your home, I think
6   you said, desktop is an Apple?
7   A.  Yes.
8   Q.  Do you have any other computers at home?
9   A.  I have an old, an old Apple laptop that was my
10  wife's.
11  Q.  You used that today?
12  A.  No.
13  Q.  Did you use it in 2017?
14  A.  I may have used it to print something off.
15  Q.  Did you store any information on it?
16  A.  No.
17  Q.  What else do you have by way of computers or
18  laptops or iPhones?
19  A.  I believe my youngest daughter has a Dell
20  laptop that we've never used or I've never used.
21  Q.  You've never stored any information on it?
22  A.  No.
23  Q.  What kind of computer does your wife have?
24  A.  Well, we use the Apple computer that you first

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 161

1   referenced, the desktop. That's our home computer.
2   Q. What's her e-mail address?
3   A. Ligelle@aol.com.
4   Q. Say that again.
5   A. Ligelle@aol.com.
6   Q. Do you or your wife have any other e-mail
7   addresses other than Mattd5454@hotmail.com or the one
8   you just described?
9   A. I may, but I don't use them.
10  Q. What ones?
11  A. I don't know.
12  Q. Do you know the names?
13  A. I believe I had a Yahoo account at one time. I
14  don't know the address.
15  Q. What about Gmail?
16  A. I probably have to have a Gmail account
17  somewhere because I have a Galaxy phone. I just don't
18  use it. I don't know what it is either.
19  Q. So when you said today that you might, some you
20  acknowledge you do have at home and some you might, the
21  only way to know that is to go and look at your
22  computer; right?
23  MR. SHAPIRO: Object to the form.
24  A. No.

---

Page 162

1   BY MR. WEBER:
2   Q. How else would we know?
3   A. I'm sorry. I misunderstood the question. I
4   thought you asked is that the only way I would know.
5   Q. How would one know - "one" meaning you, me, or
6   your attorneys - other than looking at your computer?
7   A. There wouldn't be another way.
8   Q. That's the only way; correct?
9   A. For me to ascertain, correct.
10  Q. Or for anyone to ascertain.
11  A. For me to ascertain, correct.
12  Q. Yeah. Now, some of the information you said
13  you possess, would you also possess it on your Lockton
14  computer?
15  A. No.
16  Q. Why are you so certain?
17  A. Because I have not opened, to the best of my
18  knowledge, I have not opened -- let me back up.
19       I deleted all of the documents that I was aware
20  of in my possession prior to leaving Mercer. I only
21  recently became aware that there were other documents
22  that I missed, and I became aware of that on or around
23  the time of the lawsuit. And I was instructed not to
24  delete anything, which is why they're still in my

---

Page 163

1   possession.
2   Q. Now, the documents that we showed you today
3   that you think might be in your possession are the ones
4   that your attorneys saw (sic) you to preserve?
5   A. I'm sorry. Can you repeat that?
6       MR. WEBER: Read it back.
7       (The requested portion of the record was read
8       back by the court reporter.)
9       MR. SIEGEL: Attorneys told you to preserve.
10      MR. SHAPIRO: Do you mind just asking it again,
11  Mike, so we get the right question.
12      MR. WEBER: Sure.
13  BY MR. WEBER:
14  Q. What I want to know is that you acknowledge
15  that you kept certain documents that you sent to
16  yourself when you were employed by Mercer?
17  A. No. I acknowledge that I didn't realize that I
18  accidentally had some of these documents after making an
19  effort to delete everything in my possession prior to
20  leaving Mercer.
21  Q. Okay. So that's what the reference was to
22  today's acknowledgment; correct?
23  A. Correct.
24  Q. When your attorneys advise you to preserve all

---

Page 164

1   documents --
2   A. Yes.
3   Q. -- when did they do that?
4   A. I don't remember the specific date, but I would
5   imagine it was on the same day and time the injunction
6   was delivered.
7   Q. Okay. And are there --
8   A. Yeah, I would imagine that's the case.
9   Q. Are there documents that your attorneys told
10  you to preserve that have not been discussed here today?
11  A. Not to my knowledge.
12  Q. And do they reside in your home computer?
13  A. The documents presented to me today, correct,
14  would be not -- no. Actually, no, not my home computer.
15  In my Hotmail account --
16  Q. Okay.
17  A. -- which is a cloud-based system.
18  Q. Do you use any other storage devices to
19  maintain documents?
20  A. No.
21  Q. You ever use a floppy disk?
22  A. Have I ever used a floppy disk in my life?
23  Yes.
24  Q. To maintain, to keep documents?

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

Page 165

1   A. I'm confident in the history of my life I've
2   used a floppy disk.
3   Q. In the last 12 months, have you ever used any
4   other electronic storage devices?
5   A. To the best of my knowledge, no.
6   Q. Ever use a USB drive?
7   A. Yes, I'm sure I've used a USB drive.
8   Q. For business purposes?
9   A. Yes, I'm sure in my career I've used a USB
10  drive.
11  Q. In the last 12 months I'm asking you.
12  A. Not to the best of my knowledge.
13  Q. Have you ever used any zip drives?
14  A. I'm sure I've used a zip drive within the last
15  12 months.
16  Q. For business purposes?
17  A. Yes.
18  Q. And do you have possession of those zip drives?
19  A. I don't understand. Your questions are not
20  accurate the way you're stating them.
21  Q. Okay. Do you ever use any CD's?
22  A. To listen to music, yes.
23  Q. Well, what I'm trying to get at here is there
24  are a number of devices which you can store information

---

Page 166

1   on you're aware of; correct?
2   A. Yes.
3   Q. USB drive, zip drive, CD's, external hard
4   drives, et cetera. I'm asking you over the last 12
5   months have you stored any Mercer or Marsh data on any
6   of those electronic storage devices?
7   A. And my answer to that question is I don't
8   recall in the last 12 months whether or not I've used
9   that in the course of business at Mercer for Mercer
10  business, but I most certainly did not use any of those
11  to either take, maintain, or keep information from
12  Mercer.
13  Q. But they're in your possession, these
14  electronic storage devices?
15      MR. SHAPIRO: Object to the form.
16  A. You must not have understood my answer. I just
17  stated that I don't have those things. I didn't take
18  those things.
19  BY MR. WEBER:
20  Q. I'm asking you a question. Do you currently
21  have in your home or office or elsewhere any electronic
22  storage devices that have Mercer or Marsh material on
23  them?
24  A. Please repeat the question.

---

Page 167

1   Q. Please read it back.
2       (The requested portion of the record was read
3   back by the court reporter.)
4   A. No.
5   BY MR. WEBER:
6   Q. Would you identify all telephone numbers,
7   mobile and landline, that you own?
8   A. (610) 203-4251. I have to go into my phone to
9   understand what this number is because I don't ever use
10  it.
11  Q. And tell me the service provider as well.
12  A. Sure. Hold on one second. (786) 682-8778.
13  That is a Verizon, if I'm not mistaken. And the first
14  number was a T-Mobile.
15  Q. Have you ever -- strike that.
16      Since November 1, 2017, to the present time,
17  have you contacted any Mercer employees?
18  A. Please repeat the question.
19  Q. I'll rephrase it and I'll restate it.
20      Since November 1, 2017, to January 17th, 2018,
21  have you contacted any Mercer employees about leaving
22  Mercer?
23  A. No.
24  Q. Since January 17th, 2018, to the present, have

---

Page 168

1   you contacted any Mercer employees about leaving Mercer?
2   A. No.
3   Q. Since January 17, 2018, have you contacted any
4   Mercer clients?
5   A. When were the dates again?
6   Q. January 17th, 2018, to the present.
7   A. Yes.
8   Q. Tell me who they are.
9   A. I sent an e-mail out to all of my contacts. I
10  suppose there are clients in there that received it. I
11  don't know whom.
12  Q. Okay. Any other communications?
13  A. I did make phone calls to a number of them; I
14  don't remember who they are off the top of my head.
15  Q. Make any sales calls on any -- strike that.
16      Which companies have you made sales calls on
17  since January 17th, 2018?
18      MR. SHAPIRO: Object to the form.
19  A. Define "sales calls".
20  BY MR. WEBER:
21  Q. Pitches, lunches, golf outings, to do your job.
22  Have you made any efforts to do your job to get
23  businesses January 18th or 17th, 2018, and to whom?
24      MR. SHAPIRO: Object to the form.

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 169

1   A.  So the question, if I understand it, is have I
2 made any efforts to do my business --
3 BY MR. WEBER:
4   Q.  Mm-hmm.
5   A.  -- since I joined Lockton?
6   Q.  Correct.
7   A.  Yes.
8   Q.  And who have you met with?
9   A.  I've met with many people since I've joined
10 Lockton.
11   Q.  How many?
12   A.  I don't know off the top of my head.
13   Q.  As best as you can recall, can you name them?
14   A.  I'm not at liberty to name every person I've
15 met with since I, since I joined Lockton.
16   Q.  You're not at liberty?
17   A.  Well, I mean, I don't know off the top of my
18 head how many people I've met with since I joined
19 Lockton.
20   Q.  Well, you must have a record of them somewhere;
21 right?
22   A.  Not necessarily, no.
23   Q.  So there's no record of who you met with since
24 January 17th in the last two months --

Page 170

1   A.  There would not --
2   Q.  -- and you don't recall who they are?
3   A.  No.  What I was suggesting or what I'm saying
4 is I can't remember every person I've met with since
5 January.
6   Q.  Let's start with anyone you do remember.
7   A.  Let's see.
8     MR. SIEGEL: Are you talking about Mercer
9   clients?
10     MR. DIGREGORIO: Yeah, that's why --
11     MR. WEBER: I'm talking about anyone.
12     MR. DIGREGORIO: Any human being apparently.
13 BY MR. WEBER:
14   Q.  Any business efforts in the last two months,
15 I'd like the name of the entity and the individual.
16   A.  Which you defined as lunches --
17   Q.  Any effort to get business.  You know what you
18 do.  You do it in different ways.
19   A.  But you're asking, but you're asking the
20 question.
21   Q.  I am.  Tell me every individual you met with
22 since January 17 with an intent to get their business.
23     MR. SHAPIRO: I don't see how -- it doesn't, in
24   any way, relate to Mercer -- how that relates to the

Page 171

1 expedited discovery in the preliminary injunction.
2     MR. WEBER: I'll modify my question
3 accordingly.
4     MR. SIEGEL: In what way?
5     MR. WEBER: Related to Mercer clients.
6   A.  So since we've just gone through eight versions
7 of I think the same question, have I met with any Mercer
8 clients or had lunch with any Mercer clients?
9 BY MR. WEBER:
10   Q.  Had drinks with any Mercer clients.
11   A.  Drinks with Mercer clients.
12   Q.  Any meals, any social activity, anything to get
13 their business since January --
14   A.  Those are two different questions.
15   Q.  -- since January 17th. You're right.  Let's
16 break it up.  Let's just meet with them.
17     Who have you met with?
18   A.  I've met with Duffy's.  I've met with Palm
19 Beach Country Club.  I've had social interactions with
20 Oxis.  One of the owners is a member of my country club.
21 I've met with -- I'm sure I've run into various people
22 at different networking events; I can't recall who off
23 the top of my head.
24     Who else have I met with?  I can't recall any

Page 172

1 other meetings where there were Mercer clients.
2   Q.  Do you have any recording of meetings that you
3 have or have had by way of an Outlook calendar or a
4 paper calendar?
5   A.  I do keep an Outlook calendar, yes.
6   Q.  And that would contain the meetings that you've
7 had in the last two months?
8   A.  Yes.
9     MR. WEBER: Okay.
10     MR. SHAPIRO: Good, Mike?
11     Okay.  We're going to take a break.  I might
12   just have a few questions for you.
13     MR. SIEGEL: You're done?
14     MR. WEBER: Yeah.
15     MR. SHAPIRO: All right.
16     (Off the record 11:51 a.m.)
17     (On the record 12:00 p.m.)
18     CROSS EXAMINATION
19 BY MR. SHAPIRO:
20   Q.  Hi, Matt.  I'm Lyle Shapiro, your attorney.  I
21 have a few follow-up questions --
22   A.  Okay.
23   Q.  -- with regard to the questions that Mr. Weber
24 asked you earlier today.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 173

1    First I want to talk about the e-mails that you
2    sent from your Mercer account to your personal e-mail
3    account that we just finished talking about.
4        Now, in reviewing the exhibits in those
5    e-mails, it looks like most, if not all those documents
6    were sent in October and November, and a lot of them
7    were sent on the same date in October and November.
8        At that point in time, had you received any
9    instructions or guidance from Lockton or anybody else as
10   to what documents or information could be retained upon
11   a transition of employment from Mercer to somewhere
12   else?
13   A. No.
14   Q. Could you explain, you know, with regard to the
15   exhibits that we talked about, you know, what was your
16   mindset in terms, generally speaking, sending them from
17   your Mercer account to your personal e-mail account?
18       MR. WEBER: Objection; leading. Go ahead.
19   A. To the best of my recollection, some of them
20   were for business purposes and some of them were
21   documents I thought would be helpful in the future if I
22   decided to leave.
23   BY MR. SHAPIRO:
24   Q. Okay. And at some point after sending them to

Page 174

1    your personal e-mail account you received information
2    which said that you cannot retain documents, the
3    documents that you sent from Mercer to your personal
4    e-mail account.
5    A. Yes.
6    Q. Okay. Do you recall the approximate date when
7    you first spoke with an attorney associated with your
8    possible transition to Lockton?
9    A. I don't, I don't remember the date, but I
10   believe it was December time frame.
11   Q. Okay. Do you recall that the first time we met
12   was on December 6th?
13       MR. WEBER: Leading.
14   A. Can I answer?
15   BY MR. SHAPIRO:
16   Q. Go ahead. You can answer it.
17   A. I don't, I don't recall that that was the
18   specific date. I do know it was at the W Hotel and
19   there would be a record of a room being reserved.
20   Q. Okay. Did we meet before or after the e-mails,
21   the October and November e-mails that had been marked as
22   an exhibit to this deposition which you sent from the
23   Mercer account to your personal e-mail account?
24   A. After.

Page 175

1    Q. Okay. Now, before you resigned from Lockton --
2    strike that.
3        Prior to your resignation from Mercer and
4    before you joined Lockton --
5    A. Mm-hmm.
6    Q. -- did you undertake efforts to go through your
7    personal e-mail account and delete Mercer-related
8    information?
9    A. Yes.
10   Q. Okay. Now, you testified earlier that some
11   e-mails were not deleted.
12   A. Yes.
13   Q. Okay. Do you know why that is the case?
14   A. To the best of my -- to the best that I can
15   recall, either I did not believe they were Mercer, it
16   wasn't Mercer information at the time and/or I just
17   didn't see them.
18   Q. Okay. On the date that you resigned from
19   Mercer, was it your belief, albeit a wrong one, that you
20   had deleted all of the Mercer-related e-mails from your
21   personal e-mail account?
22       MR. WEBER: Objection; leading.
23       MR. SIEGEL: You can answer.
24   A. Unequivocally. I believe that I made good

Page 176

1    faith efforts to delete and destroy all information that
2    I had in my possession electronically that was
3    confidential and/or proprietary to Mercer.
4    BY MR. SHAPIRO:
5    Q. At some point after you commenced employment at
6    Lockton --
7    A. Yep.
8    Q. -- did you determine that you did still have
9    some of those Mercer-related e-mails in your personal
10   e-mail account?
11   A. Yes.
12   Q. Okay. At any time, have you used any of the
13   information in your personal e-mail account that in any
14   way relates to Mercer in connection with your employment
15   at Lockton?
16   A. No, I did not use any information that I had in
17   my possession that I believed to be proprietary or
18   confidential to Mercer.
19   Q. You did retain a contact list, right, from --
20   your personal contact list?
21   A. Correct. And my understanding is that is not
22   confidential or proprietary information of Mercer in
23   this circumstance based off of New York law.
24   Q. Okay. And specifically, the e-mails that are

---

**Page 177**

1 currently in your personal e-mail account that relate to
2 Mercer, did you use any -- use those e-mails or any
3 information in those e-mails in your connection -- in
4 connection with your employment at Lockton?
5   A. Not specifically to generate or earn business
6 on behalf of Lockton.
7   Q. Okay. How, if at all, was it used?
8   A. If I have used it -- again, I don't recall
9 specifically when I did or didn't use it -- but if I did
10 use it, it would have been those e-mails for any event
11 that I may have hosted since I've joined Lockton and/or
12 in conjunction with my announcement.
13   Q. Okay. Which e-mails are you referring to?
14   A. There were -- can I look for the exhibit?
15   Q. Sure.
16   A. It's the exhibit with all the e-mail addresses
17 on it. I don't know which number it was. I don't want
18 to get this all messed up.
19     Yes, Exhibit 17, I may have used these e-mails
20 to send invitations for various networking functions
21 since I've joined Lockton.
22   Q. Okay. Other than that information, have you
23 used any other information contained in any of these
24 e-mails in your personal e-mail account that relate to

---

**Page 178**

1 Mercer in connection with your employment at Lockton?
2   A. No.
3   Q. Okay. Have you provided to anybody else at
4 Lockton any of the information contained in these
5 personal e-mails?
6   A. Not to my knowledge.
7   Q. Okay. When -- strike that.
8     Is the -- are the e-mails that are in
9 Exhibit 17 substantially similar to the e-mail addresses
10 that are contained in the contact list that you
11 airdropped from Mercer to your Apple iPhone?
12   A. Yes, extremely similar, if not almost
13 identical.
14   Q. Okay. When you -- upon your resignation, was
15 it your honest efforts not to retain any Mercer property
16 at all?
17     MR. WEBER: Objection.
18   A. Yes.
19 **BY MR. SHAPIRO:**
20   Q. Okay. And if I understand what you've
21 testified today, the only information that you've used
22 that in any way relates to Mercer in connection with
23 your employment at Lockton is contact information from
24 your personal contact list and potentially the e-mails

---

**Page 179**

1 from Exhibit 17; is that correct?
2     MR. WEBER: Objection.
3   A. Yes.
4 **BY MR. SHAPIRO:**
5   Q. And after you received instructions that you
6 cannot retain Mercer-related information, you undertook
7 efforts to delete the information that you had
8 previously sent to yourself based upon the expectation
9 you might have been able to use it --
10     MR. WEBER: Objection.
11 **BY MR. SHAPIRO:**
12   Q. -- at a future employment; is that correct?
13     MR. WEBER: Objection.
14 **BY MR. SHAPIRO:**
15   Q. You're looking at me strange. Let me, let me
16 rephrase it.
17   A. Yeah.
18   Q. After you received instructions that you cannot
19 retain Mercer-related information, you went back to your
20 personal e-mail account and undertook good faith efforts
21 to delete the e-mails that you thought, wrongfully, that
22 you would be able to take to a future employment; is
23 that correct?
24   A. Yes, that's correct.

---

**Page 180**

1   Q. All right. Let me, let me switch gears a
2 little bit.
3     Is there -- let me ask you an open-ended
4 question.
5     Is there anything else that you testified about
6 during Mr. Weber's deposition that you want to correct
7 or you want to clarify or you want to add to make
8 sure that the record accurately reflects your testimony?
9   A. I can think of three separate items.
10   Q. Okay.
11   A. One, I was asked questions around can you name
12 Mercer clients that you participated in. I don't know
13 why I have blanked then and why I'm blanking now. I'm
14 confident if I sat down I could come up with a list if I
15 really put time and effort into it. So that was not
16 intentionally to be misleading, and I apologize for the
17 way that may have come across.
18     Similarly to the prospects, again, I blanked
19 out and it was not intentional or purposeful, and I'm
20 confident that we could come up with something that
21 would be more representative of a realistic answer.
22     The third item is the questions around that
23 pertain to Joanne and Jada and Lockton and the
24 discussions around how it got to this point I felt --

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 181

1  I'm not sure if I answered the questions in a way that
2  could have painted the picture the correct way. I felt
3  maybe the questions that were being asked I was
4  answering but not necessarily what you were trying to
5  get to.
6      So the fact of the matter is at some point in
7  time - I don't remember the date, I don't recall the
8  month - Joanne approached me on an opportunity she was
9  presented with for a separate brokerage firm and an
10  opportunity that that recruiter thought could be good
11  for the two of us. We discussed that opportunity. We
12  looked at the opportunity.
13      As part of that same discussion, since Joanne
14  was open with me, I was open with her that I was
15  considering other opportunities. Then she asked me to
16  put her in contact with whoever I was speaking with at
17  Lockton.
18      Accurately to my testimony, I provided her
19  contact information and Jada's contact information per
20  their request to Hiram, and we separately went through
21  the process of any normal human being would go through
22  to consider a new employer.
23      Ultimately we got to a point where I think we
24  all separately agreed we were leaving, and yes, we

Page 182

1  obviously coordinated a day and time we were going to
2  leave once we all separately decided that we were going
3  to leave Mercer for our own individual reasons. That's
4  all.
5      MR. SHAPIRO: Those are all the questions I
6  have, Matt. Thank you.
7      MR. DIGREGORIO: Thank you.
8      REDIRECT EXAMINATION
9  BY MR. WEBER:
10  Q. You said you had just talked to Joanne about a
11  mutual opportunity that was presented; correct?
12  A. Yes.
13  Q. You didn't -- Jada wasn't part of that
14  discussion, was she?
15  A. Not the original discussion, no.
16  Q. But you provided her contact information, as
17  well as Joanne's, to Lockton, didn't you?
18  A. Joanne had a conversation with Jada.
19  Q. How do you know that?
20      MR. SHAPIRO: Just let him finish his answer.
21  A. Joanne had a conversation with Jada. At the
22  time that Joanne came back to me she offered me both her
23  contact information, as well as Jada's, to provide to
24  Hiram, which I did based upon their request.

Page 183

1      I will also say that, again, we each went
2  through the evaluation process separately and made our
3  own decisions individually on an employment that's best
4  for our families and our future.
5  BY MR. WEBER:
6  Q. You received a direction not to -- to preserve
7  all documents in this case; correct?
8      MR. SHAPIRO: I'm sorry?
9  BY MR. WEBER:
10  Q. You received a litigation hold notice to
11  preserve all documents, electronic or otherwise, from
12  your attorneys; isn't that right?
13  A. Yes.
14  Q. You know that applies to personal and company
15  devices?
16  A. I don't know that I understand the question.
17  Q. Okay. Your attorneys told you not to destroy
18  any documents, evidence, electronic or hard copy.
19  A. Sure.
20  Q. You understand that?
21  A. Yes.
22  Q. You understand why that's the case?
23  A. Sure.
24  Q. To preserve documents for this litigation.

Page 184

1  A. Yes.
2  Q. You understand that?
3  A. Yes.
4  Q. Do you understand that applies to both company
5  and personal devices: laptop, desktop, iPhone, airdrop,
6  anything at all you understand that?
7  A. Yeah. I have not made efforts to destroy
8  anything at all since I've been given this information.
9  Q. And you'll continue to honor that direction;
10  correct?
11  A. Yes, sir.
12  Q. The document that your counsel showed you,
13  Exhibit 17 with the list of e-mail addresses on it --
14  A. Yes, sir.
15  Q. -- are the e-mail addresses on your contact
16  list the same as the e-mails on Exhibit 17?
17  A. As I described to my attorney, they are
18  substantively, virtually the same.
19  Q. Does your contact list contain other -- does
20  your contact list contain other addresses other than
21  what are contained on Exhibit 17?
22  A. Other e-mail addresses?
23  Q. Correct.
24  A. Yes.

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

---

**Page 185**

1    Q.  How many more?

2    A.  I have no idea.

3    Q.  Can you take an estimate?

4    A.  I cannot.

5    Q.  Well, that's about four or five pages of

6    e-mails there; correct?

7    A.  More accurately six pages.

8    Q.  Okay.  Do you think your contact list has more

9    than that number?

10   A.  Yes.

11   Q.  A lot more?

12   A.  Again, I don't know the number in my contacts,

13   and I'm not going to attest to a number I'm not

14   confident in.

15   Q.  You said that New York law allows -- strike

16   that.

17       You said New York law provides that a contact

18   list is not confidential or proprietary; correct?

19   A.  That is my understanding, yes.

20   Q.  Where did you get that understanding?

21   A.  From my attorneys.

22       MR. SHAPIRO: Oh --

23       MR. DIGREGORIO: Sorry.

24

---

**Page 186**

1    BY MR. WEBER:

2    Q.  Any other answers you want to change other than

3    the ones you just testified about?

4        MR. SHAPIRO: Object to the form.

5    BY MR. WEBER:

6    Q.  You can answer.

7    A.  Not at this time.

8    Q.  Do you think there may be answers you want to

9    change at a later date?

10       MR. SHAPIRO: Object to the form.

11   A.  I can't comment on my future thoughts.

12       MR. SHAPIRO: Good, Mike?

13       MR. WEBER: I'm good.

14       MR. SHAPIRO: All right.  We'll read.

15       MR. DIGREGORIO: Thank you.

16       FURTHER DEPONENT SAITH NOT.

17       (Whereupon, the Deposition was concluded at

18   12:20 p.m.)

19

20

21

22

23

24

---

**Page 187**

1    STATE OF NEW YORK        )

2                             )    ss:

3    COUNTY OF                )

4

5        I, MATTHEW DIGREGORIO, hereby certify that I have

6    read the pages of the foregoing testimony of this

7    deposition and hereby certify it to be a true and

8    correct record.

9

10

11

12   _____

                MATTHEW DIGREGORIO

13

14

15

16   Sworn to before me this

17   _____ day of _____ , 2018.

18

19

20   _____

21       Notary Public

22

23

24

---

**Page 188**

1            CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF MIAMI-DADE

4    I, VICTORIA SUAREZ, the undersigned authority,

5    certify that MATTHEW DIGREGORIO, personally appeared

6    before me and was duly sworn on the 9th day of March,

7    2017.

8

9    Witness my hand this 11th day of March, 2018.

10

11   _____

     VICTORIA SUAREZ, COURT REPORTER

12   NOTARY PUBLIC, STATE OF FLORIDA

     Commission No.:  GG 064806

13   Commission Exp:  February 24, 2021

14

15

16

17

18

19

20

21

22

23

24

---

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Page 189

1                CERTIFICATE OF REPORTER

2   STATE OF FLORIDA

3   COUNTY OF MIAMI-DADE

4   I, VICTORIA SUAREZ, Court Reporter and Notary Public

5   for the State of Florida, do hereby certify that I

6   was authorized to and did stenographically report and

7   transcribe the foregoing proceedings, and that the

8   transcript is a true and complete record of my notes.

9   I further certify that I am not a relative, employee,

10  attorney or counsel of any of the parties, nor am I a

11  relative or employee of any of the parties' attorneys

12  or counsel connected with the action, nor am I

13  financially interested in the action.

14  Witness my hand this 11th day of March, 2018.

15

16

17  _____
    VICTORIA SUAREZ, COURT REPORTER
18  NOTARY PUBLIC, STATE OF FLORIDA

19

20

21

22

23

24

Page 190

1                  ERRATA   SHEET

2   Deposition of: MATTHEW DIGREGORIO

3   Re: MERCER HEALTH v MATTHEW DIGREGORIO, et al.

4   Date Taken: March 9, 2018

5   Page        Line #         Correction   Reason

6   _____      _____     _____

7   _____      _____     _____

8   _____      _____     _____

9   _____      _____     _____

10  _____      _____     _____

11  _____      _____     _____

12  _____      _____     _____

13  _____      _____     _____

14  _____      _____     _____

15  _____      _____     _____

16  _____      _____     _____

17

18                         _____

19                              (Signature)

20  Sworn to before me this

21  __day of_____, 2018.

22  _____

23      Notary Public

24

**$**

**$100,000 (5)**
109:2;118:5,7,11;
140:11
**$2 (2)**
105:6,8
**$250,000 (1)**
108:14
**$500,000 (1)**
108:17
**$750,000 (1)**
100:21

**A**

**ABC's (1)**
78:18
**ability (2)**
75:13;78:7
**able (5)**
112:2;126:19,20;
179:9,22
**above (6)**
14:22;118:7,11;
120:1;133:6;136:2
**accept (2)**
30:12;72:18
**Acceptable (1)**
21:6
**accepted (1)**
72:13
**access (9)**
33:13;42:2,11,13;
67:13;87:15;114:1;
124:16;126:21
**accidentally (1)**
163:18
**accordingly (1)**
171:3
**account (38)**
14:6,7,16;15:17;
81:3,15;92:14;98:17;
110:18,22;125:23;
128:4;133:7;141:12;
144:18,20;155:15;
157:12;158:8,14;
161:13,16;164:15;
173:2,3,17,17;174:1,4,
23,23;175:7,21;176:10,
13;177:1,24;179:20
**accounts (1)**
127:16
**accumulated (1)**
86:7
**accurate (11)**
65:20;72:16;74:6;
88:14;123:7;139:4,11,

13,15,15;165:20
**accurately (1)**
89:13,15;180:8;
181:18;185:7
**acknowledge (4)**
141:11;161:20;
163:14,17
**acknowledgment (1)**
163:22
**across (2)**
138:5;180:17
**action (1)**
9:11
**Actions (3)**
121:3,6,17
**Active (3)**
98:16;110:18,22
**activities (3)**
86:16;87:3;120:23
**Activity (4)**
120:13,16,20;171:12
**actual (2)**
114:19;129:21
**Actually (10)**
17:15;44:9;48:17;
127:11;136:21;137:19;
140:7,12;150:18;
164:14
**Acumen (1)**
92:12
**add (2)**
51:6;180:7
**added (1)**
63:23
**address (26)**
14:7,11;66:14;74:9;
75:5,18,24;78:6,8,9,13,
19,23;79:9;98:3;112:9;
113:23;118:21;123:18;
124:3;126:21;131:4;
137:8;156:17;161:2,14
**addresses (17)**
14:9;74:2,3,23,24;
112:16;128:8,18;
130:5,12;161:7;
177:16;178:9;184:13,
15,20,22
**advance (1)**
107:20
**advanced (1)**
71:8
**advice (1)**
69:19
**advise (2)**
68:18;163:24
**advised (1)**
89:3
**adviser (1)**
98:6

**advising (1)**
68:13
**affect (1)**
7:23
**affiliated (1)**
48:13
**Again (41)**
15:22;16:9,12;26:23;
31:24;42:11;45:19;
52:11;55:2;57:2;65:3,
6;76:24;82:5;85:1;
89:15,23;104:1;106:7;
114:15;117:6;118:6,9;
119:7;126:23;127:8;
130:4;135:7;136:6;
137:8;144:18;145:12;
163:10;168:5;177:8;
180:18;183:1;185:12
**against (1)**
124:15
**Agency (3)**
124:10,19;125:11
**Agency's (1)**
123:3
**Agenda (1)**
137:14
**aggressive (1)**
106:18
**ago (4)**
21:22;107:11;
114:11,16
**agree (2)**
36:1;38:11
**agreed (2)**
9:3;181:24
**Agreement (16)**
9:6,17,22;10:1,5;
11:24;12:16;18:13,20;
48:16;51:10,21;72:21;
73:8,11,16
**Agreements (2)**
38:13;50:12
**ahead (7)**
53:17;104:24;
110:21;150:12;158:19;
173:18;174:16
**airdrop (11)**
75:9,13;76:1,8,15,17,
22;77:4;81:11;156:20;
184:5
**airdropped (5)**
75:8;81:8;82:7;83:9;
178:11
**airdropping (1)**
75:12
**albeit (1)**
175:19
**Ale (2)**

**advising (1)**
23:17;24:21
**aligned (1)**
109:7
**Allen (1)**
136:16
**allow (1)**
108:17
**allowed (2)**
113:6;123:14
**allows (1)**
185:15
**almost (1)**
178:12
**along (2)**
15:13;30:24
**although (1)**
118:3
**always (2)**
139:11;147:4
**American (1)**
142:5
**among (2)**
78:4;86:9
**amount (1)**
101:8
**Amy (1)**
6:15
**and/or (6)**
40:2;91:22;129:5;
175:16;176:3;177:11
**announce (3)**
90:24;91:6,14
**announcement (10)**
91:10,19;92:20;
145:9,11,23,24;155:10,
11;177:12
**announcements (3)**
77:11;89:6;91:24
**announcing (1)**
90:21
**annual (6)**
87:12,12;104:15,16;
138:21;146:8
**answered (2)**
113:9;181:11
**anxious (1)**
150:12
**anymore (1)**
131:5
**Aon (1)**
132:2
**Aon's (2)**
144:13,14
**apologize (2)**
27:3;180:16
**Apparently (4)**
92:5,6;125:23;
170:12
**appear (7)**

**advising (1)**
84:4,11,16;121:16;
132:8;138:21;139:13
**appears (12)**
98:2;112:22;118:17;
121:21;130:9;134:7;
135:3;143:20;144:12;
146:12;152:6;154:15
**Apple (16)**
81:20,21,22,23;82:3,
8,9;83:14,16,18,21,24;
160:6,9,24;178:11
**applies (2)**
183:14;184:4
**appreciate (2)**
38:10,24
**approached (1)**
181:8
**appropriate (2)**
38:4;62:19;71:7;
72:1
**approximate (2)**
41:1;174:6
**Approximately (22)**
9:19;11:9;13:21;
15:24;16:17;35:14;
40:20;41:21;43:6;
49:12;54:4,18;55:23;
67:1,9;73:1;86:9;
87:13;88:7;89:9;95:23;
101:4
**apps (1)**
82:10
**AR (2)**
104:9;107:4
**Archive (1)**
121:1
**Armin (2)**
152:7,15
**around (10)**
54:13;56:11;103:20;
126:24;127:2;150:17;
162:22;180:11,22,24
**arrangement (6)**
24:13;37:14;41:8;
46:4;47:13;108:6
**arrangements (1)**
24:2
**ascertain (4)**
87:10;162:9,10,11
**aside (1)**
152:12
**aspects (1)**
47:1
**Assets (1)**
21:6
**assigned (1)**
111:20
**assignment (1)**
142:15

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

Assignments (1)
137:17
assistance (1)
66:19
associate (3)
11:8;86:3;107:4
associated (2)
152:17;174:7
associates (1)
86:12
assume (11)
14:19;15:3;32:2;
57:16,21;65:14,16;
114:18;115:20;123:3;
142:5
assuming (2)
122:3,7
assumption (1)
123:12
Atlanta (1)
103:8
attach (1)
134:6
attached (8)
63:15;110:22;
117:18;118:12,16;
122:20;123:1;126:3
attachment (7)
110:18;122:16,19;
137:13;143:14;144:5;
146:5
attachments (3)
125:24;133:23;137:5
attempt (1)
62:20
attempted (1)
95:17
attempting (1)
105:23
attend (1)
126:18
attended (4)
115:13,17,18;129:10
attendees (1)
126:17
attending (2)
86:10,12
attest (1)
185:13
attorney (14)
19:8;37:19;47:18,23;
66:20,21;67:21;68:14;
73:17;88:4;94:17;
172:20;174:7;184:17
attorney/client (4)
68:21;69:23;70:4;
71:19
attorneys (16)
6:22;8:8,12,15,18;

10:12;68:10,18;162:6;
163:4,9,24;164:9;
183:12,17;185:21
attorneys' (3)
37:24;38:1,14
attorney's (1)
45:10
August (5)
34:8,13,19;35:11;
68:17
August/September/October (3)
39:11;40:7;41:17
automatically (3)
81:23;82:2;83:1
available (6)
28:2;74:1,22;77:15,
23;80:21
average (4)
87:12;133:5,6,14
avoid (1)
38:23
aware (9)
10:11;17:1;70:19,22;
99:24;162:19,21,22;
166:1
away (1)
143:6
awhile (1)
63:2

B

Bachelor's (1)
22:16
back (29)
17:15,16;24:7,11,18;
28:14,16;31:4;39:9;
41:14;63:6;110:3;
120:7,10;123:9;
136:22;141:24;142:7,
10,11;146:18;150:2;
162:18;163:6,8;167:1,
3;179:19;182:22
background (3)
39:21;43:9,21
bad (1)
152:20
ballpark (1)
89:12
bankers (1)
86:2
base (5)
32:1;45:14;46:10;
100:24;101:2
based (9)
103:8;105:4;106:18;
126:20;141:18;153:21;
176:23;179:8;182:24
basically (1)

114:16
basis (4)
27:6;87:12,12;
104:15
bathroom (1)
39:3
BCC (1)
71:4
Beach (1)
171:19
became (6)
90:12,14,16;134:10;
162:21,22
become (1)
135:9
becomes (1)
107:18
began (3)
18:21;22:19;35:8
behalf (3)
67:7;73:20;177:6
belief (1)
175:19
belongings (1)
15:13
below (2)
133:5;149:17
Benchmarks (2)
132:23;133:6
Benefits (9)
18:19;22:13,18,21;
44:24;56:20;79:19;
144:15;151:10
beside (1)
8:15
besides (1)
10:24
best (22)
13:8;16:6;18:8;
33:20;40:24;47:5;
48:15;73:5;74:7;84:6;
96:16;100:20;141:2;
159:5;162:17;165:5,
12;169:13;173:19;
175:14,14;183:3
Better (2)
98:11;120:15
beyond (2)
44:18;145:10
bit (3)
54:8;139:5;180:2
biweekly (1)
118:2
blank (2)
23:22;27:17
blanked (2)
180:13,18
blanking (1)
180:13

board (2)
114:14;117:5
BOR (3)
104:9;105:16,17
both (10)
22:22;25:2;31:3;
62:2,10;107:4;109:9;
123:6;182:22;184:4
brain (1)
54:8
break (11)
7:16,18;15:10;38:16;
39:3;50:23;71:23;
113:21;156:22;171:16;
172:11
breakdown (1)
104:8
briefcase (1)
95:14
bring (6)
62:19;87:23;102:17;
105:7;134:14;140:13
brings (1)
105:5
broad (1)
50:7
broken (1)
118:2
broker (2)
80:4;133:15;149:6
brokerage (1)
181:9
brokers (2)
151:11,11
brought (1)
9:10
Bruno (2)
42:22,23
Buchanan (1)
153:12
building (1)
121:10
Burns (1)
90:1
Business (45)
11:16;23:7;25:12;
26:15;28:1,6;29:6,13;
39:22;62:21;74:5,5;
75:1,2;85:18,21;86:3,
12;87:3,13;102:18;
115:6;118:19,20;
129:11;133:5;136:20,
24;144:19;145:5;
151:4,14,17,21;165:8,
16;166:9,10;169:2;
170:14,17,22;171:13;
173:20;177:5
businesses (2)
133:16;168:23

button (1)
96:9
buy (2)
152:24;153:3

C

calendar (10)
30:23,24;31:10;
41:24;42:5;58:17;
126:20;172:3,4,5
calendars (2)
42:12,13
call (17)
29:16;31:18,18;
32:22;45:24;46:21;
55:5;64:18;68:12,18;
84:19;101:10,12;
105:4;126:15,22;
150:12
called (7)
6:5;21:4;28:24;
31:19;32:12;136:17;
140:16
calling (3)
32:2;33:23;34:20
calls (5)
103:9;168:13,15,16,
19
came (5)
33:23;34:21;36:24;
143:24;182:22
can (99)
7:8;10:10,20;14:16;
15:18,21;19:3;23:12,
16;25:4,18;27:1,23;
28:13;31:23;32:7;
33:12,20;34:5;38:2;
39:3;44:22;45:2;48:7,
9,17;51:6;53:13;54:9;
58:9;68:15;69:1,21;
70:5,11,11;71:17;
76:16;78:18,19;79:12,
21;82:6;83:4;85:14,23;
93:10,21;95:4;96:6,24;
97:3;98:3,6,12;99:8;
105:5;110:17;111:14;
113:2,3;114:6;117:2;
118:14;120:11,12;
121:8,10;126:3,12;
128:5;129:14;131:1,
22;132:10;134:5;
137:9;143:11;147:12;
149:5,11,17;151:7;
152:9;156:3,22;
163:5;165:24;169:13,
13;174:14,16;175:14,
23;177:14;180:9,11;
185:3;186:6

candidate (1)
  62:1
CAOs (1)
  128:21
capabilities (6)
  39:21;43:9,21;
  123:24;124:10,21
capability (1)
  26:16
capped (1)
  108:14
captures (1)
  140:6
capturing (1)
  140:5
cards (1)
  129:11
career (3)
  54:12;95:18;165:9
Caregiver (1)
  23:21
carrier (5)
  80:2;137:17,18;
  142:8,15
case (10)
  7:14;9:4;10:3,13;
  65:15;72:6;164:8;
  175:13;183:7,22
cases (3)
  79:1,2,3
casualty (1)
  151:11
catch (4)
  29:20;32:23,24;
  153:16
category (1)
  130:1
cause (1)
  133:9
CD's (2)
  165:21;166:3
cell (1)
  48:7
centers (3)
  28:3,4;116:11
CEO (2)
  112:20;114:21
CEOs (1)
  128:21
CEO's (1)
  112:21
certain (5)
  54:15;127:16;128:8;
  162:16;163:15
certainly (7)
  38:2;59:20;101:1;
  129:4;132:10;160:3;
  166:10
cetera (3)

105:18;133:4;166:4
CFO (4)
  90:4;112:20;114:21;
  136:17
CFOs (1)
  128:21
CFO's (1)
  112:21
chairman (2)
  153:13,21
Champion (1)
  23:20
chance (3)
  16:3;17:10;64:7
change (11)
  10:21;48:17;50:16;
  91:8;100:23;101:23;
  102:6,8;136:18;186:2,
  9
changed (3)
  100:24;101:1;142:4
changes (3)
  73:11,15,15
charging (1)
  152:21
chart (2)
  132:19;142:8
Chase (1)
  85:24
chat (1)
  29:14
Chicago (1)
  151:10
chief (2)
  39:18;143:22
cigar (1)
  85:9
cigars (1)
  116:16
CIOs (1)
  128:21
circumstance (1)
  176:23
City (4)
  48:19,22;49:8;50:3
claim (1)
  97:13
claims (1)
  9:10
clarify (3)
  13:9;50:19;180:7
clear (3)
  6:8;26:17;67:23
click (2)
  128:10;130:7
client (37)
  26:5,8,12;38:17;
  62:19;69:23;79:24;
  85:1;88:17,21;90:9,12,

14,16,16;92:18;
  100:12;122:11,16,16;
  123:4;124:12;133:21,
  21;134:10,12,12,14;
  135:6,8;136:5,7;144:2;
  150:24;153:15,18;
  154:16
clients (58)
  23:10,12,17;24:3,6;
  25:6,9,15,20,24;26:18;
  38:13,14;52:5;62:17,
  18;77:18,21;78:22;
  84:2,3,18;85:22;100:3;
  102:11;111:1,19,20,23;
  112:2;114:1,19,23,24;
  123:12,14;128:15,19;
  129:21,21,23,23;
  130:17,21,22,23;131:2;
  135:12;168:4,10;
  170:9;171:5,8,8,10,11;
  172:1;180:12
client's (2)
  74:4;75:1
close (5)
  118:5,10,21;139:17,
  18
closed (1)
  118:4
cloud-based (1)
  164:17
Club (2)
  171:19,20
Coast (3)
  135:20;136:3,9
cocktail (1)
  85:9
cocktails (2)
  114:17;116:16
Code (4)
  21:2;63:9,14;64:22
co-defendants (1)
  10:12
co-founded (1)
  116:11
coincidence (1)
  69:8
colleague (1)
  132:1
collengues (1)
  131:24
collect (1)
  79:13
college (1)
  129:7
colors (1)
  119:9
column (11)
  119:4,8;120:3,6;
  121:21,23;122:4;

138:4,15,21,23
columns (3)
  119:6;120:1,12
commenced (1)
  176:5
comment (7)
  38:10;53:7,12;94:7;
  126:8;136:6;186:11
commentary (1)
  120:5
comments (6)
  106:16;107:7,12;
  122:3,7;136:2
commission (13)
  24:13,19,22;25:1,2,
  5;45:14;46:11;71:21;
  132:19,23;133:5,9
commissions (8)
  11:11;44:23;80:4;
  99:2;101:7,10;133:10,
  15
commit (1)
  96:7
Committee (4)
  43:1,16;44:4,11
communicate (4)
  93:3,16;94:8,19
communicated (8)
  23:9,12;25:19;60:22;
  94:17;103:12,14;
  145:10
communicating (1)
  25:15
communication (4)
  93:6,11,23;94:3
communications (6)
  42:18;69:23;70:5;
  103:10;145:13;168:12
community (1)
  29:6
comp (16)
  101:1,2,6,13,14,17,
  23;102:7,11,16,18,22,
  23;103:23;105:12;
  109:1
companies (17)
  28:5,6;49:20;54:14,
  16;63:14;72:14;79:3,6;
  80:22;85:16;110:24;
  112:15;122:4;128:14;
  129:22;168:16
company (32)
  11:20;14:2;17:24;
  18:1,2;26:13,14;28:1;
  63:2;78:18;79:18;85:2;
  86:1;92:18;98:5;
  112:22,23;114:21;
  118:17;122:5,6,7;
  124:24;125:12;135:21;

136:10,11;151:24;
  154:19;158:22;183:14;
  184:4
company's (2)
  78:17;136:4
compensation (38)
  10:7;37:14,22,24;
  38:5;41:8,10;44:23;
  45:4,7,20;46:10,18;
  47:2,12,17;71:20;80:5;
  98:20;99:1,1;100:18,
  22,24;101:21;102:24;
  103:15,17;104:2,9,12,
  19;105:3,14;108:13;
  109:19,23;126:5
compete (2)
  124:15;134:18
competitive (1)
  132:1
competitor (6)
  124:19,20;125:2,3,7,
  13
competitors (3)
  29:7;106:19;125:1
compile (1)
  129:1
compiled (2)
  128:22;129:4
Complete (1)
  123:24
completed (1)
  20:2
completely (1)
  125:10
completing (1)
  65:16
Compliance (5)
  17:9;19:10;20:4,16;
  63:15
Compliancemmccom (1)
  64:13
complicated (1)
  107:17
comply (2)
  18:7;88:5
component (4)
  45:14;46:11;101:24;
  102:9
compromise (1)
  38:12
computer (24)
  75:4,7;81:8,11;82:4,
  8;83:10,11,13,19;
  96:16,18;97:4;115:23;
  116:3;156:20;160:23,
  24;161:1,22;162:6,14;
  164:12,14
computers (2)
  160:8,17

con (1)
  43:24
concepts (1)
  45:18
concerning (2)
  45:4;88:17
concluded (1)
  186:17
concrete (1)
  51:9
condition (1)
  18:23
conditions (1)
  45:1
Conduct (4)
  21:2;63:10,15;64:22
conference (1)
  127:11
Conferred (1)
  66:20
confident (8)
  84:17;85:1;89:18;
  106:24;165:1;180:14,
  20;185:14
confidential (14)
  12:19,21;13:1;20:24;
  22:3,9;46:15;71:12;
  88:11;110:23;176:3,
  18,22;185:18
Confidentiality (1)
  11:23
confirm (1)
  119:15
confirmed (2)
  71:12;121:12
confrontation (1)
  38:23
Congrats (1)
  154:24
congratulating (1)
  154:14
conjunction (1)
  177:12
connected (3)
  82:24;145:7;146:3
connection (5)
  176:14;177:3,4;
  178:1,22
connections (1)
  85:9
consider (2)
  129:19;181:22
consideration (2)
  38:1;136:19
Considerations (2)
  134:21;135:1
Considering (4)
  54:23;58:6;61:7;
  181:15

consist (3)
  44:5;45:14;112:14
consists (3)
  74:1,22;77:15
consultant (1)
  111:21
Consultants (3)
  23:18;110:23;111:2
contact (60)
  28:11,21;31:5;58:3;
  61:14,20,22;73:24;
  74:1,3,15,22,24;75:14;
  76:14,18,20;77:6,14,
  20;78:24;79:4,24;81:4,
  7,8,17;83:9,19;84:3,4,
  11,16;85:2,7,17,17,20;
  88:24;91:1,5;93:2;
  112:17,19;145:12;
  176:19,20;178:10,23,
  24;181:16,19,19;
  182:16,23;184:15,19,
  20;185:8,17
contacted (5)
  26:19;167:17,21;
  168:1,3
contacts (20)
  30:18;74:3,21,24;
  76:5,12;81:11;82:7;
  84:17;85:12,13,16;
  89:11;90:22;111:24;
  114:16;129:3,13;
  168:9;185:12
contain (4)
  85:7;172:6;184:19,
  20
contained (7)
  20:11;118:15;
  119:21;177:23;178:4,
  10;184:21
contains (1)
  124:4
content (1)
  121:24
continue (3)
  10:1,6;184:9
continued (1)
  11:18
contract (3)
  47:6,15,19
contractual (1)
  46:24
contractually (1)
  37:15;45:19
conversation (22)
  29:23;30:2,5,7,9,11;
  31:7,24;34:1;35:4;
  39:10;55:1;56:10;59:9,
  17;60:8;61:5;62:4;
  103:22;107:21;182:18,

21
conversations (7)
  33:19;35:12;41:1;
  54:13;62:6;88:8;
  103:20
Conversely (1)
  108:22
convey (1)
  37:4
conveyed (1)
  61:20
convince (1)
  62:20
COO (2)
  92:12;114:21
cooperative (1)
  46:14
coordinated (5)
  69:4,9,10,14;182:1
copied (1)
  66:13
copies (5)
  17:4;68:11;87:17;
  97:17;150:4
copy (11)
  52:1;66:5;68:20;
  71:5;73:24;74:14,21;
  96:15;98:15;149:24;
  183:18
corner (1)
  119:24
corporate (1)
  6:13
corporations (1)
  112:21
correctly (4)
  126:14;127:1,3;
  145:20
Cory (3)
  66:5;72:12;126:18
counsel (4)
  10:24;69:19;71:24;
  184:12
counsels (1)
  94:16
count (9)
  91:23;94:6,23;95:1;
  122:21,22;129:3;
  133:4;155:16
counted (4)
  89:10;118:3;122:23,
  24
Country (2)
  171:19,20
couple (4)
  26:24;129:8;135:20;
  153:2
course (26)
  20:3,18,23;21:1,3,5,

8,13,16,21,23;22:2,4,5,
8;54:12;64:18,24;65:2,
6,13,17,19;86:8;95:18;
166:9
courses (10)
  19:20,22;20:12,13,
  16,17,20;64:15;65:6,10
court (9)
  7:7;24:11,18;28:16;
  38:11,21;46:21;163:8;
  167:3
coverage (4)
  80:3,9;133:3;142:8
create (2)
  91:9;114:14
credit (5)
  108:14,18;140:6,12,
  14
CROSS (1)
  172:18
cross-selling (1)
  22:20
C-Suite (8)
  114:10,14,18,20,20;
  116:15;128:20;129:16
Cummings (1)
  121:14
cumulative (1)
  115:16
current (3)
  8:23;119:2;135:12
currently (3)
  26:15;166:20;177:1
Cystic (2)
  153:13,19
Czerwonka (3)
  146:13;150:9,20;
  151:20

D

daily (1)
  80:18
Data (5)
  21:13;79:13;126:5;
  134:21;166:5
date (5)
  13:19;15:24;16:6;
  30:17;34:13,16;36:6,8;
  43:5;44:24;56:6;66:24;
  70:16;72:21;73:3;
  118:21;127:1;134:11;
  164:4;173:7;174:6,9,
  18;175:18;181:7;186:9
dated (9)
  98:3;112:9;117:14;
  122:14;124:3;125:22;
  128:4;131:19;137:9
dates (6)

34:17;41:21;79:23;
88:18,21;168:5
daughter (1)
  160:19
Dave (1)
  48:1
Dave's (2)
  48:1,5
David (1)
  14:8
day (3)
  36:8;50:4;72:13;
  164:5;182:1
days (3)
  56:1;118:6,23
deal (3)
  39:1;108:17;109:3
deals (2)
  118:4,7
dealt (1)
  64:15
Deborah (1)
  134:4
December (13)
  36:20;37:10,11;43:7;
  57:16,21;61:1;73:14;
  138:17;152:7;156:10;
  174:10,12
December/January (5)
  40:15;43:23;45:5;
  47:22;73:10
December/October (1)
  73:9
decide (2)
  79:3;106:10
decided (5)
  69:16,17;76:1;
  173:22;182:2
decision (4)
  58:21;59:2,4,6
Decisions (2)
  122:2;183:3
deck (3)
  124:4,11;134:6
Declaration (7)
  72:2,6;73:22;74:19;
  77:14;95:2;159:1
defendant (2)
  7:12;38:14
defendants (3)
  8:17,18;38:6
Defendant's (1)
  153:7
Define (9)
  13:11;26:2;44:22;
  48:12;52:7;70:17;
  86:24;139:18;168:19
defined (1)
  170:16

definitely (1)
152:11
definition (1)
84:22
definitively (1)
56:2
degree (3)
22:16;104:19;106:24
delete (14)
13:17;15:24;96:8,9,
11,13,21;97:10;
162:24;163:19;175:7;
176:1;179:7,21
deleted (25)
13:15,23;14:15,17;
15:4,9,16,18,23;16:7,
15,23;17:5;95:18;
96:11,20,20;97:8,10,
13;159:5,8;162:19;
175:11,20
delivered (1)
164:6
delivers (1)
154:19
Dell (1)
160:19
dental (1)
133:4
departure (1)
91:6
depending (1)
133:16
Depends (2)
84:22;100:7
DEPONENT (1)
186:16
deposed (1)
27:6
DEPOSITION (9)
6:1;7:9;8:5;53:15;
63:24;64:1;174:22;
180:6;186:17
depositions (1)
38:2
Describe (9)
28:4;62:13,14;95:4;
110:17;118:14;120:12;
121:8;128:5
described (6)
50:6;86:16;119:20;
141:8;161:8;184:17
describing (2)
105:21;121:21
desk (1)
95:12
desktop (7)
14:21;83:14,16,18;
160:6;161:1;184:5
despite (1)

118:7
destroy (6)
68:11,13,19;176:1;
183:17;184:7
detail (1)
10:23
determine (4)
31:5,6;65:21;176:8
detriment (1)
109:9
develop (3)
25:11;27:24;111:23
development (4)
11:16;23:8;87:3;
153:12
device (2)
14:20;156:21
devices (10)
156:11,19;164:18;
165:4,24;166:6,14,22;
183:15;184:5
diary (3)
30:21,21;31:10
difference (1)
102:4
different (13)
76:19;116:15;119:9;
129:9;146:24;147:2,7,
10;148:2;151:14;
170:18;171:14,22
differential (1)
102:1
difficult (2)
27:3;46:7
DIGREGORIO (39)
6:1,4,10;24:23;27:2,
11,16;53:2;69:24;70:7;
84:24;99:10,16,18,20;
100:5;110:2,5;113:12;
120:18,23;121:2,6;
147:2,18,24;151:6;
152:22,24;154:9;
157:18,20;158:7;
159:9;170:10,12;
182:7;185:23;186:15
diligence (1)
49:17
diligent (2)
71:11;95:3
DIRECT (4)
6:17;37:19;103:19;
155:11
direction (3)
53:11;183:6;184:9
directions (1)
7:2
directive (1)
88:5
directly (4)

23:9;85:18;106:16;
137:19
director (1)
153:12
directories (1)
86:11
disclosed (2)
12:21,24
discourage (1)
107:20
discovery (2)
38:20;171:1
discuss (21)
39:20;41:1,4;47:7,
12;50:8;51:3,12;53:23;
55:7,10;56:16,18,20,
23;58:2;60:15,23;68:5,
8;71:23
discussed (16)
10:13,23;30:1,7;
39:9;51:8;54:15,17;
57:2;60:8,21;69:15;
107:11;127:10;164:10;
181:11
discussing (4)
44:20;45:20;54:21;
113:16
discussion (21)
31:22;33:1;34:21,24;
35:5;41:9;45:4,13;
47:3,9,11,14;51:18;
60:5;69:17;105:16;
106:23;149:8;181:13;
182:14,15
discussions (18)
34:9;35:8;40:10,14,
17;41:3;50:5;51:19;
52:11;55:2;61:4;73:18;
102:21;109:13,18,24;
149:8;180:24
disincent (1)
107:19
disincentive (1)
107:19
disk (3)
164:21,22;165:2
disputing (1)
142:23
distinguish (1)
119:12
document (52)
12:3,6;17:8;18:16,
24;19:2,15;20:8;63:13;
64:12,21;65:3;66:4,6,
16;80:1;98:19;105:20;
109:21;111:8;112:10;
113:19;116:9;117:3;
119:10,18,22;124:5,9;
125:24;128:5;129:12;

131:6,11,21;133:1;
134:5,7,16;137:21;
140:15;141:3,4;
142:11,17;144:11;
146:9,12;148:2,10;
150:8;184:12
documents (51)
14:1,2,20,24;50:17;
63:20;68:20;69:2;
87:23;88:11,17,20,22;
95:7,10,21;96:15,17;
97:1,5,8,12,21;118:15;
143:6;147:1,3;155:13,
23;156:5,19;157:4;
162:19,21;163:2,15,18;
164:1,9,13,19,24;
173:5,10,21;174:2,3;
183:7,11,18,24
dollars (1)
139:19
Dolphins (1)
143:24
done (6)
17:6;80:10;109:23;
137:3;143:8;172:13
Doolittle (3)
103:5,12;106:17
door (2)
105:5,9
double-sided (1)
19:14
doubling (1)
105:10
doubt (2)
82:23;89:21
Doug (3)
146:13;150:9;151:23
down (8)
7:8;15:10;33:8;
50:23;102:18;103:1;
135:20;180:14
download (2)
80:23;82:16
downloaded (1)
82:13
draft (7)
9:22;67:18,24;68:1;
73:7;128:7;142:7
drafted (2)
66:16;67:19
drafting (2)
66:19;67:21
drawing (2)
23:21;27:17
Dream (3)
134:8,16,18
drinks (2)
171:10,11
drive (6)

165:6,7,10,14;166:3,
3
drives (3)
165:13,18;166:4
drop (2)
75:17;77:3
dropped (1)
102:15
due (2)
49:17;71:19
Duffy's (1)
171:18
duly (1)
6:6
during (19)
13:13;23:13;29:22;
30:1;34:19;38:16;
39:12;40:3,7,11;41:1;
53:14;60:7;71:23;
86:15;113:8;128:22;
129:2;180:6
duties (1)
11:14

E

earlier (5)
112:1;137:11,20;
172:24;175:10
early (3)
36:20;37:11;144:22
earn (1)
177:5
easier (1)
128:10
education (3)
22:23;39:22;43:9
effort (4)
146:1;163:19;
170:17;180:15
efforts (10)
127:19;168:22;
169:2;170:14;175:6;
176:1;178:15;179:7,
20;184:7
eight (9)
19:23;29:4;114:10,
13,15,15;140:18;
153:14;171:6
either (15)
13:15;30:23;31:9;
62:5;73:5;114:23;
118:4;130:24;134:11;
139:11;153:1;156:19;
161:18;166:11;175:15
electronic (13)
30:21;31:10;42:6;
68:11,19;71:13;
156:11;165:4;166:6,

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

14,21;183:11,18
**electronically (2)**
14:1;176:2
**else (36)**
8:11,15;10:14,18;
35:23;37:6,8;39:12;
41:11;42:18;43:13,24;
56:5,7,9;62:6;68:2;
81:4,9;83:20;91:11;
95:15;96:12;118:12;
119:17,21;136:24;
137:2;138:13;160:17;
162:2;171:24;173:9,
12;178:3;180:5
**elsewhere (1)**
166:21
**e-mail (146)**
14:6,9,11,16;65:24;
66:4,13;71:4;74:3,9,
23;75:5,18,23,24;78:5,
8,8,9,13,23;79:9;88:24;
90:18,20,23;91:12,22;
94:9,18,19;95:16;
97:23;98:2,3,16;104:4,
6;105:13;106:15;
110:16;112:5,8;
113:17,22;114:2,5,8;
116:5,8,10,22;117:4,6,
8,13;122:10,14;123:2,
18,23;124:2,3;125:18,
22,22;126:10;127:23;
128:3,7,8,18;130:5,8,
12,16;131:4,15,19,24;
132:16,18,22;133:22;
134:2,4;137:4,7,11,20;
142:22,23;143:13,16,
21;144:4,7,8,12;
145:11,17;146:3,4,7,
15,20;147:9;148:5,19;
149:1;150:9;152:2,6;
153:4,8,11,24;154:4,
13;155:15;156:17;
157:11,23;158:8,14;
159:2;161:2,6;168:9;
173:2,17;174:1,4,23;
175:7,21;176:10,13;
177:1,16,24;178:9;
179:20;184:13,15,22
**e-mailed (2)**
146:17,18
**Emails (1)**
128:4
**e-mails (28)**
91:1,17;94:5;145:9;
155:13,20;156:8,16;
173:1,5;174:20,21;
175:11,20;176:9,24;
177:2,3,10,13,19,24;
178:5,8,24;179:21;

184:16;185:6
**employed (10)**
19:18,24;23:13;43:2;
49:20;62:11;155:14;
156:10,17;163:16
**employee (10)**
22:12,21;37:17;
70:23,24;71:2;118:21;
133:4;144:15;151:10
**employees (8)**
52:5;80:6;99:4,20;
138:10;167:17,21;
168:1
**employer (4)**
8:24;133:7,17;
181:22
**employers (3)**
49:22;78:24;154:20
**Employer's (2)**
78:14,15
**Employment (42)**
9:6,16,21;10:1,5;
11:5;13:13;17:23,24;
18:22,23;22:11,19;
38:13;44:21,22;45:1;
50:16,21,22;53:23;
55:3,7,10;60:15;65:7;
72:21;73:3,8;86:15;
90:6;128:23;129:5;
173:11;176:5,14;
177:4;178:1,23;
179:12,22;183:3
**encouragement (1)**
67:4
**Encryption (1)**
21:8
**end (1)**
149:7
**ended (1)**
150:13
**engaged (1)**
26:16
**enough (4)**
49:24;75:17;77:3;
152:21
**enrollment (1)**
150:13
**entail (1)**
54:24
**entirety (1)**
19:4
**entities (1)**
50:8
**entitled (6)**
20:23;21:13;46:3;
63:14;113:18;137:22
**entity (1)**
170:15
**equitable (1)**

108:5
**equity (2)**
128:12,14
**equivalent (1)**
129:3
**essentially (2)**
28:7,9
**estimate (3)**
84:6;89:12;185:3
**et (3)**
105:18;133:4;166:4
**evaluate (3)**
59:5,22,24
**evaluating (2)**
149:6,11
**evaluation (1)**
183:2
**even (5)**
123:14;124:22,24;
129:23;153:20
**event (8)**
10:2;27:14;114:12,
14;116:14;130:14;
153:14;177:10
**events (9)**
85:8,9;86:11;114:10;
115:8;116:20;129:10;
153:22;171:22
**everyone (5)**
44:3,10;48:10,12;
88:24
**everyone's (1)**
6:7
**evidence (1)**
183:18
**exact (8)**
14:1;66:24;69:7;
88:9;94:23;95:1;
107:24;129:15
**exactly (7)**
33:9;54:16;90:8;
107:23;126:12;140:4;
150:1
**EXAMINATION (3)**
6:17;172:18;182:8
**example (4)**
78:22;85:23;94:5;
140:10
**Excel (1)**
134:18
**exchange (2)**
146:16,17
**exclusively (1)**
69:16
**excuse (11)**
26:14;69:16;73:9;
74:17;108:10;114:9;
121:13;125:5;136:21;
150:10;153:7

**executed (1)**
47:15
**Executive (8)**
42:24;43:16;44:4,11;
92:11;114:20,21;
129:20
**executives (5)**
114:15,18;116:15;
117:5;128:21
**executives' (2)**
78:19;79:4
**Exhibit (84)**
11:22,23;12:3,6;
18:12,16;19:10,14;
20:5,11;63:9,13;65:24;
66:4;72:2,6;73:23;
97:23;98:2,16;110:16;
112:4,5,8;113:17;
114:2,5;116:5,8,22;
117:2,8,11;120:7;
122:10,14;123:23;
124:2;125:18,21;
127:23;128:3;131:15,
19;132:18,21;133:22;
134:2;137:4,7;143:13,
16;144:4,7;146:4,7;
147:10;148:5,9;152:2,
6;153:4,8,24;154:4;
155:18;158:13,14;
159:3,4,6,10,10,11,11;
174:22;177:14,16,19;
178:9;179:1;184:13,
16,21
**Exhibits (4)**
50:12;157:23;173:4,
15
**exist (7)**
51:22;52:12;83:19;
156:11;157:4,10,11
**existing (1)**
111:22
**exists (1)**
42:8
**exited (1)**
99:23
**expand (1)**
151:21
**expectation (2)**
149:18;179:8
**expected (1)**
119:3
**expecting (1)**
104:15
**expedited (1)**
171:1
**expense (4)**
86:22;87:2,5,17
**expenses (4)**
86:16,20;87:14;

116:18
**experience (4)**
22:12,15,22,23
**expert (2)**
75:16;76:24
**explain (6)**
69:13;75:12;104:20;
126:3;152:9;173:14
**explore (1)**
60:9
**exploring (2)**
56:11;61:11
**extent (3)**
20:9;24:24;38:3
**external (1)**
166:3
**extra (3)**
130:15;149:24;150:4
**extremely (2)**
102:14;178:12
**eyes (6)**
37:24;38:1,15;
120:15;144:13,24

**F**

**FabSouth (2)**
90:4,15
**fact (3)**
69:7;104:6;181:6
**factors (1)**
133:9
**faith (2)**
176:1;179:20
**familiar (9)**
19:1,6;20:7;64:9;
66:6;72:7;124:4;148:9,
13
**families (1)**
183:4
**family (1)**
10:19
**far (1)**
44:19
**fashion (2)**
91:13,15
**fast (1)**
143:11
**faxes (4)**
91:3,5;92:1,7
**Feather (3)**
135:21;136:3,9
**Federated (1)**
131:3
**fee (5)**
24:12,19,22;25:2,5
**feel (2)**
71:7,9
**fees (2)**

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

8:23;24:5
**feet (1)**
  82:21
**felt (4)**
  108:2;131:10;
  180:24;181:2
**few (5)**
  139:19;157:11,17;
  172:12,21
**Fibrosis (2)**
  153:13,19
**figure (3)**
  87:9;121:20;147:12
**figures (1)**
  138:18
**File (3)**
  21:9;96:21;97:10
**files (2)**
  96:11,14
**filings (2)**
  79:10,17
**final (2)**
  106:8;115:14
**finalist (1)**
  118:22
**finally (1)**
  73:12
**financial (4)**
  38:8;117:5;131:20;
  141:5
**find (6)**
  51:17;78:1,18,19;
  95:19,21
**fine (9)**
  11:4;23:23;27:20;
  30:12;53:16;76:14;
  119:23,24;151:8
**finish (6)**
  7:17,17;57:8;79:21;
  113:5;182:20
**finished (1)**
  173:3
**firm (3)**
  48:3;151:2;181:9
**first (35)**
  6:5;9:21;11:14;23:1;
  28:10;29:1;30:11;31:7;
  32:1,13;44:20;45:4;
  58:18;61:5;66:23;
  67:12;73:7;78:9;
  102:13;105:9;118:4;
  120:14,16,20;140:22;
  141:8,10;142:2;
  157:17,23;160:24;
  167:13;173:1;174:7,11
**five (6)**
  19:15;35:16;89:14;
  94:22;125:23;185:5
**Flag (1)**

128:5
**flexibility (1)**
  143:9
**flexible (1)**
  100:2
**floppy (3)**
  164:21,22;165:2
**Florida (19)**
  112:13;115:6;117:8,
  17;122:11,15,16;
  123:3;137:14,15,15,22,
  23;138:1,2,2;151:18;
  153:14,22
**Follow (1)**
  128:5
**following (1)**
  119:6
**follows (1)**
  6:6
**follow-up (1)**
  172:21
**forgot (1)**
  110:8
**form (59)**
  9:12;10:8;14:23;
  15:19;16:4,8;25:16;
  26:1,6;32:8,16;33:10;
  36:3;42:10;50:14;55:9;
  57:1;58:7;59:10,13,19;
  61:17;64:4,16;67:6;
  69:20;74:11;75:20;
  76:23;78:16;79:10,16;
  80:12,24;81:3,10;
  82:20;84:21;91:16;
  93:8,13,19;111:12;
  114:8;116:10;117:4,6;
  141:16;154:7,10;
  156:12;157:5,6;
  161:23;166:15;168:18,
  24;186:4,10
**format (1)**
  116:15
**formed (1)**
  114:10
**former (2)**
  131:24;132:1
**forms (2)**
  79:17;93:11
**Forum (1)**
  115:6
**forward (2)**
  69:18;142:10
**forwarded (3)**
  126:17,20;137:11
**forwarding (1)**
  134:3
**found (3)**
  97:7;155:7,9
**Foundation's (1)**

153:20
**founding (1)**
  115:5
**four (1)**
  185:5
**foursome (1)**
  130:15
**fourth (3)**
  120:3,6;138:16
**frame (15)**
  20:1;28:17;30:16;
  31:13;33:5;34:24;
  36:11;47:22;48:23;
  49:6;50:16;57:13;67:2;
  68:9;174:10
**framework (1)**
  45:22
**friend (3)**
  48:6;136:16;143:23
**friends (1)**
  10:19;86:2;93:2
**front (7)**
  20:4;37:17;58:17;
  62:23;72:23;99:3;
  146:20
**full (1)**
  58:18
**fully (1)**
  25:1
**functions (3)**
  29:13;86:13;177:20
**further (6)**
  52:16;69:3;120:7;
  131:9;140:15;186:16
**future (8)**
  62:17;114:1;133:21;
  173:21;179:12,22;
  183:4;186:11

**G**

**Galaxy (1)**
  161:17
**game (1)**
  143:24
**gave (4)**
  62:2;82:19;110:10,
  11
**gears (1)**
  180:1
**Gee (1)**
  23:20
**general (14)**
  11:19;16:14;19:7;
  23:6;31:23;33:15;
  39:22;44:23,24;45:4,7;
  46:10;55:2;65:1
**generally (15)**
  11:18;27:21,24;41:4;

45:10,11,13;50:7;
  51:12;54:21;58:24;
  68:12;106:22;118:14;
  173:16
**generate (2)**
  11:15;177:5
**gentlemen (2)**
  8:9,22
**gestures (1)**
  7:5
**gigantic (1)**
  85:24
**given (5)**
  48:10;71:16;79:19;
  138:20;184:8
**giving (2)**
  98:15;140:14
**glean (1)**
  112:1
**Gmail (2)**
  161:15,16
**goal (12)**
  104:9,9;105:5,10,17,
  17,17,17;106:1;
  137:22;138:14,16
**goals (7)**
  104:14,18;105:16;
  106:4,18;107:1,4
**goes (2)**
  121:19;138:4
**Golf (4)**
  130:9,14;131:1;
  168:21
**Good (22)**
  6:19,20;21:2;22:6;
  34:11;38:20;63:14;
  64:15,19,21;65:19;
  84:9;92:6;143:7;147:4;
  152:22;172:10;175:24;
  179:20;181:10;186:12,
  13
**Greater (8)**
  21:1;22:5;63:14;
  64:15,19,21;65:19;
  133:8
**green (1)**
  119:9
**Grid (1)**
  137:16
**group (2)**
  131:1,2
**Growth (4)**
  137:16,17;140:19;
  141:8
**Gubnitsky (1)**
  143:21
**guess (7)**
  49:5;58:18;83:22,23;
  122:8;142:15,16

**guessing (2)**
  91:10;142:13
**guidance (9)**
  67:21;68:1,14;70:3,
  12,15,17;71:16;173:9
**guideline (1)**
  105:24
**guidelines (1)**
  106:3
**gun (3)**
  98:14;152:13;153:11
**guys (2)**
  99:11;104:22

**H**

**Haderer (1)**
  142:3
**half (1)**
  139:20
**hand (1)**
  119:24
**handbook (3)**
  70:23,24;71:3
**handed (2)**
  147:10,18
**handful (2)**
  40:21;49:13
**Handout (2)**
  137:16,17
**happen (1)**
  82:13
**happened (5)**
  82:14,15;91:4;92:4,5
**happens (1)**
  10:7
**happy (7)**
  37:23;71:23;99:21;
  108:20;109:5,10;
  143:12
**hard (10)**
  68:11,20;87:9;96:15;
  97:17;121:15,20;
  122:1;166:3;183:18
**harmless (1)**
  9:10
**Harmonization (1)**
  134:19
**Harold (1)**
  143:21
**hend (10)**
  7:5;23:15;25:22;
  44:17;48:2;130:24;
  168:14;169:12,18;
  171:23
**heading (1)**
  121:9
**headings (1)**
  130:4

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

**headquartered (1)**
86:2
**Health (6)**
18:19;22:3,17;32:3;
44:24;127:15
**Healthcare (4)**
22:19;127:14,17,21
**heard (2)**
6:21;68:24
**henring (1)**
38:22
**Hello (1)**
30:3
**help (9)**
11:15;13:9;16:22;
31:11;41:24;67:23;
70:10,11;139:1
**helped (1)**
67:17
**helpful (15)**
99:10;111:15;
124:15,17,18,23;125:3,
6,13;127:19,20;
131:10;133:20;147:4;
173:21
**helping (1)**
112:1
**helps (2)**
111:22,23
**here's (1)**
61:24
**hey (1)**
106:9
**Hi (1)**
172:20
**high (1)**
149:18
**high-end (1)**
152:15
**highlight (1)**
119:8
**highlighted (1)**
63:21
**Hiram (21)**
28:20;29:4;30:14;
31:17;41:13,16;44:14;
45:8,9,13;57:18;58:2;
61:13,14,16,21,24;
88:3;94:16;181:20;
182:24
**history (1)**
165:1
**hit (1)**
105:10
**hold (10)**
9:9;52:23;68:13,19,
24;122:2;137:14;
142:14;167:12;183:10
**Holdings (3)**

134:8,17,19
**Hollander (7)**
134:20,24;135:5;
136:12,14,17;137:3
**home (47)**
14:21,21;30:24;
66:13;74:8;75:4,5,7,18,
23;81:8,11;83:10,11;
95:7;98:3;111:5;112:9;
113:22;123:17,18;
124:3,7,14;125:22;
126:10,21;128:3;
140:23;141:6,11,15;
144:16;146:8;148:17;
153:8;155:15;156:17;
157:24;158:14;160:5,
8;161:1,20;164:12,14;
166:21
**honest (1)**
178:15
**honestly (1)**
34:14
**honor (1)**
184:9
**hope (1)**
53:7
**hosted (1)**
177:11
**hosting (2)**
116:19;130:14
**Hotel (1)**
174:18
**Hotmail (9)**
14:24;15:4,17;66:13;
75:5;125:23;128:3;
137:8;141:11;164:15
**hours (4)**
52:22;100:8,9;143:5
**House (3)**
23:18;24:21;95:11
**HR (3)**
129:17,19;144:15
**HRS (1)**
154:19
**HSP (4)**
134:20,24;135:5,6
**human (4)**
129:20;150:10;
170:12;181:21
**Humorous (1)**
152:12
**hundred (3)**
79:18;139:11,19
**hyperlink (1)**
112:22

**I**

**ID (6)**

81:20,21,23;82:9;
83:21,24
**idea (9)**
15:1;89:8,10;91:3;
92:5;138:14;153:19;
155:6;185:2
**ideas (1)**
19:7
**identical (1)**
178:13
**identification (28)**
11:24;18:13;19:11;
63:10;66:1;72:3;97:24;
98:17;112:6;114:3;
116:6,23;117:9;
122:11;123:24;125:19;
127:24;131:16;132:19;
133:23;137:5;143:14;
144:5;146:5;148:6;
152:3;153:5;154:1
**identified (2)**
118:22;160:5
**identify (3)**
62:18;117:2;167:6
**ie (1)**
107:19
**II (3)**
134:8,16,19
**imagine (2)**
164:5,8
**iMercer (1)**
126:5
**Immediately (1)**
17:23
**impact (1)**
105:6
**impacted (1)**
106:6
**important (1)**
100:4
**impressed (1)**
120:22
**incentive (1)**
109:17
**include (3)**
74:4;75:1;85:11
**included (1)**
18:5
**including (2)**
86:9;99:9
**incur (2)**
86:16;87:13
**Indeed (1)**
147:11
**indemnification (1)**
9:24
**indemnify (2)**
9:3,10
**indication (1)**

91:19
**individual (12)**
38:14;39:17;46:9;
47:24;50:18;82:6;
111:2;128:11;130:8;
170:15,21;182:3
**individually (1)**
183:3
**individuals (29)**
28:11;42:16;44:1,5,
12,15,18;45:6;48:13,
20;49:7,10,19;50:6;
77:21;85:8,17,20;88:8;
94:20;105:24;112:16;
114:23;115:1;127:16;
128:13;129:18;130:5;
140:2
**individunl's (1)**
78:5
**industry (4)**
107:2;112:16;133:8,
14
**influence (3)**
28:3,4;116:12
**information (87)**
12:19,22;13:1;15:23;
20:24;21:6,11,17;22:3,
9;28:2;37:16;42:12;
47:16;58:3;61:14,20,
22;71:13,24;74:2,22;
76:13,14,18,20;77:15,
20,22;78:2;79:4,23;
80:2,2,8,21,23;81:2;
82:3,19,23;84:3;85:2;
87:10,16,24;88:11;
91:8;99:19;111:10,15;
114:1;115:21;125:6;
132:4;133:20;135:3,4;
141:5;155:2;160:15,
21;162:12;165:24;
166:11;173:10;174:1;
175:8,16;176:1,13,16,
22;177:3,22,23;178:4,
21,23;179:6,7,19;
181:19,19;182:16,23;
184:8
**Infrequently (1)**
94:21
**initial (3)**
34:9;145:10,17
**initially (1)**
30:14
**initiated (1)**
35:1
**injunction (4)**
10:2;38:22;164:5;
171:1
**input (1)**
78:8

**instead (4)**
75:18;100:8,9;109:3
**instructed (2)**
88:3;162:23
**instruction (2)**
69:1;123:16
**instructions (1)**
173:9;179:5,18
**Insurance (5)**
22:17;98:5,6;158:21,
21
**insure (1)**
98:6
**insured (4)**
25:1,2;98:10;144:14
**intelligence (1)**
132:2
**intent (1)**
170:22
**intentional (1)**
180:19
**intentionally (2)**
91:2;180:16
**interactions (3)**
62:9;86:8;171:19
**interest (6)**
32:14;50:12;51:5;
52:8,17;93:17
**interested (4)**
32:3;35:6;61:11;
62:3
**Internationnl (1)**
117:6
**Internet (1)**
86:11
**internship (1)**
129:8
**into (17)**
33:1;45:2;65:11;
69:22;77:3;82:18;
83:10;91:22;112:1;
118:2;120:7;133:7;
135:12;142:11;167:8;
171:21;180:15
**intro (1)**
121:15
**introductions (1)**
112:3
**introductory (1)**
17:17
**Invitation (3)**
114:3;116:6,23
**invitations (4)**
128:9,11;130:6;
177:20
**invite (2)**
114:16;116:16
**invitees (2)**
115:15;117:7

**Invites (1)**
130:1
**involved (1)**
11:1
**iPad (2)**
14:21;83:24
**iPhone (6)**
14:22;82:24;83:18;
156:20;178:11;184:5
**iPhones (1)**
160:18
**irrelevant (3)**
105:13;125:10;
127:20
**IRS (1)**
79:17
**issues (2)**
98:20,22
**item (1)**
180:22
**items (5)**
18:5;43:10;128:9;
136:3;180:9

**J**

**Jada (9)**
6:11;60:11;62:3;
69:12;140:10;180:23;
182:13,18,21
**Jada's (2)**
181:19;182:23
**January (43)**
9:20;11:6;36:4,20;
37:11;41:12;43:7;
58:13,14,15,19;59:12;
60:4,6,20;66:10;68:9;
72:11;73:2,4,14;
121:13;135:18;136:10,
15;138:17;149:5,11;
153:9;154:5;155:3,12;
167:20,24;168:3,6,17,
23;169:24;170:5,22;
171:13,15
**Jennifer (1)**
153:11
**Jewelers (2)**
98:5;158:20
**jewelry (2)**
98:7;158:21
**Jim (1)**
136:16
**JJ (2)**
23:17;24:12
**Joanne (14)**
6:11;53:19;55:11;
60:19;62:3;69:12;
140:10;180:23;181:8,
13;182:10,18,21,22

**Joanne's (1)**
182:17
**job (10)**
11:13,14;23:1;25:11;
27:22;28:8;111:11,16;
168:21,22
**John (1)**
121:14
**join (11)**
35:21;36:1,15;54:23;
55:7;56:17,19,24;57:6,
12;60:9
**joined (17)**
89:3,7;90:9;91:20;
92:16;135:13;145:1;
150:21;151:23;154:22;
169:5,9,15,18;175:4;
177:11,21
**joining (28)**
29:17;30:6,10;32:4,
15;33:1;34:22;41:6;
47:9;51:19;54:3,10;
55:6,11;56:9;58:6;
60:24;61:8;77:12;
88:12;90:21;91:6,14;
92:2;116:20;129:14;
145:21;151:2
**JP (1)**
85:24
**judge (1)**
45:24

**K**

**Kansas (4)**
48:19,22;49:8;50:3
**Karen (6)**
103:5,12,20;106:17;
107:7;108:3
**keep (10)**
30:21;87:17;96:6;
97:12;128:7,8;137:24;
164:24;166:11;172:5
**keeps (1)**
14:24
**Ken (1)**
142:3
**kept (3)**
95:10;96:15;163:15
**Keys (1)**
21:13
**kind (6)**
62:22;83:13;91:9;
120:11;151:4;160:23
**knew (4)**
29:5;75:17;77:3;
139:23
**knowing (2)**
67:11;124:20

**knowledge (17)**
13:8,9;16:6;18:8;
47:5;51:9;74:7;79:5;
102:6;135:9;137:2;
159:5;162:18;164:11;
165:5,12;178:6
**knowledgeable (1)**
62:23
**known (1)**
29:4

**L**

**Lage (2)**
134:4,4
**landline (1)**
167:7
**laptop (6)**
14:3,21;156:20;
160:9,20;184:5
**laptops (1)**
160:18
**large (1)**
85:24
**larger (1)**
102:13
**largest (2)**
153:14,22
**last (23)**
25:20;44:16;48:1;
80:12,14;96:24;97:2;
113:9;116:14;130:9;
138:6;139:23;144:19;
149:5;155:18;165:3,
11,14;166:4,8;169:24;
170:14;172:7
**Late (4)**
9:20;36:20;37:11;
144:22
**later (4)**
46:21;48:9;120:4;
186:9
**law (3)**
176:23;185:15,17
**lawsuit (2)**
10:7;162:23
**lawyers (1)**
68:12
**lay (1)**
142:2
**lead (3)**
110:23;111:21;142:8
**leadership (2)**
142:3,4
**leading (3)**
173:18;174:13;
175:22
**learned (1)**
155:1

**learning (1)**
35:7
**least (1)**
80:19
**leave (6)**
56:23;58:21;147:15;
173:22;182:2,3
**leaving (9)**
13:18;26:19;87:6;
150:18;162:20;163:20;
167:21;168:1;181:24
**left (9)**
15:12;57:17;58:15;
69:2;80:7;119:24;
138:4;145:19;155:4
**left-hand (1)**
122:4
**legal (3)**
8:23;20:3;49:24
**lengthwise (1)**
121:19
**Less (2)**
94:22,24
**letter (12)**
66:9;67:18,20,22,24;
68:13,24;71:11;72:12;
158:6,16,17
**level (2)**
129:19,20
**liberty (2)**
169:14,16
**life (2)**
164:22;165:1
**Ligelle@nolcom (2)**
161:3,5
**light (1)**
45:10
**liked (1)**
130:14
**likely (1)**
107:1
**limited (1)**
108:13
**line (5)**
118:20;121:18,18;
133:5,16
**lines (6)**
30:24;74:5;75:2;
80:3,8;133:3
**link (5)**
126:6;132:11,14,15;
140:16
**LinkedIn (5)**
78:3,5,7;91:8,21
**links (7)**
125:18,24;126:4;
127:4;132:4,5,8
**list (58)**
73:24;74:1,3,15,22,

24;77:6,11,15,18;79:4,
12;81:4,7,8,17;83:10,
19;84:4,11,16;85:7;
89:1;91:1,5;110:18,22;
112:6,13;113:18;
115:15,16,18,20,21,24;
122:11,16,17;123:4,6;
128:22;129:1;130:12;
133:3;138:4;140:2;
176:19,20;178:10,24;
180:14;184:13,16,19,
20;185:8,18
**listed (1)**
138:17
**listen (1)**
165:22
**Listing (1)**
98:17
**lists (2)**
18:3;110:23
**litigation (6)**
7:11;37:19;68:12,19;
183:10,24
**little (4)**
54:8;100:3;139:5;
180:2
**LLC (4)**
18:19;49:20;72:14;
134:17
**loaded (1)**
82:2
**locate (1)**
95:17
**location (1)**
118:19
**locations (2)**
77:8;79:13
**Lock (1)**
57:6
**Lockton (146)**
9:3,7;10:5;28:11,12;
29:17;30:6,10,10;31:5;
32:4,15;33:1;34:22;
35:7,21;36:2,16,22;
37:13,14;39:12,12;
41:5,6,11;42:17,19;
43:3,13,24;44:21;46:9,
24;47:10,15;48:11,14,
16;49:8,20,23;50:6,8,
13;51:12,20;52:1;
53:23;54:3,10,15,17,
23;55:6,7,11;56:9,11,
17,19,20,24;57:12;
58:6,12;60:1,9,16,24;
61:8;62:6,9;67:5,7;
71:21;72:14,18,22;
73:3;77:9,12;81:15,17;
82:1,4,10,18,24;83:19;
87:23,24;88:8,12;89:4,

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

7;90:21;91:6,14,20;
92:2;93:4,7,24;94:8;
115:20,22;116:2;
135:14;136:18,23,24;
137:2;145:1,21;
150:21,24;151:4,6,10,
21;153:2;154:22;
155:1;156:20;162:13;
169:5,10,15,19;173:9;
174:8;175:1,4;176:6,
15;177:4,6,11,21;
178:1,4,23;180:23;
181:17;182:17

'

'Lockton (1)
72:14

**L**

Lockton's (9)
50:11;51:4;52:8,17;
67:3;93:17;94:16;
153:18;157:5
lodge (1)
71:22
logged (5)
81:22;82:8,9;83:21,
23
long (2)
49:24;50:2
longer (2)
42:13;156:10
Long-term (1)
109:17
look (24)
12:3,18;19:15;20:7,
14;47:18,24;64:7;65:3;
79:20;80:18;112:2;
119:5;120:11;121:16;
122:3;132:15;141:14;
146:21;148:11;150:11,
16;161:21;177:14
looked (6)
47:23;80:12,15;
102:3;140:24;181:12
looking (8)
80:20;129:12;
138:24;141:7;146:23;
152:16;162:6;179:15
looks (7)
122:1;132:6,15;
133:2;136:2;142:2;
173:5
losses (1)
9:4
lot (3)
122:1;173:6;185:11

loud (1)
17:19
lower (3)
102:22,23;133:8
lsupportlists (1)
132:7
LTI (1)
109:13
luck (1)
34:15
lunch (2)
153:17;171:8
lunches (2)
168:21;170:16
Lyle (6)
6:10;66:22,23;94:17;
99:5;172:20
Lynn (5)
66:5,10;68:3;72:12;
126:18

**M**

maintain (4)
11:19;164:19,24;
166:11
makes (1)
121:20
making (1)
163:18
Management (6)
22:17,18;112:23;
123:16;126:16;137:18
manager (3)
103:8;118:18,19
Manual (1)
21:11
many (24)
23:18;35:14;39:23;
40:17;41:19;43:11;
44:5,7;49:9,12;65:6;
78:3;89:6,10;95:21;
115:13;151:12,12;
153:21,21;169:9,11,18;
185:1
March (1)
6:2
mark (6)
46:20,20;98:13;
110:12;147:22;148:3
marked (50)
11:24;12:2;18:13,15;
19:11,13;63:10,12;
66:1,3;72:2,5;97:23;
98:1,17;110:15;112:6;
114:3;116:6,23;117:9,
11;122:11,13;123:24;
125:19;127:23;128:2;
131:15,18;132:19;

133:23;137:5;143:14;
144:5;146:5;147:9,14,
23,24;148:1,5,8;150:2;
152:2,5;153:4,24;
154:3;174:21
marketing (1)
127:21
marking (1)
109:21
Marrero (13)
28:20,21;31:17;
32:22;33:20;34:2;35:1,
20;37:4;39:10;44:14;
45:8;88:3
Marsh (25)
12:24,24;22:19,23;
23:1;63:9,13;108:12,
16,22;112:5,13;
113:18;123:3,7;
124:10,19;125:11,13;
129:5,14;130:17,20;
166:5,22
Marsh-Mercer (1)
108:6
Marty (2)
6:11;119:11
Mary (1)
145:4
material (4)
17:7;95:4;127:22;
166:22
Materials (19)
13:3,6,12,14;14:13,
15,17;15:9,11,16,18;
16:7,24;17:5,7,22;
18:10;68:13;97:20
Matt (5)
6:10;14:8;106:9;
172:20;182:6
M-A-T-T (1)
14:8
Mattd5454@hotmailcom (1)
161:7
matter (2)
6:22;181:6
MATTHEW (2)
6:1,4
may (33)
9:14;11:1;36:8;
51:13,15,21;54:24,24;
73:17;83:7,8;95:17;
106:16;108:2,3;112:2;
130:13;133:9;141:21;
152:9,10;159:1,10,10,
11,11;160:3,14;161:9;
177:11,19;180:17;
186:8
Maybe (6)
30:13;40:23;58:18;

94:16;121:17;181:3
McLellan (2)
123:3;124:10,19;
125:11,14
McLennan (3)
13:1;63:9,13
meals (1)
171:12
mean (22)
19:3;26:13;30:11;
50:7;59:3,5;62:14,14;
69:13,15;82:12;85:12;
100:8;101:7;114:20;
119:23;121:15;122:2;
140:24;142:10;144:21;
169:17
meaning (11)
78:17;101:8;102:9;
105:5;107:22;108:14;
109:8;129:2;138:1;
140:6;162:5
means (3)
25:24;26:8;142:1
meant (1)
142:11
medical (1)
133:3
medications (2)
7:23;8:2
meet (8)
8:4,7;49:12;62:19;
90:7;129:10;171:16;
174:20
meeting (12)
8:19;30:20,22;40:6;
42:6;121:12;126:16,
23;133:21,21;137:10,
15
meetings (6)
30:18;40:9;50:2;
172:1,2,6
member (2)
115:5;171:20
members (1)
10:19
memory (1)
7:24
Mention (1)
158:13
mentioned (8)
42:17;44:2,15,17;
83:9;94:20;119:22;
130:13
mentioning (1)
33:16
Mercer (205)
6:15,22;9:11;11:5,
15;12:21;13:6,7,13,18;
14:15;15:9,10,23;17:5,

7,7;18:10,10,19,22;
19:18,24;22:12,20;
23:4,9;24:3;25:12;
26:13,15,16,20;27:22;
36:7;19:37:17;38:9;
41:12;42:19;50:9;51:2,
4,21;52:6,10;54:13,22;
55:3,8;56:2,4,21,24;
62:11,16,21,24;65:7,
18;69:1;70:24;71:3,12;
72:13,19;73:24;74:4,
20;75:1;77:18,21;84:2,
15,18;85:3,3;86:15,19;
87:14,20,23;88:22;
90:6,9,10,12,14,16;
92:14,16,18;93:18;
95:3,18;96:17;97:5,7;
98:21;99:1,4,7,9,19,20;
100:19,22;101:8;
102:7,12,21;103:9;
104:14;105:5;108:10,
12,17,23;111:1,18,20;
115:9;116:17,20;
118:18,21;123:6;
124:11,20;125:2,4,7,
10;127:18;128:15,19,
23;129:5,14,24;130:17,
22,23;131:1,20;132:2;
135:8;136:3,5,22;
138:1,2,10;140:6,13,
16;142:3,4;153:15;
154:16;155:14;156:10,
17;162:20;163:16,20;
166:5,9,9,12,22;
167:17,21,22;168:1,1,
4;170:8,24;171:5,7,8,
10,11;172:1;173:2,11,
17;174:3,23;175:3,15,
16,19;176:3,14,18,22;
177:2;178:1,11,15,22;
180:12;182:3
MercerLink (1)
140:19
Mercer-related (5)
175:7,20;176:9;
179:6,19
Mercer's (7)
78:23;105:3;107:1;
135:4,12;144:2;160:4
Mercer-sponsored (1)
85:8
message (1)
92:21
messages (7)
92:23,24;93:3,12,14,
16;94:4
messed (1)
177:18
met (25)

40:2,4;48:19;49:7,9,
10;85:8;90:6,8;129:13;
142:5;169:8,9,15,18,
23;170:4,21;171:7,17,
18,18,21,24;174:11
**method (4)**
76:1;93:6,23;94:2
**Metvani (1)**
92:8
**Metzheiser (1)**
43:14
**Michnel (5)**
6:16,21;39:2;63:18;
119:7
**middle (3)**
132:6;146:21;148:20
**might (11)**
10:2;16:14;31:10;
106:6;127:12;159:8;
161:19,20;163:3;
172:11;179:9
**Mike (5)**
17:12;143:4;163:11;
172:10;186:12
**Miller's (2)**
23:17;24:21
**million (3)**
105:6,8;139:20
**mind (4)**
23:19,24;99:11;
163:10
**mindset (1)**
173:16
**mine (6)**
48:6;90:17;120:15;
136:16;143:23;147:6
**Minoj (5)**
6:11;39:16;41:10;
44:14;94:16
**minor (1)**
22:18
**minus (1)**
101:21
**minute (1)**
107:11
**minutes (3)**
27:1;52:24,24
**misinformed (1)**
104:11
**misleading (1)**
180:16
**missed (1)**
162:22
**mistake (1)**
147:20
**mistaken (4)**
63:5;144:1;150:17;
167:13
**misunderstood (1)**

162:3
**MiX (1)**
27:17
**MMA (3)**
122:10,15,16
**MMA-FL (1)**
123:23
**Mm-hmm (5)**
87:4;97:6;140:9;
169:4;175:5
**mobile (1)**
167:7
**model (1)**
83:15
**modify (1)**
171:2
**money (4)**
87:7;101:8;140:13,
13
**month (11)**
9:19;16:11;30:13;
33:6,7;49:2,3;55:17,
23;138:20;181:8
**monthly (1)**
138:19
**months (17)**
16:13,16,17;39:24;
55:5,19,21;118:9;
138:17;165:3,11,15;
166:5,8;169:24;
170:14;172:7
**more (21)**
27:23;34:6;35:7,16,
18;94:4;96:1,3,5;
98:22;100:4;108:5;
129:19;139:5,6;146:2;
180:21;185:1,7,8,11
**Morgan (1)**
85:24
**morning (5)**
6:19,20;66:11;104:7;
156:18
**most (6)**
101:1;107:1;119:4;
160:3;166:10;173:5
**Motion (1)**
127:4
**mouth (1)**
49:11
**move (9)**
53:9;62:20;70:18;
149:17,19,21;150:12;
154:14;155:1
**much (5)**
84:19;87:8,13;100:7;
139:6
**multiple (6)**
29:7;35:12;77:8;
118:2;156:23;157:1

**music (1)**
165:22
**must (3)**
126:11;166:16;
169:20
**Mutual (3)**
98:5;158:20;182:11
**mutually (3)**
69:16;109:7,7
**myself (12)**
41:5;68:4;69:12;
70:10;73:24;74:14,21;
111:6;114:9,13;
131:12;137:12

## N

**name (16)**
6:7,21;27:1;44:16;
47:24;48:1,5;62:2;
118:20;122:5,6;
158:21;169:13,14;
170:15;180:11
**names (19)**
24:7;25:21;26:18;
44:12;48:10,20;65:8;
74:2,23;78:20;85:7;
86:6;110:23;112:15,
16,20;118:17;138:6;
161:12
**narrative (2)**
104:22,23
**narrow (1)**
50:7
**National (1)**
131:3
**Nationwide (1)**
129:9
**nature (2)**
42:18;46:17
**necessarily (3)**
115:17;169:22;181:4
**necessary (1)**
38:21
**need (9)**
7:16,18;24:20,21;
79:15;87:10;96:13;
111:10;121:17
**needed (1)**
130:15
**negative (1)**
107:18
**negotiating (1)**
41:10
**neighborhood (1)**
100:21
**Neil (3)**
43:14,15,16
**networking (4)**

86:10;114:10;
171:22;177:20
**new (12)**
25:12;27:7;62:17;
90:24;102:17;105:23;
118:18;142:3;176:23;
181:22;185:15,17
**News (2)**
112:23;121:1
**Next (6)**
6:10;24:16;30:9;
118:6,9;130:1
**nice (1)**
153:1
**nine (3)**
29:4;114:10,16
**Ninety (1)**
11:10
**nod (1)**
7:5
**non (1)**
70:4
**none (3)**
96:23;97:1;119:5
**Non-Solicitation (6)**
18:12,20;50:8;51:3,
13,20
**Nope (1)**
109:11
**nor (2)**
38:6,7
**normal (1)**
181:21
**normally (1)**
108:24
**norms (1)**
133:8
**North (1)**
142:5
**notated (1)**
42:12
**notations (1)**
41:24
**notes (2)**
74:4;75:1
**Nothing's (1)**
98:8
**notice (8)**
63:18;65:24;66:5,17;
70:20;71:8;154:21;
183:10
**noting (2)**
30:20;42:5
**November (34)**
49:6;57:21;61:1;
67:10;117:14;131:20;
132:16,22;133:19;
134:3;136:7;137:9,15;
138:12;139:8,12,16;

142:18,21;143:17;
144:9;146:8,18;
148:15,20;149:1,22;
150:15;156:9;167:16,
20;173:6,7;174:21
**November/December (1)**
73:12
**number (36)**
18:3;19:20;49:10;
80:5,6;83:15;84:9;
95:22,24;96:2,4,6,7;
105:12;106:1;118:23;
119:2,20;120:8;
122:19;139:13,15;
149:4;155:16,21;
157:20;158:13;159:3;
165:24;167:9,14;
168:13;177:17;185:9,
12,13
**numbered (1)**
122:21
**numbers (13)**
45:17,21;47:2,17;
62:2;74:2,23;101:22;
115:14;120:1;138:20,
24;167:6
**numerous (1)**
117:18

## O

**oath (2)**
6:24;37:18
**Object (48)**
9:12;10:8;14:23;
15:19;16:1,4,8;25:16;
26:1,6;32:5,8,16;
33:10;36:3;42:10;
50:14;55:9;57:1;58:7;
59:10,13,19;61:17;
64:16;67:6;69:20;
74:11;75:20;76:23;
78:16;81:10;82:20;
84:21;91:16;93:8,13,
19;111:12;141:16;
154:7;156:12;161:23;
166:15;168:18,24;
186:4,10
**objected (1)**
154:10
**objection (9)**
45:11;53:4;71:23;
173:18;175:22;178:17;
179:2,10,13
**obligated (1)**
37:15
**obligation (3)**
46:24;70:19;71:9
**obligations (4)**

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

50:9;51:3,14;52:4
**observation (1)**
135:4
**Observations (2)**
134:21;135:1
**observed (1)**
81:2
**obtain (1)**
80:21
**obtained (2)**
22:16;124:11
**obviously (4)**
6:16,23;121:19;
182:1
**Occasionally (1)**
29:15
**October (38)**
31:6;33:19;34:8,16,
19;35:11;49:5;67:9,9,
10;98:3,21;102:20;
103:10,23;104:5,7;
105:16,19;110:16;
112:9;113:18;114:6;
121:13;122:14;123:9,
10,19,21;124:3;
125:22;127:2;128:4;
131:7;156:9;173:6,7;
174:21
**October/November (2)**
67:2,14
**Off (20)**
23:15;25:22;36:8;
39:6;44:17;48:1;
100:14,15;101:9;
102:15;105:4;113:13;
130:23;160:14;168:14;
169:12,17;171:22;
172:16;176:23
**offer (17)**
35:21,23;36:15,19,
21;37:2,13;45:12;
49:14;55:7,10;58:12;
59:6,7,16,23;62:24
**offered (1)**
182:22
**offering (1)**
143:23
**office (8)**
15:13;95:12;110:24;
118:19;121:14;151:10,
18;166:21
**officer (2)**
39:18;143:22
**offices (1)**
8:13
**offsite (2)**
126:16,23
**often (2)**
94:13,19

**old (2)**
160:9,9
**once (7)**
40:3,5;43:12;80:19;
105:8;119:7;182:2
**one (75)**
6:21;7:12;17:15;
20:17,18;24:16;37:15;
40:5,6;42:3;44:10;
45:2,3;51:9,9,17,21;
52:12,20;56:12;71:1;
75:14;76:7;77:9,10;
78:1;79:19;92:6;94:16;
103:19;104:9,9;107:5;
109:8,8,9;111:22;
113:8;114:9;115:10;
116:10;121:11,19;
127:4;130:9,13;
131:24;133:16;135:9,
11;138:20;146:2;
147:5,10,12,13,14,16,
16,24;150:3,6;153:1,
22;156:23;158:1,3;
161:7,13;162:5,5;
167:12;171:20;175:19;
180:11
**one-on-one (1)**
104:8
**ones (13)**
23:23;34:10;79:7;
84:10;128:16;157:13;
159:7,8,8,22;161:10;
163:3;186:3
**online (8)**
19:20,22;21:5;64:14,
17;65:6,9;98:5
**only (25)**
25:1;37:24;38:1,15;
40:5;51:19;52:11;
68:24;76:14,17,17;
81:12;107:17;108:17,
18;118:7,9;138:2;
147:3;159:7;161:21;
162:4,8,20;178:21
**open (3)**
150:13;181:14,14
**opened (5)**
140:24;141:2,4;
162:17,18
**open-ended (1)**
180:3
**operating (1)**
39:18
**opinion (3)**
105:22;106:9,11
**opportunities (10)**
11:15;22:20;54:14;
56:11;57:3;60:9,16;
62:17;103:20;181:15

**opportunity (18)**
27:12;54:17,23;
56:17,18;57:6,12,14;
59:24;60:21;61:12;
118:20;119:1;181:8,
10,11,12;182:11
**Optimize (1)**
134:18
**order (1)**
38:21
**organization (2)**
115:4;117:4
**organizations (1)**
116:11
**original (2)**
73:16;182:15
**originally (5)**
64:2;92:14,15;111:7;
144:21
**others (5)**
23:18,19;78:4;
114:13;134:4
**otherwise (7)**
17:5;26:15;47:2,17;
71:13;118:23;183:11
**Out (46)**
17:19;23:1;25:11;
28:22,22;29:9;32:23,
24;51:17;52:21;78:18,
19;80:7;87:9;99:8,12,
14;109:1;114:9;117:7;
121:20;128:9,10;
130:15;135:13;136:9,
14,17;142:3;144:24;
145:3,8,14,21;146:1,2;
147:12;150:20;151:9,
17;153:16,21;155:7,9;
168:9;180:19
**outings (1)**
168:21
**Outlook (17)**
30:18,23;31:10;
42:11;73:24;74:1,14,
21,21;77:10;82:7,10;
83:23;84:17;129:3;
172:3,5
**outside (1)**
99:6
**over (19)**
19:23;25:20;29:3,7;
39:24;40:1,15;50:4;
55:3;65:6;79:18;86:8;
87:11;91:23;95:18;
108:23;109:2;118:5;
126:19;131:5;150:11,
16;166:4
**overview (1)**
31:23
**owe (1)**

87:8
**owed (1)**
87:7
**own (7)**
59:4;69:17;138:24;
158:7;167:7;182:3;
183:3
**owners (1)**
171:20
**Oxis (1)**
171:20

## P

**Pacific (3)**
135:20;136:3,9
**package (6)**
71:20;99:2;103:15,
23,24;109:19
**page (23)**
12:10;17:8;63:18;
66:16;110:22;118:3;
120:9,10;134:22,23;
135:22;137:21;140:17,
18,18;141:7,9,10,18;
142:2,14;146:21;
148:20
**pages (20)**
12:8;19:14,15;63:16;
114:6;117:18,22;
118:12,15;119:17;
120:4,7;122:20;123:1;
135:20;142:7,9;147:3;
185:5,7
**paid (8)**
8:23;105:6,8,11,12;
108:23,24;127:15
**Paige (1)**
44:16
**Paige's (1)**
44:16
**painted (1)**
181:2
**Palm (1)**
171:18
**paper (7)**
30:24;31:10;42:6,13;
95:6,10;172:4
**paragraph (19)**
12:18;13:3,4;17:8,
16,17;18:7;71:10;
72:11;73:22;74:18;
85:11,14;86:6,17;
87:22;88:10,16;89:1
**part (8)**
12:16;49:17;71:20;
78:18;115:3;140:14;
181:13;182:13
**participants (2)**

79:18;80:6
**participate (2)**
80:6;126:19
**participated (1)**
180:12
**particular (4)**
13:19;26:16;36:23;
122:7
**parties (1)**
85:9
**party (2)**
7:11;115:22
**passing (1)**
11:1
**past (1)**
109:13
**Paul (3)**
42:22,23;43:21
**pay (3)**
108:18;114:17;
116:16
**PDF (1)**
110:20
**PE (2)**
128:12;129:16
**pending (1)**
53:5
**people (23)**
44:7;49:9;62:24;
78:24;89:6,10;91:3,22,
22;92:1;93:2;107:19;
112:17,19;115:13;
129:10,13,19;130:13;
138:8;169:9,18;171:21
**people's (1)**
76:12
**per (4)**
61:14;133:5;149:17;
181:19
**percent (11)**
108:13,14,15,19,23;
109:1,4;125:2;139:11,
21,22
**percentage (11)**
84:7;101:9,15;
102:13,14;105:8;
108:24;109:3,4;
137:22;138:16
**percentages (1)**
133:9
**perception (1)**
53:2
**performed (2)**
71:11;95:3
**Perhaps (1)**
10:19
**period (29)**
30:13;33:6,15;34:4,
5,5,8,19;35:9,11,21;

39:11,13;40:1,3,7,11,
  12,16;41:17;43:23;
  45:5;55:3,5;60:19;
  61:2;67:15;73:10;
  102:10
periods (1)
  34:9
person (10)
  28:19;40:6;44:10;
  48:21;75:11;126:18;
  128:11;130:15;169:14;
  170:4
personal (40)
  14:6,16;15:13,17;
  20:23;21:16;22:3;38:4,
  5;76:5;81:3;82:8;86:7,
  12;95:16;109:1;
  115:21,23;129:10;
  136:16;156:19;157:11;
  159:1;173:2,17;174:1,
  3,23;175:7,21;176:9,
  13,20;177:1,24;178:5,
  24;179:20;183:14;
  184:5
perspective (4)
  65:22;85:21;86:4;
  138:19
pertain (1)
  180:23
Pete (1)
  131:3
ph (1)
  92:8
phone (16)
  48:7;74:2,16,23;
  76:7;81:22,24;82:4,9,
  18;83:22;91:23;
  126:19;161:17;167:8;
  168:13
phones (1)
  82:21
physical (1)
  32:3
physically (1)
  157:14
picture (1)
  181:2
pin (1)
  33:8
pink (1)
  119:9
pipeline (5)
  103:21;117:9,17;
  118:1,24
pitched (2)
  136:20,24
Pitches (1)
  168:21
Place (6)

21:23;50:2;55:1;
  61:4;75:14;81:12
places (1)
  129:9
plaintiff (2)
  7:12;50:12
Plaintiff's (62)
  11:22,23;12:2,5;
  18:12,15;19:10,13;
  20:4,11;63:9,12;65:24;
  66:3;71:24;72:2,5;
  73:22;97:23;98:1,16;
  110:15;112:4,5,8;
  113:16;114:2,5;116:5,
  8,22;117:8;122:10,14;
  123:23;124:2;125:18,
  21;127:23;128:2;
  131:15,18;132:18,21;
  133:22;134:2;137:4,7;
  143:13,16;144:4,7;
  146:4,7;148:5,9;152:2,
  5;153:4,8,24;154:3
plan (5)
  79:19;105:4;107:23;
  109:13,17
pleasantries (1)
  30:3
please (22)
  7:1,7;12:6;17:11;
  19:15;24:7;26:2;28:14;
  57:9;74:18;83:4,6;
  85:15;96:24;113:2;
  131:22;156:13;157:16;
  158:13;166:24;167:1,
  18
pm (4)
  123:10,20;172:17;
  186:18
point (21)
  32:24;34:21;35:20;
  36:1;38:1;39:2;49:1;
  52:9;55:14;56:10;57:2;
  82:3,16;107:19;
  130:13;173:8,24;
  176:5;180:24;181:6,23
points (1)
  54:15
Policies (1)
  63:15
Policy (7)
  19:10;20:4,7,14,16;
  21:11,17
portion (5)
  24:10,17;28:15;
  163:7;167:2
position (5)
  72:13,18;73:23;
  74:20;90:24
positive (1)

126:19
possess (2)
  162:13,13
possession (20)
  13:12,16,24;15:12;
  71:13;97:18;124:11,
  13;132:3;155:23;
  157:5,6;162:20;163:1,
  3,19;165:18;166:13;
  176:2,17
possibilities (1)
  60:23
possibility (3)
  30:6;41:6;51:8
possible (2)
  32:4;174:8
potential (9)
  53:23;60:15;61:24;
  114:18,24;117:7;
  118:21;129:21,23
Potentially (15)
  16:19,21;26:14;
  30:10;112:1,2;118:10;
  129:22;130:18,20;
  133:15;144:17;158:20;
  160:2;178:24
preceding (2)
  56:15,16
precluded (2)
  45:19;47:1
prefer (1)
  99:3
preferences (4)
  74:5;75:2;88:17,21
preferred (2)
  93:23;94:2
preliminary (2)
  38:22;171:1
premium (1)
  80:1
premiums (1)
  133:7
prepare (1)
  8:4
prepared (1)
  37:21
prerogative (1)
  99:17
presence (1)
  99:7
present (4)
  8:15;167:16,24;
  168:6
presentation (1)
  124:23
presented (10)
  57:3,6,11,14;106:8,
  8;134:7;164:13;181:9;
  182:11

preserve (7)
  163:4,9,24;164:10;
  183:6,11,24
President (5)
  72:15;92:12;143:22;
  146:13;150:10
press (1)
  15:7
Preston (9)
  6:11;60:11,24;62:5,
  11;68:6;69:5;99:22;
  110:6
presume (1)
  34:21
presumption (1)
  113:24
Prevention (1)
  21:24
previously (1)
  179:8
prices (1)
  152:16
pricing (5)
  24:2;74:6;75:2;
  88:17,21
principal (1)
  107:5
Principle (1)
  23:5
print (4)
  119:24;120:1,2;
  160:14
Prior (50)
  13:18;18:9;22:11;
  23:13;25:14;26:19;
  29:9,10;36:15,18;
  41:11;42:19;44:13;
  48:11;51:2,19;52:10;
  54:3,10,18,20,22;55:7,
  11,15;59:9,17;60:3;
  62:6,9;68:9;70:20;
  73:23;74:20;80:14,17;
  87:6,6;90:6;93:4,7,17,
  24;94:9;116:20;151:2,
  3;162:20;163:19;175:3
private (2)
  128:12,14
privilege (2)
  68:21;71:19
privy (1)
  135:12
probably (9)
  27:5;35:19;45:5;
  55:4;80:16;91:9;
  139:24;140:1;161:16
problem (1)
  100:6
proceeding (2)
  11:2;37:23

process (3)
  75:15;181:21;183:2
processes (1)
  39:22
ProcessMAP (1)
  143:22
produce (2)
  104:15;140:7
produced (2)
  92:14;140:10
production (2)
  137:24;138:20
Products (2)
  134:20,24
professional (8)
  15:5;62:15;85:12,13,
  16;86:8,10;111:24
program (3)
  127:14;134:19;136:4
programs (2)
  19:17;62:24
prohibits (1)
  47:15
promotions (1)
  103:21
proper (1)
  53:3
property (5)
  13:7;88:22;151:11;
  178:15
proposal (2)
  145:5;150:23
proprietary (7)
  127:17;144:13,15;
  176:3,17,22;185:18
propriety (1)
  151:6
prospect (7)
  84:23;86:1;111:22;
  112:6,13;113:18;
  121:12
prospective (10)
  25:15,19,24;26:5,8,
  12,18;62:18;85:22;
  134:12
prospects (9)
  52:5;84:15,19,20;
  85:3,4,18,20;180:18
Protecting (3)
  20:23;22:2,8
protections (2)
  38:4;72:1
provide (5)
  37:23;38:12;106:15;
  107:12;182:23
provided (6)
  61:14;68:1;135:5;
  178:3;181:18;182:16
provider (1)

MERCER HEALTH & BENEFITS, LLC v.
MATTHEW DIGREGORIO, et al.

MATTHEW DIGREGORIO
March 09, 2018

167:11
providers (1)
28:5
provides (1)
185:17
providing (3)
22:20;61:22;71:24
provision (3)
9:24;10:6;70:22
Prygelski (1)
131:3
public (4)
78:1,3,12;79:8
publicly (6)
28:2;74:1,22;77:15,
23;80:21
pull (1)
81:23
purchase (2)
79:12;80:4
purchased (1)
80:9
purpose (4)
76:11,19;80:20;
146:15
purposeful (1)
180:19
purposes (4)
76:18;165:8,16;
173:20
pursue (2)
52:16;69:3
pursuit (3)
118:23;134:15;
140:14
push (1)
34:15
put (8)
45:2;49:11;61:13;
105:23;146:13;149:24;
180:15;181:16
putting (2)
75:14;109:13

**Q**

quick (3)
143:20;150:12;
153:10
quickly (2)
130:6;142:4

**R**

rack (1)
54:8
raising (1)
96:6
range (1)

16:20
Rarely (1)
29:15
Raysa (1)
145:4
re (2)
67:5;131:20
reach (7)
28:22,22;136:14;
145:3,14,21;146:1
reached (6)
135:13;136:9;
144:24;145:8;146:2;
150:20
renching (4)
29:9;32:23,24;
153:16
rend (32)
17:10,16;19:3;24:10,
17;28:14,15;74:18;
85:14;118:13;119:3,4,
6;120:1,18;121:10,15;
122:1;131:9,22;
132:10;133:2;142:2;
143:20;148:12;149:16;
153:10;163:6,7;167:1,
2;186:14
readily (1)
124:16
reading (4)
12:8;20:8;64:12;
131:8
ready (3)
149:17,19,21
real (3)
140:13;143:20;
153:10
realistic (1)
180:21
realize (1)
163:17
really (2)
95:10;180:15
renson (5)
7:21;12:15;17:24;
126:11;147:21
reasons (2)
142:19;182:3
recall (91)
9:18,23;12:8,12;
13:20,22,23;14:1,18;
16:9,12;19:22;20:1,8,
22;21:12,15;22:4;
26:21;28:10;29:12;
30:3;31:1,22;33:5,20;
35:5,14;40:19,23;41:2,
9,20;43:5;47:14,14;
51:10,15;54:9,16,21;
58:23;64:12;65:5;69:1;

71:2;88:9;90:8;94:12,
14;95:22,24;96:7;
103:4,16,18,22;104:1,
3;106:7,14,22;107:3,6,
7;109:12,18;111:6;
113:24;132:17;134:10;
135:17;141:18,22,24;
142:19;143:1;148:18;
159:19,24;166:8;
169:13;170:2;171:22,
24;174:6,11,17;
175:15;177:8;181:7
receive (4)
10:6;11:11;68:14;
101:15
received (20)
19:5;49:14;58:12;
59:7,16;71:1;73:7,14;
89:6;90:23;91:3;92:1;
133:10;168:10;173:8;
174:1;179:5,18;183:6,
10
receives (1)
92:6
receiving (1)
71:2
recently (1)
162:21
Recertification (1)
22:6
recess (3)
113:2,3,10
recognize (4)
12:7;18:16;116:9;
131:1
recollection (20)
16:23;20:15,20;
31:11;35:6;40:24;42:1;
48:15;49:4;63:7;65:1;
73:5;96:16;100:20;
105:15;126:24;127:8;
139:1;141:2;173:19
recommended (2)
57:24;107:4
record (30)
6:8;10:20;17:19;
21:19;24:10,17,21;
28:15;31:9;39:6,7,9;
65:16;67:11;74:18;
75:12;100:14,15,16;
113:13,14;152:24;
163:7;167:2;169:20,
23;172:16,17;174:19;
180:8
recording (1)
172:2
records (7)
65:12,18,21;71:5
recruiter (1)

181:10
REDIRECT (1)
182:8
reduced (1)
109:19
reentered (1)
110:7
Reference (2)
159:3;163:21
referenced (2)
44:19;161:1
references (1)
80:8
referral (1)
108:6
referred (4)
34:10;60:5;67:21;
108:16
referring (7)
50:17;55:2;104:13;
106:20;108:9;137:10;
177:13
refers (2)
140:6;142:1
reflect (1)
65:18
reflects (1)
180:8
refresh (6)
16:23;20:15;31:11;
41:24;105:15;139:1
refreshes (2)
20:19;63:7
refusing (1)
46:23
regard (3)
86:23;172:23;173:14
regardless (1)
10:7
region (1)
103:9
Regional (1)
142:5
register (2)
30:22;65:9
regular (3)
27:6;86:22,24
reimburse (2)
86:19;116:17
reimbursed (2)
87:5,14
relate (4)
104:18;170:24;
177:1,24
related (8)
20:20;29:17;65:2;
86:16;87:2;88:20;
137:19;171:5
relates (3)

170:24;176:14;
178:22
relationship (6)
62:13;118:18,19;
121:11;137:18;149:6
relationships (1)
111:23
relative (8)
47:16;51:20;52:12;
104:14;106:1;107:2,
23;114:1
relevant (4)
37:23;46:7,8;119:18
rely (1)
86:3
remark (1)
133:6
remarkable (1)
98:8
remember (72)
20:3,10,12;21:1,3,5,
8,16,21,23;22:2,5,8;
24:2;25:8,15,21;26:18;
27:9,10,13,15;28:19;
29:11;34:12,12,17;
36:24;37:12;41:21;
42:5;43:22;44:16,18;
48:1,3,20,23,24;49:2,3,
9;54:5,7;61:5;64:14,
17,24;65:1,8;66:24;
105:19,20;106:3,6;
107:10,14,20;108:6;
113:18;123:11;126:14;
127:1,3;131:12;
144:23;164:4;168:14;
170:4,6;174:9;181:7
reminder (1)
98:12
reminds (1)
98:9
renewal (4)
79:23;88:18,21;
146:9
repeat (10)
24:7;28:13;68:15;
76:16;96:24;97:3;
156:13;163:5;166:24;
167:18
rephrase (5)
7:1;81:6;156:7;
167:19;179:16
Report (7)
117:9,17;118:1,8;
137:23;140:5,5
reporter (6)
7:8;24:11,18;28:16;
163:8;167:3
reports (7)
86:22;87:2,5,17;

103:19;139:10,14
**represent (1)**
    123:1
**representative (2)**
    6:14;180:21
**representatives (4)**
    93:7,24;94:9;102:21
**represented (2)**
    8:21;68:22
**representing (10)**
    28:12;39:12;48:14;
    50:6,11;51:4;52:8,17;
    67:12;93:17
**request (3)**
    61:15;181:20;182:24
**requested (6)**
    24:10,17;28:15;72:1;
    163:7;167:2
**requesting (1)**
    132:1
**requests (1)**
    18:1
**required (2)**
    38:7;79:17
**research (1)**
    86:11
**reserved (1)**
    174:19
**reside (2)**
    77:6;164:12
**residence (1)**
    95:7
**resignation (38)**
    18:9;23:14;25:14;
    36:18;44:13;48:11;
    51:2;52:10;54:18,20,
    22;55:8,15,24;56:1,8;
    66:1,5,9,17;68:5;69:4;
    70:16,20;71:8,10;
    72:12;80:14;93:4,7,18;
    94:1,9;158:6,16,17;
    175:3;178:14
**resigned (9)**
    16:11,13;23:3;36:6;
    55:6;69:7;72:19;175:1,
    18
**resigning (11)**
    36:15;41:12;42:19;
    55:13;56:2,4,14;60:22;
    73:23;74:20;115:8
**resources (3)**
    129:20;146:14;
    150:10
**respect (2)**
    96:17;136:18
**respective (1)**
    112:21
**respond (2)**
    38:19;70:5

**responded (1)**
    115:17
**response (5)**
    13:10;21:24;32:11;
    58:23;149:16
**responsibilities (2)**
    11:13;23:6
**responsibility (1)**
    11:19
**responsible (1)**
    80:1
**restate (2)**
    7:2;167:19
**restroom (1)**
    113:7
**retain (9)**
    66:23;67:3;88:16,20;
    174:2;176:19;178:15;
    179:6,19
**retained (2)**
    67:7;173:10
**Retention (1)**
    21:19
**retrievable (1)**
    15:3
**Return (4)**
    13:3;15:11;17:22;
    18:1
**returned (6)**
    13:6,11,13,15;15:10,
    14
**revenue (4)**
    104:16;105:4;119:1,
    2
**revenues (2)**
    101:14;140:3
**review (9)**
    12:6;19:8;20:19;
    28:2;63:16;65:21;
    118:1;134:19;150:18
**reviewed (3)**
    118:7,10;135:3
**reviewing (3)**
    86:11;150:3;173:4
**Rick (1)**
    44:17
**ridiculous (1)**
    107:1
**right (69)**
    7:20;8:9;19:2;25:9,
    12;29:17;35:10;39:4;
    53:21;59:23;65:9,12,
    18;72:19;74:9;75:19;
    77:4,6;78:10;82:19;
    88:14;89:1,4;92:18;
    96:21;99:24;102:10,
    11;104:10,24;111:3;
    115:20;120:4,6,19;
    123:5,17,21;124:7;

125:4;131:7;132:9;
    134:9,21;138:13;
    140:23;141:12;142:14,
    21,24;143:19;144:8;
    145:11;146:19;147:16;
    148:23;149:2,14;
    155:20;158:9;161:22;
    163:11;169:21;171:15;
    172:15;176:19;180:1;
    183:12;186:14
**Risk (2)**
    22:17,18
**Robert (1)**
    149:1
**Roberts (1)**
    146:22
**Rogi (1)**
    92:8
**Rolodex (1)**
    130:7
**room (4)**
    6:9;53:21;115:1;
    174:19
**roundabout (1)**
    101:22
**ruling (2)**
    38:11;46:20
**run (1)**
    171:21
**running (1)**
    91:22

**S**

**SAITH (1)**
    186:16
**salary (6)**
    10:2;11:9;44:23;
    45:14;46:11;107:15
**sales (19)**
    103:8;105:10;106:1;
    119:5;126:16;127:10,
    19;137:14,16,22;
    138:18,22;139:1,3,17;
    140:3;168:15,16,19
**salespeople (1)**
    109:14
**salesperson (3)**
    62:23;84:20;133:11
**same (25)**
    23:7;28:6;29:6;32:1,
    13;33:6;34:4,5;43:21;
    46:14;60:19;63:20;
    69:7;71:22;72:13;
    136:2,11;140:4;147:6;
    164:5;171:7;173:7;
    181:13;184:16,18
**snt (1)**
    180:14

**save (1)**
    17:2
**saved (1)**
    116:2
**savings (1)**
    127:15
**savvy (2)**
    75:11;82:5
**snw (4)**
    9:21;64:11;71:1;
    163:4
**saying (15)**
    12:12;71:16;76:11;
    107:3,6,14;109:12;
    139:10;141:1,4,7,17,
    17;150:11;170:3
**scheduled (1)**
    121:12
**school (1)**
    23:1
**SCP (3)**
    105:4;107:8,10
**search (3)**
    71:11;95:3,5
**searched (1)**
    97:4
**second (23)**
    17:15;31:20,24;
    32:12;36:13;52:20;
    53:10;58:18;60:3,6,20;
    71:10;102:14;118:6;
    120:13,19;121:2;
    129:15;131:22;133:2;
    138:15;148:11;167:12
**secrets (2)**
    12:22;13:1
**section (1)**
    17:12
**Secure (1)**
    21:9
**Security (2)**
    21:11,14
**seeing (3)**
    12:12;140:22;141:18
**seem (3)**
    33:18;34:12;120:4
**seems (1)**
    134:5
**self (2)**
    25:2;144:14
**selling (2)**
    99:2;106:19
**Seminar (1)**
    130:1
**send (34)**
    14:13;68:2;74:15;
    75:3;76:8;77:11;78:7;
    81:9;90:18,20;91:12;
    92:20;109:2;111:5;

113:22;114:8,9;117:6;
    123:8,17;124:14;
    128:9,10,11;130:6,8,
    15;132:16;133:18;
    144:16;148:17;150:14;
    154:21;177:20
**sending (6)**
    68:9;75:18;91:1;
    105:20;173:16,24
**sends (2)**
    108:12,22
**Sendyne (1)**
    23:21
**Senior (6)**
    11:8;72:15;112:23;
    129:16,19;153:12
**sense (6)**
    16:14;24:5;57:15;
    69:13;81:5;89:17
**sensitive (1)**
    38:6
**sent (51)**
    66:10;72:12;73:24;
    74:8,14,16,21;81:7,12;
    88:24;95:17;104:6;
    111:6;113:17;124:7;
    126:10;128:3;131:6,
    12;132:22;140:23;
    141:5,11,15;142:17,19,
    21;143:17;144:8,8,13;
    146:8;148:15;149:1;
    152:6;153:8;155:10,
    11,14,23;156:9,16;
    157:24;163:15;168:9;
    173:2,6,7;174:3,22;
    179:8
**sentence (1)**
    149:5
**sentences (1)**
    149:4
**separate (4)**
    125:11;137:23;
    180:9;181:9
**separately (4)**
    181:20,24;182:2;
    183:2
**September (6)**
    28:17;29:10,16;31:6,
    13;33:19
**September/October (1)**
    30:15
**series (8)**
    6:23;39:19;42:24;
    43:3,17;44:4,10;72:14
**Seriously (1)**
    17:20
**server (1)**
    160:4
**service (2)**

28:5;167:11
**Services (1)**
  23:21
**set (3)**
  6:16;105:5;149:18
**sets (1)**
  104:14
**seven (3)**
  19:23;63:16;114:13
**several (4)**
  25:19;39:24;40:1;
  48:19
**shadow (2)**
  140:6,12
**SHAPIRO (123)**
  6:9,10;9:12;10:8;
  14:23;15:19;16:1,3,8;
  17:12;24:20;25:16;
  26:1,6,24;27:9,12;32:5,
  8,16;33:10;36:3;37:21;
  38:16,19,24;42:10;
  45:15,23;46:2,6,13,17;
  50:14;52:23;53:8,16;
  55:9;57:1,8;58:7;
  59:10,13,19;61:17;
  64:16;66:22,23;67:6,
  12,17,23;69:20,22;
  70:1,4,9;71:22;74:11;
  75:20;76:23;78:16;
  81:10;82:20;83:2;
  84:21;91:16;93:8,13,
  19;99:6,9,11;100:10,
  12;109:23;110:10;
  111:12;121:1;141:16;
  143:4,7,10;146:24;
  147:5,8,22;151:8;
  152:21;154:7,10;
  156:12;157:16,19,21;
  158:6,9;159:3;161:23;
  163:10;166:15;168:18,
  24;170:23;172:10,15,
  19,20;173:23;174:15;
  176:4;178:19;179:4,
  11,14;182:5,20;183:8;
  185:22;186:4,10,12,14
**share (5)**
  37:15,16;38:7,8;58:3
**shared (2)**
  18:10;106:15
**sharing (2)**
  47:1,16
**Sharma (7)**
  6:12;39:16,23;40:3;
  44:14;99:22;110:6
**show (24)**
  18:15;19:13;50:11;
  72:5;98:1,19;106:20;
  112:8;114:5;116:8;
  117:2,11;122:13;

124:2;128:2;131:18;
132:21;134:2;137:7;
144:7;146:7;148:8;
152:5;154:3
**showed (4)**
  82:10;137:20;163:2;
  184:12
**showing (8)**
  12:2,5;63:12;66:3;
  110:15;125:21;143:16;
  153:7
**shows (1)**
  86:10
**sic (1)**
  163:4
**side (1)**
  22:21
**Siegel (38)**
  6:11,13;27:14;39:2;
  50:15,19;52:19;53:5,
  10,13;63:18,21,23;
  64:2,4;70:12;84:22;
  98:13;99:19;100:7;
  109:21;119:7,12;
  120:13,17,19;121:4;
  147:9,13;148:1;150:4;
  158:16;159:7;163:9;
  170:8;171:4;172:13;
  175:23
**sign (2)**
  9:16;18:23
**signature (3)**
  12:10;23:18;72:9
**signed (7)**
  18:21;19:5;50:18;
  51:10,21;71:1;73:12
**significantly (1)**
  133:8
**signing (1)**
  80:1
**similar (6)**
  105:20;107:4;
  116:14;156:21;178:9,
  12
**Similarly (1)**
  180:18
**simply (1)**
  96:20
**sister (1)**
  124:24
**sit (1)**
  114:13
**Site (1)**
  140:18
**sits (2)**
  42:24;43:16
**sitting (6)**
  10:13;26:22;46:18;
  53:21;60:13;95:12

**situation (1)**
  38:8
**situations (1)**
  124:16
**six (8)**
  16:13,16;40:22;41:1;
  55:5;63:16;118:9;
  185:7
**size (1)**
  133:17
**Sleep (2)**
  134:20,24
**slightly (1)**
  116:14
**Slowly (1)**
  24:9
**small (4)**
  102:14;120:2;
  129:24;138:15
**smoking (3)**
  98:14;152:13;153:11
**social (2)**
  171:12,19
**Software (4)**
  154:16,18,19,20
**sold (1)**
  92:15
**solicit (1)**
  52:5
**Solutions (1)**
  23:21
**somebody's (3)**
  46:17;78:13;79:9
**somehow (2)**
  82:4;91:3
**someone (7)**
  31:5;35:23;37:6,8;
  78:8;87:22;129:19
**sometimes (1)**
  119:9
**Somewhere (14)**
  30:16;35:11;36:8,11;
  42:8;49:5;89:20,22;
  100:20;126:24;132:11;
  161:17;169:20;173:11
**soon (1)**
  39:2
**sorry (25)**
  12:4;17:12;23:22;
  27:7,18;52:20;64:23;
  70:9,13;76:16;85:19;
  90:13;97:2;110:8;
  112:18;120:3,9;
  130:19;148:4;159:12,
  23;162:3;163:5;183:8;
  185:23
**sort (2)**
  118:8;134:6
**sounds (1)**

51:18
**sources (3)**
  78:3,12;79:8
**South (3)**
  115:6;153:14,22
**Southeast (7)**
  39:19;42:24;43:3,17;
  44:3,10;72:14
**Southeast' (1)**
  72:15
**speak (12)**
  28:3;31:16;38:16;
  39:11,15,23;43:4,8,11,
  20;45:6;57:18
**speaking (6)**
  27:21;103:16,18;
  104:1;173:16;181:16
**specific (18)**
  20:12;25:5,5;26:18;
  27:23;33:5;34:6,17;
  35:5;55:5;56:8;58:23;
  98:22;123:11;136:3;
  141:18;164:4;174:18
**specifically (12)**
  20:6,22;29:16;36:24;
  41:9;64:17,23;65:5;
  106:14;176:24;177:5,9
**specifics (5)**
  31:22;41:2;45:11;
  46:4;54:16
**Spectralink (1)**
  23:20
**speculate (2)**
  96:2,4
**spend (1)**
  100:4
**spoke (18)**
  29:3;30:14;31:20;
  40:2,4;41:11,13,16;
  42:22;43:13;44:1,3,9,
  13;104:5;111:24;
  121:14;174:7
**spoken (2)**
  29:1;119:23
**spreadsheet (1)**
  121:19
**Staff (1)**
  137:15
**stage (1)**
  118:22
**Standard (2)**
  132:18,22
**start (8)**
  11:4;44:20,24;
  144:18;157:18,20,23;
  170:6
**started (4)**
  11:14;20:1;23:7;
  114:15

**starting (2)**
  22:11;158:4
**starts (2)**
  107:18;158:2
**state (8)**
  9:9;10:1,20;72:11;
  73:23;86:6;87:22;
  88:10
**stated (4)**
  89:1;95:2;133:14;
  166:17
**statement (9)**
  72:16;74:6;82:12;
  88:14;89:13,16;
  107:22;144:14,15
**states (1)**
  13:3
**stating (1)**
  165:20
**stay (1)**
  147:14
**Steed (14)**
  6:11;53:19;55:8,11;
  57:18;58:2,11;62:5,10;
  68:5;69:4;99:13,22;
  110:6
**step (2)**
  99:8,14
**stepping (1)**
  99:11
**steps (1)**
  95:4
**still (12)**
  50:20;83:10;87:6;
  98:10;105:11,12;
  115:3;131:8;151:19;
  156:18;162:24;176:8
**stop (1)**
  104:24
**stop-loss (1)**
  133:3
**Storage (6)**
  21:9;164:18;165:4;
  166:6,14,22
**store (2)**
  160:15;165:24
**stored (2)**
  160:21;166:5
**strange (1)**
  179:15
**strategy (1)**
  143:22
**strike (18)**
  8:22;9:2;14:19;17:3;
  29:21;30:17;33:23;
  37:12;45:12;71:6;
  87:11;102:5;150:19;
  167:15;168:15;175:2;
  178:7;185:15

Strom (2)
    152:7,15
structure (5)
    47:2,17;49:23;50:1;
    105:22
stuff (2)
    98:10;126:17
sub (1)
    130:4
subject (5)
    122:15;128:4;146:8;
    152:7;154:24
submit (1)
    86:22
submitted (2)
    87:2,18
subparagraph (1)
    17:9
subparagraphs (1)
    18:5
subsequent (1)
    40:12
substance (1)
    65:2
substantial (1)
    155:21
substantially (1)
    178:9
substantively (1)
    184:18
sufficient (1)
    26:21
suggesting (2)
    132:14;170:3
Sunrise (1)
    137:15
support (1)
    67:20
suppose (4)
    91:9,23;132:2;
    168:10
Sure (59)
    6:9;10:22;17:18;
    19:4;24:8;26:21;27:16,
    16;33:7;34:3,7;37:19;
    38:21;41:7;42:7;48:18;
    51:7;63:8;68:16;70:7;
    79:22;81:1;84:7;85:24;
    89:18;91:21;93:5,22;
    94:17;95:6,8,11;98:23;
    102:8;107:13;111:15;
    116:2;119:14;120:24;
    126:5;128:19;131:23;
    135:7;143:2;148:22;
    149:20;154:6;156:15;
    163:12;165:7,9,14;
    167:12;171:21;177:15;
    180:8;181:1;183:19,23
surprised (1)

98:9
switch (1)
    180:1
sworn (2)
    6:6;74:19
system (2)
    83:1;164:17

T

tab (3)
    118:4,6,8
tabs (1)
    118:2
tagged (2)
    128:8;140:7
talk (6)
    38:2;53:13;100:12;
    149:5,11;173:1
talked (3)
    48:11;173:15;182:10
talking (14)
    29:11;35:9;40:1;
    41:22;50:15,20;91:17,
    22;113:19;143:11;
    147:16;170:8,11;173:3
target (1)
    116:15
targeting (2)
    28:7;114:14
Taylor (2)
    23:17;24:12
Team (3)
    112:23;134:15;142:3
technically (2)
    123:13;158:9
technological (1)
    82:5
technologically (1)
    75:11
technology (3)
    15:5;75:16;76:24
tele (1)
    29:22
Telematics (1)
    27:17
telephone (3)
    29:22;30:2;167:6
telling (3)
    33:9;59:1;104:4
tells (1)
    87:23
Temple (1)
    22:16
ten (6)
    19:14;35:18;63:4;
    94:24;96:1;123:1
tenure (1)
    105:22

tenured (1)
    105:24
term (1)
    25:23
Termination (3)
    13:4;17:22,23
terms (8)
    19:1,6;37:22;44:20,
    22,24;46:10;173:16
testified (5)
    6:6;175:10;178:21;
    180:5;186:3
testify (1)
    7:21;32:20
testifying (1)
    6:24
testimony (12)
    17:2,4;77:22;78:15,
    22;141:14;155:22;
    156:2,4,8;180:8;
    181:18
Thanksgiving (1)
    150:17
Thereupon (1)
    6:3
thinking (2)
    32:21;139:8
third (6)
    34:1;118:8;138:15,
    21,23;180:22
thorough (2)
    71:11;95:3
though (9)
    31:14;35:16;59:17;
    123:14;124:22,24;
    127:19;147:19;149:18
thought (9)
    15:23;32:20;69:9;
    106:18;159:21;162:4;
    173:21;179:21;181:10
thoughts (1)
    186:11
thousand (3)
    11:10;89:14;139:19
three (9)
    16:17;49:7;55:21;
    69:15;100:9;105:17;
    119:6;143:6;180:9
three-hour (1)
    143:9
three-page (2)
    72:6;147:8
three-year (1)
    119:2
thresholds (1)
    107:15
tickets (1)
    143:23
tied (2)

105:7;107:15
till (1)
    72:18
Tim (1)
    90:1
times (7)
    39:23;41:19;43:11;
    62:8;94:22,24;146:2
timing (1)
    126:15
title (8)
    11:7;23:3;43:18;
    64:21;92:11;106:2;
    121:9,23
titled (1)
    110:18
T-Mobile (1)
    167:14
today (14)
    7:21;10:13;26:22;
    38:14;50:22;68:17;
    157:4;160:11;161:19;
    163:2;164:10,13;
    172:24;178:21
today's (1)
    163:22
together (9)
    54:13;105:7,24;
    137:16,17;140:11,19;
    141:8;146:13
told (9)
    56:1,13;58:5;68:11;
    88:2;98:6;163:9;164:9;
    183:17
took (4)
    19:21,23;65:19;95:4
top (11)
    23:15;25:22;44:17;
    48:1;109:14;118:13;
    130:24;168:14;169:12,
    17;171:23
topic (2)
    20:11,21
topics (1)
    20:13
total (17)
    99:1;100:18,22;
    101:14,19,20,20,23;
    102:7,24;103:14,16,23;
    104:18;109:19;119:1;
    139:10
totally (1)
    125:11
touch (2)
    32:1;61:13
track (1)
    76:22
tracking (1)
    75:15

trade (3)
    12:22;13:1;86:10
trail (1)
    75:15
Trailer (3)
    146:14;150:11;151:5
training (4)
    19:17;20:10;64:14,
    18
transcript (1)
    98:13
transfer (3)
    17:5;81:3;97:15
transferred (2)
    81:14;82:1
transition (2)
    173:11;174:8
treated (1)
    46:13
Tree (3)
    6:15;99:14,24
true (2)
    102:20;107:22
truthfully (1)
    7:21
try (4)
    38:23;49:11;54:8;
    132:13
trying (9)
    16:14;46:7,14;51:17;
    100:11;105:23;121:18;
    165:23;181:4
turn (1)
    15:15
turned (1)
    33:1
twice (1)
    80:19
two (33)
    8:9,21;18:5;23:13;
    25:14,20;26:19;33:7;
    37:16;42:16;55:19;
    58:16;63:19;70:19;
    100:3,8;105:7,17,17;
    107:5;111:23;114:6;
    142:7,8;146:2;147:3,6;
    152:16;169:24;170:14;
    171:14;172:7;181:11
two-and-a-half (3)
    52:22;100:9;143:5
two-page (2)
    66:4;150:6
two-year (1)
    102:10
type (6)
    30:4;79:13;106:23;
    111:15;132:11,13
types (1)
    86:7

**Typical (1)**
30:3
**typically (2)**
31:1;78:20

**U**

**UHC (1)**
127:4
**Ultimate (2)**
154:16,18
**Ultimately (1)**
181:23
**under (8)**
6:24;7:23;8:2;24:12;
37:18;46:24;121:9,24
**Understood (8)**
7:6;19:7;34:18;
82:11;85:6;108:20;
123:12;166:16
**undertake (1)**
175:6
**undertook (2)**
179:6,20
**Unequivocally (1)**
175:24
**United (3)**
127:14,17,21
**Universal (3)**
146:14;150:11;151:5
**University (1)**
22:17
**Unlock (2)**
137:16,16
**Unlocking (2)**
140:19;141:8
**up (17)**
29:20;32:23;33:1;
50:22;81:23;82:10;
83:7;121:18,18;128:5;
153:16;156:22;162:18;
171:16;177:18;180:14,
20
**uploaded (1)**
83:1
**Upon (7)**
13:3;17:22,23;
173:10;178:14;179:8;
182:24
**upper (1)**
119:24
**USB (4)**
165:6,7,9;166:3
**Use (38)**
21:6;25:23;30:18,20;
31:1;38:3;70:11;76:1,
9,15,17,18,22;92:23,
24;93:1,3,11,14,16;
94:4,19;160:13,24;

161:9,18;164:18,21;
165:6,21;166:10;
167:9;176:16;177:2,2,
9,10;179:9
**used (29)**
27:5;48:6;76:2,19;
77:11;88:11;93:12;
97:20;117:5;128:7;
137:23;160:11,14,20,
20;164:22;165:2,3,7,9,
13,14;166:8;176:12;
177:7,8,19,23;178:21
**using (3)**
30:23,23;96:9

**V**

**vacation (1)**
150:18
**vague (1)**
35:6
**variable (14)**
101:1,6,13,14,17,24;
102:1,9,11,18,22,23;
105:3,12
**varies (1)**
102:9
**various (9)**
19:17;20:13;29:13;
54:13,15;79:12;93:11;
171:21;177:20
**vary (1)**
133:9
**verbal (1)**
7:4
**verbally (1)**
7:7
**Verizon (1)**
167:13
**versions (1)**
171:6
**versus (2)**
56:20;128:10
**via (9)**
78:7;81:20,21;92:20;
94:9,17;145:9,23;
146:3
**Vice (4)**
72:15;92:11;146:13;
150:10
**Violence (1)**
21:24
**virtually (1)**
184:18
**vision (1)**
133:4
**VP (1)**
150:9

**W**

**W-2 (1)**
102:3
**Wait (3)**
53:10,10;122:6
**walked (1)**
82:18
**Warren (5)**
154:4,13;155:7,9,11
**watches (5)**
152:16,17;153:1,2,3
**watchmaker (1)**
152:15
**water (1)**
83:4
**way (31)**
31:4,8;33:8;38:12;
46:14;53:1;62:15;
76:22;87:1;91:1,7;
107:24;108:15;109:2,
8,8,9;160:17;161:21;
162:4,7,8;165:20;
170:24;171:4;172:3;
176:14;178:22;180:17;
181:1,2
**ways (1)**
170:18
**WEBER (185)**
6:7,15,16,18,21;
9:13;10:9;11:22;12:1;
15:2,20;16:5,10;17:14;
18:14;19:12;25:3,17;
26:3;9:27:4,19;28:14,
18;32:6,10,18;33:11;
36:5;38:10,18;20:39:1,
4,8;42:15;45:16,24;
46:3,8,15,19,22;50:17,
23;51:1;52:21;53:3,6,
9,11,14,18;55:12;57:4,
10;58:8;59:11,14,21;
61:19;63:11,20,22;
64:1,3,5,6,20;66:2;
67:8;69:21;70:2,11,14;
72:4;74:13;75:22;77:2;
78:21;81:13;82:22;
83:5;85:5;91:18;93:9,
15,20;98:15,18;99:5,8,
15,17;100:1,6,8,11,14,
17;109:22;110:1,4,8,
11,14;111:13;112:7;
113:11,15;114:4;
116:7;117:1,10;
119:10,14,16;120:15,
21;121:7;122:12;
124:1;125:20;128:1;
131:17;132:20;134:1;
137:6;141:20;143:6,8,

11,15;144:6;146:6;
147:4,6,11,15,20,23;
148:3,7;150:5;151:13;
152:4,23;153:6;154:2,
8,12;156:14;157:22;
158:12,18;159:13;
162:1;163:6,12,13;
166:19;167:5;168:20;
169:3;170:11,13;
171:2,5,9;172:9,14,23;
173:18;174:13;175:22;
178:17;179:2,10,13;
182:9;183:5,9;186:1,5,
13
**Weber's (1)**
180:6
**website (6)**
65:11,12;78:15,17,
18;112:23
**websites (3)**
78:3,14,23
**week (11)**
58:16,18,19;60:3,6,
20;80:13,16,16,19;
115:12
**weeks (2)**
58:16;70:20
**Wellness (1)**
131:20
**weren't (4)**
90:16;123:13;135:8;
136:7
**what's (42)**
12:2;14:7;18:15;
19:13;26:11;43:18;
46:6;63:12;66:3;70:8;
72:5,21;79:16;80:20;
84:6;98:1;105:13;
110:15,19;117:11;
118:7,14,15;119:3;
120:16;121:8;122:13,
19;126:3;127:7;128:2;
131:18;137:13,21;
138:3,4;139:22;148:8;
152:5;154:3,8;161:2
**whenever (2)**
30:13;87:2
**Whereupon (1)**
186:17
**Wherever (3)**
14:24;83:23;157:18
**who's (2)**
146:13;153:12
**widely (1)**
123:6
**wife (6)**
10:17,24;14:11;
158:24;160:23;161:6
**wife's (2)**

98:7;160:10
**willing (1)**
24:24
**wipe (1)**
96:14
**Wirth (1)**
154:4
**within (13)**
18:6;26:19;30:13;
35:21;55:23;56:1;
136:3;139:18,19,21,24;
144:13;165:14
**without (1)**
46:4
**witness (5)**
6:5,9;7:14;53:12,13
**word (7)**
110:19;120:13,14,
16,19,20;121:2
**words (4)**
33:18;49:11;102:24;
119:20
**Work (14)**
21:23;29:6;39:21;
53:1;77:21;109:6,8;
111:2;128:13;131:4,4;
144:14,15;153:20
**worked (6)**
29:7;62:10,15;84:3;
109:8;129:9
**working (3)**
31:7;54:12;62:13
**works (4)**
29:6;107:23,24;
127:21
**worry (2)**
68:23;105:2
**worth (1)**
140:11
**write (1)**
85:11
**written (3)**
37:2;47:4,5
**wrong (3)**
114:22;146:23;
175:19
**wrongfully (1)**
179:21
**wrote (2)**
149:13,14

**Y**

**Yahoo (1)**
161:13
**year (16)**
48:24;79:19;102:9,9,
13;104:9,9;105:9,17,
17,17;118:9;119:2;

131:5;139:9;144:19
years (21)
  19:23;21:22;23:13;
  25:14,20;26:19;29:3,4,
  8;63:4;86:9;106:1;
  107:5;114:11,15,16;
  151:2,12;153:2,14,22
yellow (1)
  119:8
Yep (4)
  117:23;152:8,14;
  176:7
York (3)
  176:23;185:15,17
youngest (1)
  160:19

**Z**

zero (1)
  105:6
zip (4)
  165:13,14,18;166:3

**1**

1 (11)
  11:22,23;12:3,6;
  50:12;63:18;117:21;
  120:11;140:18;167:16,
  20
1:03 (1)
  123:10
1:03:22 (1)
  123:20
10 (15)
  52:24;88:10;108:13,
  14,15,19;114:2,5;
  117:21;120:11;122:23,
  24;139:21,22;159:10
10,000 (3)
  89:17,18,20
10/10/16 (1)
  121:10
10:22 (2)
  100:15,16
10:30 (1)
  121:14
10:35 (1)
  113:13
10:40 (1)
  113:14
100 (2)
  108:23;125:2
100,000 (1)
  109:3
10th (3)
  121:13;138:12;
  139:12

11 (6)
  88:16;116:5,8;
  117:21;121:20;159:11
11.16.17 (1)
  117:17
11:45 (1)
  146:19
11:51 (1)
  172:16
11:54 (3)
  148:21,22;149:2
1-1-18 (1)
  127:4
11th (18)
  98:3;103:23;104:5,7;
  105:16;110:16;112:9;
  113:18;114:6;122:14;
  123:10,19,21;124:3;
  125:22;127:2;128:4;
  131:7
12 (10)
  89:1;116:22;117:2,
  21;159:11;165:3,11,
  15;166:4,8
12:00 (1)
  172:17
12:20 (1)
  186:18
13 (4)
  117:8,11,21;159:14
130 (1)
  101:22
130,000 (1)
  101:5
13th (6)
  131:20;132:16,22;
  133:19;134:3;136:7
14 (4)
  117:21;122:10,14;
  159:16
14th (3)
  137:9;142:18,21
15 (5)
  52:24;117:22;
  123:23;124:2;159:18
16 (4)
  117:22;125:18,21;
  159:19
16th (10)
  117:14;143:17;
  144:9;146:8,18;
  148:15,20;149:1;
  150:15;153:9
17 (12)
  117:22;127:23;
  128:3;159:19;168:3;
  170:22;177:19;178:9;
  179:1;184:13,16,21
17th (16)

36:12;66:10;72:11;
  73:2,4,6;135:18;
  136:10,15;167:20,24;
  168:6,17,23;169:24;
  171:15
18 (5)
  86:9;117:22;131:15,
  19;159:20
18th (3)
  36:4,12;168:23
19 (5)
  117:22;132:18,21;
  159:19,24
19th (1)
  36:12

**2**

2 (9)
  18:12,16;50:12;
  66:16;117:21;120:11;
  137:17;140:18;152:13
2,500 (1)
  89:22
20 (4)
  96:3;117:22;133:22;
  134:2
2000 (1)
  144:22
2010 (1)
  11:6
2016 (4)
  99:1;100:18;101:19;
  144:22
2017 (33)
  28:12;29:10,16;31:2;
  34:20;42:14;49:1;
  57:22;67:9;98:3,21;
  100:22;101:23;102:7;
  103:11,13;104:5,7;
  109:19;112:13;121:11,
  13;137:15,17,22;
  138:12,14;139:12;
  144:22;146:18;160:13;
  167:16,20
2018 (14)
  6:2;36:4;41:12;
  42:14;72:12;73:2,4;
  135:18;167:20,24;
  168:3,6,17,23
203-4251 (1)
  167:8
21 (3)
  117:22;137:4,7
22 (4)
  117:22;143:13,16;
  160:1
22nd (1)
  155:12

23 (4)
  117:22;144:4,7;
  160:1
24 (8)
  146:4,7;147:10,14,
  17;148:3;150:2;160:2
25 (4)
  147:14;148:5,9;
  160:1
250,000 (1)
  108:18
26 (3)
  152:2,6;160:2
26th (2)
  154:5;155:3
27 (3)
  153:4,8;160:3
28 (6)
  153:24;154:4,9;
  155:13,18;160:3
28-page (1)
  124:4

**3**

3 (10)
  12:18;17:9;19:10,14;
  20:5,11;117:21;
  120:11;137:21;153:11
3,285,305 (1)
  139:22
3.5 (1)
  139:7
30 (2)
  96:5;118:6
30,000 (1)
  152:18
320 (1)
  139:22
320,000 (1)
  139:23

**4**

4 (9)
  13:3;17:16;63:9,13,
  19;72:11;117:21;
  120:11;134:23
4,000 (1)
  152:18

**5**

5 (8)
  12:10;65:24;66:4;
  73:22;74:18;117:21;
  120:11;158:14
5,000 (2)
  89:20,22

5.5.17pdf (1)
  122:17
50 (2)
  109:1,4
500,000 (1)
  140:1
54,000 (1)
  152:19
5454@hotmailcom (1)
  14:8
5500 (6)
  79:10,16,17;80:12,
  24;81:3

**6**

6 (13)
  12:8,12;17:8;72:2,6;
  73:23;85:11;86:6,17;
  117:21;120:11;135:23;
  159:4
610 (1)
  167:8
682-8778 (1)
  167:12
6th (1)
  174:12

**7**

7 (5)
  12:8,13;97:23;98:2;
  117:21
750 (3)
  101:19,21,21
786 (1)
  167:12

**8**

8 (13)
  98:16;110:9,10,11,
  11,12,13,16;117:21;
  120:11;121:20;141:7;
  159:6
8:35 (1)
  66:11
8:56 (1)
  104:7
8th (1)
  152:7

**9**

9 (10)
  6:2;87:22;110:12;
  112:4,5,8;113:17;
  117:21;120:11;159:10
9:13 (1)

39:6
**9:19 (1)**
  39:7