Page 1

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
2
                CASE NO. 18-CIV-01805 (JGK)
3

4    MERCER HEALTH & BENEFITS LLC,

5          Plaintiff,

6    vs.

7    MATTHEW DIGREGORIO, JOANNE STEED,
     JADA PRESTON and LOCKTON COMPANIES, LLC,
8
           Defendants.
9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

10

11                          2 S. Biscayne Boulevard
                            Suite 2250
12                          Miami, Florida
                            Monday, March 12, 2018
13                          1:56 p.m. to 2:50 p.m.

14

15

16

17

18              DEPOSITION OF MELANIE FAVA

19

20

21        Taken on behalf of the Defendants before Carol

22   Hill Weng, FPR, RMR, CRR, CMRS, CPE, CRI, a Notary

23   Public in and for the State of Florida at Large,

24   pursuant to Defendants' Notice of Taking Deposition in

25   the above cause.

Page 2

1 APPEARANCES:
2 On behalf of Plaintiff:
    A. MICHAEL WEBER, ESQ.
3 Littler Mendelson, P.C.
    900 Third Avenue
4 New York, NY  10022-3298
    mweber@littler.com
5
    On behalf of Defendants:
6 LERON THUMIM, ESQ.
    MARTIN S. SIEGEL, ESQ.
7 Golenbock Eiseman Assor Bell & Peskoe LLP
    711 Third Avenue
8 New York, NY  10017
    lthumim@golenbock.com
9 msiegel@golenbock.com
    LYLE SHAPIRO, ESQ.
10 Herskowitz Shapiro LLP
11 9100 S. Dadeland Boulevard
    Suite 908
12 Miami, FL  33156
    lyle@hslawfl.com
13
14 Also present:  Amy Tree
15         Matthew DiGregorio
16
17
18
19
20
21
22
23
24
25

Page 3

1             INDEX
2 WITNESS                         PAGE
3 Melanie Fava
4   Direct Examination by Leron Thumim        4
    Cross-Examination by Michael Weber       55
5   Redirect Examination by Leron Thumim     56
6
7
8             EXHIBITS
9 NUMBER     DESCRIPTION          PAGE
10 Exhibit 1    Declaration         29
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1 THEREUPON:
2         MELANIE FAVA,
3 was called as a witness and, having been first duly
4 sworn, and responding "I do," was examined and
5 testified as follows:
6         DIRECT EXAMINATION
7 BY MR. THUMIM:
8    Q.   Ms. Fava, my name is Leron Thumim.
9 I'm from the law firm of Golenbock Eiseman Assor
10 Bell & Peskoe, New York.  I'm here on behalf of
11 the defendants in this case and I'll be taking
12 your deposition today.
13         Have you ever been deposed before?
14   A.   Yes.
15   Q.   How many times?
16   A.   Once.
17   Q.   About how long ago was that?
18   A.   30 years ago.
19   Q.   What kind of case was it?
20   A.   Medical malpractice case.
21   Q.   Do you remember -- at that deposition
22 do you remember what the purpose of -- I guess
23 remember what it was like being deposed?
24   A.   Yes.
25   Q.   So it's a long time ago.  Before we

Page 5

1 begin I'm going to go over some ground rules and
2 expectations just so we have the same
3 understanding.
4         Is that okay?
5   A.   Uh-huh.
6   Q.   So in this deposition I will be asking
7 you questions and your answers will be recorded
8 by the court reporter.  You will need to speak
9 loudly enough so that the court reporter can
10 hear you, and you'll need to give verbal
11 responses, so no nods, gestures or even sounds
12 like "uh-huh" so that the transcript accurately
13 reflects your response.
14         Understood?
15   A.   Yes.
16   Q.   Any questions about that?
17   A.   Nope.
18   Q.   Likewise, to make sure the transcript
19 is clear, we can't talk over each other.  So
20 that means that it's important you wait until I
21 finish my question before you begin answering.
22         Even if you think you know how my
23 question is going to end, please wait until I'm
24 done anyway.  Make sense?
25   A.   Yes.

2 (Pages 2 - 5)

Page 6

1    Q.   If you don't understand a question,
2  please feel free to ask for clarification.
3  Otherwise, let me ask the questions.
4    A.   Okay.
5    Q.   You just took an oath to tell the
6  whole truth and nothing but the truth.
7       Do you understand what that means?
8    A.   Yes.
9    Q.   And do you understand that's the same
10  oath that you would give if you were in court in
11  front of a judge?
12    A.   Yes.
13    Q.   So the goal of this deposition is for
14  us to find out everything you know that's
15  relevant to this lawsuit, and for that reason we
16  need complete and full answer to the questions I
17  ask.  In other words, looking for the whole
18  truth.
19       Understood?
20    A.   Yes.
21    Q.   From time to time your lawyer may
22  object to questions that I ask.  You understand
23  that unless he tells you not to answer my
24  question, you still have to answer?
25    A.   Yes.

Page 7

1    Q.   At reasonable intervals we may take a
2  break.  If at some point you need to take before
3  then, let us know and we'll try to take a break
4  as soon as that line of questioning ends.
5    A.   Okay.
6    Q.   Have you taken any drugs or medication
7  that would make it difficult for you to
8  understand and answer my questions today?
9    A.   No.
10    Q.   Is there any other reason that you
11  cannot provide complete and accurate testimony
12  today?
13    A.   No.
14    Q.   What did you do to prepare for today's
15  deposition?
16    A.   Via telephone I met with our attorneys
17  and just told them what I knew about the case.
18    Q.   Did you meet with anyone in person?
19    A.   No.
20    Q.   How many times did you meet with your
21  attorneys?
22    A.   Twice.
23    Q.   For how long?
24    A.   About a few minutes, about 15 minutes
25  a call.

Page 8

1    Q.   Without going into what you discussed
2  on the meeting, were there any documents that
3  you reviewed that refreshed your recollection?
4    A.   Just the -- I guess it's an affidavit.
5    Q.   The declaration?
6    A.   Declaration.  That's it.
7    Q.   No other documents?
8    A.   No.
9    Q.   Did you talk about this case with
10  anybody else involved in the case?
11    A.   No.
12    Q.   Did you talk to -- talk about the case
13  with any of the other -- you know other people
14  submitted declarations too, right?
15    A.   Yes.
16    Q.   Did you talk about the case with any
17  of them?
18    A.   No.
19    Q.   Did you talk with Cory Lynn about your
20  declaration?
21    A.   No.
22    Q.   About your deposition today?  Did you
23  talk with Cory Lynn about your deposition today?
24    A.   No.
25    Q.   Are you familiar with this lawsuit?

Page 9

1    A.   Yes.
2    Q.   What do you know about it?
3    A.   That three people from the Sunrise
4  office left and presumed violation of their
5  noncompete.
6    Q.   How did you first learn about the
7  lawsuit?
8    A.   Cory called me and -- well, Cory
9  called and told me that they had left and that I
10  would be assuming two accounts, and that Amy
11  would be in contact with me to tell me who those
12  accounts were.
13       I didn't find out about the actual
14  lawsuit until the -- our attorney had called me
15  and told me.
16    Q.   Are you familiar with Lockton?
17    A.   Yes.
18    Q.   You know Lockton is one of the
19  defendants in this lawsuit also?
20    A.   Yes.
21    Q.   What do you know about Lockton?
22    A.   They are a competitor, and I know a
23  few people that work over at Lockton.
24    Q.   So you knew about Lockton before the
25  lawsuit?

1   A.   Yes.
2   Q.   You also knew of Lockton before Matt,
3   Joanne and Jada left for Lockton?
4   A.   Yes.
5   Q.   So just to go over some brief overall
6   background.  If you could just give me a brief
7   summary of your educational background,
8   beginning with college.
9   A.   I have a bachelor's degree in
10  technology and management, business management,
11  in Orlando at University of Phoenix.  And I have
12  a license to practice -- 218 license for
13  insurance.
14  Q.   Where did you work, I guess after
15  college?
16  A.   I originally started at Marsh.  I was
17  there for about six years.
18  Q.   And when was that, about when to when?
19  A.   I actually started there in 1999.
20  Q.   You were there until when?
21  A.   Around 2005.
22  Q.   When you left Marsh where did you go?
23  A.   Willis.
24  Q.   I'm sorry.  Let me back up.
25       At Marsh, what was your role?

1   A.   I started out as consultant.  When I
2   left I managed the benefits practice.
3   Q.   Marsh is a broker?
4   A.   Yes.  It's part of the Mercer family,
5   yeah.
6   Q.   The role that you had when you left,
7   was that involved in -- was that -- in what way
8   is that similar, I guess, to the role that you
9   have now?
10  A.   A little different.  I was in more of
11  a management role back then.  So now I'm a
12  producing consultant.
13  Q.   And you left to Willis, I guess, about
14  '05?
15  A.   I started -- yeah.  I opened the
16  practice for Willis, benefits practice in
17  Orlando in 2005, and I was there until -- I
18  guess it's seven years.
19  Q.   Around 2012?
20  A.   Yes.
21  Q.   What was your title when you were at
22  Willis?
23  A.   When I was at Willis?  Benefits
24  practice leader of Orlando.
25  Q.   And your role -- can you describe what

1   that entailed?
2   A.   It was managing, hiring, retention,
3   sales, new sales.
4   Q.   When you left Willis in 2012, where
5   did you go?
6   A.   I started my own practice.  So I
7   became an independent consultant, and I was
8   contracted with an organization called Insurance
9   Office of America.
10  Q.   At that point you were, I guess,
11  self-employed?
12  A.   Correct.  I was a contracted
13  consultant.
14  Q.   Did you have your own LLC?
15  A.   Corporation.
16  Q.   What was the name of that?
17  A.   Melanie Fava Inc.  I wasn't very
18  creative.
19  Q.   It works.  It gets the job done.
20       How long were you doing that for?
21  A.   Seven years.  '12 up until 2017, so I
22  guess almost six years.
23  Q.   Then that's when you went to Mercer?
24  A.   Correct.
25  Q.   How did you come to work at Mercer?

1   A.   I was looking to get out of running my
2   own business and I just wanted to go and sell
3   again and manage a book of business.  So I was
4   very familiar with Mercer, being that I worked
5   with them before, highly reputable and just
6   decided to pursue to see if they had any
7   openings and they did.
8   Q.   Were there any people you had been in
9   contact with at Mercer since your time at Marsh?
10  A.   Yes.
11  Q.   Who were you in touch?
12  A.   John Cooney.
13  Q.   What is his title?
14  A.   I'm not sure, actually.  He's a
15  partner.
16  Q.   He's also involved in selling
17  services?
18  A.   Yeah.  Primarily resources and sales.
19  So he introduces other disciplines to clients,
20  outside of like what I would normally do, just
21  benefits.  He would do -- introduce other
22  resources.
23  Q.   What position -- or what title did you
24  have when you started at Mercer?
25  A.   Producing consultant.

4 (Pages 10 - 13)

Page 14

1    Q.    What does that entail?
2    A.    Retention, new business.
3    Q.    Is that also a principal?
4    A.    It is, correct.
5    Q.    Does anybody also have the producing
6  consultant title?
7    A.    I don't believe so in the state of
8  Florida.  But yes, in the country there is, yes.
9    Q.    Who hired you when you came to Mercer?
10   A.    Cory Lynn.
11   Q.    So let's talk a little bit about other
12  people at Mercer you might -- who are involved
13  in the suit you might know, what your connection
14  with them might be.
15        So first, Matt DiGregorio.  Do you
16  know what Matt's title was?
17   A.    Sales.
18   Q.    In what way did your -- I guess did
19  your role -- in what way is your role different
20  than his?
21   A.    I also have retention
22  responsibilities.  He only had sales.  So I
23  would sell and then I also have to manage the
24  book.
25   Q.    So your role encompassed his role and

Page 15

1  then some?
2    A.    Correct.
3    Q.    And in what way did you, I guess,
4  interact with him professionally?  Did you work
5  together on things?
6    A.    No.
7    Q.    Never on any situation?
8    A.    I met him twice, I think, at sales
9  meetings, so in a group environment.  Not
10  really -- didn't really have like a lot of
11  one-on-one interaction.
12   Q.    You had no direct -- you didn't work
13  together on any project of any kind?
14   A.    No.
15   Q.    How about Joanne Steed, do you know
16  what her title is?
17   A.    I don't.
18   Q.    Did you work on anything with her?
19   A.    No.
20   Q.    Did you interact with her at all
21  really at Mercer?
22   A.    No.
23   Q.    Did you know who she was before I
24  guess she left in early January?
25   A.    I may have met her once, but I don't

Page 16

1  recall.  I don't believe I did.
2    Q.    Jada Preston.  Do you know what her
3  title was?
4    A.    Client manager.  She was responsible
5  for retention.
6    Q.    Did you ever work with her?
7    A.    No.
8    Q.    Did you have any interaction with her
9  before?
10   A.    No.
11   Q.    Cory Lynn.  Do you know what his title
12  is?
13   A.    Practice leader.
14   Q.    What is your understanding of what
15  that job entails?
16   A.    He manages the state of Florida for
17  employee benefits.
18   Q.    How often, I guess, do you interact
19  with him on a daily basis, weekly basis?
20   A.    Probably monthly.
21   Q.    Monthly.
22        So let's talk a little bit more about,
23  I guess, your role.  So in your declaration,
24  which we'll talk about in a second, you have
25  described your role and used a couple of

Page 17

1  phrases.  I just want to unpack them a little
2  bit.
3        One thing you say is you manage client
4  relationships.  What do you mean by that?
5    A.    So I have one consultant that works on
6  my team.  I'm the lead consultant.  So I will
7  meet with the clients, typically on a quarterly
8  basis, if not more frequently, and responsible
9  for making sure that the scope of work is
10  adhered to and that any additional resources
11  that we need to bring to the table are
12  introduced.
13   Q.    So the consultant on your team, are
14  you that consultant's supervisor?
15   A.    Indirectly.  So she -- down the line
16  to me but no, she actually reports to somebody
17  in Tampa.
18   Q.    Is there anyone that you are a
19  supervisor for?
20   A.    No.
21   Q.    And do you have a direct supervisor?
22   A.    Would be Cory.
23   Q.    You said generating new client
24  business.  Is that just referring to trying to
25  bring in new clients?

5 (Pages 14 - 17)

Page 18

1   A.   Correct.
2   Q.   Maintaining and growing business, is
3   that the fact we talked about earlier in
4   servicing them and retention?
5   A.   Yes.
6   Q.   Primary client contact for clients and
7   address day-to-day client needs, what does that
8   mean?  Unpack -- on a day-to-day basis, what
9   would you likely do for clients?
10   A.   Well, we'll do their -- work on their
11   financials.  We'll work on any wellness
12   programs.  We'll work on if they have claims,
13   advocacy issues.  We'll work with the
14   administrators and the carriers as their liaison
15   on any outstanding issues or -- again,
16   introduce cost saving techniques to help
17   mitigate their renewals.
18   Q.   Are there any clients with whom you
19   have a -- you've built, I guess, a personal
20   relationship, you know, that's not exclusively a
21   professional one anymore?
22   A.   Yes.
23        MR. WEBER:  Can you be a little more
24   specific?
25   Q.   Anyone who you're -- you know, if you

Page 19

1   stopped working tomorrow, anyone you'd still be
2   friends with, in other words?
3   A.   Yes.
4   Q.   Is that something that other people at
5   Mercer sometimes do in terms when they build
6   client relationships?
7   A.   I can't comment.  I work in Orlando by
8   myself.  I don't know what everybody else's
9   relationship is.
10   Q.   Do you have any sense of whether
11   that's something that Mercer generally
12   encourages or discourages or is neutral about?
13   A.   I would presume neutral.
14   Q.   In your experience, can it be good for
15   business to build personal relationships with
16   clients?
17   A.   Yes.
18   Q.   Do you have a list of contacts in,
19   let's say, Outlook or otherwise?
20   A.   Yes.
21   Q.   What information is on your contact
22   list?
23   A.   Title -- name, title, company, phone
24   number, addresses.
25   Q.   When did you begin compiling that

Page 20

1   contact list, how far back does it go?
2   A.   When I started at Mercer.
3   Q.   Within the last two years or do you
4   have a contact list that you had that goes
5   further back?
6   A.   No.  Well, no.  My contact list
7   started when I started at Mercer.  So as far as
8   what's on the Mercer contacts, yes.
9   Q.   Do you have a separate contact list
10   that predates Mercer?
11   A.   Well, my previous contacts that I had
12   if there's still something I'm working on that
13   I've incorporated them into the Mercer database.
14   Q.   So you've incorporated -- you've
15   entered your previous contacts --
16   A.   Correct.
17   Q.   Got it.
18        When did that list that you
19   incorporated, when did you begin compiling that?
20   A.   Probably December of 2016.
21   Q.   Do you have any list contact that goes
22   back even further to, let's say, when you were
23   at Marsh?
24   A.   No.  I wouldn't think so, unless
25   they're still a client.

Page 21

1   Q.   In your contact list, is there a place
2   to put notes about clients?
3   A.   Yes.
4   Q.   What do you -- what, if anything, do
5   you put in that space?
6   A.   I don't typically use that.
7   Q.   Do you have any information in your
8   contact list about client pricing?
9   A.   No.
10   Q.   Or any specific details about clients,
11   beyond contact information?
12   A.   No.
13   Q.   Does your contact list include any
14   personal, in other words, not in any way related
15   to business contacts, like friends or family?
16   A.   No.  It might have a couple of my like
17   reward passwords.
18   Q.   Fair enough.
19        So you're responsible in part for, I
20   guess, identifying new prospective clients.
21        What kind of strategies do you use to
22   identify new clients to originate new business?
23   A.   Well, I've been in business for a
24   while, so I work a lot off referrals.  Or if I'm
25   doing cold prospecting, I'll use a database

1 called -- that you pull up Schedule As or 5500s
2 to pull up information about clients.
3    Q.   What do you use to access -- you said
4 "database."  Is there an actual --
5    A.   Yeah.  So I subscribe on a monthly
6 basis to a database that -- it's called Biz.com,
7 I think, something like that.
8    Q.   One of the forms you mentioned, 5500s,
9 what are those?
10    A.   They're -- 5500s are a required filing
11 for any ERISA plan that has employees over 100
12 employees.  And so you can find out information
13 as to what the premium is, typically sometimes
14 commissions and who the carrier relationships
15 are and the contacts at each prospect.
16    Q.   So you could use a 5500 form to find
17 out, I guess, what kinds of services a
18 prospective client might need?
19    A.   I don't know about services.  You can
20 find out what they have historically put in
21 place from a carrier perspective.
22    Q.   And that could help you identify who
23 might be a good target to try and sell to?
24    A.   Sometimes.  I typically use it just so
25 I can go in with knowledge to say I know this

1 about you.  But it doesn't really get into that
2 much detail as to what kind of services they're
3 looking for.
4    Q.   What kind of services do you sell to
5 clients?
6    A.   Health and welfare consulting.
7    Q.   Do any of your clients use more than
8 one company to provide the kinds of services
9 that you sell?
10    A.   Not currently.
11    Q.   But historically you have had clients
12 that have used more than one company to provide
13 the kinds of services that you provide?
14    A.   Yes.
15    Q.   Have you ever had a client that was
16 both your client and a client of Lockton?
17    A.   No.
18    Q.   Briefly go back on Biz.com.
19       How long have you had that
20 subscription for?
21    A.   Six years, at least.
22    Q.   Do you recall roughly how much it is a
23 much?
24    A.   $50.
25    Q.   Do you pay yourself or does Mercer pay

1 for it?
2    A.   I pay for it myself.
3    Q.   In addition to 5500, what other
4 information does it compile?
5    A.   That's it.  It's a 5500 database.
6    Q.   And earlier you were talking about how
7 a lot of your origination comes through
8 referrals and networking.
9       Are there any websites you use for
10 networking purposes?
11    A.   LinkedIn.
12    Q.   That's what I thought.
13       How many clients -- are there clients
14 that you have not originated but that you are
15 involved in helping to retain?
16    A.   Yes.
17    Q.   How many clients fall into that
18 category?
19    A.   Two.
20    Q.   What do you do to help retain them?
21    A.   I do the day-to-day -- not the
22 day-to-day, but I'll do the overall client
23 management with a client team and other
24 resources.
25    Q.   That's what would be called servicing,

1 right?
2    A.   Correct.
3    Q.   So for how many clients are you the
4 relationship manager?
5    A.   Five.
6    Q.   Are there clients that are -- that you
7 consider, I guess, yours or that you have some
8 credit for that don't have a relationship
9 manager?
10    A.   I'm not sure I understand.
11    Q.   I think earlier today someone said
12 that some clients are small, don't necessarily
13 have a relationship manager at all.
14       MR. WEBER:  Objection to the form of
15    the question.
16    Q.   So I guess the question is, are there
17 any clients that, I guess, you originated or
18 that you're the primary contact for but that
19 don't have a relationship manager at all?
20    A.   As far as -- all of the clients that
21 are assigned have a relationship manager, but --
22 yeah.  But I'm not sure they have a
23 relationship.  But in the database they have a
24 relationship manager assigned.
25    Q.   How many clients, I guess current

1 clients, of Mercer were you responsible for
2 bringing into Mercer?
3    A.   Five.
4    Q.   For the two clients that you're
5 involved in servicing that you didn't originate,
6 who assigned those clients to you to service?
7    A.   Cory or Amy. I don't know. Amy told
8 me about -- when the two -- when the team left
9 about the two. I assume it was Cory that gave
10 the directive. And then I have one -- that
11 actually one client is not there. The other
12 client Cory did.
13    Q.   So just to clarify. So the two -- the
14 only two clients that you have that you service
15 but did not originate are two that came over in
16 the last month or so after Matt, Joanne and Jada
17 have left?
18    A.   Well, I don't technically count the
19 one because I hadn't even met them. So they
20 were here -- they were assigned to me and then
21 they were gone within two weeks.
22    Q.   The point is, there's no others --
23    A.   Correct.
24    Q.   That's what I meant.
25        And I guess when somebody has a client

1 that they've either originated or they service,
2 is there some kind of origination credit that
3 they get for that that impacts their
4 compensation?
5    A.   Yes.
6    Q.   And what's the total number of clients
7 that you have some kind of origination credit
8 for?
9    A.   Five.
10    Q.   I will ask a few questions about
11 Salesforce.
12        Do you know what Salesforce is?
13    A.   Yes.
14    Q.   What is Salesforce?
15    A.   Salesforce is the database that the
16 salespeople use to either track communication
17 with a client or to look up information about a
18 specific client or prospect.
19    Q.   Do you use it?
20    A.   Yes.
21    Q.   And why do people generally use
22 Salesforce? What's the purpose of it?
23    A.   Really to track progress on prospects
24 and to make sure that other people that -- to
25 make sure that they understand that you're

1 working on it so that your prospect isn't taken
2 away.
3    Q.   So what would prompt you, let's say,
4 to enter a certain contact into Salesforce?
5    A.   New relationship or progress with the
6 relationship.
7    Q.   Would you enter someone into
8 Salesforce you just met with?
9    A.   Yes. If they're not already in there
10 and assigned to somebody.
11    Q.   Would you enter someone into
12 Salesforce that you haven't yet met with but you
13 had some other way of making connection with
14 them?
15    A.   I haven't, but I can see where people
16 would if it's not assigned to anybody.
17    Q.   So in other words, somebody might be
18 entered into Salesforce if they aren't at the
19 point yet where you're about to prepare a pitch
20 for them?
21    A.   Yes. If it's not assigned to
22 somebody, then you want to make sure that it is
23 before you prepare the pitch.
24    Q.   Does entering, I guess, prospective
25 clients into Salesforce impact, I guess, who

1 gets origination credit for a client?
2    A.   It can. Yeah.
3    Q.   So is it fair to say it's an incentive
4 to try to put as many clients into the
5 Salesforce as you reasonably can?
6    A.   Yes.
7    Q.   One of the declarations that was
8 submitted in this case by Cory Lynn says that
9 Matt's Salesforce data was pulled and he had
10 colleagues go through it.
11        Were you involved at all in going
12 through Matt's Salesforce data?
13    A.   No.
14    Q.   Now, finally, I'm going to put your
15 declaration -- I'm going to mark this as Fava1.
16 It's a copy of the declaration that you signed
17 and filed in support of Mercer's motion for a
18 temporary restraining order.
19        (Thereupon, Declaration was marked as Exhibit
20 1 for identification.)
21    Q.   Have you seen this before?
22    A.   Yes.
23    Q.   When did you first see it?
24    A.   I don't know the dates. Probably last
25 week, the day I signed it, February 26.

8 (Pages 26 - 29)

1   Q.   Who prepared this affidavit --
2 declaration?
3   A.   I believe Sean.
4   Q.   Before it was prepared, did you
5 discuss -- not going into the details of your
6 conversation, did you discuss generally the
7 facts with your attorneys?
8   A.   Yes.
9   Q.   Do you recall signing it?
10   A.   Yes.
11   Q.   Do you intend to prepare any other
12 declaration at this point?
13   A.   No.
14   Q.   Let's go through the declaration a
15 little bit.  Let's start with paragraph 3 where
16 it says:  On January 17th you learned that Matt
17 DiGregorio, Joanne Steed and Jada Preston
18 resigned their positions at Mercer to begin
19 working at Lockton Companies.
20       So first question is, how did you
21 learn that Matt resigned his position?
22   A.   Cory.
23   Q.   How did that happen?  Did Cory call
24 you or e-mail you?
25   A.   Called.

1   Q.   And what did Cory say?
2   A.   That they had left and that they have
3 some cases that need to be reassigned and that
4 two of the cases would be assigned to me and my
5 team, and that Amy would be getting in contact
6 with me over the next couple of days to tell me
7 who they are.
8   Q.   When you say "you and your team," who
9 else is part of your team?
10   A.   Jenn Legenhausen.
11   Q.   And she is a consultant you mentioned
12 earlier.
13   A.   Correct.
14   Q.   Anybody else?
15   A.   No.
16   Q.   Was anyone else on the call where Cory
17 told you about Matt leaving?
18   A.   No.
19   Q.   How did you learn that Matt went to
20 work at Lockton?
21   A.   Cory told me.
22   Q.   Same call?
23   A.   Uh-huh.
24   Q.   And you say he went to work at Lockton
25 companies.  Just to confirm, you didn't mean a

1 specific Lockton entity you just meant Lockton
2 in general, right?
3   A.   Lockton in general.
4   Q.   And you don't know anything about
5 Lockton's corporate structure one way or the
6 other?
7   A.   No.
8   Q.   How did you learn that Steed and
9 Preston resigned?
10   A.   Same call.
11   Q.   And that they began working at
12 Lockton?
13   A.   Yes.
14   Q.   Same call.
15       So when you discussed their leaving
16 with Cory, did you discuss with Cory reaching
17 out to prospective clients -- to current clients
18 that had been working with Matt, Joanna or Jada?
19   A.   No.
20   Q.   The two clients that he assigned to
21 you that had been theirs or one of theirs, did
22 you discuss any strategy for how to approach
23 those clients?
24   A.   No.
25   Q.   Did he ask you to in any way, shape or

1 form reach out to them?
2   A.   Well, during that call it wasn't -- no
3 cases were assigned.  He just said they would
4 be.
5   Q.   He said there would be two cases
6 assigned to you?
7   A.   Correct.
8   Q.   And did he specify which two?
9   A.   No.
10   Q.   He said Amy would be in touch?
11   A.   Correct.
12   Q.   Got it.
13       So on the next paragraph on the same
14 day you had a call from -- this is the same call
15 that -- paragraph 3 and 4 really refer to the
16 same exact call; is that right, or is that --
17 actually, let me back up.
18   A.   That was the same call.
19   Q.   The paragraph 4 says:  That same day
20 you received a call informing you that you're
21 inheriting two clients, Caregiver Services and
22 Planned Parenthood.
23       But that call, just to clarify, is not
24 the call you actually found out the identity of
25 those clients?

9 (Pages 30 - 33)

Page 34

1    A.   Correct.
2    Q.   That didn't happen until a couple days
3  later?
4    A.   Until I received an e-mail from Amy
5  telling me who the clients were.
6    Q.   And that was -- when was that?  Same
7  day or a couple days later?
8    A.   It was a probably a day or two later.
9    Q.   And did you -- you received an e-mail
10  from Amy informing you of that?
11    A.   Correct.
12    Q.   Did you have a follow-up phone call
13  with Amy or anybody else?
14    A.   No.  She just gave me the contact
15  information and I reached out to the clients.
16    Q.   Was there anything other than the
17  contact information in that e-mail?
18    A.   Just some information about the
19  client, but...
20    Q.   Did she ask you to reach out to them?
21    A.   Yes.
22    Q.   Did she ask you to discuss Matt,
23  Joanna and Jada leaving?
24    A.   No.
25    Q.   Let's talk about Planned Parenthood a

Page 35

1  little bit.
2        In paragraph -- sorry.  Let me back up
3  a moment.
4        Before -- sorry.  A few things.  One:
5  Had Lynn given you clients before that call?
6    A.   Lynn?
7    Q.   Cory Lynn gave you these two
8  clients -- sorry.  Cory and Amy gave you these
9  two clients?
10    A.   Correct.
11    Q.   Had you been given any clients by Cory
12  or Amy before then?
13    A.   I inherited one that -- called KLX,
14  that --
15        MR. WEBER:  Don't mention the names of
16    any clients.
17        MR. SIEGEL:  Except Planned
18    Parenthood.
19    A.   Yes.
20    Q.   And when was that client given to you?
21    A.   It's been -- let's see.  It's been one
22  year now.  When I first came.  So about a year.
23    Q.   Do you know why that client was given
24  to you?
25    A.   Yes.

Page 36

1    Q.   Why was that client given to you?
2    A.   Conflict of personalities with the
3  prior team.
4    Q.   And is that still a client that you
5  service?
6    A.   Yes.
7    Q.   Prior to finding out that you would be
8  servicing Planned Parenthood, had you had any
9  relationship with Planned Parenthood beforehand?
10    A.   No.
11    Q.   Same question for Caregiver Services,
12  had you had any prior relationship with them
13  beforehand?
14    A.   No.
15    Q.   What did you know about the
16  relationship between, I guess, contacts at
17  Planned Parenthood and their prior contacts at
18  Mercer?
19        Do you know who their prior Mercer
20  contacts were before you were assigned to them?
21    A.   At Planned Parenthood.
22    Q.   Planned Parenthood first.
23    A.   Jada and Joanne.
24    Q.   How did you find that out?
25    A.   Amy.

Page 37

1    Q.   Did she just say these are -- well,
2  who -- of Jada or Joanne, both of them or just
3  one of them?
4    A.   I don't recall.  I think it was both.
5    Q.   And did you also find out who the
6  person at Planned Parenthood that was their
7  contact was at the same time?
8    A.   Yes.
9    Q.   And did you learn anything else about
10  the nature of the relationship between Jada and
11  Joanne and the contact at Planned Parenthood?
12    A.   There was a -- somebody's daughter --
13  one of them's daughter worked at Planned
14  Parenthood.
15    Q.   So you knew that there was some kind
16  of personal relationship as well?
17    A.   Yes.
18    Q.   Did you discuss with anyone at Mercer
19  potential challenges in retaining Planned
20  Parenthood as a client?
21    A.   Yes.
22    Q.   Who did you discuss that with?
23    A.   Amy.
24    Q.   What was that conversation about?
25    A.   That it's going to be difficult

10 (Pages 34 - 37)

Page 38

1 because of their relationship, long-term after
2 the contract was up.
3    Q.   When did you have that conversation?
4    A.   I think it was in the e-mail, just
5 advising me. Yeah.
6    Q.   Did you do anything else after that
7 e-mail to educate yourself as to Planned
8 Parenthood?
9    A.   I tried to establish a meeting with
10 them of which it was scheduled, then later
11 canceled.
12    Q.   Did you do anything else to, I guess,
13 look up on the system information you had about
14 it?
15    A.   Yes.
16    Q.   What did you do?
17    A.   Tried to find out what their plans
18 were, tried to find out who their carriers were.
19    Q.   And what services did Mercer provide
20 for Planned Parenthood?
21    A.   Health and welfare consulting.
22    Q.   Do you know if Planned Parenthood uses
23 any other company to -- at the time used any
24 other company to provide services?
25    A.   I don't know that.

Page 39

1    Q.   Do you know if Planned Parenthood
2 files an IRS Form 5500?
3    A.   They're probably nonprofit, so
4 probably not. I didn't look.
5    Q.   Do you know how much revenue Mercer
6 received annually from Planned Parenthood?
7        MR. WEBER: Objection. Don't answer.
8        MR. THUMIM: Sorry?
9        MR. WEBER: Don't answer.
10        MR. THUMIM: It's Planned
11 Parenthood -- it's relevant to your damages
12 claims. This is a client that actually
13 left.
14        MR. WEBER: We're not at the damages
15 level yet.
16        MR. THUMIM: I understand that, but
17 it's relevant to claims in your complaint.
18        MR. WEBER: It's not related to the
19 preliminary injunction. It's related to
20 damages.
21        MR. THUMIM: I understand that, but
22 that --
23        MR. WEBER: If you want to get into
24 damages, then we'll have to go back and --
25        MR. THUMIM: What's --

Page 40

1        MR. WEBER: Excuse me. For the
2 record. Your colleagues objected to any
3 discussion about compensation, et cetera,
4 et cetera. So if you want to go back and
5 take their depositions, we better do that
6 tonight. We're not going to talk about
7 damages here.
8        Do you want to change your -- get your
9 clients back here, Marty? I'm enjoying
10 Florida so I --
11        MR. SIEGEL: I'll check on it.
12        MR. WEBER: Particularly with the
13 weather coming in to New York.
14        MR. SIEGEL: We'll reserve.
15        MR. THUMIM: Let's shelve this for
16 now.
17    Q.   What services did Mercer provide for
18 Caregiver Services?
19    A.   Or do they?
20    Q.   Do they?
21    A.   Health and welfare consulting.
22    Q.   Do you know if Caregiver Services uses
23 any other company to provide services that
24 Mercer also provides?
25    A.   I don't believe they do.

Page 41

1    Q.   Do you know if Caregiver Services has
2 to file an IRS 5500?
3    A.   Yes.
4    Q.   Do you know how Planned Parenthood
5 originally became a Mercer client?
6    A.   No.
7    Q.   Do you know -- let's move on to the
8 next paragraph.
9        Paragraph 5 you said you exchanged
10 emails with the COO of Planned Parenthood.
11        That's the person that, as you
12 understood it, had the close personal
13 relationship with Steed, right?
14    A.   I don't know. I just know that she
15 had a -- one of them had a daughter that worked
16 there, but I don't know what the relationship
17 with the COO is.
18    Q.   Prior to -- this is a January 22nd
19 e-mail, had you ever had any contact with this
20 person before?
21    A.   No.
22    Q.   What did you say in your initial
23 e-mail?
24        Did you initially reach out to them or
25 did they e-mail you?

11 (Pages 38 - 41)

Page 42

1   A.   I reached out to them.
2   Q.   And what did you say in your initial
3 e-mail?
4   A.   That myself and my team were going to
5 be managing their account moving forward and
6 would like to set up a meeting.
7   Q.   You knew to e-mail the COO because Amy
8 gave you that person's information?
9   A.   Correct.
10   Q.   Do you have any understanding as to
11 who the person at Planned Parenthood is that has
12 decision-making power?
13   A.   No.
14   Q.   Given that you attached to your
15 declaration the February 22nd e-mail, is there
16 any reason you didn't attach this e-mail
17 exchange with the COO?
18   A.   No.  The only thing I had with the COO
19 was to set up a meeting.  So there's no reason
20 other than -- there's no information other than
21 we're going to set up this meeting.
22   Q.   Did you mention Matt, Joanne or Jada
23 in that e-mail?
24   A.   No.
25   Q.   Did you mention Lockton in that

Page 43

1 e-mail?
2   A.   No.
3   Q.   So how did you schedule the e-mail --
4 sorry, how did you schedule the meeting for
5 February 6th?
6   A.   Rowena Geisler at Planned Parenthood
7 set up an Outlook calendar meeting.
8   Q.   Was Rowena also on the e-mail chain
9 you had with the COO?
10   A.   No.  She forwarded it, I believe.
11   Q.   Where was the meeting supposed to take
12 place?
13   A.   At Planned Parenthood.
14   Q.   When did they first reschedule?
15      It says that they rescheduled to
16 February 27, but it doesn't say when they
17 rescheduled.  If you recall.
18      Was it days before the February 6
19 meeting?  Was it a week before?
20   A.   Actually, I think it was like a day
21 before.  Actually, it was, because I was
22 actually already down in South Florida.  So it
23 was the day before.
24   Q.   Did they give a reason for
25 rescheduling it?

Page 44

1   A.   That they wanted another -- I don't
2 know, I think it was their CFO, I don't recall,
3 wanted them to join the meeting and he wasn't
4 available.
5   Q.   Between that and the February 22nd
6 e-mail, which is attached to your declaration,
7 did you have any other contact with them?
8   A.   No.
9   Q.   So the only previous contact you had
10 with Rowena was to schedule the February 6
11 meeting?
12   A.   Correct.
13   Q.   Do you know who at Planned Parenthood
14 made the decision as to which broker to use?
15   A.   I don't know.  The letter came from
16 Rowena.  But I don't know who made the decision.
17   Q.   What did you do in response to getting
18 this e-mail?
19   A.   I said, thank you very much and let us
20 know if we need anything to help with the
21 transition.
22   Q.   Did you talk to anyone at Mercer about
23 it?
24   A.   I think I -- I think I sent an e-mail
25 to the Sunrise office.  I sent an e-mail to the

Page 45

1 Sunrise office just advising them that --
2 actually, no.  They sent one to me saying a
3 carrier contacted them and received a BOR, and I
4 acknowledged it and said, yes, I just got that
5 from the client as well.
6   Q.   Did anyone from Planned Parenthood
7 ever tell you why they left Mercer?
8   A.   No.
9   Q.   So ultimately you don't really know
10 exactly why they switched?
11   A.   No.
12   Q.   Then you made a February 23rd call to
13 a carrier.  Who did you call?
14   A.   Actually, I was already on the phone
15 with Lincoln Mutual and they had -- the carrier,
16 so I just happened to ask them while we were on
17 the phone if they knew where they went since
18 they were the carrier of Planned Parenthood.
19   Q.   Why did you ask?
20   A.   Curious.
21   Q.   What did they say?
22   A.   Lockton.
23   Q.   So let's move on to something else.
24      Do you sometimes get recruiters about
25 other job opportunities?

12 (Pages 42 - 45)

Page 46

1    A.   Yes.
2    Q.   How often, roughly?
3    A.   A couple times a year.
4    Q.   Have you ever discussed job
5    opportunities with any other employees at
6    Mercer?
7    A.   No.
8    Q.   Have you ever discussed the
9    possibility of leaving Mercer with anybody else
10   at Mercer?
11   A.   No.
12   Q.   If you left, would the consultant you
13   work with be significantly impacted?
14        MR. WEBER: Objection, speculative.
15   Don't answer.
16        MR. THUMIM: I mean, she can -- she
17   knows the consultant's role.
18   Q.   How would the consultant be affected
19   if you left?
20        MR. WEBER: Speculative. Objection.
21   Q.   You can answer.
22        MR. WEBER: You can answer if you can.
23   A.   She would acquire -- she would work
24   under another lead consultant.
25   Q.   If you were at some point decided to

Page 47

1    leave, would you give the consultant a heads up?
2    A.   Yes.
3    Q.   Are you aware of any two-week notice
4    requirement to leave Mercer?
5    A.   Yes.
6    Q.   Are you aware of anywhere where it's
7    written down?
8    A.   No.
9    Q.   Do you know other people, I guess,
10   with a similar job titles and roles to Matt,
11   Joanne or Jada who left Mercer within the last
12   two years?
13   A.   No. Because I've only been there a
14   little over a year.
15   Q.   Do you know any new principals who
16   joined Mercer from other brokers within the past
17   few years?
18   A.   Yep. Matt -- well, actually, no. He
19   was at Mercer just a different office, so no.
20   Q.   So go back through your employment
21   history a little bit. Just a couple of
22   follow-up questions on that.
23        So when you went from Marsh to Willis
24   in 2005, a very long time ago.
25   A.   Yes.

Page 48

1    Q.   After you moved to Willis, did you
2    have any contact with any clients that had been
3    Marsh clients when you were at Marsh?
4    A.   No.
5    Q.   When you went, I guess, from Willis to
6    IOA or being your own employee or doing work
7    with IOA, after you went -- after you left
8    Willis did you have any contact with clients
9    that had been clients of Willis when you were at
10   Willis?
11   A.   Yes.
12   Q.   And who did -- how many clients did
13   you initiate contact with?
14   A.   I didn't initiate. We were personal
15   friends.
16   Q.   So how many clients are we talking
17   about then?
18   A.   Two.
19   Q.   Two clients.
20        Are those clients that had been Willis
21   clients but you had personal relationships with?
22        MR. WEBER: Objection to form.
23   A.   Right.
24   Q.   Did you retain any contact
25   information -- any contact list that you put

Page 49

1    together while you were at Willis when you left?
2    A.   Can you restate that?
3    Q.   I guess any contact information that
4    you had about, I guess, Willis clients or that
5    you had -- you know, a contact list you had
6    developed while at Willis, did you take any of
7    that information with you when you left Willis?
8    A.   Yes.
9    Q.   What information did you take with
10   you?
11   A.   Name, address, same would be in my
12   contact.
13   Q.   The two clients that you had personal
14   relationships with, did they leave Willis to
15   become clients of yours?
16   A.   Not until my noncompete was up.
17   Q.   That's the next question.
18        Did you have a noncompete of some
19   kind?
20   A.   Yes.
21   Q.   And how long did it run for?
22   A.   Two years.
23   Q.   So those two clients that you had
24   personal relationships with did not come over
25   for those two years?

13 (Pages 46 - 49)

1   A.   Correct.
2   Q.   Did you also have a confidentiality
3 agreement with Willis?
4   A.   Yes.
5   Q.   Before coming from IOA -- or to
6 Mercer -- I'll ask you this.
7        When you were working yourself but I
8 guess in conjunction with IOA, did you also have
9 some kind of nonsolicitation agreement with IOA?
10   A.   Yes and no.  No if I brought the
11 client to them.  Yes if it was a referral from
12 like a property and casualty salesperson.
13   Q.   Did you have clients that fell into
14 that second category required by --
15   A.   Yes.
16   Q.   -- the NSA?
17        Before coming to Mercer, you said that
18 Cory Lynn hired you.  Did you have any
19 conversations with Cory about a book of
20 business?
21   A.   Yes.
22   Q.   And did you have any conversation in
23 which anyone at Mercer expressed an expectation
24 of how many clients might follow you to Mercer?
25   A.   Yes.

1   Q.   Have you -- were you ever sued by
2 Willis?
3   A.   No.
4   Q.   Were you ever sued by IOA?
5   A.   No.
6        MR. THUMIM:  I think we can take a
7   short break at this point.
8   Q.   Did you ever receive a letter from
9 Willis?
10   A.   Yes.
11   Q.   What letter did you receive from
12 Willis?
13   A.   It was a letter stating that I should
14 not reach out to a client.
15   Q.   Did you receive any letter from Willis
16 that addressed contact information you might
17 have taken with you?
18   A.   Yes.
19   Q.   What did that letter say?
20   A.   Just said that it's violation and
21 cease and assist.
22   Q.   What did you do in response to that
23 letter?
24   A.   Didn't pursue it.
25   Q.   Didn't pursue what?

1   A.   Additional contact.
2   Q.   With who?
3   A.   With the client.
4   Q.   Were you also barred in any way in a
5 nonsolicitation from reaching out to not just
6 actual clients of Willis but prospective clients
7 of Willis?
8   A.   Not knowingly, no.
9   Q.   Did you find out about any prospective
10 clients at Willis that you then reached out to
11 after leaving Willis?
12   A.   I'm sorry, say that again.
13   Q.   While you were at Willis, did you find
14 out about any potential -- prospective clients,
15 not actual Willis clients, but Willis maybe
16 wanted to pitch to that you then reached out to
17 after you left Willis?
18   A.   I wouldn't know who all Willis is
19 going after, so no, not knowingly.
20        MR. WEBER:  I'll object to the line of
21   questioning.  It's really far afield.
22   Q.   While you were at IOA did you have any
23 prospective clients that you were -- that you
24 aware you were trying to reach out to, let's
25 say?

1   A.   Did I have prospective clients while I
2 was at IOA?  Yes.
3   Q.   Do you know if your nonsolicitation
4 agreement covered any prospective clients of
5 IOA?
6   A.   I don't know.
7   Q.   Did IOA send you a letter?
8   A.   No.
9   Q.   Caregiver Services, you're not aware
10 of any contact that entity had with Matt, Joanne
11 or Jada after they left, are you?
12        MR. WEBER:  Objection to the form.
13        You can answer if you know.
14   Q.   Are you aware of any contact that --
15   A.   Yes.
16   Q.   Are you aware that they had any or did
17 not have any?
18   A.   That they did.
19   Q.   And how did you find that out?
20   A.   I met with the team at Caregiver
21 Services.  They told me that Matt had reached
22 out and told them they had left.  I don't know
23 if that's a personal -- a face-to-face meeting
24 or telephonic.
25   Q.   When did you meet with Caregiver

14 (Pages 50 - 53)

Page 54

1 Services?
2    A.   I would have to look.  About six weeks
3 ago.
4    Q.   How did it come up that they had heard
5 from Matt and Matt had left?
6    A.   I had met them for the first time.  I
7 said, As you're aware, the team had left.  And
8 they said, Yes, Matt had reached out to us and
9 apparently they went to Lockton.
10   Q.   Did they say whether Matt asked them
11 to take business away from Mercer?
12   A.   No.
13   Q.   Did they say that Matt -- they didn't
14 say that Matt told them to bring business to
15 Lockton?
16         MR. WEBER:  Objection to the form.
17   A.   No.
18   Q.   So why isn't that contact in your
19 declaration?
20         MR. WEBER:  Objection to the form.
21         You can answer if you can.
22   Q.   You mentioned in your declaration
23 contact with Planned Parenthood.  You don't
24 mention Caregiver Services having had contact
25 with Matt, Joanne or Jada.

Page 55

1        Is there any reason that you don't
2 mention it?
3    A.   No.  I shared this.
4        (Recess.)
5        MR. THUMIM:  We have no further
6    questions.
7           CROSS-EXAMINATION
8 BY MR. WEBER:
9    Q.   You mentioned contact with Caregiver
10 Services, correct?
11   A.   Yes.
12   Q.   You just testified about that.
13        You spoke to individuals at that
14 entity, did you not?
15   A.   Correct.
16   Q.   What did they tell you about any
17 contact they received from Matt DiGregorio or
18 Jada Preston or Joanne Steed?
19   A.   I asked them if they are aware the
20 team had left, which they knew that was the
21 purpose of the meeting.  They said, yes, that
22 Matt had reached out and told them that they
23 were at Lockton.
24   Q.   Matt reached out to individuals at
25 Caregiver?

Page 56

1    A.   I think it was just Tom Hoyer.
2    Q.   Tom?
3    A.   Yes.
4    Q.   Last name?
5    A.   Hoyer.  The CFO.
6    Q.   Did Tom or anyone else from Caregivers
7 mention if anyone other than Matt had reached
8 out to them?
9    A.   No.
10   Q.   Did he mention when Matt reached out
11 to him?
12   A.   No.
13         MR. WEBER:  No questions.
14          REDIRECT EXAMINATION
15 BY MR. THUMIM:
16   Q.   One or two follow-up questions.
17        Did they say whether Matt reached out
18 to them directly or were there -- did they
19 specify whether it could have been a mass e-mail
20 or direct --
21   A.   They did not.  We just moved on from
22 the meeting after that.
23   Q.   So there's nothing they said to
24 indicate that it wasn't necessarily some generic
25 announcement?

Page 57

1    A.   Correct.
2    Q.   They didn't say he reached out
3 directly personally?
4    A.   Correct.
5         MR. THUMIM:  No further questions.
6         MR. WEBER:  No further.
7        (Witness requests reading of
8 transcript.)
9        (Deposition concluded at 2:50 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

15 (Pages 54 - 57)

Page 58

1 RE:     Mercer Health Benefits, LLC v. Matthew
  DiGregorio, et al.
2 DEPO OF:  Melanie Fava
  TAKEN:    March 12, 2018
3
4         EXCEPT FOR ANY CORRECTIONS
        MADE ON THE ERRATA SHEET BY
5       ME, I CERTIFY THIS IS A TRUE
        AND ACCURATE TRANSCRIPT.
6       FURTHER DEPONENT SAITH NOT.
7       _____
        Melanie Fava
8
9 STATE OF FLORIDA    )
                       ) SS:
10 COUNTY OF MIAMI-DADE )
11       Sworn and subscribed to before me this
12 _____ day of _____, 2018.
13 PERSONALLY KNOWN _____ or I.D._____
14
15       _____
        Notary Public in and for
16      the State of Florida at
        Large.
17
18 My commission expires:
19
20
21
22
23
24
25

Page 59

1         ERRATA SHEET
2 RE:     Mercer Health Benefits, LLC v. Matthew
  DiGregorio, et al.
3 DEPO OF:  Melanie Fava
  TAKEN:    March 12, 2018
4
5 DO NOT WRITE ON TRANSCRIPT. ENTER ANY CHANGES HERE
6 Page #| Line #| Change      | Reason
7 _____|_____|_____|_____
8 _____|_____|_____|_____
9 _____|_____|_____|_____
10 _____|_____|_____|_____
11 _____|_____|_____|_____
12 _____|_____|_____|_____
13 _____|_____|_____|_____
14 _____|_____|_____|_____
15 _____|_____|_____|_____
16 _____|_____|_____|_____
17 _____|_____|_____|_____
18 _____|_____|_____|_____
19 _____|_____|_____|_____
20 _____|_____|_____|_____
21 State of Florida)
   County of   (    )
22
   Under penalties of perjury, I declare that I have read
23 by deposition transcript, and it is true and correct
   subject to any changes in form or substance entered
24 here.
   _____ _____
25 Date       Melanie Fava

Page 60

1     CERTIFICATE OF OATH OF WITNESS
2
3 STATE OF FLORIDA      )
                        ) SS.
4 COUNTY OF MIAMI-DADE   )
5
6     I, Carol Hill Weng, FPR, RMR, CRR, CMRS, CRI, CPE,
7 Notary Public in and for the State of Florida at Large,
8 certify that the witness, Melanie Fava, personally
9 appeared before me on March 12, 2018, and was duly
10 sworn by me.
11     WITNESS my hand and official seal this March 14,
12 2018.
13
14
15 _____
      Carol Hill Weng, FPR, RMR, CRR, CMRS,
16    CRI, CPE
      Notary Public, State of Florida at Large
17
18 Notary No.: FF 958116
19 My Commission Expires:  March 4, 2020
20
21
22
23
24
25

Page 61

1     REPORTER'S DEPOSITION CERTIFICATE
2
3     I, Carol Hill Weng, FPR, RMR, CRR, CMRS, CPE, CRI,
4 certify that I was authorized to and did
5 stenographically report the deposition of Melanie Fava,
6 the witness herein on March 12, 2018; that a review of
7 the transcript was requested; that the foregoing pages
8 are a true and complete record of my stenographic notes
9 of the deposition of said witness; and that this
10 computer-assisted transcript was prepared under my
11 supervision.
12     I further certify that I am not a relative,
13 employee, attorney or counsel of any of the parties,
14 nor am I a relative or employee of any of the parties'
15 attorney or counsel connected with the action.
16     DATED this March 14, 2018.
17
18 _____
19    Carol Hill Weng, FPR, RMR, CRR
      CMRS, CPE, CRI
20
21
22
23
24
25

16 (Pages 58 - 61)

**&**

**&**   1:4 2:7 4:10

**0**

**01805**   1:2
**05**   11:14

**1**

**1**   3:10 29:20
**100**   22:11
**10017**   2:8
**10022-3298**   2:4
**12**   1:12 12:21 58:2
  59:3 60:9 61:6
**14**   60:11 61:16
**15**   7:24
**17th**   30:16
**18**   1:2
**1999**   10:19
**1:56**   1:13

**2**

**2**   1:11
**2005**   10:21 11:17
  47:24
**2012**   11:19 12:4
**2016**   20:20
**2017**   12:21
**2018**   1:12 58:2,12
  59:3 60:9,12 61:6
  61:16
**2020**   60:19
**218**   10:12
**2250**   1:11
**22nd**   41:18 42:15
  44:5
**23rd**   45:12
**26**   29:25
**27**   43:16
**29**   3:10
**2:50**   1:13 57:9

**3**

**3**   30:15 33:15
**30**   4:18
**33156**   2:12

**4**

**4**   3:4 33:15,19
  60:19

**5**

**5**   41:9
**50**   23:24
**55**   3:4
**5500**   22:16 24:3,5
  39:2 41:2
**5500s**   22:1,8,10
**56**   3:5

**6**

**6**   43:18 44:10
**6th**   43:5

**7**

**711**   2:7

**9**

**900**   2:3
**908**   2:11
**9100**   2:11
**958116**   60:18

**a**

**access**   22:3
**account**   42:5
**accounts**   9:10,12
**accurate**   7:11 58:5
**accurately**   5:12
**acknowledged**
  45:4
**acquire**   46:23
**action**   61:15
**actual**   9:13 22:4
  52:6,15

**addition**   24:3
**additional**   17:10
  52:1
**address**   18:7
  49:11
**addressed**   51:16
**addresses**   19:24
**adhered**   17:10
**administrators**
  18:14
**advising**   38:5 45:1
**advocacy**   18:13
**affidavit**   8:4 30:1
**afield**   52:21
**ago**   4:17,18,25
  47:24 54:3
**agreement**   50:3,9
  53:4
**al**   58:1 59:2
**america**   12:9
**amy**   2:14 9:10
  26:7,7 31:5 33:10
  34:4,10,13 35:8,12
  36:25 37:23 42:7
**announcement**
  56:25
**annually**   39:6
**answer**   6:16,23,24
  7:8 39:7,9 46:15
  46:21,22 53:13
  54:21
**answering**   5:21
**answers**   5:7
**anybody**   8:10 14:5
  28:16 31:14 34:13
  46:9
**anymore**   18:21
**anyway**   5:24
**apparently**   54:9
**appearances**   2:1

**appeared**   60:9
**approach**   32:22
**asked**   54:10 55:19
**asking**   5:6
**assigned**   25:21,24
  26:6,20 28:10,16
  28:21 31:4 32:20
  33:3,6 36:20
**assist**   51:21
**assisted**   61:10
**assor**   2:7 4:9
**assume**   26:9
**assuming**   9:10
**attach**   42:16
**attached**   42:14
  44:6
**attorney**   9:14
  61:13,15
**attorneys**   7:16,21
  30:7
**authorized**   61:4
**available**   44:4
**avenue**   2:3,7
**aware**   47:3,6
  52:24 53:9,14,16
  54:7 55:19

**b**

**bachelor's**   10:9
**back**   10:24 11:11
  20:1,5,22 23:18
  33:17 35:2 39:24
  40:4,9 47:20
**background**   10:6
  10:7
**barred**   52:4
**basis**   16:19,19
  17:8 18:8 22:6
**began**   32:11
**beginning**   10:8
**behalf**   1:21 2:2,5
  4:10

[believe - consultant's]                                                                    Page 2

**believe**  14:7 16:1
  30:3 40:25 43:10
**bell**  2:7 4:10
**benefits**  1:4 11:2
  11:16,23 13:21
  16:17 58:1 59:2
**better**  40:5
**beyond**  21:11
**biscayne**  1:11
**bit**  14:11 16:22
  17:2 30:15 35:1
  47:21
**biz.com**  22:6
**biz.com.**  23:18
**book**  13:3 14:24
  50:19
**bor**  45:3
**boulevard**  1:11
  2:11
**break**  7:2,3 51:7
**brief**  10:5,6
**briefly**  23:18
**bring**  17:11,25
  54:14
**bringing**  26:2
**broker**  11:3 44:14
**brokers**  47:16
**brought**  50:10
**build**  19:5,15
**built**  18:19
**business**  10:10
  13:2,3 14:2 17:24
  18:2 19:15 21:15
  21:22,23 50:20
  54:11,14

**c**

**calendar**  43:7
**call**  7:25 30:23
  31:16,22 32:10,14
  33:2,14,14,16,18
  33:20,23,24 34:12

  35:5 45:12,13
**called**  4:3 9:8,9,14
  12:8 22:1,6 24:25
  30:25 35:13
**canceled**  38:11
**caregiver**  33:21
  36:11 40:18,22
  41:1 53:9,20,25
  54:24 55:9,25
**caregivers**  56:6
**carol**  1:21 60:6,15
  61:3,19
**carrier**  22:14,21
  45:3,13,15,18
**carriers**  18:14
  38:18
**case**  1:2 4:11,19
  4:20 7:17 8:9,10
  8:12,16 29:8
**cases**  31:3,4 33:3,5
**casualty**  50:12
**category**  24:18
  50:14
**cause**  1:25
**cease**  51:21
**certain**  28:4
**certificate**  60:1
  61:1
**certify**  58:5 60:8
  61:4,12
**cetera**  40:3,4
**cfo**  44:2 56:5
**chain**  43:8
**challenges**  37:19
**change**  40:8 59:6
**changes**  59:5,23
**check**  40:11
**civ**  1:2
**claims**  18:12 39:12
  39:17

**clarification**  6:2
**clarify**  26:13
  33:23
**clear**  5:19
**client**  16:4 17:3,23
  18:6,7 19:6 20:25
  21:8 22:18 23:15
  23:16,16 24:22,23
  26:11,12,25 27:17
  27:18 29:1 34:19
  35:20,23 36:1,4
  37:20 39:12 41:5
  45:5 50:11 51:14
  52:3
**clients**  13:19 17:7
  17:25 18:6,9,18
  19:16 21:2,10,20
  21:22 22:2 23:5,7
  23:11 24:13,13,17
  25:3,6,12,17,20,25
  26:1,4,6,14 27:6
  28:25 29:4 32:17
  32:17,20,23 33:21
  33:25 34:5,15
  35:5,8,9,11,16
  40:9 48:2,3,8,9,12
  48:16,19,20,21
  49:4,13,15,23
  50:13,24 52:6,6,10
  52:14,15,23 53:1,4
**close**  41:12
**cmrs**  1:22 60:6,15
  61:3,19
**cold**  21:25
**colleagues**  29:10
  40:2
**college**  10:8,15
**come**  12:25 49:24
  54:4
**comes**  24:7

**coming**  40:13 50:5
  50:17
**comment**  19:7
**commission**  58:18
  60:19
**commissions**
  22:14
**communication**
  27:16
**companies**  1:7
  30:19 31:25
**company**  19:23
  23:8,12 38:23,24
  40:23
**compensation**
  27:4 40:3
**competitor**  9:22
**compile**  24:4
**compiling**  19:25
  20:19
**complaint**  39:17
**complete**  6:16
  7:11 61:8
**computer**  61:10
**concluded**  57:9
**confidentiality**
  50:2
**confirm**  31:25
**conflict**  36:2
**conjunction**  50:8
**connected**  61:15
**connection**  14:13
  28:13
**consider**  25:7
**consultant**  11:1,12
  12:7,13 13:25
  14:6 17:5,6,13
  31:11 46:12,18,24
  47:1
**consultant's**  17:14
  46:17

| | | | |
|---|---|---|---|
| **consulting** 23:6 38:21 40:21 | **cory** 8:19,23 9:8,8 14:10 16:11 17:22 | 25:23 27:15 **date** 59:25 | **detail** 23:2 **details** 21:10 30:5 |
| **contact** 9:11 13:9 18:6 19:21 20:1,4 20:6,9,21 21:1,8 21:11,13 25:18 28:4 31:5 34:14 34:17 37:7,11 41:19 44:7,9 48:2 48:8,13,24,25 49:3 49:5,12 51:16 52:1 53:10,14 54:18,23,24 55:9 55:17 | 26:7,9,12 29:8 30:22,23 31:1,16 31:21 32:16,16 35:7,8,11 50:18,19 **cost** 18:16 **counsel** 61:13,15 **count** 26:18 **country** 14:8 **county** 58:10 59:21 60:4 **couple** 16:25 21:16 31:6 34:2,7 | **dated** 61:16 **dates** 29:24 **daughter** 37:12,13 41:15 **day** 18:7,7,8,8 24:21,21,22,22 29:25 33:14,19 34:7,8 43:20,23 58:12 **days** 31:6 34:2,7 43:18 **december** 20:20 | **developed** 49:6 **different** 11:10 14:19 47:19 **difficult** 7:7 37:25 **digregorio** 1:7 2:15 14:15 30:17 55:17 58:1 59:2 **direct** 3:4 4:6 15:12 17:21 56:20 **directive** 26:10 **directly** 56:18 57:3 |
| **contacted** 45:3 **contacts** 19:18 20:8,11,15 21:15 22:15 36:16,17,20 | 46:3 47:21 **court** 1:1 5:8,9 6:10 **covered** 53:4 | **decided** 13:6 46:25 **decision** 42:12 44:14,16 | **disciplines** 13:19 **discourages** 19:12 **discuss** 30:5,6 32:16,22 34:22 |
| **contract** 38:2 **contracted** 12:8 12:12 | **cpe** 1:22 60:6,16 61:3,19 **creative** 12:18 | **declaration** 3:10 8:5,6,20 16:23 29:15,16,19 30:2 | 37:18,22 **discussed** 8:1 32:15 46:4,8 |
| **conversation** 30:6 37:24 38:3 50:22 **conversations** 50:19 | **credit** 25:8 27:2,7 29:1 **cri** 1:22 60:6,16 61:3,19 | 30:12,14 42:15 44:6 54:19,22 **declarations** 8:14 29:7 | **discussion** 40:3 **district** 1:1,1 **documents** 8:2,7 **doing** 12:20 21:25 |
| **coo** 41:10,17 42:7 42:17,18 43:9 **cooney** 13:12 | **cross** 3:4 55:7 **crr** 1:22 60:6,15 61:3,19 | **declare** 59:22 **defendants** 1:8,21 1:24 2:5 4:11 9:19 | 48:6 **drugs** 7:6 **duly** 4:3 60:9 |
| **copy** 29:16 **corporate** 32:5 **corporation** 12:15 | **curious** 45:20 **current** 25:25 32:17 | **degree** 10:9 **depo** 58:2 59:3 **deponent** 58:6 | **e** |
| **correct** 12:12,24 14:4 15:2 18:1 20:16 25:2 26:23 31:13 33:7,11 34:1,11 35:10 42:9 44:12 50:1 55:10,15 57:1,4 59:23 | **currently** 23:10 **d** **dade** 58:10 60:4 **dadeland** 2:11 **daily** 16:19 **damages** 39:11,14 39:20,24 40:7 | **deposed** 4:13,23 **deposition** 1:18,24 4:12,21 5:6 6:13 7:15 8:22,23 57:9 59:23 61:1,5,9 **depositions** 40:5 **describe** 11:25 | **e** 30:24 34:4,9,17 38:4,7 41:19,23,25 42:3,7,15,16,23 43:1,3,8 44:6,18 44:24,25 56:19 **earlier** 18:3 24:6 25:11 31:12 **early** 15:24 |
| **corrections** 58:4 | **data** 29:9,12 **database** 20:13 21:25 22:4,6 24:5 | **described** 16:25 **description** 3:9 | **educate** 38:7 **educational** 10:7 **eiseman** 2:7 4:9 |

**either**  27:1,16
**else's**  19:8
**emails**  41:10
**employed**  12:11
**employee**  16:17
  48:6 61:13,14
**employees**  22:11
  22:12 46:5
**employment**  47:20
**encompassed**
  14:25
**encourages**  19:12
**ends**  7:4
**enjoying**  40:9
**entail**  14:1
**entailed**  12:1
**entails**  16:15
**enter**  28:4,7,11
  59:5
**entered**  20:15
  28:18 59:23
**entering**  28:24
**entity**  32:1 53:10
  55:14
**environment**  15:9
**erisa**  22:11
**errata**  58:4 59:1
**esq**  2:2,6,6,10
**establish**  38:9
**et**  40:3,4 58:1 59:2
**everybody**  19:8
**exact**  33:16
**exactly**  45:10
**examination**  3:4,4
  3:5 4:6 55:7 56:14
**examined**  4:4
**exchange**  42:17
**exchanged**  41:9
**exclusively**  18:20
**excuse**  40:1

**exhibit**  3:10 29:19
**exhibits**  3:8
**expectation**  50:23
**expectations**  5:2
**experience**  19:14
**expires**  58:18
  60:19
**expressed**  50:23

**f**

**face**  53:23,23
**fact**  18:3
**facts**  30:7
**fair**  21:18 29:3
**fall**  24:17
**familiar**  8:25 9:16
  13:4
**family**  11:4 21:15
**far**  20:1,7 25:20
  52:21
**fava**  1:18 3:3 4:2,8
  12:17 58:2,7 59:3
  59:25 60:8 61:5
**fava1**  29:15
**february**  29:25
  42:15 43:5,16,18
  44:5,10 45:12
**feel**  6:2
**fell**  50:13
**ff**  60:18
**file**  41:2
**filed**  29:17
**files**  39:2
**filing**  22:10
**finally**  29:14
**financials**  18:11
**find**  6:14 9:13
  22:12,16,20 36:24
  37:5 38:17,18
  52:9,13 53:19
**finding**  36:7

**finish**  5:21
**firm**  4:9
**first**  4:3 9:6 14:15
  29:23 30:20 35:22
  36:22 43:14 54:6
**five**  25:5 26:3 27:9
**fl**  2:12
**florida**  1:12,23
  14:8 16:16 40:10
  43:22 58:9,16
  59:21 60:3,7,16
**follow**  34:12 47:22
  50:24 56:16
**follows**  4:5
**foregoing**  61:7
**form**  22:16 25:14
  33:1 39:2 48:22
  53:12 54:16,20
  59:23
**forms**  22:8
**forward**  42:5
**forwarded**  43:10
**found**  33:24
**fpr**  1:22 60:6,15
  61:3,19
**free**  6:2
**frequently**  17:8
**friends**  19:2 21:15
  48:15
**front**  6:11
**full**  6:16
**further**  20:5,22
  55:5 57:5,6 58:6
  61:12

**g**

**geisler**  43:6
**general**  32:2,3
**generally**  19:11
  27:21 30:6
**generating**  17:23

**generic**  56:24
**gestures**  5:11
**getting**  31:5 44:17
**give**  5:10 6:10 10:6
  43:24 47:1
**given**  35:5,11,20
  35:23 36:1 42:14
**go**  5:1 10:5,22
  12:5 13:2 20:1
  22:25 23:18 29:10
  30:14 39:24 40:4
  47:20
**goal**  6:13
**goes**  20:4,21
**going**  5:1,23 8:1
  29:11,14,15 30:5
  37:25 40:6 42:4
  42:21 52:19
**golenbock**  2:7 4:9
**golenbock.com**
  2:8,9
**good**  19:14 22:23
**ground**  5:1
**group**  15:9
**growing**  18:2
**guess**  4:22 8:4
  10:14 11:8,13,18
  12:10,22 14:18
  15:3,24 16:18,23
  18:19 21:20 22:17
  25:7,16,17,25
  26:25 28:24,25
  36:16 38:12 47:9
  48:5 49:3,4 50:8

**h**

**hand**  60:11
**happen**  30:23 34:2
**happened**  45:16
**heads**  47:1
**health**  1:4 23:6
  38:21 40:21 58:1

59:2
**hear**  5:10
**heard**  54:4
**help**  18:16 22:22
  24:20 44:20
**helping**  24:15
**herskowitz**  2:10
**highly**  13:5
**hill**  1:22 60:6,15
  61:3,19
**hired**  14:9 50:18
**hiring**  12:2
**historically**  22:20
  23:11
**history**  47:21
**hoyer**  56:1,5
**hslawfl.com**  2:12
**huh**  5:5,12 31:23

**i**

**i.d.**  58:13
**identification**
  29:20
**identify**  21:22
  22:22
**identifying**  21:20
**identity**  33:24
**impact**  28:25
**impacted**  46:13
**impacts**  27:3
**important**  5:20
**incentive**  29:3
**include**  21:13
**incorporated**
  20:13,14,19
**independent**  12:7
**index**  3:1
**indicate**  56:24
**indirectly**  17:15
**individuals**  55:13
  55:24

**information**  19:21
  21:7,11 22:2,12
  24:4 27:17 34:15
  34:17,18 38:13
  42:8,20 48:25
  49:3,7,9 51:16
**informing**  33:20
  34:10
**inherited**  35:13
**inheriting**  33:21
**initial**  41:22 42:2
**initially**  41:24
**initiate**  48:13,14
**injunction**  39:19
**insurance**  10:13
  12:8
**intend**  30:11
**interact**  15:4,20
  16:18
**interaction**  15:11
  16:8
**intervals**  7:1
**introduce**  13:21
  18:16
**introduced**  17:12
**introduces**  13:19
**involved**  8:10 11:7
  13:16 14:12 24:15
  26:5 29:11
**ioa**  48:6,7 50:5,8,9
  51:4 52:22 53:2,5
  53:7
**irs**  39:2 41:2
**issues**  18:13,15

**j**

**jada**  1:7 10:3 16:2
  26:16 30:17 32:18
  34:23 36:23 37:2
  37:10 42:22 47:11
  53:11 54:25 55:18

**january**  15:24
  30:16 41:18
**jenn**  31:10
**jgk**  1:2
**joanna**  32:18
  34:23
**joanne**  1:7 10:3
  15:15 26:16 30:17
  36:23 37:2,11
  42:22 47:11 53:10
  54:25 55:18
**job**  12:19 16:15
  45:25 46:4 47:10
**john**  13:12
**join**  44:3
**joined**  47:16
**judge**  6:11

**k**

**kind**  4:19 15:13
  21:21 23:2,4 27:2
  27:7 37:15 49:19
  50:9
**kinds**  22:17 23:8
  23:13
**klx**  35:13
**knew**  7:17 9:24
  10:2 37:15 42:7
  45:17 55:20
**know**  5:22 6:14
  7:3 8:13 9:2,18,21
  9:22 14:13,16
  15:15,23 16:2,11
  18:20,25 19:8
  22:19,25 26:7
  27:12 29:24 32:4
  35:23 36:15,19
  38:22,25 39:1,5
  40:22 41:1,4,7,14
  41:14,16 44:2,13
  44:15,16,20 45:9
  47:9,15 49:5

52:18 53:3,6,13,22
**knowingly**  52:8,19
**knowledge**  22:25
**known**  58:13
**knows**  46:17

**l**

**large**  1:23 58:16
  60:7,16
**law**  4:9
**lawsuit**  6:15 8:25
  9:7,14,19,25
**lawyer**  6:21
**lead**  17:6 46:24
**leader**  11:24 16:13
**learn**  9:6 30:21
  31:19 32:8 37:9
**learned**  30:16
**leave**  47:1,4 49:14
**leaving**  31:17
  32:15 34:23 46:9
  52:11
**left**  9:4,9 10:3,22
  11:2,6,13 12:4
  15:24 26:8,17
  31:2 39:13 45:7
  46:12,19 47:11
  48:7 49:1,7 52:17
  53:11,22 54:5,7
  55:20
**legenhausen**  31:10
**leron**  2:6 3:4,5 4:8
**letter**  44:15 51:8
  51:11,13,15,19,23
  53:7
**level**  39:15
**liaison**  18:14
**license**  10:12,12
**likewise**  5:18
**lincoln**  45:15
**line**  7:4 17:15
  52:20 59:6

**linkedin**  24:11
**list**  19:18,22 20:1
   20:4,6,9,18,21
   21:1,8,13 48:25
   49:5
**little**  11:10 14:11
   16:22 17:1 18:23
   30:15 35:1 47:14
   47:21
**littler**  2:3
**littler.com**  2:4
**llc**  1:4,7 12:14
   58:1 59:2
**llp**  2:7,10
**lockton**  1:7 9:16
   9:18,21,23,24 10:2
   10:3 23:16 30:19
   31:20,24 32:1,1,3
   32:12 42:25 45:22
   54:9,15 55:23
**lockton's**  32:5
**long**  4:17,25 7:23
   12:20 23:19 38:1
   47:24 49:21
**look**  27:17 38:13
   39:4 54:2
**looking**  6:17 13:1
   23:3
**lot**  15:10 21:24
   24:7
**loudly**  5:9
**lthumim**  2:8
**lyle**  2:10,12
**lynn**  8:19,23 14:10
   16:11 29:8 35:5,6
   35:7 50:18

**m**

**mail**  30:24 34:4,9
   34:17 38:4,7
   41:19,23,25 42:3,7
   42:15,16,23 43:1,3

43:8 44:6,18,24,25
   56:19
**maintaining**  18:2
**making**  17:9 28:13
   42:12
**malpractice**  4:20
**manage**  13:3
   14:23 17:3
**managed**  11:2
**management**
   10:10,10 11:11
   24:23
**manager**  16:4
   25:4,9,13,19,21,24
**manages**  16:16
**managing**  12:2
   42:5
**march**  1:12 58:2
   59:3 60:9,11,19
   61:6,16
**mark**  29:15
**marked**  29:19
**marsh**  10:16,22,25
   11:3 13:9 20:23
   47:23 48:3,3
**martin**  2:6
**marty**  40:9
**mass**  56:19
**matt**  10:2 14:15
   26:16 30:16,21
   31:17,19 32:18
   34:22 42:22 47:10
   47:18 53:10,21
   54:5,5,8,10,13,14
   54:25 55:17,22,24
   56:7,10,17
**matt's**  14:16 29:9
   29:12
**matthew**  1:7 2:15
   58:1 59:2

**mean**  17:4 18:8
   31:25 46:16
**means**  5:20 6:7
**meant**  26:24 32:1
**medical**  4:20
**medication**  7:6
**meet**  7:18,20 17:7
   53:25
**meeting**  8:2 38:9
   42:6,19,21 43:4,7
   43:11,19 44:3,11
   53:23 55:21 56:22
**meetings**  15:9
**melanie**  1:18 3:3
   4:2 12:17 58:2,7
   59:3,25 60:8 61:5
**mendelson**  2:3
**mention**  35:15
   42:22,25 54:24
   55:2 56:7,10
**mentioned**  22:8
   31:11 54:22 55:9
**mercer**  1:4 11:4
   12:23,25 13:4,9,24
   14:9,12 15:21
   19:5,11 20:2,7,8
   20:10,13 23:25
   26:1,2 30:18
   36:18,19 37:18
   38:19 39:5 40:17
   40:24 41:5 44:22
   45:7 46:6,9,10
   47:4,11,16,19 50:6
   50:17,23,24 54:11
   58:1 59:2
**mercer's**  29:17
**met**  7:16 15:8,25
   26:19 28:8,12
   53:20 54:6
**miami**  1:12 2:12
   58:10 60:4

**michael**  2:2 3:4
**minutes**  7:24,24
**mitigate**  18:17
**moment**  35:3
**monday**  1:12
**month**  26:16
**monthly**  16:20,21
   22:5
**motion**  29:17
**move**  41:7 45:23
**moved**  48:1 56:21
**moving**  42:5
**msiegel**  2:9
**mutual**  45:15
**mweber**  2:4

**n**

**name**  4:8 12:16
   19:23 49:11 56:4
**names**  35:15
**nature**  37:10
**necessarily**  25:12
   56:24
**need**  5:8,10 6:16
   7:2 17:11 22:18
   31:3 44:20
**needs**  18:7
**networking**  24:8
   24:10
**neutral**  19:12,13
**never**  15:7
**new**  1:1 2:4,8 4:10
   12:3 14:2 17:23
   17:25 21:20,22,22
   28:5 40:13 47:15
**nods**  5:11
**noncompete**  9:5
   49:16,18
**nonprofit**  39:3
**nonsolicitation**
   50:9 52:5 53:3

**nope**  5:17
**normally**  13:20
**notary**  1:22 58:15
  60:7,16,18
**notes**  21:2 61:8
**notice**  1:24 47:3
**nsa**  50:16
**number**  3:9 19:24
  27:6
**ny**  2:4,8

**o**

**oath**  6:5,10 60:1
**object**  6:22 52:20
**objected**  40:2
**objection**  25:14
  39:7 46:14,20
  48:22 53:12 54:16
  54:20
**office**  9:4 12:9
  44:25 45:1 47:19
**official**  60:11
**okay**  5:4 6:4 7:5
**once**  4:16 15:25
**opened**  11:15
**openings**  13:7
**opportunities**
  45:25 46:5
**order**  29:18
**organization**  12:8
**originally**  10:16
  41:5
**originate**  21:22
  26:5,15
**originated**  24:14
  25:17 27:1
**origination**  24:7
  27:2,7 29:1
**orlando**  10:11
  11:17,24 19:7
**outlook**  19:19 43:7

**outside**  13:20
**outstanding**  18:15
**overall**  10:5 24:22

**p**

**p.c.**  2:3
**p.m.**  1:13,13 57:9
**page**  3:2,9 59:6
**pages**  61:7
**paragraph**  30:15
  33:13,15,19 35:2
  41:8,9
**parenthood**  33:22
  34:25 35:18 36:8
  36:9,17,21,22 37:6
  37:11,14,20 38:8
  38:20,22 39:1,6,11
  41:4,10 42:11
  43:6,13 44:13
  45:6,18 54:23
**part**  11:4 21:19
  31:9
**particularly**  40:12
**parties**  61:13,14
**partner**  13:15
**passwords**  21:17
**pay**  23:25,25 24:2
**penalties**  59:22
**people**  8:13 9:3,23
  13:8 14:12 19:4
  27:21,24 28:15
  47:9
**perjury**  59:22
**person**  7:18 37:6
  41:11,20 42:11
**person's**  42:8
**personal**  18:19
  19:15 21:14 37:16
  41:12 48:14,21
  49:13,24 53:23
**personalities**  36:2

**personally**  57:3
  58:13 60:8
**perspective**  22:21
**peskoe**  2:7 4:10
**phoenix**  10:11
**phone**  19:23 34:12
  45:14,17
**phrases**  17:1
**pitch**  28:19,23
  52:16
**place**  21:1 22:21
  43:12
**plaintiff**  1:5 2:2
**plan**  22:11
**planned**  33:22
  34:25 35:17 36:8
  36:9,17,21,22 37:6
  37:11,13,19 38:7
  38:20,22 39:1,6,10
  41:4,10 42:11
  43:6,13 44:13
  45:6,18 54:23
**plans**  38:17
**please**  5:23 6:2
**point**  7:2 12:10
  26:22 28:19 30:12
  46:25 51:7
**position**  13:23
  30:21
**positions**  30:18
**possibility**  46:9
**potential**  37:19
  52:14
**power**  42:12
**practice**  10:12
  11:2,16,16,24 12:6
  16:13
**predates**  20:10
**preliminary**  39:19
**premium**  22:13

**prepare**  7:14
  28:19,23 30:11
**prepared**  30:1,4
  61:10
**present**  2:14
**preston**  1:7 16:2
  30:17 32:9 55:18
**presume**  19:13
**presumed**  9:4
**previous**  20:11,15
  44:9
**pricing**  21:8
**primarily**  13:18
**primary**  18:6
  25:18
**principal**  14:3
**principals**  47:15
**prior**  36:3,7,12,17
  36:19 41:18
**probably**  16:20
  20:20 29:24 34:8
  39:3,4
**producing**  11:12
  13:25 14:5
**professional**  18:21
**professionally**
  15:4
**programs**  18:12
**progress**  27:23
  28:5
**project**  15:13
**prompt**  28:3
**property**  50:12
**prospect**  22:15
  27:18 28:1
**prospecting**  21:25
**prospective**  21:20
  22:18 28:24 32:17
  52:6,9,14,23 53:1
  53:4

prospects  27:23
provide  7:11 23:8
  23:12,13 38:19,24
  40:17,23
provides  40:24
public  1:23 58:15
  60:7,16
pull  22:1,2
pulled  29:9
purpose  4:22
  27:22 55:21
purposes  24:10
pursuant  1:24
pursue  13:6 51:24
  51:25
put  21:2,5 22:20
  29:4,14 48:25

**q**

quarterly  17:7
question  5:21,23
  6:1,24 25:15,16
  30:20 36:11 49:17
questioning  7:4
  52:21
questions  5:7,16
  6:3,16,22 7:8
  27:10 47:22 55:6
  56:13,16 57:5

**r**

reach  33:1 34:20
  41:24 51:14 52:24
reached  34:15
  42:1 52:10,16
  53:21 54:8 55:22
  55:24 56:7,10,17
  57:2
reaching  32:16
  52:5
read  59:22

reading  57:7
really  15:10,10,21
  23:1 27:23 33:15
  45:9 52:21
reason  6:15 7:10
  42:16,19 43:24
  55:1 59:6
reasonable  7:1
reasonably  29:5
reassigned  31:3
recall  16:1 23:22
  30:9 37:4 43:17
  44:2
receive  51:8,11,15
received  33:20
  34:4,9 39:6 45:3
  55:17
recess  55:4
recollection  8:3
record  40:2 61:8
recorded  5:7
recruiters  45:24
redirect  3:5 56:14
refer  33:15
referral  50:11
referrals  21:24
  24:8
referring  17:24
reflects  5:13
refreshed  8:3
related  21:14
  39:18,19
relationship  18:20
  19:9 25:4,8,13,19
  25:21,23,24 28:5,6
  36:9,12,16 37:10
  37:16 38:1 41:13
  41:16
relationships  17:4
  19:6,15 22:14
  48:21 49:14,24

relative  61:12,14
relevant  6:15
  39:11,17
remember  4:21,22
  4:23
renewals  18:17
report  61:5
reporter  5:8,9
reporter's  61:1
reports  17:16
reputable  13:5
requested  61:7
requests  57:7
required  22:10
  50:14
requirement  47:4
reschedule  43:14
rescheduled  43:15
  43:17
rescheduling
  43:25
reserve  40:14
resigned  30:18,21
  32:9
resources  13:18
  13:22 17:10 24:24
responding  4:4
response  5:13
  44:17 51:22
responses  5:11
responsibilities
  14:22
responsible  16:4
  17:8 21:19 26:1
restate  49:2
restraining  29:18
retain  24:15,20
  48:24
retaining  37:19
retention  12:2
  14:2,21 16:5 18:4

revenue  39:5
review  61:6
reviewed  8:3
reward  21:17
right  8:14 25:1
  32:2 33:16 41:13
  48:23
rmr  1:22 60:6,15
  61:3,19
role  10:25 11:6,8
  11:11,25 14:19,19
  14:25,25 16:23,25
  46:17
roles  47:10
roughly  23:22
  46:2
rowena  43:6,8
  44:10,16
rules  5:1
run  49:21
running  13:1

**s**

s  1:11 2:6,11
saith  58:6
sales  12:3,3 13:18
  14:17,22 15:8
salesforce  27:11
  27:12,14,15,22
  28:4,8,12,18,25
  29:5,9,12
salespeople  27:16
salesperson  50:12
saving  18:16
saying  45:2
says  29:8 30:16
  33:19 43:15
schedule  22:1 43:3
  43:4 44:10
scheduled  38:10
scope  17:9

**seal** 60:11
**sean** 30:3
**second** 16:24
  50:14
**see** 13:6 28:15
  29:23 35:21
**seen** 29:21
**self** 12:11
**sell** 13:2 14:23
  22:23 23:4,9
**selling** 13:16
**send** 53:7
**sense** 5:24 19:10
**sent** 44:24,25 45:2
**separate** 20:9
**service** 26:6,14
  27:1 36:5
**services** 13:17
  22:17,19 23:2,4,8
  23:13 33:21 36:11
  38:19,24 40:17,18
  40:22,23 41:1
  53:9,21 54:1,24
  55:10
**servicing** 18:4
  24:25 26:5 36:8
**set** 42:6,19,21 43:7
**seven** 11:18 12:21
**shape** 32:25
**shapiro** 2:10,10
**shared** 55:3
**sheet** 58:4 59:1
**shelve** 40:15
**short** 51:7
**siegel** 2:6 35:17
  40:11,14
**signature** 60:14
  61:18
**signed** 29:16,25
**significantly** 46:13

**signing** 30:9
**similar** 11:8 47:10
**situation** 15:7
**six** 10:17 12:22
  23:21 54:2
**small** 25:12
**somebody** 17:16
  26:25 28:10,17,22
**somebody's** 37:12
**soon** 7:4
**sorry** 10:24 35:2,4
  35:8 39:8 43:4
  52:12
**sounds** 5:11
**south** 43:22
**southern** 1:1
**space** 21:5
**speak** 5:8
**specific** 18:24
  21:10 27:18 32:1
**specify** 33:8 56:19
**speculative** 46:14
  46:20
**spoke** 55:13
**ss** 58:9 60:3
**start** 30:15
**started** 10:16,19
  11:1,15 12:6
  13:24 20:2,7,7
**state** 1:23 14:7
  16:16 58:9,16
  59:21 60:3,7,16
**states** 1:1
**stating** 51:13
**steed** 1:7 15:15
  30:17 32:8 41:13
  55:18
**stenographic** 61:8
**stenographically**
  61:5

**stopped** 19:1
**strategies** 21:21
**strategy** 32:22
**structure** 32:5
**subject** 59:23
**submitted** 8:14
  29:8
**subscribe** 22:5
**subscribed** 58:11
**subscription** 23:20
**substance** 59:23
**sued** 51:1,4
**suit** 14:13
**suite** 1:11 2:11
**summary** 10:7
**sunrise** 9:3 44:25
  45:1
**supervision** 61:11
**supervisor** 17:14
  17:19,21
**support** 29:17
**supposed** 43:11
**sure** 5:18 13:14
  17:9 25:10,22
  27:24,25 28:22
**switched** 45:10
**sworn** 4:4 58:11
  60:10
**system** 38:13

**t**

**table** 17:11
**take** 7:1,2,3 40:5
  43:11 49:6,9 51:6
  54:11
**taken** 1:21 7:6
  28:1 51:17 58:2
  59:3
**talk** 5:19 8:9,12,12
  8:16,19,23 14:11
  16:22,24 34:25
  40:6 44:22

**talked** 18:3
**talking** 24:6 48:16
**tampa** 17:17
**target** 22:23
**team** 17:6,13
  24:23 26:8 31:5,8
  31:9 36:3 42:4
  53:20 54:7 55:20
**technically** 26:18
**techniques** 18:16
**technology** 10:10
**telephone** 7:16
**telephonic** 53:24
**tell** 6:5 9:11 31:6
  45:7 55:16
**telling** 34:5
**tells** 6:23
**temporary** 29:18
**term** 38:1
**terms** 19:5
**testified** 4:5 55:12
**testimony** 7:11
**thank** 44:19
**theirs** 32:21,21
**them's** 37:13
**thing** 17:3 42:18
**things** 15:5 35:4
**think** 5:22 15:8
  20:24 22:7 25:11
  37:4 38:4 43:20
  44:2,24,24 51:6
  56:1
**third** 2:3,7
**thought** 24:12
**three** 9:3
**thumim** 2:6 3:4,5
  4:7,8 39:8,10,16
  39:21,25 40:15
  46:16 51:6 55:5
  56:15 57:5

| | | | |
|---|---|---|---|
| **time** 4:25 6:21,21 13:9 37:7 38:23 47:24 54:6 | 49:13,22,23,25 56:16 | 40:1,12 46:14,20 46:22 48:22 52:20 53:12 54:16,20 | **works** 12:19 17:5 **write** 59:5 **written** 47:7 |

**time** 4:25 6:21,21
  13:9 37:7 38:23
  47:24 54:6
**times** 4:15 7:20
  46:3
**title** 11:21 13:13
  13:23 14:6,16
  15:16 16:3,11
  19:23,23
**titles** 47:10
**today** 4:12 7:8,12
  8:22,23 25:11
**today's** 7:14
**told** 7:17 9:9,15
  26:7 31:17,21
  53:21,22 54:14
  55:22
**tom** 56:1,2,6
**tomorrow** 19:1
**tonight** 40:6
**total** 27:6
**touch** 13:11 33:10
**track** 27:16,23
**transcript** 5:12,18
  57:8 58:5 59:5,23
  61:7,10
**transition** 44:21
**tree** 2:14
**tried** 38:9,17,18
**true** 58:5 59:23
  61:8
**truth** 6:6,6,18
**try** 7:3 22:23 29:4
**trying** 17:24 52:24
**twice** 7:22 15:8
**two** 9:10 20:3
  24:19 26:4,8,9,13
  26:14,15,21 31:4
  32:20 33:5,8,21
  34:8 35:7,9 47:3
  47:12 48:18,19

49:13,22,23,25
  56:16
**typically** 17:7 21:6
  22:13,24

**u**

**uh** 5:5,12 31:23
**ultimately** 45:9
**understand** 6:1,7
  6:9,22 7:8 25:10
  27:25 39:16,21
**understanding** 5:3
  16:14 42:10
**understood** 5:14
  6:19 41:12
**united** 1:1
**university** 10:11
**unpack** 17:1 18:8
**use** 21:6,21,25
  22:3,16,24 23:7
  24:9 27:16,19,21
  44:14
**uses** 38:22 40:22

**v**

**v** 58:1 59:2
**verbal** 5:10
**violation** 9:4 51:20
**vs** 1:6

**w**

**wait** 5:20,23
**want** 17:1 28:22
  39:23 40:4,8
**wanted** 13:2 44:1
  44:3 52:16
**way** 11:7 14:18,19
  15:3 21:14 28:13
  32:5,25 52:4
**weather** 40:13
**weber** 2:2 3:4
  18:23 25:14 35:15
  39:7,9,14,18,23

40:1,12 46:14,20
  46:22 48:22 52:20
  53:12 54:16,20
  55:8 56:13 57:6
**websites** 24:9
**week** 29:25 43:19
  47:3
**weekly** 16:19
**weeks** 26:21 54:2
**welfare** 23:6 38:21
  40:21
**wellness** 18:11
**weng** 1:22 60:6,15
  61:3,19
**went** 12:23 31:19
  31:24 45:17 47:23
  48:5,7 54:9
**willis** 10:23 11:13
  11:16,22,23 12:4
  47:23 48:1,5,8,9
  48:10,20 49:1,4,6
  49:7,14 50:3 51:2
  51:9,12,15 52:6,7
  52:10,11,13,15,15
  52:17,18
**witness** 3:2 4:3
  57:7 60:1,8,11
  61:6,9
**words** 6:17 19:2
  21:14 28:17
**work** 9:23 10:14
  12:25 15:4,12,18
  16:6 17:9 18:10
  18:11,12,13 19:7
  21:24 31:20,24
  46:13,23 48:6
**worked** 13:4 37:13
  41:15
**working** 19:1
  20:12 28:1 30:19
  32:11,18 50:7

**works** 12:19 17:5
**write** 59:5
**written** 47:7

**y**

**yeah** 11:5,15
  13:18 22:5 25:22
  29:2 38:5
**year** 35:22,22 46:3
  47:14
**years** 4:18 10:17
  11:18 12:21,22
  20:3 23:21 47:12
  47:17 49:22,25
**yep** 47:18
**york** 1:1 2:4,8
  4:10 40:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.