UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

MERCER HEALTH & BENEFITS LLC,

                    Plaintiff,

        - against -

MATTHEW DIGREGORIO, ET AL.,

                    Defendants.

———————————————————————

18-cv-1805 (JGK)

OPINION & ORDER

JOHN G. KOELTL, District Judge:

The plaintiff, Mercer Health & Benefits LLC, has moved for a preliminary injunction enjoining the defendants, Matthew DiGregorio, JoAnne Steed, Jada Preston (collectively, the "Individual Defendants"), and their alleged employer Lockton Companies, LLC ("Lockton Co."), and any entity or person acting in concert with them, under their supervision, or on their behalf, from violating the terms of the Non-Solicitation and Confidentiality Agreements that each Individual Defendant signed during their respective employment with Mercer, and from engaging in continued tortious conduct. On March 1, 2018, Judge Engelmayer issued a temporary restraining order, which the parties agreed to continue until March 16, 2018. The Court held an evidentiary hearing on March 16, 2018, after which it modified and continued the restraining order as modified until March 30, 2018. The parties then stipulated to continuing the restraining order as modified until April 6, 2018.

Having reviewed the evidence and assessed the credibility of the witnesses, the Court now makes the following findings of fact and reaches the following conclusions of law. The Court will issue a separate Order **granting in part** and **denying in part** Mercer's motion for a preliminary injunction.

## FINDINGS OF FACT

### A.

1.    Mercer is a Delaware limited liability company with its principal place of business located at 1166 Avenue of the Americas, New York, New York. Mercer is a wholly-owned subsidiary of Marsh & McLennan Companies, Inc. ("MMC"), and is a provider of health and benefits solutions, including managing employee benefit plans, assisting clients with choosing the right employee benefits plans to fit their needs, providing access to market experts, and advising clients on regulatory compliance. (Complaint ¶ 12; Lynn Decl. ¶ 3;[1] Tr. of March 16, 2018, Hearing ("March 16 Tr.") 57-58). The sole member of Mercer is Mercer (US) Inc., a Delaware corporation with its principal place of business in New York. (Dkt. No. 60).

2.    Lockton Co., the sole corporate defendant in this case, is a Missouri limited liability company with its principal place of business located in Kansas City, Missouri. Lockton Co. is

---

[1] Citations to the "Lynn Decl." refer to the Declaration of Cory Lynn executed on February 26, 2018 (Dkt. No. 25).

registered to do business in the State of New York. (Complaint ¶ 16; March 16 Tr. 23-24; Abercrombie Decl. ¶¶ 3, 4).[2] Lockton Co. is a citizen of the District of Columbia and eleven States, none of which is Delaware or New York. (Dkt. No. 61).[3]

3.    For whatever reason, the Lockton companies have a complex, interrelated corporate structure. The defendants maintain that Lockton Co., whom Mercer has sued, has no employees and no operations, and its sole member is another limited liability company. (Abercrombie Decl. ¶ 5). Ann Abercrombie is the assistant secretary for Lockton Co., as well as the assistant secretary for Lockton Management, LLC, a Delaware limited liability company based in Kansas City, Missouri, and Lockton, Inc., a Missouri S-corporation with its principal place of business in Missouri. (Id. ¶ 3; Dkt. No. 61).

4.    Lockton, Inc., is the holding company for the Lockton organization. Lockton, Inc., has no operations, office, or staff

---

[2] Citations to the "Abercrombie Decl." refer to the Declaration of Ann Abercrombie executed on March 14, 2018, and received by the Court via fax on March 15, 2018.

[3] Lockton Co,'s sole member is Lockton Insurance Agency, LLC, a Missouri limited liability company. Lockton Insurance Agency's sole member is Lockton Operating Companies, LLC, a Missouri limited liability company. Lockton Operating Companies's sole member is Lockton Partners, LLC, a Missouri limited liability company. Lockton Partners's members are LPCM, LLC, a Missouri limited liability company, and various individual members who reside in the District of Columbia and eleven States, none of which is Delaware or New York. LPCM, LLC's sole member is Lockton, Inc., a Missouri corporation with its principal place of business in Missouri. (Dkt. No. 61).

in New York. It is not authorized to do business in New York. (Id. ¶¶ 3, 6).

5.   Lockton Management is the manager of Lockton Co. and each of the Lockton Co. series companies. (Id. ¶ 3).

6.   There are nine operating series of Lockton Co., which together have approximately 3,500 employees. (Id. ¶ 11). The Lockton series companies are organized under the Missouri Limited Liability Company Act. (See id. ¶ 9). Each series is treated by Missouri law as a separate entity for purposes of its debts, liabilities, and obligations incurred, contracted for, or otherwise existing. Each series may sue and be sued in its own name. (Id. ¶ 10 (citing Mo. Rev. Stat. § 347.186.2(1), (2) & (4)).

7.   Pursuant to a shared services agreement, Lockton Management provides each Lockton series with various operational services, including legal services. (Id. ¶ 3).

8.   Lockton Co. holds the insurance licenses for all Lockton series, including the Southeast Series of Lockton Companies, LLC ("Lockton Southeast") and the Northeast Series of Lockton Companies, LLC ("Lockton Northeast"), and enters into contracts on behalf of all of the Lockton series. (Id. ¶¶ 4-5).

9.   Lockton Southeast is a Missouri series limited liability company that has offices in Georgia, North Carolina, South Carolina and Florida. Lockton Southeast is one of the nine operating series affiliated with Lockton Co. Lockton Southeast has approximately

201 employees. Lockton Southeast has its own president, chief operating officer, and executive committee that oversee its operations. (Id. ¶¶ 7, 11). Lockton Southeast services many different lines of insurance business, but it competes with Mercer only in the health and benefits insurance space, which is the scope of Mercer's business. (Id. ¶ 6). Lockton Southeast is headquartered in Atlanta, Georgia. (See March 16 Tr. 120).

10. Lockton Northeast is also one of the nine operating series affiliated with Lockton Co. It is the only series with an office in New York. (Abercrombie Decl. ¶ 5).

11. Each of the Individual Defendants was recruited by representatives of Lockton Southeast and other Lockton entities.

12. The Individual Defendants coordinated their resignations from Mercer and their employments by Lockton Southeast.

13. DiGregorio was employed by Mercer from January, 2010, until January 17, 2018, when he resigned his employment and joined Lockton Southeast. (March 16 Tr. 12, 57, 66). DiGregorio allegedly resides in Parkland, Florida. (Compl. ¶ 13).

14. Steed was employed by Mercer from April, 2007, until January 17, 2018, when she resigned her employment and joined Lockton Southeast. (Lynn Decl. ¶¶ 13, 25). Steed allegedly resides in Hypoluxo, Florida. (Compl. ¶ 14).

15. Preston was employed by Mercer from October, 2006, until January 17, 2018, when she resigned her employment and joined

Lockton Southeast. (Lynn Decl. ¶¶ 19, 25). Preston allegedly resides in Pembroke, Florida. (Compl. ¶ 15).

16. DiGregorio is a Producer Member of Lockton Southeast; Steed and Preston are employees of Lockton Southeast. (Sharma Dep. 12).[4]

**B.**

17. Mercer maintains confidential information concerning its clients in several internal Mercer systems: its accounting system; a proprietary version of technology developed by Salesforce.com, and a Microsoft Access database. (March 16 Tr. 6).

18. The information contained in Mercer's internal systems regarding Mercer clients would be of commercial value to Mercer's competitors. (Id.; Lynn Decl. ¶ 11).

19. Some of the information in these Mercer systems is not available from public sources, including client contact information and notes on the types of services and lines of coverage that Mercer provides to its clients. (March 16 Tr. 7-8).

20. Other portions of the information in Mercer's systems are derived from public sources, such as publicly filed Internal Revenue Service Form 5500s and public company websites. (Id. at 6-7, 58-59). The publicly available information includes: the

---

[4] Citations to the "Sharma Dep." refer to the Transcript of Deposition of Manoj Sharma, taken on March 9, 2018 and attached as Exhibit G to the Reply Declaration of A. Michael Weber (Dkt. No. 33).

benefits that a company uses; the amounts paid out in premiums; plan terms; plan renewal dates; a contact person and a phone number for the entity; the number of people covered; the identity of the broker; the amount paid out in commissions and fees to the broker; and the amount paid out in claims. (Id. at 33-35, 80-81).

21. Access to Mercer's internal client information systems is password-protected and limited to Mercer employees; the systems are not available to the general public. (Id. at 6).

22. Mercer further protects this confidential business information by requiring its employees to sign Confidentiality Agreements and training its employees on their obligations under these Agreements. (Id. at 8-13, 15-16; Plaintiff's Exs. 1, 4, 29, 41).

23. Mercer also requires that employees who receive variable compensation sign a Non-Solicitation Agreement not to solicit certain of Mercer's clients, prospective clients, or employees for one year after leaving Mercer. (March 16 Tr. 15; Plaintiff's Ex. 2).

**C.**

24. DiGregorio began his employment with Mercer as a Principal/Sales Professional in January, 2010. (March 16 Tr. 12, 57).

25. Immediately prior to joining Mercer, DiGregorio worked at Mercer's affiliated company, Marsh USA Inc., as an Associate

Client Executive with a focus on property and casualty liability insurance. (Id. at 98; Lynn Decl. ¶ 6).

26. DiGregorio joined Marsh immediately after graduating from college. (March 16 Tr. 98).

27. Prior to joining Mercer, DiGregorio had limited experience selling employee health and benefits solutions of the type that Mercer provides. (Lynn Decl. ¶ 7).

28. During his employment at Mercer, DiGregorio was responsible for generating new client business and developing business with existing clients. (March 16 Tr. 12, 57).

29. DiGregorio relied on his Mercer colleagues to help him develop client relationships by, for example, handling day-to-day service issues for clients so that he could focus on client development. (Lynn Decl. ¶ 9).

30. Mercer supported DiGregorio's client-facing role by sponsoring client events, financing DiGregorio's membership in professional and networking organizations, and investing in marketing and sales tools, all of which DiGregorio used to form and strengthen client relationships on Mercer's behalf. (Id. ¶ 10).

31. While working at Mercer, DiGregorio gained valuable knowledge of Mercer's clients, including their health and benefits needs and preferences, fees and revenues paid to Mercer, amounts

paid in insurance premiums, recent losses and other risk factors, and plan terms and renewal dates. (<u>Id.</u> ¶ 11).

32. DiGregorio's annual cash compensation at Mercer, including salary and variable compensation, totaled approximately $600,000 in 2017. (March 16 Tr. 99).

33. Steed began her employment with Mercer in or around April 2007. She was a Lead Consultant. (<u>Id.</u> at 16; Lynn Decl. ¶ 13).

34. Steed was responsible for managing directly client relationships and ensuring client retention by evaluating client risks and responding to client needs. (March 16 Tr. 17).

35. Steed served as a primary client contact for day-to-day client needs and client questions. (Lynn Decl. ¶ 14).

36. Steed managed approximately twelve client relationships at Mercer. (<u>Id.</u> ¶ 15).

37. Steed relied on financial and internal resources from Mercer to manage client relationships, and developed client relationships by virtue of her employment and with the support of an experienced team of other Mercer employees, on whom she relied to carry out her job duties. (<u>Id.</u> ¶ 16).

38. Mercer supported Steed's client-facing role by financing client-related travel and entertainment expenses, sponsoring client events, and investing in marketing and sales tools, all of which Steed used to manage and strengthen client relationships on behalf of Mercer. (<u>Id.</u> ¶ 17).

39. Preston began her employment with Mercer in or around October, 2006. Preston was an Enterprise Consulting Analyst. (Id. ¶ 19).

40. Preston managed client relationships and ensured client retention by evaluating client risks and developing solutions to address client needs. (Id. ¶ 20).

41. Preston served as a client contact for day-to-day client needs and client questions. (Id. ¶ 21).

42. Preston assisted Steed in managing approximately twelve client relationships, working hand in hand with Steed and serving as her primary deputy. (Id. ¶ 22)

43. Preston relied on financial and internal resources from Mercer to manage client relationships. (Id. ¶ 23).

44. Preston developed client relationships by virtue of her employment and with the support of an experienced team of Mercer employees, on whom she relied to carry out her job duties on behalf of Mercer. (Id. ¶ 23).

45. DiGregorio, Steed, and Preston each executed a Non-Solicitation Agreement and a Confidentiality Agreement at the start of his or her employment at Mercer. (March 16 Tr. 14, 17-18, 19; Plaintiff's Exs. 1, 2, 29, 30, 35, 36).

46. Under the Non-Solicitation Agreement, each Individual Defendant agreed that he or she would not, for twelve months following his or her departure from Mercer, directly or indirectly

solicit business from or perform services for any Mercer clients or prospective clients with whom he or she had contact or about whom he or she obtained confidential information during his or her last two years of employment for Mercer. (Plaintiff's Exs. 2, 30, 36).

47. Further, each Individual Defendant agreed that he or she would not, for twelve months following his or her departure from Mercer, directly or indirectly solicit employees with whom he or she worked in the last two years of his or her employment, or about whom he or she obtained confidential information. (Plaintiff's Exs. 2, 30, 36).

48. Finally, each Individual Defendant agreed that he or she would not use his or her "position, influence, knowledge of Confidential Information or Trade Secrets or [Mercer's] assets for personal gain." (Plaintiff's Exs. 2, 30, 36).

49. Under the Confidentiality Agreement, each Individual Defendant agreed not to disseminate or disclose to any other person, organization, or entity any of Mercer's "Confidential Information and Trade Secrets," which includes among other information: "client information," including the amounts paid by such clients to Mercer, "personnel information," and information relating to any prospective client. (Plaintiff's Exs. 1, 29, 35).

50. By signing the Confidentiality Agreement, each Individual Defendant acknowledged: (1) that Mercer "is engaged in

a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by [Mercer] at its great effort and expense"; and (2) that "any disclosing, divulging, revealing or using of any of the Confidential Information and Trade Secrets, other than in connection with [Mercer's] business or as specifically authorized by [Mercer], will be highly detrimental to [Mercer] and cause it to suffer serious loss of business and pecuniary damage." (Plaintiff's Exs. 1, 29, 35).

51. Each of the Individual Defendants completed Mercer's training programs regarding his or her obligations under the Confidentiality Agreement. (March 16 Tr. 9-12, 15-16; Plaintiff's Ex. 41).

52. In both the Non-Solicitation Agreement and the Confidentiality Agreement, each Individual Defendant expressly acknowledged that a breach of his or her obligations under either Agreement would cause Mercer irreparable harm, that monetary damages would not be readily calculable and that Mercer would be entitled to temporary and permanent injunctive relief, without the necessity of posting a bond, and recovery of its attorneys' fees. (Plaintiff's Ex. 1, 2, 29, 30, 35, 36).

53. Additionally, in both the Non-Solicitation Agreement and the Confidentiality Agreement, each Individual Defendant agreed

that the Agreement would be construed according to the laws of the State of New York and that "any action or proceeding" arising out of the Agreements or the Individual Defendants' employment must be brought in the Supreme Court of the State of New York, New York County or the United States District Court for the Southern District of New York. (Plaintiff's Ex. 1, 2, 29, 30, 35, 36).

**D.**

54. Lockton Co. is a privately-held company and a competitor of Mercer that also provides clients with health insurance and benefits services, as well as property and casualty insurance services. (March 16 Tr. 23-24).

55. The Lockton companies began recruiting DiGregorio at some point between August and October, 2017. (Id. at 60, 62, 117-18; DiGregorio Dep. 28-31).[5]

56. Hiram Marrero, an executive vice president for Lockton Southeast, made the initial outreach to DiGregorio. (March 16 Tr. 24, 62, 117-18).

57. Earlier in 2017, Marrero had tried to recruit Cory Lynn, Mercer's Florida office leader, who oversaw the office in which the Individual Defendants worked. During several discussions with Lynn, Marrero asked Lynn to list clients Lynn would bring on his

---

[5] Citations to the "DiGregorio Dep." refer to the Transcript of Deposition of Matthew DiGregorio, taken on March 9, 2018 and attached as Exhibit A to the Reply Declaration of A. Michael Weber (Dkt. No. 33).

first day with Lockton Southeast and suggested that Lockton Southeast would (i) advise Lynn on how to avoid liability for breaching his non-solicitation agreement and (ii) pay for Lynn's attorneys' fees if Lynn chose not to honor his non-solicitation obligations. Further, Marrero told Lynn that it was "cheaper" for Lockton to pay attorneys' fees for new employees because Lockton gains new clients from hiring a competitor's employees. (Id. at 24-25, 29-30). Marrero referred to other employees that Lockton Southeast had recruited from other competitors. (Id. at 29).

58. Lynn rebuffed Marrero's recruitment efforts because he was not interested in Lockton and was uncomfortable with what Marrero proposed. (Id. at 29-30).

59. Manoj Sharma, whom Lockton Co. designated as its Fed. R. Civ. P. 30(b)(6) witness, was personally involved in recruiting DiGregorio beginning in September, 2017. (Sharma Dep. 12-13). Sharma is the chief operating officer of Lockton Southeast. (Id. at 6).

60. Although DiGregorio had informed Mercer colleagues of past efforts by competitors to recruit him, he did not disclose to Mercer that he was having discussions with Lockton in 2017. DiGregorio provided no credible explanation for why, contrary to his past practice, he did not disclose to Mercer his discussions with Lockton in 2017. (March 16 Tr. 60-62).

61. Aside from Sharma, DiGregorio met with Marrero and Lockton executives Paige Crozer and Rick Elliott numerous times between September and December, 2017. DiGregorio also met with Lockton Southeast executives Neil Metzheiser and Doug Hutcherson, and spoke on the phone with Paul Bruno, the executive vice president of Lockton Southeast. (Id. at 63, 119-21; DiGregorio Dep. 28, 31, 42-44, 48-50; Sharma Dep. 14, 16-18, 20, 29).

62. DiGregorio also met with a "handful" of individuals whose names he cannot recall in Kansas City, Missouri. (March 16 Tr. 119-22).

63. During his recruitment process, DiGregorio told Steed and Preston that he was considering joining a Lockton entity, and he provided Marrero with the contact information for Steed and Preston. (March 16 Tr. 125; DiGregorio Dep. 53-54, 58-62; Steed Dep. 31, 41-43;[6] Preston Dep. 18-19).

64. Sharma and Marrero also recruited Steed and Preston beginning in or about November, 2017. (Steed Dep. 31-34; Preston Dep. 22-24;[7] Sharma Dep. 31).

---

[6] Citations to the "Steed Dep." refer to the Transcript of Deposition of Joanne Steed, taken on March 9, 2018 and attached as Exhibit C to the Reply Declaration of A. Michael Weber (Dkt. No. 33).

[7] Citations to the "Preston Dep." refer to the Transcript of Deposition of Jada Preston, taken on March 9, 2018 and attached as Exhibit E to the Reply Declaration of A. Michael Weber (Dkt. No. 33).

65. Sharma, Marrero, Crozer, Hutcherson and Metzheiser are described in publicly available documents, including in their own LinkedIn profiles, as employees of "Lockton," "Lockton Companies," or "Lockton Companies, LLC." (Weber Reply Decl. Exs. H, I).[8]

66. Sharma testified that he believes that Trey Humphrey, in-house counsel for a Lockton parent entity, would have discussed DiGregorio's non-solicitation restrictions with DiGregorio during the hiring process, possibly during DiGregorio's Kansas City, Missouri meetings. (Sharma Dep. 29).

67. Sharma explained that there is an "overall, overarching Lockton umbrella," and that the Lockton Co. parent entity receives ten percent of the revenues of the Lockton Series entities in exchange for providing them with legal, financial, employee benefits and technical resources. (Sharma Dep. 7-9).

68. From November, 2017, to January, 2018, Steed and Preston met repeatedly with Sharma and Marrero. (Steed Dep. 31-36; Preston Dep. 16-24).

69. Steed recalls DiGregorio telling her he was going to go to a Lockton entity before he actually resigned, and she herself spoke with Preston more than five times during the same period about joining a Lockton entity. (Steed Dep. 41-43).

---

[8] Citations to the "Weber Reply Decl." refer to Reply Declaration of A. Michael Weber, executed on March 13, 2018 (Dkt. No. 33). Some of the exhibits to this declaration were filed under seal.

**E.**

70.   The Individual Defendants conferred about the date and sequence in which they would resign from Mercer -- first DiGregorio, then Steed, then Preston. (March 16 Tr. 125-26; Steed Dep. 44-45; Preston Dep. 26-27).

71.   On January 17, 2018, within minutes of each other, the Individual Defendants resigned their employment by submitting nearly identical "Notices of Resignation" to Cory Lynn, Mercer's Florida Office Leader. (March 16 Tr. 20-23, 126; Plaintiff's Exs. 5, 31, 37).

72.   DiGregorio, Steed and Preston gave no advance notice of their resignations. (March 16 Tr. 23-24).

73.   Steed and Preston's resignation letters to Lynn stated that each "plan[ned] on accepting a position at Lockton"; DiGregorio did not disclose to Lynn where he was going. (Plaintiff's Exs. 31, 37; see March 16 Tr. 20-22).

74.   Later on January 17th, Lockton Inc. announced DiGregorio's appointment as senior vice president for Lockton Southeast's South Florida operation. Lockton Inc.'s announcement stated that DiGregorio would "advise clients . . . on employee benefits programs" and touted his experience both as "a principal with Mercer Health & Benefits based in Fort Lauderdale" and as a member of several "professional associations" (for which Mercer had paid DiGregorio's membership fees). See

https://www.lockton.com/newsroom/post/digregorio-will-join-lockton-as-senior-vice-president-in-florida (last visited April 2, 2018).

75. The press release announcing DiGregorio's hiring was issued on January 17, 2018, and remains publicly available on Lockton Inc.'s website. See http://www.lockton.com/newsroom/post/digregorio-will-join-lockton-as-senior-vice-president-in-florida (last visited April 2, 2018). (Weber Supp. Reply Decl. Ex. D).[9]

76. The press release states that "Lockton is a global professional services firm with 6,500 Associates." (Id.)

77. The press release also includes three Media Contacts, each of whom has a Kansas City, Missouri phone number. (Id.)

78. The Terms of Use for www.lockton.com, where the press release is posted, are available at https://www.lockton.com/terms-of-use (last visited April 2, 2018). (Weber Supp. Reply Decl. Ex. E). The Terms of Use indicate that the website is operated by Lockton, Inc., and that inquiries should be directed to Lockton, Inc. (Id. at 1, 11).

79. On or about January 19, 2018, just two days after their abrupt resignations, the Individual Defendants began soliciting

---

[9] Citations to the "Weber Supp. Reply Decl." refer to the Supplemental Reply Declaration of A. Michael Weber, executed and received by the Court via fax on March 15, 2018.

clients with whom they had contact at Mercer. (Lynn Decl. ¶ 29; Pernice Decl. ¶ 6; Marini Decl. ¶¶ 6-9).[10]

80. Specifically, during the week of January 22, 2018, the Vice President for Human Resources for one of Mercer's current clients told Joanna Marini, a Mercer principal, that DiGregorio had telephoned the prior Friday and told this Vice President for Human Resources that he had resigned his position at Mercer and accepted a position at Lockton. (Lynn Decl. ¶¶ 30-31; Marini Decl. ¶¶ 1, 9).

81. On January 31, 2018, during a meeting with representatives of another Mercer client, the client representatives told Maggie Novo-Chavarry, another Mercer principal, that Steed and Preston met with them after resigning from Mercer and attempted to sell them health and benefit services on behalf of Lockton Companies. (Lynn Decl. ¶¶ 32-33; Novo-Chavarry Decl. ¶¶ 1, 5-8).[11]

82. On February 7, 2018, Marini received two emails from the chief financial officer of a Mercer client, forwarding emails that

---

[10] Citations to the "Pernice Decl." refer to the Declaration of Denise Pernice executed on February 26, 2018 (Dkt. No. 26), and citations to the "Marini Decl." refer to the Declaration of Joanna Marini executed on February 26, 2018 (Dkt. No. 27).

[11] Citations to the "Novo-Chavarry Decl." refer to the Declaration of Maggie Novo-Chavarry executed on February 26, 2018 (Dkt. No. 28).

the chief financial officer had received from DiGregorio. (Lynn Decl. ¶ 34; Marini Decl. ¶¶ 10-13 & Ex. G).

83. Also on February 7th, Denise Pernice, another Mercer principal, received a forwarded copy of a text message that a Mercer client had received from DiGregorio discussing DiGregorio's new position at Lockton. (Lynn Decl. ¶¶ 35-36; Pernice Decl. ¶ 9 & Ex. F).

84. On February 15, 2018, Pernice and Lynn met with the Owner and the chief financial officer of a restaurant client that Steed and Preston had serviced while employed at Mercer. (Lynn Decl. ¶ 39; Pernice Decl. ¶ 13). During that meeting, the chief financial officer stated that the restaurant was considering moving its business to a different vendor. (Lynn Decl. ¶ 39; Pernice Decl. ¶ 14). He acknowledged that he had recently met Steed and Preston, and that he was considering moving his business to a Lockton entity. (Lynn Decl. ¶ 39; Pernice Decl. ¶ 14). Notably, this client was unaware that the Individual Defendants were subject to non-solicitation agreements and upon learning that fact, responded that he "didn't want to get anybody in trouble." (Pernice Decl. ¶ 15).

85. Then, on February 22, 2018, Planned Parenthood of South, East and North Florida ("Planned Parenthood"), a client formerly serviced by Steed and Preston, terminated its relationship with

Mercer to engage the services of a new vendor. (Lynn Decl. ¶ 40; Fava Decl. ¶ 7 & Ex. H).[12]

86. Mercer learned the following day that Planned Parenthood had engaged a Lockton entity as its new insurance broker of record. (Lynn Decl. ¶ 41; Fava Decl. ¶ 8).

## F.

87. Prior to their depositions in this matter, each of the Individual Defendants declared, in identical language: "I did not retain any documents concerning client pricing, preferences, or renewal dates." (Dkt. Nos. 14-16).

88. Each of the Individual Defendants also claimed, in nearly identical resignation notices, that upon resigning from Mercer, he or she had conducted a thorough search and possessed no confidential Mercer material. (Plaintiff's Exs. 5, 31, 37).

89. DiGregorio conceded that on October 11, 2017, after beginning discussions with Lockton Southeast in August or September of 2017, he sent nine emails from his work account to his personal email account. The emails contained Mercer information. DiGregorio had no explanation for why he suddenly sent these emails at that time. (March 16 Tr. 64-65, 149-50; DiGregorio Dep. 110-31; Plaintiff's Ex. 8, 9, 13-17). DiGregorio

---

[12] Citations to the "Fava Decl." refer to the Declaration of Melanie Fava executed on February 26, 2018 (Dkt. No. 29).

also conceded, however, that one of his thoughts was to use the information at Lockton Southeast. (March 16 Tr. 64).

90.  Just prior to sending these emails to himself on October 11, 2017, DiGregorio attended an internal meeting at Mercer about a proposed redesign of compensation goals, in which he expressed his dissatisfaction with the proposal. (March 16 Tr. 148-49).

91.  Between November 13, 2017, and November 16, 2017, DiGregorio sent himself nine more emails from his work account to his personal email account. In or around the same timeframe, DiGregorio used the application "Airdrop" to transfer his Outlook contact list to his personal computer, which ultimately synced with his Lockton computer. (March 16 Tr. 128-29; DiGregorio Dep. 75, 82, 131-51; Plaintiff's Ex. 18, 20, 21, 23).

92.  Airdrop is a way to transfer information from one Apple device to another Apple device over a wireless network. (March 16 Tr. 128-29; DiGregorio Dep. 75).

93.  The emails DiGregorio sent to himself included: (i) an "Active Account Listing" marked "Confidential" containing client names together with consultant and office assignments (Plaintiff's Ex. 8); (ii) a "Marsh 2017 Prospect List" spreadsheet, containing hyperlinks to prospect company websites, leadership profiles and company news (Plaintiff's Ex. 9); (iii) a Florida Pipeline Report marked "Confidential Information: Do Not Distribute" and containing information about recently closed or anticipated Mercer

deals (Plaintiff's Ex. 13); (iv) an "MMA Florida Client List" (Plaintiff's Ex. 14); and (v) an email that contained hundreds of email addresses taken from DiGregorio's Outlook contact list at Mercer (Plaintiff's Ex. 17; see March 16 Tr. 85-86).

94. DiGregorio emailed everyone whose contact information was in his Mercer Outlook list to announce that he had left Mercer and moved to Lockton; he does not know how many people received that email. (March 16 Tr. 129-30).

95. DiGregorio testified that in October, 2017, he believed that "it was OK to take" this material from Mercer because "it was partly [his] work product." (Id. at 64).

96. DiGregorio described why he sent himself this material: "to have access to information relative to future clients." (DiGregorio Dep. 113-14).

97. He continued, "some of them were for business purposes and some of them were documents I thought would be helpful in the future if I decided to leave." (Id. at 173).

98. In response to questioning by the Court, DiGregorio stated that he wanted to use "the same documents that [he] had developed at Mercer when [he] went to Lockton." (March 16 Tr. 64).

99. DiGregorio still has copies of some of the Mercer documents that he emailed himself in his personal email account. (DiGregorio Dep. 159).

100. DiGregorio became aware that he retained these copies of Mercer documents "around the time of the lawsuit" -- i.e., before stating in his Declaration that he retained no Mercer materials other than his contact list. (Id. at 162-63; see DiGregorio Decl. ¶ 11).[13]

101. DiGregorio also stated that as to those Mercer emails and documents that he did not delete, he "didn't believe those were . . . proprietary or confidential to Mercer." (March 16 Tr. 67). Some of these documents contain nonpublic information, such as Mercer's capabilities and intended prospects. (See Plaintiff's Exs. 9, 15, 23).

102. Steed and Preston also emailed confidential information from their work accounts to their personal accounts during their recruitment by Lockton Southeast. During the same week that DiGregorio sent nine emails containing confidential information from his Mercer account to his personal account, Steed emailed herself a list of Mercer clients, including annual revenues derived from those clients, and a list of all Florida-based Mercer employees and their contact information. (Steed Dep. 76-81; Weber Reply Decl. Ex. D).

103. Just one day earlier, Preston emailed herself a Statement of Work for a Mercer client, which set forth "the scope

---

[13] Citations to the "DiGregorio Decl." refer to the Declaration of Matthew DiGregorio, executed on March 7, 2018 (Dkt. No. 14).

of [Mercer's] work and the compensation for [the] engagement."
(Weber Reply Decl. Ex. F).

104. Steed testified that she did not send herself her full
Mercer contact list, contrary to the statement in her Declaration,
but rather Airdropped "selected" contacts to take based on her
"thoughts of which ones [she] wanted to have." (Steed Dep. 56; see
Steed Decl. ¶ 5).

105. Steed did not mail out a general announcement regarding
her move to Lockton; instead, on the day she resigned, Steed
individually telephoned "13 to 15" Mercer clients, specifically
told them of her move and followed up by email with her new contact
information. (Steed Dep. 12, 17, 65-67).

106. Earlier, in December, 2017, Steed had told the chief
operating officer of Planned Parenthood, a Mercer client at the
time, that she was thinking of moving to Lockton. (Id. at 73-74).

107. Similarly, Preston individually telephoned "certain"
Mercer clients to tell them that she had left Mercer for Lockton.
(Preston Decl. ¶ 10; see Preston Dep. 48).

108. Following her resignation, Steed met with at least three
Mercer clients with whom she had previously worked to "talk about
Lockton['s] capabilities." (Steed Dep. 17-25).

109. DiGregorio attended at least two of Steed's meetings
with Mercer clients after they both joined Lockton Southeast. (Id.
at 18, 24).

110. DiGregorio admitted that he solicited two Mercer clients on Lockton Southeast's behalf after leaving Mercer in January, 2018. (March 16 Tr. 150-52).

111. Sharma attested in his Declaration that "[e]ach of the individual defendants were told not to solicit or recruit other Mercer employees." (Sharma Decl. ¶ 8).[14]

112. Sharma testified that he "do[es] not believe" that anyone at Lockton Southeast asked DiGregorio "about any restrictions he had on joining Lockton," but assumes that Trey Humphrey would have asked DiGregorio about such restrictions. (Sharma Dep. 27; see Sharma Dep. 29, 46-48).

113. The Individual Defendants do not recall anyone from any Lockton entity asking them about the specific content of their non-solicitation obligations. DiGregorio recalls telling individuals from a Lockton entity that he did not know whether he had any restrictions, and Steed and Preston are not sure what restrictions their Mercer Non-Solicitation Agreements impose. (DiGregorio Dep. 51-52; Steed Dep. 26-27; Preston Dep. 26).

114. DiGregorio testified that he told representatives of a Lockton entity that he did not recall whether he had a non-solicitation agreement, and that no one from any Lockton entity followed up with him to find out whether in fact he had one. (March

---

[14] Citations to the "Sharma Decl." refer to the Declaration of Manoj Sharma, executed on March 7, 2018 (Dkt. No. 17).

16 Tr. 94-96). It is not credible that DiGregorio was unaware that he had a non-solicitation agreement with Mercer or that Lockton would be so unconcerned about the issue that it would not follow up, particularly when Lockton hired a lawyer to represent DiGregorio before he left Mercer.

115. Lockton Southeast required DiGregorio to sign a non-solicitation agreement that lasts at least two years. (Id. at 124; Sharma Dep. 35-36).

116. A Lockton entity retained Lyle Shapiro, Esq., as counsel for the Individual Defendants in or about October or November, 2017 -- nearly three months before they resigned their positions at Mercer. (March 16 Tr. 65-66; DiGregorio Dep. 66-67; Steed Dep. 15).

117. Shapiro met with each Individual Defendant in person in early December, 2017, and later advised the Individual Defendants concerning the resignation letters they submitted to Mercer on January 17, 2018. (March 16 Tr. 66; DiGregorio Dep. 67-68; Steed Dep. 44; Preston Dep. 27-28).

118. DiGregorio testified that Hiram Marrero and Trey Humphrey were also present when he met with Shapiro. (March 16 Tr. 91).

119. DiGregorio testified that after meeting with Shapiro in December and taking instruction regarding Mercer documents and information, he went through his emails, "delete[d] those

documents that [he] believed to be proprietary and confidential to Mercer," and "deleted the delete file." (March 16 Tr. 66-67; see March 16 Tr. 70-73, 133-34).

120. At the time he scrubbed his personal email file, DiGregorio and his lawyer should have anticipated litigation over the circumstances of his resignation from Mercer and his hiring by Lockton Southeast. However, it appears at this point that the documents DiGregorio destroyed in his personal email account remained in the Mercer email system and that Mercer later retrieved the emails from its system.

121. A Lockton entity is paying the Individual Defendants' attorneys' fees in this action, pursuant to indemnification and hold-harmless clauses in their agreements with Lockton. (March 16 Tr. 71, 88-89, 92; DiGregorio Dep. 6-9; Steed Dep. 8; Preston Dep. 8-9).

122. As early as January 23, 2018, Mercer reminded the Individual Defendants of their contractual obligations and informed Lockton Southeast of the breaches. Specifically, Jeffery Rosier, senior employment counsel for MMC, sent cease-and-desist letters to each Individual Defendant and emailed copies of these

letters to counsel for Lockton Southeast. (March 16 Tr. 152-53; Rosier Decl. ¶¶ 5-9 & Exs. I-L).[15]

123. On or about January 31, 2018, after learning that Steed and Preston had visited a Mercer client to pitch work, Rosier again emailed an attorney for Lockton to ask the attorney to "escalate th[e] matter quickly so that it does not get out of hand." (Rosier Decl. ¶ 11; see Rosier Decl. ¶ 10 & Ex. M). Rosier ended his email by stating, "[w]e expect Ms. Steed and Ms. Preston to honor their obligations, but it appears they are presently ignoring them." (Rosier Decl. Ex. M) The Lockton attorney acknowledged receipt of the email. (Rosier Decl. ¶ 12 & Ex. M).

124. On March 20, 2018, Mercer's representatives received an email relating to DiGregorio from Chris Ryan, executive vice president, human resources for The GEO Group, Inc. (Snook Decl. ¶ 18; Weber Second Supp. Decl. ¶ 2 & Ex. A).[16]

125. The GEO Group is a current client of Mercer for defined contribution advisor services, and Mercer had been meeting with GEO Group representatives for over a year to discuss and pitch an

---

[15] Citations to the "Rosier Decl." refer to the Declaration of Jeffery Rosier, executed on February 27, 2018 (Dkt. No. 30).

[16] Citations to the "Snook Decl." refer to the Supplemental Declaration of Matthew Snook, executed on March 28, 2018 (Dkt. No. 46); citations to the "Weber Second Supp. Decl." refer to the Second Supplemental Declaration of A. Michael Weber, executed on March 28, 2018 (Dkt. No. 47).

expansion into health and benefits services. (Snook Decl. ¶¶ 4-16).

126.    DiGregorio was integral to Mercer's discussions with The GEO Group, and in the course of these discussions, he provided The GEO Group with confidential analyses generated from a proprietary Mercer database. (Snook Decl. ¶¶ 4-14).

127.    Ryan's March 20th email informed Mercer that, among other things, The GEO Group had been in ongoing discussions with Lockton "since last year" for the same services that Mercer had been discussing with them and that "a Lockton representative from Kansas City" had informed The GEO Group that Lockton had recruited DiGregorio. (Weber Second Supp. Decl. Ex. A; see Weber Second Supp. Decl. ¶¶ 2, 14).

128.    The GEO Group has taken its health and benefits insurance business to a Lockton entity and, after DiGregorio joined Lockton Southeast, GEO requested that DiGregorio be permitted to service their account. (Snook Decl. ¶¶ 18, 19). However, it appears that The GEO Group turned to the Kansas City Series of Lockton Companies rather than Mercer because of a contact wholly independent of DiGregorio, Steed, or Preston. (Runnion Decl. ¶ 5).[17]

---

[17] Citations to the "Runnion Decl." refer to the Declaration of Brooke E. Runnion, executed on March 30, 2018 (Dkt. No. 54).

## CONCLUSIONS OF LAW

### A.

1.    The Court exercises original subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the plaintiffs and the defendants, and the amount in controversy exceeds $75,000.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the forum selection clause in each Individual Defendant's Non-Solicitation Agreement and Confidentiality Agreement with Mercer provides that this Court is the only federal venue for any action arising out of those Agreements or the Individual Defendants' employment with Mercer.

### B.

3.    Lockton Co. argues that this Court cannot exercise personal jurisdiction over it because it does not conduct any business in New York.[18] Mercer principally asserts that Lockton Co. is subject to general personal jurisdiction in New York pursuant to N.Y. C.P.L.R. § 301 because Lockton Co. "does business" in the state.[19]

---

[18] The Individual Defendants do not dispute that they are subject to this Court's personal jurisdiction.

[19] Mercer also asserts that the Court can exercise specific personal jurisdiction over Lockton Co. pursuant to N.Y. C.P.L.R. § 302(a)(3). That provision permits a court to exercise specific jurisdiction over any party that "commits a tortious act without the [S]tate causing injury to person or property within the [S]tate" if the party either (i) regularly conducts or solicits business in the State or derives substantial revenue from within the State, or (ii) expects or

4. "Likelihood of success on the merits also applies to the question of whether [the] plaintiff has personal jurisdiction over the defendant." Pan Atl. Grp., Inc. v. Quantum Chem. Co., No. 90-cv-5155, 1990 WL 180160, at *1 (S.D.N.Y. Nov. 8, 1990).

5. "Under the Federal Rules of Civil Procedure, a [c]ourt may exercise jurisdiction over any defendant 'who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located,' Fed. R. Civ. P. 41(k)(1)(a), provided of course that such an exercise of jurisdiction comports with the Fifth Amendment's Due Process Clause." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000).

6. Under New York law, a foreign corporation may be subject to general personal jurisdiction -- i.e., jurisdiction over any and all claims -- when the company is "doing business" in New York. Wiwa, 226 F.3d at 95 (citing N.Y. C.P.L.R. § 301). To comport with the Due Process Clause, a court may exercise general jurisdiction over a foreign corporation only when the

---

reasonably should have expected the act to have consequences in the State and derives substantial revenue from interstate or international commerce. N.Y. C.P.L.R. § 302(a)(3). Mercer does not make any substantive argument in support of jurisdiction on this basis and thus has not shown that is it likely to succeed in establishing that Lockton Co. is subject to personal jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(3).

corporation's affiliations with the State in which suit is brought are so constant and pervasive "as to render [it] essentially at home in the forum State." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011); see Daimler AG v. Bauman, 134 S. Ct. 746, 751 (2014). If the forum State is the corporation's principal place of business or its place of incorporation, then the corporation is "at home" in that State and the exercise of general jurisdiction is appropriate. See Daimler, 134 S. Ct. at 760.

7.    In support of its argument that the Court lacks general personal jurisdiction, Lockton Co. asserts that it is not headquartered in New York, it was not incorporated in New York, and that it does not have an office in New York or conduct any business there. Abercrombie Decl. ¶¶ 4-5. Lockton Co. argues that it thus lacks sufficient contacts with New York to render it "at home" here.

8.    In response, Mercer argues that the Court has general jurisdiction over Lockton Co. not because of Lockton Co.'s own contact with the state, but according to the "mere department" theory of general jurisdiction set forth by the Second Circuit Court of Appeals in Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp. ("Beech Aircraft"), 751 F.2d 117 (2d Cir. 1984).

9.    In that case, the Court of Appeals held that, while "the presence of a local corporation does not create

jurisdiction over a related, but independently managed, foreign corporation," personal jurisdiction may exist over a foreign corporation whose "control [over a local subsidiary] extends far beyond mere ownership," such that the local subsidiary is the "mere department" of the foreign corporation. Id. at 120.

10.  The Court of Appeals set forth several factors to consider when determining whether a local subsidiary is the "mere department" of a foreign parent corporation. As a threshold matter, there must be common ownership between the foreign entity and the domestic entity to support a finding of personal jurisdiction under the "mere department" theory. Id. at 120. If that threshold requirement is satisfied, then a court must consider three additional factors: (1) the financial interdependency of the domestic and foreign entities; (2) the degree to which one entity interferes in the selection and assignment of the other's executive personnel and the extent to which the corporations observe corporate formalities; and (3) the degree of control exercised by the parent over the subsidiary's marketing and operational policies. Id. at 121-22.

11.  Beech Aircraft is a decision from 1984. The Supreme Court has recently handed down two important decisions regarding general personal jurisdiction over corporations -- Goodyear Dunlop Tires Operations, S.A. v. Brown and Daimler AG v. Bauman.

Mercer has not addressed the impact of these decisions on the "mere department" theory of general personal jurisdiction.

12.  In Daimler, the Supreme Court considered the reach of general personal jurisdiction over a foreign corporation, Daimler, which had an indirect subsidiary with contacts to California, MBUSA. The plaintiffs argued that Daimler was subject to general personal jurisdiction in California because of the presence of MBUSA under an agency theory, which considered whether the local subsidiary "performs services that are sufficiently important to the foreign corporation that if [the parent] did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." 134 S. Ct. at 759. The plaintiffs argued that the subsidiary's sales and other operations in California were sufficiently important to the parent company to justify an exercise of general jurisdiction over the parent. Id. While the Supreme Court declined to decide whether the agency theory was sufficient for constitutional purposes, the Court noted that the agency theory's focus on the "importance" of the subsidiary "stacks the deck" in favor of a finding of jurisdiction, and that the agency theory may subject foreign corporations to general jurisdiction in scenarios far beyond the limits of the Due Process Clause explained in Goodyear. Thus, the Daimler Court expressed doubt as to the

constitutionality of general jurisdiction over a foreign entity based on an agency theory that focuses on the importance of the related local entity. The Supreme Court ultimately found dispositive that neither Daimler nor MBUSA were incorporated in California, and neither had its principal place of business there. Neither Daimler nor MBUSA were "at home" in California. Thus, it was error to subject Daimler to general jurisdiction in California even if MBUSA's contacts with California were attributable to Daimler. Id. at 761-62.

13. It is unclear what effect, if any, Daimler has on the continued vitality of the "mere department" theory of general jurisdiction set forth in Beech Aircraft. The Second Circuit Court of Appeals has not endorsed the "mere department" theory -- or any theory based on a local subsidiary presence -- after Daimler. See Am. Lecithin Co. v. Rebmann, No. 12-cv-929, 2017 WL 4402535, at *6 n.6 (S.D.N.Y. Sept. 30, 2017) ("In Daimler AG v. Bauman, the Supreme Court expressed some doubt regarding the ongoing viability of mere department theory, but th[e] [Court of Appeals] has not definitely addressed this issue." (citation omitted)). Judges in this District have taken varying views of Daimler's effect on the "mere department" theory. See, e.g., SPV OSUS Ltd. v. AIA LLC, No. 15-cv-619, 2016 WL 3039192, at *3 (S.D.N.Y. May 26, 2016) (applying the "mere department" test post-Daimler); In re Aluminum Warehousing

Antitrust Litig., 90 F. Supp. 3d 219, 227-228 (S.D.N.Y. 2015) (recognizing that the agency and "mere department" theories have "at the very least been called into doubt by Daimler"). Judge Kaplan, for example, has read Daimler to "express[] some doubt about the constitutionality of subjecting a company to general jurisdiction under the[] mere department or agency theory." NYKCool A.B. v. Pacific Intern Servs. Inc., 66 F. Supp. 3d 385, 393 (S.D.N.Y. 2014).

14. The "mere department" test is not exactly the same as the agency theory the Supreme Court disapproved of in Daimler. The "mere department" theory does not consider the same factors or have the same requirements as an agency theory. See, e.g., Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998) (noting that the agency theory and the "mere department" theory set forth in Beech Aircraft are two distinct bases for general personal jurisdiction and noting the differences in the tests). The "mere department" test does not focus solely on whether the parent corporation would perform the services if the subsidiary was absent from the jurisdiction. Rather, the "mere department" test considers a variety of factors including, common ownership, financial interdependency, compliance with corporate formalities, and indicia of the parent dominating the operations of the subsidiary.

15. The factors considered in the "mere department" test are closer to yet another theory of general jurisdiction -- the alter ego theory. See Wilmington Tr. Co. v. Hellas Telecommunications, S.à.r.l., No. 12-cv-8686, 2016 WL 7339112, at *9 (S.D.N.Y. Aug. 4, 2016) ("Beech is often used to determine alter ego responsibility for jurisdictional purposes."); SAT Int'l Corp. v. Great White Fleet (US) Ltd., No. 03-cv-7481, 2006 WL 661042, at *14 (S.D.N.Y. Mar. 16, 2006) (noting that the "[f]actors that may be used by a court in determining whether to pierce the corporate veil under an alter ego theory . . . [to find] personal jurisdiction" include the absence of corporate formalities, overlap in executives between the two companies, the amount of discretion exercised by the subsidiary, and whether the corporations are treated as independent profit centers).

16. To the extent the "mere department" theory has survived Daimler, Mercer has not shown that it is likely to succeed in showing that there is an entity that is "at home" in New York State that is a "mere department" of Lockton Co. On the current record, the only Lockton entity with even one office in New York is Lockton Northeast. (Abercrombie Decl. ¶ 5). But the Lockton series companies are organized under Missouri law, not New York law, and there is no evidence that Lockton Northeast has its principal place of business in New York. (Id. ¶ 9).

Therefore, Mercer has not shown that it is likely to succeed in showing that there is personal jurisdiction over Lockton Co. based on the existence of any "mere department" that is "at home" in New York.

17. Moreover, even if Mercer could demonstrate that Lockton Northeast is "at home" in New York, Mercer has not come close to showing that Lockton Co. is subject to general personal jurisdiction here by virtue of the "mere department" theory.

a. Mercer has not established the indispensable prerequisite of the "mere department" theory, namely that Lockton Co. and Lockton Northeast are commonly owned. See Beech Aircraft, 751 F.2d at 120.

b. With respect to financial interdependency, a plaintiff must show that at least one of the companies "cannot run its business without the financial backing" of the other. Am. Lecithin Co., 2017 WL 4402535, at *7. Mercer has failed to show this level of interdependence.

c. The third factor considers the level of control exercised by the corporate parent over the selection and assignment of the local subsidiary's personnel, together with the degree to which both corporations respect corporate formalities. There is no evidence at this point that Lockton Co. and Lockton Northeast fail to observe corporate formalities. While DiGregorio met with

representatives from Lockton parent entities in Kansas City, Missouri during his recruitment, it is unclear whether those representatives were personnel of Lockton Co., the only entity that Mercer has sued. The defendants maintain that Lockton Co. holds the insurance licenses for the Lockton series companies but does not actually have any personnel and does not interfere in the personnel decisions of the Lockton series companies.

d.     Finally, there is no evidence that Lockton Co. exercises control over Lockton Northeast's marketing and operational policies. Mercer points to a press release issued by Lockton Inc. that announced the hiring of DiGregorio, which lists three Kansas City, Missouri contact phone numbers, does not mention Lockton Southeast, and directs inquiries to Lockton Inc. But there is no evidence that Lockton, Inc., is the same company as Lockton Co., the defendant. And whatever evidence there may be about the involvement of Lockton parent entities in announcing the hiring of DiGregorio by Lockton Southeast, there is no evidence of the connection between Lockton Co. and marketing by Lockton Northeast, which is the relevant inquiry for general jurisdiction in New York.

18.   In sum, Mercer has not shown that it is likely to succeed in its claim that this Court has general jurisdiction over Lockton

Co. in New York. Discovery may develop sufficient evidence of general jurisdiction or specific jurisdiction over Lockton Co. or one or more of the other Lockton entities, but Mercer has not produced such evidence yet. Mercer therefore is not entitled to any preliminary injunction against Lockton Co.

### C.

19. "[A] party seeking a preliminary injunction must establish (1) irreparable harm," "(2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party," and (3) that the preliminary injunction is in the interest of the public. Oneida Nation of New York v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation marks omitted).

20. Mercer seeks a preliminary injunction enforcing the Non-Solicitation and Confidentiality Agreements, which are substantially the same as the restrictive covenants this Court preliminarily enforced in Marsh USA Inc. v. Karasaki, No. 08-cv-4195, 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008). See also Marsh USA Inc. v. Schuhriemen, 183 F. Supp. 3d 529 (S.D.N.Y. 2016) (issuing a preliminary injunction substantially similar to the injunction in Karasaki based on substantially similar restrictive covenants). But cf. Marsh USA, Inc. v. Alliant Ins. Servs., Inc., 26 N.Y.S.3d

725 (Table), at *3-*4 (Sup. Ct. Oct. 19, 2015) (finding a Marsh non-solicitation agreement unenforceable because the former Marsh employees retained only rolodexes and because insurance brokers are not "unique or extraordinary employees"). Mercer is therefore entitled to a preliminary injunction of the same scope as the one authorized in Karasaki.

### D.

21. "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (internal quotation marks omitted). A plaintiff must establish "that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent." Grand River Enters. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). Furthermore, "[i]rreparable harm is 'injury for which a monetary award cannot be adequate compensation.' " Int'l Dairy Foods Assoc. v. Amestoy, 92 F.3d 67, 71 (2d Cir. 1996) (quoting Jackson Dairy Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam)). If an adequate remedy at law exists, no preliminary injunction may issue. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004); see also Karasaki, 2008 WL 4778239, at *13.

22. As the plaintiff argued in <u>Karasaki</u>, Mercer argues that it will suffer irreparable harm in the form of additional lost clients, lost customer goodwill, and additional lost employees in the absence of a preliminary injunction. Mercer also argues that these injuries are not readily quantifiable and that they are actual and imminent, pointing to current clients that have recently been pursued by Lockton Southeast that are lost or at risk of being lost. The Individual Defendants argue that any lost client accounts can be adequately compensated by a monetary award.

23. It is well established in this Circuit that the loss of client relationships and customer goodwill that results from the breach of a non-compete clause generally constitutes irreparable harm. <u>Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.</u>, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (collecting cases). As the Court of Appeals for the Second Circuit has recognized, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." <u>Ticor Title Ins. Co. v. Cohen</u>, 173 F.3d 63, 69 (2d Cir. 1999). Mercer's loss of current clients and goodwill resulting from the defendants' alleged breaches of their non-solicitation agreements is no exception. The total monetary value of Mercer's loss of clients would be very difficult, if not impossible, to calculate with any exactitude. Nor could the lost goodwill that Mercer has built with

these clients be easily quantified and compensated. _See also_ _Karasaki_, 2008 WL 4778239, at *14.

24. In this case, the Individual Defendants met with Lockton representatives repeatedly over a period of months while still employed with Mercer, and emailed confidential Mercer documents to their personal email accounts during the same period; orchestrated simultaneous resignations from Mercer; sent Mercer clients targeted announcements of their move to Lockton Southeast; sought and held meetings with several Mercer clients after joining Lockton Southeast; and persuaded at least one Mercer client, Planned Parenthood, to move its business to Lockton Southeast.

25. Mercer clients have corroborated that the Individual Defendants have pursued their business after joining Lockton Southeast.

26. This conduct, which has persisted even after Mercer informed the Individual Defendants of their breaches and their continuing obligations, demonstrates that injunctive relief is warranted. The Individual Defendants' violations of their Non-Solicitation Agreements "threaten to cause [Mercer] irreparable harm by luring away the business of a number of long-term [Mercer] clients." _Johnson Controls, Inc._, 323 F. Supp. 2d at 532.

27. The Individual Defendants have targeted significant Mercer clients, with whom they developed relationships by virtue of their employment with Mercer. As a result of the Individual

Defendants' conduct, Mercer has already lost at least one client relationship (Planned Parenthood), while the Individual Defendants have actively attempted to divert other current Mercer clients to Lockton Southeast. These losses, and the accompanying loss of goodwill with the concerned customers, cannot be adequately compensated by monetary damages. See Uni-World Capital L.P. v. Preferred Fragrance, Inc., 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014).

28. Mercer has also been deprived of the time and opportunity to transition clients from the Individual Defendants to other Mercer employees without interference. See, e.g., Johnson Controls, 323 F. Supp. 2d at 532 ("[T]he purpose behind the non-compete clauses is to allow [the plaintiff] a brief period to transfer the client relationships maintained through [the defendants] to their replacements[.] [T]hat benefit is inexorably lost by the failure to enforce the clauses immediately."). Mercer stands to lose additional client relationships and goodwill that would produce indeterminate revenue in the future. See id.

29. Further, each Individual Defendant expressly acknowledged that "irreparable injury will result to [Mercer] in the event of a breach by the Employee of his/her obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor." (Plaintiff's Exhibits 1, 2, 29, 30, 35, 36). In the Second Circuit, such contractual provisions, while not

45

dispositive, support a finding of irreparable harm. See, e.g., N. Atl. Instruments Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999) (relying on former employee's acknowledgement that a breach of his agreement would cause "irreparable injury" to the employer); Devos, Ltd. v. Record, No. 15-cv-6916, 2015 WL 9593616, at *10 (E.D.N.Y. Dec. 24, 2015) (finding irreparable harm where the restrictive covenant agreement stated that a breach would cause irreparable injury, that damages would be unascertainable in monetary terms, and that the plaintiff would have no adequate remedy at law); Uni-World Capital, 73 F. Supp. 3d at 236-37 (citing provision that any breach of the non-compete agreement "may result in irreparable harm and continuing damages to the Employer and its business and that the Employer's remedy at law for any such breach or anticipated or threatened breach will be inadequate").

**E.**

**1.**

30.  Mercer has established a likelihood of success on some of its breach of contract claims (Claims I, II, and III). As in Karasaki, Mercer will likely be able to prove that the Non-Solicitation and Confidentiality Agreements are enforceable in part. Mercer is also likely to establish that the Individual Defendants breached the enforceable elements of those Agreements.

31.  Under New York law, "[t]he issue of whether a restrictive covenant not to compete is enforceable by way of an injunction

depends in the first place upon whether the covenant is reasonable in time and geographic area." Ticor Title Ins. Co., 173 F.3d at 69 (citing Reed, Roberts Assocs. v. Strauman, 353 N.E.2d 590 (N.Y. 1976)). In determining whether a restrictive covenant is reasonable, courts must balance the employer's legitimate business concerns with New York's strong public policy against causing a person to lose the ability to earn a livelihood. Id. at 69. "A restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999) (emphases omitted); see also Karasaki, 2008 WL 4778239, at *15.

32. The Non-Solicitation and Confidentiality Agreements in this case are reasonably limited in time and geographical scope. Although the Agreements do not contain a geographical limitation, the Individual Defendants do not raise any objection to the Agreements' geographical reach, and there is no evidence that the Individual Defendants solicited or serviced clients for Mercer other than in the Southeast area, which Lockton Southeast also services. The Agreements do set a very reasonable time limitation -- they restrict the Individual Defendants from soliciting covered clients for one year after leaving Mercer. The provision is further limited because it only applies to Mercer clients with whom the

Individual Defendants had contact or obtained confidential information about in the last two years of their employment with Mercer. The Individual Defendants do not and cannot argue that these time limitations are unreasonable. New York courts have routinely found longer restrictions reasonable. See id. at *16 (citing Willis of New York Inc. v. DeFelice, 750 N.Y.S.2d 39, 41-42 (1st Dep't 2002)); see also Oliver Wyman, Inc. v. Eielson, 282 F. Supp. 3d 684, 695-96 (S.D.N.Y. Sept. 29, 2017) (finding that a one-year non-solicitation clause is not unduly burdensome); Schuhriemen , 183 F. Supp. 3d at 535 (same); Silipos, Inc. v. Bickel, No. 06-cv-02205, 2006 WL 2265055, at *6 (S.D.N.Y. Aug. 8, 2006) (same). Indeed, Lockton Southeast requires its employees to sign non-solicitation agreements that apply for two years after the employee leaves the company.

33. If the scope of a restrictive covenant is reasonable in time and geographic area, "enforcement will be granted to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." Ticor, 173 F.3d at 70 (citing Purchasing Assocs. v. Weitz, 196 N.E.2d 245 (N.Y. 1963)). "Furthermore, whether viewed conceptually as a type of special service, an offshoot from an employer's interest in safeguarding

customer information, or as a distinct cognizable interest, it is now clear that under New York law an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer's expense." Johnson Controls, 323 F. Supp. 2d at 534; see also BDO Seidman, 712 N.E.2d at 1224-25. In Ticor, the Court of Appeals found that an insurance company could enforce a restrictive covenant against a former senior vice president in charge of several major sales contracts for a period of six months following his employment based on his special relationships with his clients. 173 F.3d 63.

34. The employer's legitimate interest, however, is only in the protection of client relationships acquired during the course of employment and which the employer has invested its resources -- through the employee -- to cultivate. BDO Seidman, 712 N.E.2d at 1224-25. It does not extend to clients with whom the employee never acquired a relationship through the resources provided by the employer, nor to client relationships that the employee developed independently and without the benefit of any expenditure of effort or resources by the employer. Id. at 1225.

35. New York courts have also recognized that an employer's interest in protecting client relationships developed by a former employee extends to clients of other employees who were supervised by the former employee. See Johnson Controls, 323 F. Supp. 2d at 542 (granting a preliminary injunction to enforce a non-

49

solicitation agreement which prohibited the defendants from directly or indirectly servicing any of the plaintiff's customers who had been served or solicited by the defendants, or by another employee under the defendants' supervision); <u>Spinal Dimensions, Inc. v. Chepenuk</u>, No. 4805-07, 2007 WL 2296503, at *6 (Sup. Ct. Aug. 9, 2007) (holding that the employer's legitimate interest in protecting its client relationships extended to clients of sales representatives whom the defendant supervised); <u>see also</u> <u>Karasaki</u>, 2008 WL 4778239, at *16-*17.

36. The Non-Solicitation Agreements are reasonable to the extent they apply to the solicitation of current clients of Mercer, and the Confidentiality Agreements are reasonable to the extent they apply to the use of Mercer's confidential information to pitch prospective clients and service existing clients.

37. In <u>Karasaki</u>, this Court found that the restrictions imposed by non-solicitation agreements involving Mercer's affiliated company, Marsh, which contained nearly identical terms, were reasonable to the same limited extent, given the interests the agreements sought to protect. 2008 WL 4778239, at *3-*4, *16-*18; <u>accord</u> <u>Schuhriemen</u>, 183 F. Supp. 3d at 535. The Individual Defendants in this case largely do not dispute that the Non-Solicitation Agreements are reasonable as limited to current Mercer clients.

38.  Mercer proposes a preliminary injunction that would also restrain the Individual Defendants from soliciting many of Mercer's prospective clients. Mercer does not have a legitimate interest in that expansive application of the Non-Solicitation Agreements.

39.  In *Karasaki*, this Court declined to enforce preliminarily the non-solicitation agreements as they applied to soliciting prospective clients of Marsh. 2008 WL 4778239, at *17-*18; accord *Schuhriemen*, 183 F. Supp. 3d at 535. The protection of client relationships does not justify enforcement "of the portions of the non-compete clauses relating to *potential* clients of [the employer] who [are] merely *solicited* at the direction of [the employee]." *Johnson Controls*, 323 F. Supp. 2d at 540. An employer does not forge a protectable client relationship with a prospective customer simply by sending the company a business proposal or making a pitch for its business in a sales meeting. See id. And if the law were to provide otherwise, it would be difficult, if not impossible, to draw the appropriate line for how much contact the employee must have had with a prospective customer to establish a protectable client relationship. See also *Karasaki*, 2008 WL 4778239, at *17.

40.  Mercer argues that the amount of time and expense it devoted -- through the Individual Defendants -- to soliciting prospective clients is greater than that devoted in *Karasaki*. But

the Court's conclusion in Karasaki rested not on Marsh's lack of effort in soliciting prospective clients but on the broader principle that no protectable client relationship can arise until the employer has engaged a potential customer as a client; merely soliciting a client is insufficient. Mercer's attempt to distinguish this case from Karasaki based on how much effort it expended in seeking its prospective clients points up the exact line-drawing issue explained above.

41. However, the Confidentiality Agreements protect a broader legitimate interest than the Non-Solicitation Agreements. Restrictions on the use of trade secrets and confidential information in the solicitation of prospective clients can be justified based on the need to protect that information. Johnson Controls, 323 F. Supp. 2d at 540; see also Karasaki, 2008 WL 4778239, at *18. Thus, Mercer has a legitimate interest in enforcing the Confidentiality Agreements to prevent the use of covered information in dealing with both current and prospective clients.

42. The Non-Solicitation and Confidentiality Agreements do not impose undue hardship on the Individual Defendants. New York courts have routinely found that an individual does not suffer undue hardship where a restrictive covenant merely prohibits him from soliciting his former employer's clients for a reasonably defined period of time. See USI Ins. Servs. LLC v. Miner, 801 F.

Supp. 2d 175, 190 (S.D.N.Y. 2011) ("USI is not seeking to preclude Miner from working as an insurance producer . . . . USI instead seeks only to preclude Miner from soliciting or servicing former USI clients."). Because the Individual Defendants may pursue a "wide array" of other clients on behalf of Lockton, and because the non-solicitation restrictions apply for only one year, Mercer is likely to prevail on its showing that the agreements do not impose an undue hardship on the Individual Defendants. See also Karasaki, 2008 WL 4778239, at *18.

43. Enforcing the Non-Solicitation and Confidentiality Agreements will not harm the public. The Individual Defendants can continue to solicit non-Mercer clients in lawful ways. Mercer will have the opportunity over the coming year to transition its current clients to personnel other than the Individual Defendants to service their accounts. "If anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." Uni-World, 73 F. Supp. 3d at 237.

44. Mercer is therefore likely to establish that the Non-Solicitation Agreements are enforceable to the extent they apply to current clients of Mercer and the Confidentiality Agreements are enforceable to the extent they apply to the use of such information with both current and prospective clients of Mercer.

45. Mercer is also likely to establish that the Individual Defendants breached the enforceable portions of the Non-Solicitation and Confidentiality Agreements. In USI Insurance Services v. Miner, the court found that the defendant breached his non-solicitation agreements by emailing everyone on his contact list including his former clients about his new position at a competing insurance company and touting his new employer's merits. 801 F. Supp. 2d at 192-93. And in Schuhriemen, the court found that the defendant's notice announcing his new employment, which he sent to the contacts he could recall, including his clients, was likely in violation of the defendant's non-solicitation agreement. 183 F. Supp. 3d at 536.

46. The selective email, text and phone solicitations by the Individual Defendants here are no different. Following their resignations, each of the Individual Defendants reached out to, met with, and promoted Lockton's services to multiple Mercer clients with whom they worked during their last two years of employment, in likely contravention of their Non-Solicitation Agreements. Furthermore, the Individual Defendants' announcements of their departures to existing Mercer clients through individualized distribution and other targeted solicitations, as well as any use by the Individual Defendants of any of Mercer's confidential information in the pursuit of potential clients, also likely violated the Non-Solicitation and Confidentiality

Agreements. See Karasaki, 2008 WL 4778239, at *21 (granting injunctive relief where "Karasaki has been in flagrant breach of the agreements since his resignation").

47. The Individual Defendants argue that Mercer is unlikely to be able to prove that they breached their Confidentiality Agreements because none of the information they took upon leaving Mercer was confidential. Some of the information the Individual Defendants took was available from public sources and therefore not confidential. See, e.g., Kelly v. Evolution Mkts., Inc., 626 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) ("[A] customer list is not confidential where the past or prospective customers are 'readily ascertainable' from non-confidential sources outside the employer's business." (quoting Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 369 N.E.2d 4 (N.Y. 1977))).

48. But other portions of the information the Individual Defendants sent themselves plainly contain nonpublic information. The Florida Pipeline Report, which DiGregorio sent himself before leaving Mercer, contains a list of prospective clients Mercer was targeting over thirty-, sixty- and ninety-day periods, with estimates of their expected total and calendar year revenues, a list of products that Mercer was pitching each prospective client, and anticipated deal closing dates for each prospective client. (Mar 16 Tr. 105-06; Plaintiff's Ex. 13). The Florida Pipeline Report includes information about clients and prospective clients

who DiGregorio contacted after his resignation from Mercer, (see Mar. 16 Tr. at 140-44), as well as clients and prospective clients about which DiGregorio emailed himself other confidential information (see Plaintiff's Exs. 20 & 23). This is information regarding prospects that Mercer reasonably expected to become clients within a short timeframe, and is not generally available on any public filing. Indeed, the Florida Pipeline Report spreadsheet is labeled "Confidential Information: Do Not Distribute." (Plaintiff's Ex. 13).

49. Similarly, the "MMA-FL Complete Capabilities" PowerPoint presentation, the "Financial wellness – Mercer" email, and the "Hollander Deck" PowerPoint presentation, which DiGregorio emailed himself, are not publicly available. (Plaintiff's Ex. 15, 18, 20). Those documents discuss how Mercer and its sister company position themselves in the market and differentiate themselves from competitors like Lockton. (Plaintiff's Ex. 15, 18, 20). The "Florida 2017 Sales and % to Goal" table (Plaintiff's Exhibit 21) and the "Mercer Next Steps" email (Plaintiff's Ex. 23) also contain information which is not publicly available in government filings or from other public sources.

50. The conclusion that Mercer will be able to establish that the Individual Defendants took and used confidential information to pursue prospective clients is reinforced by the Individual Defendants' surreptitious transfer of confidential

information from their Mercer email accounts to their personal email accounts while they were still working for Mercer and DiGregorio's efforts in December, 2017, after meeting with Lockton lawyers, to scrub his computer of evidence that he sent himself confidential Mercer information. DiGregorio admits that his reason for initially emailing these documents to himself was "to have access to information relative to future clients" and that these documents "would be helpful in the future if [he] decided to leave" Mercer. (DiGregorio Dep. 113-14, 173; Mar 16 Tr. 64-65). If, as Defendants assert, the documents the Individual Defendants emailed to themselves contained only publicly available information, they would have had no need to email these documents to themselves for future use. Similarly, DiGregorio would have had no reason to scrub the documents from his personal computer if he had a right to have them.

51. The fact that the Individual Defendants claim not to have taken any confidential documents from Mercer is not enough to provide a free pass from an injunction enforcing the Confidentiality Agreements. It is plain that the Individual Defendants surreptitiously emailed documents to themselves while they were still employed by Mercer. While the Individual Defendants claimed in their resignation letters not to have taken confidential documents when they left Mercer, at least DiGregorio was able to

state so only because he had destroyed his email copies.[20] And the statement was not even true because DiGregorio did retain Mercer documents after he left. (DiGregorio Dep. 159). There is of course no way to scrub any confidential information from the Individual Defendants' memories, regardless of whether that information is still recorded in their personal email accounts. Given the Individual Defendants' efforts to take that confidential information, an injunction is needed to assure that they do not use any confidential information covered by the Confidentiality Agreements.

52. Accordingly, Mercer is likely to establish that the Individual Defendants breached (i) their Non-Solicitation Agreements to the extent the Agreements bar for one year following the Individual Defendants' departures from Mercer the solicitation of current Mercer Clients with whom the Individual Defendants had contact during their last two years at Mercer, and (ii) their Confidentiality Agreements.

**2.**

53. Mercer is likely to establish that the Individual Defendants breached their fiduciary duties to Mercer (Claim IV), engaged in unfair competition (Claim VII), and misappropriated confidential information (Claim VIII).

---

[20] Mercer does not seek any remedies pursuant to Rule 37(e) of the Federal Rules of Civil Procedure at this time.

54. Under New York law, at-will employees owe their employers a fiduciary duty of loyalty, including a duty not to use the employer's confidential information to compete with the employer. See, e.g., Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 521-22 (S.D.N.Y. 2011) (collecting cases). Under New York law, a defendant engages in unfair competition if the defendant misappropriated and used the plaintiff's property or commercial advantage to compete against the plaintiff. ITC Ltd. v. Punchgini, Inc., 880 N.E.2d 852, 859 (N.Y. 2007). Similarly, "[t]o state a claim for misappropriation of confidential information, a plaintiff must allege that the defendant used the plaintiff's confidential information for the purpose of securing a competitive advantage." Reed Constr. Data Inc. v. McGraw-Hill Cos., 745 F. Supp. 2d 343, 352 (S.D.N.Y. 2010).

55. Mercer is likely to succeed on all three of these claims for the same reasons. As discussed above, there is ample evidence that the Individual Defendants took confidential information from Mercer while they were employed at Mercer. And there is evidence that the Individual Defendants may have used proprietary Mercer information to pitch current and prospective Lockton Southeast clients about whom they had confidential information from Mercer. These conclusions are buttressed by DiGregorio's deletion of emails containing Mercer information in December, 2017, and the Individual Defendants' admissions that they sent themselves

confidential Mercer information in 2017 with the purpose of using that information after leaving Mercer. For those reasons, Mercer is likely to succeed on the merits of its breach of fiduciary duty claim, unfair competition claim, and misappropriation of confidential information claim.

**3.**

56. Mercer is likely to establish that the Individual Defendants tortiously interfered with its business relations with its current clients (Claim V).

57. "To state a claim for tortious interference with business relations under New York law, four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." Scutti Enters., LLC. v. Park Place Entm't Corp., 322 F.3d 211, 215 (2d Cir. 2003) (internal quotation marks omitted). Here, Mercer has business relationships with its current clients, including Planned Parenthood. The Individual Defendants likely interfered with this relationship by meeting with Planned Parenthood representatives and soliciting Planned Parenthood after joining Lockton Southeast. The Individual Defendants likely used unfair or improper means to solicit Planned Parenthood because doing so was in violation of their Non-

Solicitation Agreements. And Planned Parenthood has terminated its relationship with Mercer based on Defendants' tortious conduct. Therefore, Mercer is likely to satisfy all four elements of a tortious interference claim insofar as the Individual Defendants have solicited Mercer's current clients.

**F.**

58. The Court finds that the balance of the equities tips decidedly in favor of Mercer.

59. Mercer merely seeks to maintain the status quo for its current clients and prevent Defendants from breaching their contractual obligations, breaching their fiduciary duties and engaging in tortious and unfair business practices. The Individual Defendants' contractual obligations are reasonable and narrowly tailored, and do not prevent the Individual Defendants from working for Lockton or developing business based on their current employment and resources. Nor do the Agreements prevent Lockton from engaging in fair competition with Mercer.

60. On the other hand, if immediate equitable relief is not granted, Defendants will be able to continue to compete unfairly with Mercer using Mercer's confidential information and undermining Mercer's substantial investment of time, resources and goodwill in its current client relationships. Therefore, the balance of the equities weighs decidedly in favor of Mercer with regard to its current clients and confidential information. See

*Schuhriemen*, 183 F. Supp. 3d at 536-37 (observing with respect "to the balance of equities," that the individual defendant was unlikely to suffer "great hardship" if he was prevented for one year from soliciting the plaintiffs' clients, while plaintiff could have "face[d] the prospect of losing business to a major competitor, transported by a high-level company official").

61. However, the balance of equities tips against a preliminary injunction to the extent that Mercer seeks to prevent Lockton Co., Lockton Southeast, or any other Lockton entity within the Lockton Corporate Structure from servicing or soliciting any existing clients of those entities, whether the client joined that entity from Mercer, or whether the client is a client of both Mercer and Lockton.

62. An injunction preventing any entity within the Lockton corporate structure from servicing or soliciting its existing clients would be a mandatory injunction that alters the status quo. Not only would such an injunction require a heightened showing of entitlement to relief, see N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 36-37 (2d Cir. 2018), but the harm it would inflict on Lockton's clients must be balanced against its necessity.

63. There is no justification for enjoining the Individual Defendants or any of the Lockton entities from servicing or soliciting clients who have already chosen to retain their

services. See, e.g., <u>Kanan, Corbin, Schupak & Aronow, Inc. v. FD</u> <u>Int'l Ltd.</u>, 797 N.Y.S. 2d 883, 891 (Sup. Ct. 2005) (finding that "[a]n injunction will not serve to retrieve these lost clients, and the court cannot compel these clients to return to [the plaintiff]" and that "an injunction will not serve to prevent [current clients] from exercising their own preference by moving elsewhere").

**G.**

64. The Non-Solicitation Agreements also prevent the Individual Defendants for a period of time from soliciting certain Mercer employees now that they have left Mercer. Mercer has not attempted to show that any of the Individual Defendants attempted to solicit any Mercer employees after the Individual Defendants left Mercer. Therefore, there is no showing of a likelihood of success for such a claim and no showing of irreparable injury if such practice is not preliminarily enjoined. If any of the Individual Defendants attempt to breach their Non-Solicitation Agreements in that manner, Mercer can of course apply for additional injunctive relief.

**H.**

65. Mercer belatedly requests an award of the attorneys' fees and costs incurred in bringing this motion for injunctive relief pursuant to the Individual Defendants' Non-Solicitation and Confidentiality Agreements. Mercer did not raise this request in

its original Order to Show Cause; it first made this request in its proposed findings of fact and conclusions of law. Moreover, the language in the Non-Solicitation and Confidentiality Agreements that authorizes fee-shifting is best read as providing for fees and costs only after a final judgment on the merits in Mercer's favor, not merely upon the entry of an interlocutory preliminary injunction. (See, e.g., Plaintiff's Ex. 1, at 4 (providing for "recovery of all reasonable sums and costs, including attorneys' fees" "in the event of [a] breach" -- not a likely breach -- of the agreement)). Mercer's request for fees and costs is therefore **denied without prejudice**.

## CONCLUSION

The foregoing constitutes this Court's Findings of Fact and Conclusions of Law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure. The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, any remaining arguments are either moot or without merit. For the reasons explained above, Mercer's motion for a preliminary injunction is **granted in part** and **denied in part**. The Court will issue the preliminary injunction as a separate Order.

**SO ORDERED.**

Dated:    New York, New York
          April 5, 2018

_____
John G. Koeltl
United States District Judge